1                    UNITED STATES DISTRICT COURT

2            FOR THE EASTERN DISTRICT OF CALIFORNIA

3



**FILED**

FEB 1 1 2025

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
          DEPUTY CLERK

**Stanley Zhong, Nan Zhong** and
**SWORD (Students Who Oppose
Racial Discrimination)**,

                 Plaintiffs,

v.

**The Regents of the University of
California,** in their official capacity as
the governing body of the University of
California; **Michael V. Drake**, in their
official capacity as President of the
University of California; **Katherine S.
Newman**, in their official capacity as
Provost and Executive Vice President
of Academic Affairs of the University of
California; **Han Mi Yoon-Wu**,
individually and in their official capacity
as Associate Vice Provost and
Executive Director of Undergraduate
Admissions of the University of
California; **Erwin Chemerinsky**,
individually and in their official capacity
as Dean of the Law School of the
University of California at Berkeley;
**The University of California at
Davis; Robert Penman**, in their official
capacity as Executive Director of
Undergraduate Admissions of the
University of California at Davis; **Dipak
Ghosal**, in their official capacity as
Chair of the Department of Computer
Science of the University of California
at Davis; **The University of California
at Berkeley; Olufemi Ogundele**, in

Case No. 2:25-CV-0495 DJC-CSK
(CPS)

COMPLAINT

JURY TRIAL DEMANDED

their official capacity as Director of Undergraduate Admissions of the University of California at Berkeley; **Claire J. Tomlin**, in their official capacity as Chair of the Department of Computer Science of the University of California at Berkeley; **The University of California at Santa Barbara; Lisa Przekop**, in their official capacity as Executive Director of Admissions of the University of California at Santa Barbara; **Divyakant Agrawal**, in their official capacity as Chair of the Department of Computer Science of the University of California at Santa Barbara; **The University of California at Los Angeles; Gary Clark**, in their official capacity as Director of Undergraduate Admissions of the University of California at Los Angeles; **Todd Millstein**, in their official capacity as Chair of the Department of Computer Science of the University of California at Los Angeles; **The University of California at San Diego; Blia Yang**, in their official capacity as Executive Director of Undergraduate Admissions of the University of California at San Diego; **Sorin Lerner**, in their official capacity as Chair of the Department of Computer Science of the University of California at San Diego; **Other persons Does 1-10** acting in concert with those named above; **The U.S. Department of Education,**

Defendants.

1 **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND**

2 **DAMAGES**

3 **I. INTRODUCTION**

4  1. Plaintiffs Stanley Zhong ("Stanley"), Nan Zhong ("Nan"), and Students

5      Who Oppose Racial Discrimination ("SWORD"), represented by Nan

6      Zhong on behalf of its members and all others similarly situated,

7      collectively referred to as "Plaintiffs," bring this civil rights action against

8      the University of California ("UC") and the named UC officials (collectively,

9      "Co-Defendant UC") for engaging in racially discriminatory admissions

10     practices that disadvantage highly qualified Asian-American applicants,

11     including Stanley and members of SWORD.

12  2. Despite Stanley's exceptional academic achievements and remarkable

13     professional accomplishments at a young age, his applications to

14     undergraduate programs at five University of California campuses were

15     either rejected or waitlisted. These results stand in stark contrast to his

16     receipt of a full-time job offer from Google for a position requiring a Ph.D.

17     degree or equivalent practical experience.

18  3. Stanley's experience is emblematic of a broader pattern of racial

19     discrimination against highly qualified Asian-American applicants at UC.

20     These admissions practices violate the Fourteenth Amendment to the

21     United States Constitution, Title VI of the Civil Rights Act of 1964, and the

1    California Constitution's prohibition on racial discrimination in public
2    education.

3    4. Plaintiffs also assert claims against the U.S. Department of Education
4    ("ED"), named herein as a Co-Defendant ("Co-Defendant ED"),
5    challenging the use of numeric racial targets in its federal grant programs,
6    which not only violates the Fifth Amendment but also incentivizes
7    violations of the Fourteenth Amendment and Title VI of the Civil Rights Act
8    of 1964.

9    5. Plaintiffs further assert claims against Co-Defendant ED for its failure to
10   properly investigate and address UC's racially discriminatory practices, in
11   violation of the Administrative Procedure Act (APA).

## II. JURISDICTION AND VENUE

13   6. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331,
14   as this action arises under the Constitution and laws of the United States,
15   including Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d.

16   7. Venue is proper in this district under 28 U.S.C. § 1391(b) because a
17   substantial part of the events or omissions giving rise to the claim
18   occurred in this district.

1 **III. PARTIES**

2 **A. Plaintiffs**

3 **A1. Co-plaintiff Stanley Zhong**

4 8. Co-plaintiff Stanley Zhong, born in 2005, is an Asian-American residing in
5 California. Stanley's parents are first-generation immigrants to the United
6 States from China. Stanley Zhong is a US citizen.

7 9. As a self-taught programmer, Stanley has distinguished himself in various
8 coding contests, ranking highly enough to receive an invitation from
9 Google for a full-time job interview in 2019, without Google realizing he
10 was only 13 years old. Upon disclosure of his age, the interview was
11 canceled due to Google's policy against hiring minors (See Exhibit 1 for
12 email exchanges with a Google recruiter).

13 10. Competing against top professionals from around the world, Stanley
14 advanced to the Google Code Jam Coding Contest semi-final in 2021
15 (See Exhibit 2).

16 11. Competing against top professionals from around the world, Stanley
17 advanced to the Meta (Facebook) Hacker Cup semi-final in 2023 (See
18 Exhibit 3).

19 12. Stanley won the 2nd place in MIT (Massachusetts Institute of Technology)
20 Battlecode's global high school division twice (2nd place and 1st place in

1    the US, respectively) (See Exhibit 4). He was invited to MIT with expenses
2    paid.

3    13. Stanley won the 2nd Place in CMU (Carnegie Mellon University)
4    cybersecurity competition picoCTF (See Exhibit 5). He was invited to CMU
5    with expenses paid.

6    14. Stanley won the 6th place in Stanford ProCo (See Exhibit 6).

7    15. Stanley advanced to the USA Computing Olympiad (USACO) Platinum
8    Division (See Exhibit 7).

9    16. In April 2020, after seeing an NPR news story that the unemployment
10    office's system programmed in COBOL was not keeping up with the
11    workload caused by COVID (See Exhibit 8), Stanley taught himself
12    COBOL, sent his sample code on GitHub (See Exhibit 9) to COBOL
13    Cowboys featured in the news story, and volunteered to help. Mr. Bill
14    Hinshaw, COBOL Cowboys CEO, graciously called Stanley and offered
15    encouraging words (although he did mention putting a 14-year-old in front
16    of his clients would probably freak them out). (See Exhibit 10 for the email
17    exchange with Mr. Bill Hinshaw to set up the call.)

18    17. After the attempt to volunteer for COBOL Cowboys fell through, Stanley
19    saw news reports about surging demand for e-signing services caused by
20    the COVID lockdown. Stanley was unhappy that DocuSign didn't provide

1    any relief. So, he launched an unlimited free e-signing service named

2    RabbitSign in 2021 (See Exhibit 11).

3    18. Built on Amazon Web Services (AWS), RabbitSign was designed and

4    implemented so well that AWS's Well-Architected Review concluded that it

5    was "one of the most efficient and secure accounts" they'd ever reviewed

6    (See Exhibit 12).

7    19. To showcase RabbitSign's exemplary use of AWS Serverless and

8    compliance services, AWS decided to feature it in a case study—a

9    prestigious recognition that is notoriously difficult to attain, even for

10    seasoned professionals (See Exhibit 13).

11    20. Shortly before Stanley turned 18, five randomly selected full-time Google

12    engineers, who were specifically trained and qualified to evaluate

13    candidates, devoted no less than ten hours collectively to evaluating

14    Stanley's skills, including his technical expertise and soft skills, such as

15    teamwork. Based solely on their assessments, without any external

16    influence, these Google engineers concluded that Google should hire

17    Stanley for an L4 position, which requires a Ph.D. degree or equivalent

18    practical experience. Consequently, Google made an offer for a full-time

19    L4 position to Stanley in September 2023, shortly after Stanley turned 18

20    (See Exhibit 14).

21. Google's compensation structure is tied to the level of its employees' positions, creating a natural disincentive to over-assess an employee's qualifications.

22. In January 2025, Stanley received his performance evaluation as a Google employee for the entirety of 2024, with a rating and manager assessment indicating that he fully met the expectations for his position at Google and demonstrated a strong growth trajectory.

23. Because of his groundbreaking work to provide the world's only unlimited free HIPAA-compliant e-signing service to help lower America's healthcare cost, Stanley received an inbound interview request from *Viewpoint with Dennis Quaid*, a series of short documentaries on innovations aired on CNBC, Fox Business, Bloomberg, and public TV stations across the US. Their past guests included President George H.W. Bush, Secretary Colin Powell, and Fortune 500 CEOs. (See Exhibit 15 for the industry news coverage for RabbitSign's free HIPAA-compliant e-signing. See Exhibit 16 for the episode of *Viewpoint with Dennis Quaid* featuring RabbitSign and Stanley.)

24. Stanley's high school grade point average was 3.97 (unweighted) and 4.42 (weighted) (See Exhibit 17).

25. Although Stanley's high school does not publish individual student rankings based on grade point average, he is confirmed to be within the top 9% of his class, as he qualified for the UC's "Eligibility in the Local

1    Context" (ELC). (See Exhibit 18 for Stanley's ELC qualification.) ELC

2    guarantees admission to a UC campus for California high school students

3    who rank in the top 9% of their class, as determined by their GPA in

4    UC-approved coursework completed in the 10th and 11th grades.

5    26. Stanley also satisfied UC's A-G subject requirements. In fact, UC Merced

6    offered him admission even though he did not apply, as UC policy requires

7    admitting students who qualify for ELC to at least one of its campuses.

8    27. U.S. News and World Report ranks Stanley's high school (Henry Gunn

9    High School) #14 in California and #135 nationally (See Exhibit 19).

10   28. Niche ranks Stanley's high school (Henry Gunn High School) #1 best

11   public high school in San Francisco Bay Area and  #4 best public high

12   school in California (See Exhibit 20).

13   29. Stanley achieved a maximum PSAT score without any preparation (See

14   Exhibit 21).

15   30. Stanley scored 1590 (out of 1600) on the SAT with only a few nights of

16   self study without any paid test prep (See Exhibit 21 as well). He took the

17   SAT only once.

18   31. Stanley was a National Merit Scholarship finalist (See Exhibit 22).

19   32. While in high school, Stanley participated in and led numerous

20   extracurricular and volunteer activities.

33. Stanley served as a founding officer and president of the competitive programming club at his high school (See Exhibit 23).

34. Stanley co-founded and served as the 2nd president of a nonprofit named OpenBrackets, which brought free coding lessons to 500+ kids in underserved communities in California, Washington, and Texas over 2 years (See Exhibit 24). It received positive feedback from Stackoverflow co-founder, Mr. Jeff Atwood.

35. Because of his work at OpenBrackets, Stanley received the highest level of the President's Volunteer Service Award (See Exhibit 25).

36. Stanley's college application essay was pretty much captured in the Viewpoint interview mentioned supra. It discussed why he created RabbitSign, how he overcame rejections to eventually find a partner to provide free HIPAA-compliant e-signing to help lower America's healthcare cost, and how RabbitSign is the first Activism Corporation created to counter corporate greed.

37. For enrollment in fall 2023, Stanley applied to the undergraduate Computer Science programs at five UC campuses, namely the University of California at Davis, the University of California at Berkeley, the University of California at Santa Barbara, the University of California at Los Angeles, and the University of California at San Diego.

38. Stanley's applications to all five UC campuses were either rejected or waitlisted.

39. In direct connection with UC's rejection of his applications, Stanley Zhong suffered emotional distress.

40. Stanley's story was reported in national news in October 2023 (See Exhibit 26) and cited in a congressional hearing in September 2023 (See Exhibit 27).

41. After Stanley's story hit the news in October 2023, multiple college admission counselors examined his application, including his essay. None of them could figure out a legitimate reason why Stanley was rejected. Some of them offered to serve as expert witnesses in a trial.

42. Stanley was denied the opportunity to compete for admission to UC on equal footing with other applicants on the basis of race or ethnicity due to UC's discriminatory admissions policies and practices.

43. Stanley is ready, able and intends to apply to UC when it ceases its intentional discrimination against Asian-Americans.

44. Stanley, Nan and SWORD reached out to multiple legal resources and entities for representation. However, these entities either declined to take the case or failed to respond. Consequently, Stanley is compelled to represent himself as a pro se litigant.

**A2. Co-plaintiff Nan Zhong**

45. Co-plaintiff, Nan Zhong, an Asian-American resident of California, is Stanley Zhong's father.

46. A first-generation immigrant from China, Nan has a direct and personal stake in this matter due to the discriminatory practices of UC's admissions process.

47. The 2024 decision of the Second Circuit Court of Appeals in *Chinese American Citizens Alliance of Greater New York (CACAGNY) v. Adams*, 116 F.4th 161, affirms that an "equal protection claim can be asserted by individuals alleging they suffered harm from the discriminatory policy or law, as well as other individuals (such as a parent or guardian) or organizations that also have standing to sue."

48. Nan suffered financial loss as a result of UC's rejection of Stanley's applications, necessitating preparations to bear the significantly higher costs of out-of-state tuition at alternative institutions. Additionally, the rejection caused him emotional distress. These harms, directly tied to UC's discriminatory policies, establish his standing to bring this claim.

49. Nan's children intend to apply for admission to UC but will be denied the opportunity to compete on equal footing with other applicants due to UC's discriminatory admissions policies. As a result, they may face rejection based on race or ethnicity rather than merit. Additionally, Nan may be

1    forced to pay higher out-of-state tuition should his children need to attend

2    college elsewhere. These personal impacts further establish Nan's

3    standing to bring this claim.

4    50. Beyond personal impact, Nan is acutely aware of the chilling effect that

5    Asian-American students face when asserting their legal rights in college

6    admissions. Public hostility toward such efforts is well-documented,

7    particularly on college campuses.

8    51. For example, during the *SFFA v. Harvard* trial, widespread protests

9    erupted against SFFA's challenge to race-conscious admissions (See

10    Exhibit 28). Even after the Supreme Court ruled against Harvard,

11    then-president Claudine Gay responded with open defiance, stating, "We

12    will comply with the court's decision. But it doesn't change our values."

13    (See Exhibit 29.) While the first half of her statement reflects legal

14    necessity, the latter half unmistakably signals defiance. Notably, following

15    the Supreme Court's ruling in SFFA, not a single Harvard administrator

16    apologized for the harm their policies inflicted on Asian-American

17    applicants.

18    52. Academics such as Professor Janelle Wong and Professor Viet Thanh

19    Nguyen publicly asserted that no Asian-American had suffered

20    discrimination in the college admissions process, misleading the public

21    with statements like, "Not a single Asian-American student has testified

22    that they faced discrimination in the high-profile Harvard case." (See

1    Exhibit 30.) Such assertions are demonstrably inaccurate and serve to

2    suppress legitimate grievances. On November 4, 2024, Nan challenged

3    both Professor Janelle Wong and Professor Viet Thanh Nguyen to a public

4    debate. Neither replied as of the filing of this lawsuit.

5    53. This hostile climate has a direct, suppressive effect on potential plaintiffs.

6    Many Asian-American applicants rejected by UC initially expressed

7    interest in joining SWORD's lawsuit. However, after spending just a few

8    months on college campuses as freshmen, most withdrew.

9    54. A particularly striking example occurred at a panel discussion following a

10    screening of the MSNBC documentary *Admission Granted* in San

11    Francisco on May 9, 2024. The reaction of the audience, a few hundred

12    people strong, vividly illustrated this bias. When the moderator introduced

13    a Harvard student advocating for race-conscious admissions, the room

14    erupted in thunderous applause and cheers. In contrast, the

15    Asian-American student whose case launched the SFFA lawsuit received

16    only sparse clapping—approximately a quarter of which likely came from

17    Nan alone.

18    55. This pervasive social hostility—manifesting in microaggressions and overt

19    hostility—creates a profound chilling effect that discourages

20    Asian-American students from challenging discriminatory policies,

21    effectively silencing those who have been harmed. It is therefore

22    reasonable to infer that numerous Asian-American applicants, either

1  already harmed by UC's admissions practices or anticipating future

2  discrimination, remain silent due to legitimate concerns about retaliation.

3  Under the chilling effects doctrine, which recognizes that individuals may

4  refrain from asserting their rights due to fear of reprisal, Nan's standing to

5  sue is further reinforced.

6  56. Stanley, Nan and SWORD reached out to multiple legal resources and

7  entities for representation. However, these entities either declined to take

8  the case or failed to respond. Consequently, Nan is compelled to

9  represent himself as a pro se litigant.

10  **A3. Co-plaintiff Students Who Oppose Racial Discrimination (SWORD)**

11  57. Co-plaintiff, Students Who Oppose Racial Discrimination ("SWORD"), is a

12  voluntary membership organization focused on stopping racial

13  discrimination in college admissions through litigations. It was established

14  in October 2024 by people harmed and outraged by flagrant racial

15  discrimination in college admissions.

16  58. SWORD is a coalition comprising prospective applicants to higher

17  education institutions, individuals who were denied admission, their

18  parents, and supporters of the organization's mission to eliminate racial

19  discrimination in higher education admissions.

20  59. Nan Zhong is the President of SWORD.

21  60. SWORD's website is https://sword.education.

1   61. SWORD has at least one Asian-American member who applied for and

2       was denied admission to UC in recent years.

3   62. SWORD has at least one Asian-American member who is currently in high

4       school and intends to apply for admission to UC ("Future Applicants").

5   63. Future Applicants will be denied the opportunity to compete for admission

6       to UC on equal footing with other applicants on the basis of race or

7       ethnicity due to UC's discriminatory admissions policies. As a result,

8       Future Applicants may be denied admission to UC because of these

9       discriminatory policies and practices.

10  64. SWORD has at least one Asian-American member whose children either

11      intend to apply for admission to UC or applied for but were denied

12      admission to UC in recent years ("Parents").

13  65. Parents' children were or will be denied the opportunity to compete for

14      admission to UC on equal footing with other applicants on the basis of

15      race or ethnicity due to UC's discriminatory admissions policies. As a

16      result, Parents' children were or may be denied admission to UC because

17      of these discriminatory policies and practices. Consequently, Parents in

18      California were or may be forced to pay higher out-of-state tuition for their

19      children.

20  66. Under *Hunt v. Washington State Apple Advertising Commission, 432 U.S.*

21      *333 (1977)*, SWORD qualifies for associational standing because 1)

1   SWORD has members who have standing to sue UC themselves, 2) this

2   lawsuit is germane to SWORD's purpose, and 3) neither the claim

3   asserted nor the relief requested requires the participation of individual

4   members in the lawsuit.

5   67. Stanley is not a member of SWORD.

6   68. The emotional toll experienced by Stanley and financial loss experienced

7   by Nan exemplify the broader emotional and economic harms associated

8   with racially discriminatory admissions practices by UC. Such policies do

9   not merely affect statistical representation; they impose real-world

10  consequences on a large group of individual applicants.

11  69. Stanley, Nan and SWORD reached out to multiple legal resources and

12  entities for representation. However, these entities either declined to take

13  the case or failed to respond. Consequently, as President of SWORD, Nan

14  is compelled to represent the organization as a pro se litigant.

15  **B. Defendants**

16  70. Co-Defendant UC is a public university system in the State of California,

17  subject to Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et.*

18  *seq*.

19  71. Co-Defendant ED administers federal grant programs that involve

20  race-based criteria and policies. Co-Defendant ED's OCR (Office of Civil

21  Rights) is responsible for enforcing federal anti-discrimination laws at UC.

## IV. FACTUAL ALLEGATIONS

### A. Asian Applicants Receiving Discriminatory Results Again and Again

72. In 2023, Stanley applied to five UC campuses. Despite his extraordinary qualifications, he was rejected or waitlisted by all five campuses. These outcomes defy common sense and contradict expert assessments of his application. As the Supreme Court noted in *Miller v. Johnson*, 515 U.S. 900,901 (1995), "bizarreness" can serve as "persuasive circumstantial evidence that race for its own sake…was a legislature's dominant and controlling rationale." Similarly, the stark disparity between Stanley's qualifications and the UC campuses' admissions decisions raises serious concerns about the role of race in UC's admissions process. This striking incongruity strongly suggests that UC's admissions policies are being applied in a discriminatory fashion.

73. Plaintiffs believe and allege that Stanley's rejection from these UC campuses was not based on his qualifications but on his race, as an Asian-American.

74. This belief is supported by a pattern of similar rejections experienced by other Asian-American applicants with outstanding qualifications.

### B. Widespread Culture of Anti-Asian Discrimination at Elite Universities

75. UC has a documented history of discrimination against Asian-Americans. After the state <u>audit</u> in 1987 (See <u>Exhibit 31</u>), UC Berkeley Chancellor Ira

1    Michael Heyman publicly apologized in 1989 for admissions policies that
2    led to a decline in Asian-American undergraduate enrollment (See Exhibit
3    32).

4    76. On September 22, 2016, *Inside Higher Education* released a survey of
5    admission officers. It revealed 42% of admission officers from private
6    colleges and 39% of admission officers from public colleges believe that
7    colleges hold Asian-American applicants to a higher standard (See Exhibit
8    33).

9    77. On May 25, 2016, Dr. Michele Hernandez, former Dartmouth admission
10   officer, revealed on *Huffington Post* "how even the so-called 'holistic
11   process' can discriminate against Asian students" and how Ivy League
12   college admission officers often use racial stereotypes to discriminate
13   against Asian-American applicants (See Exhibit 34).

14   78. Harvard openly gave preferential treatment to some racial groups at the
15   expense of Asian-American applicants until its practice was ruled illegal by
16   the Supreme Court in *SFFA v. Harvard* in 2023. Notably, following the
17   Supreme Court's ruling in SFFA, not a single Harvard administrator
18   apologized for the harm their policies inflicted on Asian-American
19   applicants.

20   79. As documented in the SFFA's legal complaint against Harvard (page 60),
21   Asian-American applicants and their families know that they are being
22   discriminated against by elite universities (See Exhibit 35).

80. As documented in the SFFA's legal complaint against Harvard (page 57), college counselors acknowledge discrimination against Asian-Americans at elite universities (See Exhibit 36).

81. It is well documented that many Asian-American applicants attempt to appear "less Asian" on their college applications to avoid potential bias (See Exhibit 37).

82. Admission officers at elite universities have described Asian-American applicants using derogatory racial stereotypes, such as labeling them as "yet another textureless math grind" (See Exhibit 39).

83. Evidence also shows that elite universities were aware of discriminatory practices but often ignored or denied the issue until confronted with legal challenges. For instance, in 2006, Jian Li, an Asian-American applicant, filed a formal complaint against Princeton University for racial discrimination in admissions. Following this action, Princeton's admission rate for Asian-American students rose from 14.7% in 2007 to 25.4% in 2014 (See Exhibit 38). Similarly, after SFFA sued Harvard in 2015, the percentage of Asian-American admits increased from 17% in 2014 to 22% in 2016 (See Exhibit 38 as well).

84. These patterns demonstrate a troubling reality: institutions were capable of increasing Asian-American enrollment without changing applicant qualifications, suggesting prior suppression of Asian admissions through discriminatory policies. This raises serious legal concerns about UC's own

1  admissions practices, especially given its pursuit of numeric racial targets

2  (See infra). Legal scrutiny is warranted to uncover the extent of UC's

3  awareness of and complicity in similar practices that have disadvantaged

4  highly qualified Asian-American applicants.

5  **C. Documented Instances of Race-based Discrimination in UC's**

6 **Admissions and Hiring**

7  85. Compiling his Pulitzer Prize-winning reporting into a book titled *The Price*

8  *of Admission*, Daniel Golden documented multiple highly qualified Asian

9  applicants rejected by UC. For example, UCLA and UC Berkeley rejected

10  Stanley Park, a Korean American student who faced serious adversity

11  (single immigrant parent with cancer and no college degree), while

12  accepting non-Asian students with SAT scores 520 points lower. (See

13  Exhibit 39 for the relevant excerpt from *The Price of Admission*.)

14  86. In 2003, Mr. John Moores, then chairman of the UC Board of Regents,

15  accused UC's flagship campus of "blatantly" discriminating against

16  Asian-Americans (See Exhibit 40).

17  87. Following the implementation of a holistic review system, UCLA prohibited

18  faculty members on its Admissions Committee from accessing admissions

19  data. In response, Professor Tim Groseclose invoked whistleblower

20  protections and resigned from UCLA in protest (See Exhibit 41). In

21  *Cheating: An Insider's Report on the Use of Race in Admissions at UCLA*,

22  Professor Groseclose described how then-UCLA Chancellor Norm

1    Abrams explicitly cited raising African American enrollment as the

2    motivation behind adopting holistic admissions. In addition, Professor

3    Groseclose's statistical analysis showed that, for a group of applicants

4    receiving the same scores from their initial readers, UCLA admitted 55%

5    poor African Americans, 38% rich African Americans, 23% poor North

6    Asians and 18% rich North Asians. Note that *rich* African Americans were

7    admitted much more frequently than *poor* North Asians. UC never

8    disputed the accuracy of Professor Groseclose's account. (See <u>Exhibit 42</u>

9    for excerpts from Professor Tim Groseclose's book *Cheating*.)

10   88. Around 2018, UC refused to fulfill public records requests and litigated

11   against a lawsuit that sought access to its admissions data for research

12   purposes (See <u>Exhibit 43</u>). This was despite having provided similar data

13   in 2008. UC's actions are part of the persistent pattern of concealing

14   admissions data from 3rd-party examinations. The public needs to know

15   why the UC goes to such extraordinary lengths to hide their admissions

16   data.

17   89. UC insists on implementing both "holistic reviews" and a "test-blind"

18   admissions policy. However, this position is inherently contradictory. A

19   review cannot be truly holistic if it deliberately excludes objective

20   measures like standardized tests, especially for STEM applicants where

21   such metrics are crucial for assessing academic preparedness. According

22   to the UC Regents' Bylaws, the Academic Senate holds the authority to

23   "set the conditions of admissions." In 2020, the UC Academic Senate

1    overwhelmingly <u>voted</u> 51-0, with one abstention, to retain standardized

2    tests such as the SAT (See <u>Exhibit 44</u>). Despite this overwhelming

3    endorsement amid growing applicant pools and widespread grade

4    inflation, the UC Board of Regents, composed primarily of political

5    appointees, <u>overruled</u> the recommendation (See <u>Exhibit 45</u>), raising

6    significant concerns about their underlying motivations. Although UC

7    claimed in 2020 that it would develop a "new test," no such test was ever

8    created, resulting in the complete elimination of standardized testing from

9    the admissions process. This decision appears to be a calculated move to

10   compromise intellectual honesty and academic integrity, potentially

11   facilitating the concealment of discriminatory practices against

12   Asian-American applicants. Notably, leading institutions like MIT,

13   Dartmouth, Yale, Brown, Harvard, Caltech, Cornell, and the University of

14   Texas at Austin have reinstated standardized testing, further highlighting

15   the questionable nature of UC's continued "test-blind" policy post-COVID.

16   The UC is increasingly isolated in its stance as an "SAT Denier", where

17   they avoid releasing objective data by refusing to collect it in the first

18   place. These circumstances necessitate legal scrutiny of UC's policy, its

19   underlying motivations, its disparate impact on Asian-American applicants,

20   and whether UC continues to merit the traditional judicial deference

21   granted to bona fide academic institutions.

22   90. UC San Diego employs a <u>point-based system</u> for admissions to selective

23   majors for continuing students, assigning one point for each of the

1    following four criteria: a 3.0 GPA or higher in major screening courses,

2    California residency, Pell Grant eligibility, and first-generation college

3    status (See Exhibit 46). Assuming all applicants are California residents,

4    under this point-based system, a middle-class applicant with a 4.0 GPA

5    can earn a maximum of only two points. In contrast, an applicant from a

6    poor family may earn three points even with a 1.0 GPA. This policy

7    exemplifies UC's decision-making that weighs students' immutable

8    characteristics far more than academic criteria. When used excessively as

9    overriding criteria, these immutable characteristics can act as proxies for

10    race, resulting in disparate impacts on Asian-American applicants by

11    "insulat(ing) applicants who belong to certain racial or ethnic groups from

12    the competition for admission." Grutter, 539 U.S. at 334 (citation omitted).

13    This put further doubt on whether UC continues to merit the traditional

14    judicial deference granted to bona fide academic institutions.

15    91. Admissions and hiring are inherently interconnected and inseparable in

16    the context of racial discrimination within educational institutions. Faculty

17    and administrators play a pivotal role in shaping academic standards,

18    mentoring students, and influencing the culture and policies of a university,

19    including admissions criteria and practices. A racially biased hiring

20    process can create and perpetuate a discriminatory culture by fostering an

21    environment where certain racial perspectives are prioritized over

22    objective, merit-based considerations. Racially-motivated hiring policies

23    often have a direct ripple effect on student admissions. It is unrealistic and

1     unreasonable to assume that a university can operate one process in a

2     race-conscious manner while keeping the other race-neutral, as both are

3     fundamentally linked in their goals and execution. Therefore, examining

4     both admissions and hiring practices is essential to providing a holistic

5     assessment of whether a university's policies violate constitutional and

6     statutory protections against racial discrimination.

7  92. In a public talk to a large audience, Professor Erwin Chemerinsky, the

8     Dean of UC Berkeley Law School, admitted that his school systematically

9     considers race in its internal decision-making and actively conceals this

10    practice (See Exhibit 47). As evidenced in the video, when discussing the

11    consideration of race in faculty hiring, Mr. Chemerinsky described and

12    preached the "unstated Affirmative Action" practiced at UC as follows:

13    "Don't say that [you are considering the candidate's race]. You can think it.

14    You can vote it... Don't ever articulate that is what you are doing." He also

15    said "If I'm ever deposed, I'm going to deny I said this to you." His

16    statements reveal deliberate intent by senior UC administrators to actively

17    conceal their use of race in decision-making. Consequently, the merit of

18    Plaintiffs' allegations should be evaluated based on whether UC's

19    admissions process has a discriminatory effect on Asian-American

20    applicants, without any further need to establish the discriminatory intent.

21    As Dean Chemerinsky admitted in the video, for student admissions, one

22    should examine "statistical measures" to check for racial discriminations.

1    Plaintiffs intend to do exactly that in the discovery phase of the present

2    lawsuit.

3    93. In November 2022, *The New Yorker* staff writer Jay Caspian Kang quoted

4    Mr. Erwin Chemerinsky as follows:

5        "What colleges and universities will need to do after affirmative action

6        is eliminated is find ways to achieve diversity that can't be

7        documented as violating the Constitution," Mr. Chemerinsky stated.

8        "So they can't have any explicit use of race. They have to make sure

9        that their admissions statistics don't reveal any use of race. But they

10       can use proxies for race." (See Exhibit 47 as well.)

11   This statement is a clear acknowledgment that university officials,

12   including those within the University of California system, intend to bypass

13   constitutional and legal prohibitions on racial discrimination by employing

14   indirect methods—namely, "proxies for race"—to achieve the same racial

15   outcomes that explicit race-based policies once facilitated.

16   94. The use of racial proxies to achieve racial balancing is unconstitutional. In

17   *Parents Involved in Community Schools v. Seattle School District No. 1*,

18   551 U.S. 701, 743 (2007), the Supreme Court held that racial balancing is

19   not a compelling state interest and that the government may not achieve

20   racial diversity through indirect methods that amount to race-conscious

21   decision-making. Similarly, in *SFFA v. Harvard*, 600 U.S. 181 (2023), the

1     Supreme Court reaffirmed that admissions policies designed to achieve
2     racial diversity by using proxies for race are equally unconstitutional.

3     95. The statements made by Professor Chemerinsky provide strong
4     circumstantial evidence that UC is knowingly and deliberately structuring
5     its admissions policies to evade legal prohibitions on racial discrimination.

6     96. As a law professor, Mr. Chemerinsky must know what he was preaching is
7     illegal. By his own admission, he clearly knew it was illegal. Yet, he
8     preached it with a sense of pride and braggadocio. It is worth emphasizing
9     that Mr. Chemerinsky is the Dean, the top administrator, of UC Berkeley
10    Law School. Mr. Chemerinsky's statements happened to be in a public
11    talk, happened to be captured in video, and happened to be shared on the
12    web. What is visible to the public must be only the tip of the iceberg. It is
13    reasonable to infer the preaching and practice of "unstated Affirmative
14    Action" is widespread at UC's admissions and hiring process, which lacks
15    transparency and accountability.

16    97. The I-am-proud-of-it attitude that Mr. Chemerinsky demonstrated in the
17    video when talking about his action of breaking the law and hiding it
18    compounded the emotional distress Stanley and Nan have endured.

19    98. Senior UC administrators not only preach and practice "unstated
20    Affirmative Action", they also actively persecute those who advocate for
21    academic excellence over identity politics. From 2022 to 2024, Professor
22    Perry Link, Chancellorial Chair for Teaching Across Disciplines at UC

1   Riverside and a leading authority on modern and contemporary Chinese
2   literature and culture, faced disciplinary action after expressing concerns
3   during a faculty search committee meeting about prioritizing a Black
4   candidate's race over qualifications. His comments, which he stated were
5   intended to caution against elevating race as the "overriding criterion,"
6   were reported to university officials without his knowledge. Professor Link
7   was subsequently removed from the search committee and subjected to a
8   prolonged disciplinary process, including hearings resembling a trial,
9   where termination was suggested as a penalty. Although a faculty
10  committee unanimously found him innocent of the charges, Chancellor
11  Kim Wilcox issued a formal letter of censure, overriding the committee's
12  recommendation (See Exhibit 48). Professor Perry Link was accused of
13  making racist comments during the hiring process but was not informed of
14  the specific remarks deemed problematic until nearly a year later. UC
15  Riverside eventually acquitted him of all charges but allegedly threatened
16  to penalize him if he spoke publicly about the ordeal. Despite UC's threats,
17  Professor Link, a distinguished scholar at age 80, courageously made the
18  incident public (See Exhibit 49). If UC has attempted to silence a
19  prominent tenured professor, it is reasonable to infer the tremendous
20  pressure any professor, non-tenured administrator or staff would face if
21  they were to speak up. Therefore it is reasonable to infer that numerous
22  similar cases exist at UC in which victims chose to remain silent, fearing
23  retaliation that could jeopardize their careers and livelihoods. This incident

1    highlights senior UC administrators' preoccupation with immutable
2    characteristics such as race, in clear violation of the California
3    Constitution. It also demonstrates the great lengths to which they go to
4    silence any dissidents or whistleblowers. Furthermore, it clearly illustrates
5    the importance of exercising the chilling effect doctrine when it comes to
6    the legal standing in lawsuits concerning UC's student admissions and
7    faculty hiring.

8    99. Professor Perry Link has agreed to testify when this lawsuit goes to trial.

9    100.    The Standing Order of UC Regents 101.1(d) explicitly states: "No
10    political test shall ever be considered in the appointment and promotion of
11    any faculty member or employee." However, UC flagrantly violates this
12    mandate by using diversity statements as a decisive factor in faculty
13    hiring. At certain UC campuses, if a faculty applicant's diversity statement
14    fails to satisfy the diversity bureaucrats, their application is summarily
15    excluded from consideration without any review of their academic
16    qualifications. In 2016, at least five campuses — Berkeley, Davis, Irvine,
17    Riverside and Santa Cruz — decided their hiring committees could
18    perform an initial screening of candidates based only on diversity
19    statements (See Exhibit 50). For instance, at UC Davis, the vice provost
20    explicitly instructed search committees to disqualify candidates who did
21    not "look outstanding" on diversity, regardless of the quality of their
22    academic research (See Exhibit 50 as well). Similarly, during the 2018-19
23    academic year, UC Berkeley's hiring process for a life sciences position

1    narrowed 894 applicants to 214, peremptorily disqualifying 76% of

2    applicants based solely on diversity statements. According to UC's

3    summary report, "The LSI [Life Sciences Initiative] Committee conducted a

4    first review and evaluated candidates based solely on contributions to

5    diversity, equity and inclusion. Only candidates that met a high standard in

6    this area were advanced for further review, narrowing the pool down to

7    214 for serious consideration." Under this faculty hiring system, even

8    Nobel Prize winners would not be considered if they focused on academic

9    research instead of diversity. This approach disproportionately affected

10   applicants of different racial groups, increasing the representation of

11   African American candidates in the pool from 2.8% to 6.1%, while

12   reducing the representation of Asian candidates from 25.7% to 18.7%

13   (See Exhibit 51). As a further example, Mr. Yoel Inbar, a noted psychology

14   professor at the University of Toronto, was rejected for a position at UCLA

15   because his podcast expressed skepticism about the use of diversity

16   statements in hiring (See Exhibit 52). In sum, UC's use of diversity

17   statements in faculty hiring violates academic freedom and the First

18   Amendment.

19   101.    Given that UC is not conducting itself as a bona fide academic

20   institution for student admissions or faculty hiring, any traditional judicial

21   deference afforded to academic institutions should not apply in lawsuits

22   concerning student admissions or faculty hiring at UC.

102.    After Dr. Jennifer Lucero took over UCLA medical school admissions in June 2020, the number of Asian matriculants at UCLA medical school declined from 84 to 55 from 2019 through 2022, a drop of 35% (See Exhibit 53). Precipitous changes in admission rates strongly suggest deliberate conscious race-based directives.

103.    Mr. Steven Dubinett, the dean of UCLA medical school, directs a center that houses a race-based fellowship. Its web page was deleted after media exposure (See Exhibit 54), indicating awareness of its illegality.

104.    A New York Times opinion piece by a former UC admissions reader shared her detection of "unspoken directives", questioned whether "Proposition 209 serve(s) merely to push race underground" and described the admission reading process as "an extreme version of the American non-conversation about race." (See Exhibit 55.)

**D. Statistical Evidence That UC Discriminates Against Asian-American Applicants**

105.    In a study commissioned by UCLA, only later obtained through public records requests, sociology professor Robert Mare documented a consistent pattern of anti-Asian discrimination in admissions at UCLA. His report said, "'North Asian' (Chinese, Japanese, Korean, Indian/Pakistani American) applicants receive somewhat less favorable holistic read scores than applicants in other ethnic identity groups who are otherwise similar in

1    measured academic qualifications, personal characteristics, and

2    measured challenges and hardships." It further indicated that "among

3    otherwise equivalent applicants, whites, African Americans and Latinos

4    are overrepresented among those admitted, and Asian-American

5    applicants are underrepresented." Additionally, the report noted that "the

6    disadvantages of Asian applicants occur, with varying magnitudes,

7    throughout the admissions process." (See Exhibit 56).

8    106.    Studies comparing the academic qualifications of admitted students by

9    race fail to fully capture the extent of racial discrimination faced by

10    Asian-American applicants. By rejecting highly qualified Asian-American

11    applicants like Stanley, UC artificially narrows the academic qualification

12    gap between admitted students of different racial groups. As a matter of

13    mathematical fact, the more highly qualified Asian-American applicants

14    the university rejects, the smaller the observed qualification gap among

15    admitted students becomes. To accurately assess the extent of racial

16    discrimination, it is necessary to compare not only the admitted

17    Asian-American students but also the rejected Asian-American applicants

18    against admitted students from other racial groups. However, limitations in

19    the publicly available UC admissions data currently prevent such an

20    analysis. The plaintiffs intend to pursue this essential data comparison

21    during the discovery phase of this lawsuit.

22    107.    Following public outcry over the Varsity Blues scandal, California state

23    lawmakers commissioned an audit of the University of California's

1    admissions practices. The California State Auditor's 2020 report found that

2    UC "has allowed for improper influence in admissions decisions, and it has

3    not treated applicants fairly or consistently." Specifically, the audit revealed

4    that UC Berkeley and UCLA "admitted thousands of applicants whose

5    records demonstrated that they were less qualified than other applicants

6    who were denied admission." (See Exhibit 57).

7    108.    The audit also identified significant bias within the admissions process.

8    Despite UC's guidelines excluding personal details such as race, gender,

9    and birthplace from the 14 official admission factors, several campuses

10   allowed application readers to access such details. For example, UC

11   Berkeley, UCLA, and UC San Diego permitted readers to view students'

12   names and native languages. Additionally, UC Berkeley and UCSD

13   exposed applicants' gender, while UC Berkeley and UCLA displayed

14   applicants' birthplaces. The audit warned that this practice could lead

15   readers to infer race or ethnicity, introducing bias into decisions (See

16   Exhibit 58).

17   109.    While the audit did not explicitly examine racial preference in UC

18   admissions—as this fell outside the scope defined by the state

19   legislature—its findings of improper influence and access to personal data

20   underscore the need for a comprehensive investigation. Such an inquiry is

21   necessary to evaluate whether UC's admissions practices comply with

22   constitutional and statutory protections against racial discrimination.

**E. Corruption in UC's Admissions and Untrustworthy Top Management**

110.    In response to the Varsity Blues scandal, UC conducted an internal review of its admissions practices, <u>concluding</u> that only two cases involved potential improper admissions (See <u>Exhibit 59</u>). However, this self-assessment was sharply refuted by the findings of the California State Auditor's report, which identified 64 cases of inappropriate admissions. These cases involved preferential treatment due to applicants' family donations and personal connections to campus staff. The report also warned that the true number of compromised admissions could exceed **400 students**—a far more pervasive issue than UC acknowledged (See <u>Exhibit 58</u> as well).

111.    The audit highlighted systemic favoritism at UC Berkeley, stating that "UC Berkeley Frequently Gave Preferential Treatment to Relatives and Friends of Faculty, Staff, and Donors". This behavior exemplifies a disregard for fairness in admissions decisions. In one egregious case, a UC Regent violated university policies by advocating for a waitlisted applicant through a personal letter to the UC Berkeley Chancellor; the applicant was subsequently admitted (See <u>Exhibit 60</u>). Despite this clear breach of policy, neither the Regent nor the Chancellor faced any consequences.

112.    Compounding these concerns, the California State Auditor's report <u>criticized</u> UC's Office of the President for failing to provide adequate

1    oversight, which allowed significant procedural weaknesses to persist

2    across campuses. The report explicitly stated, "The University Has Not

3    Made Sufficient Changes Following the National College Admissions

4    Scandal" (See Exhibit 57 as well). This pattern of inadequate

5    accountability and ineffective self-regulation raises serious doubts about

6    UC's commitment to integrity and fairness in admissions, warranting

7    further scrutiny and legal action to enforce compliance with constitutional

8    and statutory obligations.

9    113.    Following the release of the California State Auditor's report, UC

10    President Michael V. Drake claimed that UC's internal audit

11    recommendations aligned with those of the state auditor. However, this

12    assertion was publicly refuted by the state auditor, who noted significant

13    differences between the two assessments (See Exhibit 58 and Exhibit 61).

14    The state auditor warned that the entire UC admissions process requires

15    an **overhaul**, citing inconsistent standards and practices that allowed

16    applicants to be evaluated on inappropriate reasons. (See Exhibit 58 as

17    well.)

18    114.    Further reinforcing these concerns, California State Auditor Grant

19    Parks stated in a July 2024 letter to a state lawmaker that UC's actions

20    had failed to adequately address the weaknesses identified in its 2020

21    recommendations. Parks remarked, "We have found [UC's] responses to

22    not address weaknesses we have seen in their implementation of [the

23    2020] recommendation" (See Exhibit 62).

115.    This ongoing failure to implement meaningful reforms calls into question UC's commitment to transparency, accountability, and equitable treatment of all applicants. The discrepancies between UC's internal audits and the findings of independent oversight bodies demonstrate UC's systemic unwillingness to acknowledge and correct entrenched problems within its admissions framework, jointly and severally across its campuses.

116.    UC's admissions process has been repeatedly compromised by scandals involving favoritism and fraud. In 2007, *The Daily Bruin*, UCLA's student newspaper, uncovered significant ethical violations within the orthodontics residency program. The investigation revealed that the program granted preferential admissions to major donors and their relatives, directly contravening UC policies. Internal emails and interviews exposed a systemic practice of advancing donor-affiliated applicants despite lower qualifications, undermining fairness and merit-based admissions (See Exhibit 63).

117.    In 2020, UCLA men's soccer coach Jorge Salcedo was sentenced to eight months in prison for his role in the Varsity Blues scandal. Mr. Salcedo facilitated the fraudulent admission of students by falsely designating them as recruited athletes with fabricated soccer credentials (See Exhibit 64). Mr. Salcedo's actions would not have been possible without substantial cooperation from the UC Admissions office.

118.    These cases illustrate a persistent pattern of unethical admissions practices that prioritize personal connections and financial influence over academic merit. The breadth and frequency of such incidents point to systemic flaws within UC's admissions framework, necessitating comprehensive third-party oversight.

119.    Although UC may invoke autonomy as a shield against external scrutiny, its repeated lapses in admissions integrity demonstrate that its autonomy cannot supersede the need for transparency, fairness, and compliance with anti-discrimination laws. Without robust external review mechanisms, the integrity of UC's admissions system remains fundamentally compromised.

**F. Unconstitutionality of ED's Numeric Racial Targets**

120.    The U.S. Department of Education (ED) administers Minority Serving Institution (MSI) grant programs with eligibility requirements tied to numeric racial targets. Examples include: the Hispanic-Serving Institution (HSI) Program, which requires at least 25% Hispanic enrollment (See Exhibit 65); the Alaska Native-Serving and Native Hawaiian-Serving Institutions (ANNH) Program, which requires at least 20% Alaska Native or at least 10% Native Hawaiian students; and the Asian American and Native American Pacific Islander-Serving Institutions (AANAPISI) Program, which requires at least 10% enrollment of Asian American or Native American Pacific Islander students.

121.    These numeric racial thresholds are arbitrary, incentivizing institutions to manipulate or strategically balance the racial composition of their student bodies to qualify for federal grant funding (See Exhibit 66).

122.    These numeric racial targets fail to preserve or advance national security interests.

123.    These numeric racial targets do not remedy specific instances of federal government discrimination.

124.    Even if racial diversity in the college student body were recognized as a compelling government interest, these numeric racial targets may not reflect genuine diversity, as any institution meeting the numerical target qualifies, even if its student body remains racially homogeneous beyond that threshold.

125.    These numeric racial targets are not narrowly tailored to achieve a compelling government interest. If Minority-Serving Institution (MSI) programs' primary purpose is to improve educational opportunities for historically underserved communities, that objective could be more effectively and legally achieved through race-neutral alternatives. For example, reallocating MSI program funding to existing need-based programs, such as the Pell Grant program, would directly support economically disadvantaged students regardless of race, ensuring equal access to higher education without violating constitutional principles.

126.   These numeric racial targets facially discriminate among institutions based on the racial and ethnic balances of their student bodies. They are "a facially discriminatory law or policy that expressly classifies individuals on the basis of race". See *Chinese Am. Citizens All. of Greater N.Y. v. Adams*, 116 F.4th 161, 170 (2d Cir. 2024). As the Supreme Court affirmed in *Miller v. Johnson*, 515 U.S. 900, 911 (1995), "At the heart of the Constitution's guarantee of equal protection lies the simple command that the Government must treat citizens as individuals, not as simply components of a racial, religious, sexual or national class."

127.   These numeric racial targets are inherently rigid and inflexible. They fail to meet the strict scrutiny standard required for race-based government policies, as they are not narrowly tailored to serve a compelling government interest. Consequently, ED's use of such targets violates the Equal Protection principles of the Fifth Amendment and is unconstitutional.

128.   These numeric racial targets incentivize universities to suppress Asian-American enrollment as seen in UC's case infra.

**G. UC's Motive and Intent for Racial Balancing its Student Body**

129.   In June 2020, the UC Board of Regents unanimously endorsed Assembly Constitutional Amendment 5 (ACA 5) and the repeal of Proposition 209, which had banned the consideration of race and gender in admissions decisions since 1996. In a released <u>statement</u>, the Board

1  declared, "UC has long been committed to creating and maintaining a

2  student body that reflects California's laudable cultural, racial, geographic,

3  and socioeconomic diversity." UC President Janet Napolitano added, "It

4  makes little sense to exclude any consideration of race in admissions

5  when the aim of the University's holistic process is to fully understand and

6  evaluate each applicant through multiple dimensions." (See Exhibit 67.)

7  While it remains unclear how UC defines its ideal student body

8  composition—a point Plaintiffs intend to explore during discovery—it is

9  evident that UC was dissatisfied with the existing demographic makeup of

10  its student population and wants to balance it.

11  130.    In its amicus brief filed with the US Supreme Court in SFFA v. Harvard,

12  UC stated:

13          "At many of UC's campuses, especially the flagship campuses,

14          there remain stark differences between the demographics of UC's

15          enrolled student population and the demographics of the applicant

16          pool that UC seeks to serve—that is, California public high school

17          graduates. To be clear, UC does not maintain any 'specified' racial

18          targets based on the demographics of high school graduates or any

19          other baseline. See Fisher v. University of Texas at Austin, 570 U.S.

20          297, 311 (2013) ('Fisher I') (demographic targets constitute

21          impermissible racial balancing) (citation omitted). Instead, UC looks

22          at demographics to determine whether there are substantial

23          demographic disparities of the sort that this Court has recognized

1   can undermine a university's ability to provide the educational

2   benefits of diversity." (See Exhibit 68, page 21.)

3   While UC claims it does not use "specified" racial targets, the brief fails to

4   explain how it defines or measures "*substantial* demographic

5   disparities"—a point Plaintiffs intend to explore during discovery.

6   Nevertheless, UC's statement reveals its intent to increase enrollment for

7   certain racial groups, a motive that implicates strict scrutiny under

8   constitutional law.

9   131.   The Equal Protection Clause of the Fourteenth Amendment prohibits

10   states from denying any person "the equal protection of the laws." The

11   Clause's "central purpose is to prevent the States from purposefully

12   discriminating between individuals on the basis of race." See *Shaw v.*

13   *Reno*, 509 U.S. 630, 642 (1993). Thus, a state law or policy that

14   discriminates on the basis of race is subject to strict scrutiny, regardless of

15   its intended beneficiaries. See *Adarand Constructors, Inc. v. Peña*, 515

16   U.S. 200, 227 (1995).

17   132.   As the Supreme Court noted in *SFFA v. Harvard*, 143 S. Ct. 2141,

18   2169 (2023), "College admissions are zero-sum. A benefit provided to

19   some applicants but not to others necessarily advantages the former

20   group at the expense of the latter." The distinction between preferential

21   treatment and adverse impact is illusory—both actions are inherently

22   racially motivated and inseparable, representing merely different ways of

23   describing the same net discriminatory conduct. In a zero-sum situation,

1    when assessing whether a policy constitutes racial discrimination, courts

2    should focus on the presence of racial intent, regardless of whether that

3    intent manifests as preferential treatment or adverse impact. As the

4    Supreme Court affirmed in *SFFA v. Harvard*, "[W]hat cannot be done

5    directly cannot be done indirectly. The Constitution deals with substance,

6    not shadows," and the prohibition against racial discrimination is "levelled

7    at the thing, not the name." *Cummings v. Missouri*, 71 U.S. (4 Wall.) 277,

8    325, 18 L.Ed. 356 (1867).

9    133.    Article I, Section 31 of the California Constitution unequivocally states:

10    "The State shall not discriminate against, or grant preferential treatment to,

11    any individual or group on the basis of race, sex, color, ethnicity, or

12    national origin in the operation of public employment, public education, or

13    public contracting." This provision explicitly prohibits both discrimination

14    and preferential treatment on the basis of these characteristics.

15    **H. UC's Action for Racial Balancing its Student Body**

16    134.    In addition to its evident motive and intent for racial balancing, UC

17    possesses the means and opportunity to manipulate the racial

18    composition of its student body under its current "holistic" admissions

19    framework, which has a history of corruption and lacks transparency,

20    independent third-party oversight and accountability. Indeed, UC's intent is

21    matched by its actions.

1    135.    Despite claiming it does not maintain racial targets, UC actively

2    pursues Hispanic-Serving Institution (HSI) status at all its campuses. HSI

3    designation requires at least 25% Hispanic student enrollment (See

4    Exhibit 65 as well). In or around 2019, UC Berkeley and UCLA established

5    task forces led by their respective Chancellors—Carol Christ and Gene

6    Block—to achieve this racial target (See Exhibit 69). These task forces

7    demonstrate that UC has adopted policies aimed at meeting specific

8    numeric racial goals, contradicting its statements in the *SFFA v. Harvard*

9    amicus brief. This type of race-based decision-making is subject to strict

10   scrutiny. Under *SFFA v. Harvard*, it cannot survive strict scrutiny. It also

11   violates the California Constitution.

12   136.    A university policy that amounts to racial balancing is "patently

13   unconstitutional." *Grutter v. Bollinger*, 539 U.S. 306, 329 (2003). Racial

14   balancing seeks to ensure a specified percentage of a racial group within

15   the student body merely due to race or ethnicity. *Id.* Courts have

16   consistently rejected proportional representation as a constitutional

17   justification for race-based admissions. See *Id.* at 343.

18   137.    These actions also raise serious concerns that UC misrepresented

19   material facts to the Supreme Court in its amicus brief to *SFFA v. Harvard*.

20   138.    The deliberate use of numeric racial goals incentivizes actions that limit

21   Asian-American enrollment despite their growing demographic presence.

22   According to the 2020 U.S. Census, California's Asian population grew by

1   25% over the prior decade, making it the fastest-growing ethnic group in
2   the state (See Exhibit 70). However, Asian student representation at UC
3   declined from 38% in 2002 to 32% in 2022, with a general decline in
4   Chinese American enrollment between 2018 and 2024 (See Exhibits 71
5   and Exhibit 72). At UC Berkeley, one of the most selective campuses of
6   the UC system, Asian admits trended significantly downward in recent
7   years. The percentage of Asian applicants admitted by UC Berkeley went
8   from 18.9% (3,188 out of 16,866) in 2014 to 15.8% (4,416 out of 27,875)
9   in 2023. (See Exhibit 73. 2023 is the latest year for which the data is
10  publicly available.)

11  139.   The gap between Asian population growth and declining admissions
12  strongly suggests systemic discrimination. As the Court explained in *Reno*
13  *v. Bossier Parish School Board*, 520 U.S. 471, 487 (1997), the natural
14  consequences of an action often provide probative evidence of intent.
15  Here, the persistent adverse impact on Asian-American applicants
16  indicates a racially motivated policy, despite UC's denials.

17  140.   The argument that Asian-Americans constitute a plurality of UC's
18  student body does not negate claims of discrimination. Equal protection
19  requires that individuals be treated as individuals, not as members of a
20  racial class. See *Miller v. Johnson*, 515 U.S. 900, 911 (1995). Even if
21  aggregate Asian enrollment remains relatively high, systemic bias may
22  suppress their numbers below what they would be in a race-neutral
23  system. "[I]nvidious discrimination does not become less so because the

1   discrimination accomplished is of a lesser magnitude." See *Personnel*

2   *Administrator of Massachusetts v. Feeney*, 442 U.S. 256, 277 (1979).

3   141.   The Second Circuit's 2024 decision in *Chinese American Citizens*

4   *Alliance of Greater New York (CACAGNY) v. Adams* supports this case.

5   The court held that a facially neutral policy driven by racial motives

6   violates equal protection, even if aggregate enrollment improves. The

7   ruling states "if discriminatory intent is proven, a negative effect or harm

8   from that discriminatory policy on individual Asian-American students

9   applying to the SHSs [Specialized High Schools] would be sufficient to

10  trigger strict scrutiny review". The court further held that a policy or a

11  program "is not immunized from strict scrutiny because it underperforms in

12  an unconstitutional mission with respect to a targeted racial group in the

13  aggregate." Therefore, policies aiming to reach HSI designation at

14  UC—whether or not the 25% target has been met—are subject to strict

15  scrutiny and won't survive it.

16  142.   Moreover, *CACAGNY* rejected the defense that admitting students to

17  any school within a system negates discrimination claims. The Second

18  Circuit Court stated that denying a student access to their preferred

19  institution due to race is actionable. Similarly, admitting Asian-American

20  students to less selective UC campuses does not absolve more selective

21  campuses from discrimination claims.

143.   In *CACAGNY*, the Second Circuit Court stated that "Applying Supreme Court precedent, we have generally recognized three types of discriminatory laws: (1) a facially discriminatory law or policy that expressly classifies individuals on the basis of race; (2) a facially neutral law that is enforced in a discriminatory fashion; and (3) a facially neutral law that was adopted with discriminatory intent and resulted in a discriminatory effect. *See Chabad Lubavitch of Litchfield Cnty., Inc. v. Litchfield Hist. Dist. Comm'n,*768 F.3d 183, 199 (2d Cir. 2014)."

144.   In this case, all three types of discriminatory policies and practices identified by the Second Circuit Court are evident:

   a. **Facially discriminatory policies**: Ample evidence shows that UC employs explicitly race-based discriminatory policies–including numerica racial targets–that are directly tied to student admissions.

   b. **Discriminatory enforcement**: UC's regular and frequent absurd and incongruous admission outcomes strongly indicate that UC exercises its admissions policies in a discriminatory fashion.

   c. **Discriminatory intent and effect:** There is substantial evidence of adverse effects on Asian-American applicants, both individually and collectively. Additionally, UC's faculty hiring practices are demonstrably racially motivated, resulting in disparate impacts on various racial groups. Moreover, a senior UC administrator openly advocated for circumventing legal scrutiny by ensuring racial intent

was carried out without being explicitly documented—effectively

endorsing discrimination through covert means.

These actions constitute violations of the Equal Protection Clause of the

Fourteenth Amendment, Title VI of the Civil Rights Act of 1964, and Article

I, Section 31 of the California Constitution.

**I. UC's Dismissals of Complaints**

145.    UC officials have consistently ignored or dismissed complaints

regarding absurd admissions outcomes and allegations of racial

discrimination, highlighting a pervasive lack of transparency and

accountability in their admissions practices. More than a year passed

between Nan Zhong's initial complaint to the UC Board of Regents about

Stanley's admission results and the filing of this lawsuit, during which the

Board took no meaningful action. Rather than conducting an investigation,

the Board merely passed off Nan's concerns to the Admissions Office.

146.    Ms. Han Mi Yoon-Wu, UC's Associate Vice Provost and Executive

Director of Undergraduate Admissions, repeatedly dismissed the

complaints, asserting that Nan's allegations of racial discrimination were

unfounded because California law prohibits such practices. By that logic,

any criminal could claim innocence simply because the law prohibits the

very act they are accused of committing. When Nan questioned whether

the mere existence of a law guaranteed compliance, Yoon-Wu failed to

1    provide an answer. (See Exhibit 74 for the full record of Nan's year-long

2    correspondence with UC prior to filing this lawsuit.)

3    147.    Doesn't Ms. Han Mi Yoon-Wu understand the absurdity of her

4    statement? The answer must be that she does. Her dismissive and

5    irrational response can only be interpreted as an act of arrogant disregard

6    for Asian applicants and their families, conveying an implicit message: *I*

7    *can do and say whatever I want; there is nothing you can do about it. Get*

8    *lost.*

9    148.    This cavalier attitude has only compounded the emotional distress

10    endured by Stanley and Nan, intensifying the pain caused by the

11    University's discriminatory practices.

12    149.    The denial of Stanley's applications to five UC campuses—combined

13    with UC's complete failure to even acknowledge the issue for over a

14    year—cannot be dismissed as mere random error. Rather, these actions

15    reveal a pattern of systemic bias and deliberate indifference, suggesting

16    malice toward Stanley and, by extension, other similarly situated

17    Asian-American applicants. While it is true that Google's job offer came

18    after UC's rejections—meaning UC could not have foreseen that Google

19    would recognize Stanley's skills had already reached the Ph.D. level—the

20    fundamental issue remains: the technical achievements included in

21    Stanley's UC applications were substantially the same as those sent to

22    Google. Yet, while Google responded with, "This is impressive; we should

1   interview him for a Ph.D.-level position," UC's response was that Stanley

2   was not qualified for undergraduate admission. This stark contrast

3   underscores a systemic barrier that profoundly affects Asian-American

4   applicants' experiences in college admissions. Even when their

5   qualifications reach the Ph.D. level, they may still be denied

6   undergraduate admission. This fosters a pervasive sense of

7   helplessness—the belief that the system is rigged to reject you regardless

8   of your merits—that contributes significantly to the mental health

9   challenges within the Asian-American youth community.

10   150.   This case echoes the dark legacy of the Chinese Exclusion Act of

11   1882—a shameful chapter in our nation's history for which Congress

12   formally apologized in June 2012. Disturbingly, as of this lawsuit's filing—a

13   full year after UC became aware of Google's assessment of Stanley's

14   skills—UC still refuses to engage in any meaningful discussion about his

15   applications, which only compounded the emotional distress Stanley and

16   Nan have endured.

17   **J. Lack of Response by Government Officials**

18   151.   Stanley's mother filed a civil rights complaint with the Office for Civil

19   Rights (OCR) at the U.S. Department of Education. However, the OCR

20   dismissed the case after misinterpreting her email, relying on reasoning

21   that directly contradicted her intended meaning. When she pointed out the

22   misunderstanding, the OCR refused to reopen the case, stating it had

1   been closed. The official dismissal letter cited a rationale the OCR knew to

2   be false. Despite her repeated requests to correct the letter and remove

3   the inaccurate reasoning, the OCR declined to make any changes, even

4   after she escalated the matter (See Exhibit 75 for the full record of email

5   exchanges with the OCR). ED's failure to enforce civil rights laws has let

6   the direct harm to Stanley and other Asian-American applicants persist.

7   152.    Nan also raised his concerns with California Assemblymember Marc

8   Berman, mentioning that hundreds of his constituents were deeply

9   concerned about UC's admissions practices. Despite several email

10  exchanges, Mr. Berman did not respond substantively (See Exhibit 76 for

11  the full record of email exchanges with Mr. Berman and his staff).

12  153.    In November 2023, Nan organized a petition that gathered over 4,000

13  endorsements for letters expressing concerns about UC admissions.

14  These letters were sent to Governor Gavin Newsom and Lt. Governor

15  Eleni Kounalakis, both of whom serve as ex officio Regents of the

16  University of California. Neither replied. (See Exhibit 77 and Exhibit 78 for

17  the letters.)

18  154.    Plaintiffs have made every reasonable effort to engage in dialogue and

19  pursue resolution before filing this lawsuit.

20  **K. Legal Basis**

21  155.    The Supreme Court's decision in *SFFA. v. Harvard* unequivocally

22  established that racial discrimination in college admissions is

23  unconstitutional.

156.   UC's racial discriminatory admission policies and practices violate the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

157.   UC's racial discriminatory admissions policies and practices also violate Title VI of the Civil Rights Act of 1964, which prohibits racial discrimination in programs receiving federal financial assistance.

158.   UC's racial discriminatory admissions policies and practices also violate Article I, Section 31 of the California Constitution, which expressly forbids racial discrimination in public education.

159.   In addition to direct evidence of discrimination, racial "prejudice or stereotype" may be proven through circumstantial evidence. *See Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 266 (1977).

160.   Further supporting this claim, the Second Circuit Court of Appeals, in *Chinese American Citizens Alliance of Greater New York (CACAGNY) v. Adams*, 116 F.4th 161 (2d Cir. 2024), unanimously affirmed that an equal protection claim may proceed if "any individual has been negatively affected or harmed by a discriminatory law or policy based on race, even if there is no disparate impact on members of that racial class in the aggregate." Under the principle of stare decisis, this ruling provides persuasive authority for the present lawsuit.

## 1 V. CLAIMS FOR RELIEF

## 2 COUNT I - Violation of the Fourteenth Amendment (Equal Protection 3 Clause)

4   161.   Plaintiffs reallege and incorporate by reference the allegations set forth
5        above.

6   162.   Co-Defendant UC's admissions policies and practices violate the Equal
7        Protection Clause of the Fourteenth Amendment by discriminating against
8        Asian-American applicants, including Stanley, on the basis of race.

9   163.   As a result of Co-Defendant UC's discriminatory policies and practices,
10       Plaintiffs have suffered harm, including the loss of educational
11       opportunities, emotional distress, financial loss, and reputational damage.

12  164.   Plaintiffs have been and will continue to be injured by Co-Defendant
13       UC's ongoing discriminatory admissions policies, which deny them an
14       equal opportunity to compete for admission based on race or ethnicity.

15  165.   Plaintiffs are entitled to a declaratory judgment, pursuant to 28 U.S.C.
16       §2201, and a permanent injunction because there is no plain, adequate, or
17       speedy remedy at law to prevent Co-Defendant UC from continuing to use
18       admissions policies and practices that discriminate on the basis of race or
19       ethnicity in violation of the Fourteenth Amendment and because the harm
20       Plaintiffs will otherwise continue to suffer is irreparable.

1 **COUNT II - Violation of Title VI of the Civil Rights Act of 1964 (42 U.S.C. §**
2 **2000d)**

3   166.   Plaintiffs reallege and incorporate by reference the allegations set forth
4         above.

5   167.   Co-Defendant UC receives federal financial assistance and is therefore
6         subject to Title VI of the Civil Rights Act of 1964, which prohibits
7         discrimination on the basis of race, color, or national origin in any program
8         or activity receiving federal financial assistance. Co-Defendant UC's
9         admissions policies and practices discriminate against Asian-American
10        applicants, including Stanley, in violation of Title VI.

11  168.   As a result of Co-Defendant UC's discriminatory policies and practices,
12        Plaintiffs have suffered harm, including the loss of educational
13        opportunities, emotional distress, financial loss, and reputational damage.

14  169.   Plaintiffs have been and will continue to be injured by Co-Defendant
15        UC's ongoing discriminatory admissions policies, which deny them an
16        equal opportunity to compete for admission based on race or ethnicity.

17  170.   Plaintiffs are entitled to a declaratory judgment, pursuant to 28 U.S.C.
18        §2201, and a permanent injunction because there is no plain, adequate, or
19        speedy remedy at law to prevent Co-Defendant UC from continuing to use
20        admissions policies and practices that discriminate on the basis of race or

1    ethnicity in violation of Title VI of the Civil Rights Act of 1964 and because

2    the harm Plaintiffs will otherwise continue to suffer is irreparable.

3 **COUNT III - Violation of California Constitution (Article I, Section 31)**

4    171.   Plaintiffs reallege and incorporate by reference the allegations set forth

5    above.

6    172.   Article I, Section 31 of the California Constitution prohibits racial

7    discrimination in public education. Co-Defendant UC's discriminatory

8    admissions policies and practices violate this provision by denying

9    Asian-American applicants, including Stanley, equal access to public

10    educational opportunities.

11    173.   As a result of Co-Defendant UC's discriminatory policies and practices,

12    Plaintiffs have suffered harm, including the loss of educational

13    opportunities, emotional distress, financial loss, and reputational damage.

14    174.   Plaintiffs have been and will continue to be injured by Co-Defendant

15    UC's ongoing discriminatory admissions policies, which deny them an

16    equal opportunity to compete for admission based on race or ethnicity.

17    175.   Plaintiffs are entitled to a declaratory judgment, pursuant to 28 U.S.C.

18    §2201, and a permanent injunction because there is no plain, adequate, or

19    speedy remedy at law to prevent Co-Defendant UC from continuing to use

20    admissions policies and practices that discriminate on the basis of race or

21    ethnicity in violation of Article I, Section 31 of the California Constitution

1    and because the harm Plaintiffs will otherwise continue to suffer is

2    irreparable.

3  **COUNT IV - Violation of the Due Process Clause of the Fifth Amendment**

4    176.    Plaintiffs reallege and incorporate by reference the allegations set forth

5    above.

6    177.    Co-Defendant ED's use of numeric racial targets, including but not

7    limited to the 25% Hispanic enrollment requirement for Hispanic-Serving

8    Institution (HSI) status under 20 U.S.C. § 1101a, constitutes racial

9    discrimination in violation of the Due Process Clause of the Fifth

10    Amendment, which encompasses equal protection principles.

11    178.    The Fifth Amendment prohibits the federal government from treating

12    individuals differently based on race unless the policy is narrowly tailored

13    to serve a compelling governmental interest. Co-Defendant ED's racial

14    targets fail this standard, functioning as rigid racial quotas that unlawfully

15    disadvantage students of non-preferred racial groups, including

16    Asian-American applicants.

17    179.    As a direct result of ED's unlawful policies, Plaintiffs have suffered

18    harm, including the denial of equal access to federally funded educational

19    programs, loss of educational opportunities, reputational damage, and

20    emotional distress resulting from the perception that the federal

21    government endorses racial discrimination in higher education.

1 **COUNT V - Violation of the Administrative Procedure Act (APA)**

2  180.   Plaintiffs reallege and incorporate by reference the allegations set forth

3     above.

4  181.   Co-Defendant ED's failure to investigate and enforce federal

5     anti-discrimination laws, including Title VI of the Civil Rights Act of 1964

6     (42 U.S.C. § 2000d), constitutes arbitrary and capricious agency action in

7     violation of the Administrative Procedure Act (APA), 5 U.S.C. § 706.

8  182.   As a direct result of ED's unlawful actions and omissions, Plaintiffs

9     have suffered harm, including the denial of equal access to federally

10     funded educational programs, loss of educational opportunities,

11     reputational damage, and emotional distress caused by the federal

12     government's failure to uphold anti-discrimination protections in higher

13     education.

14 **VI. PRAYER FOR RELIEF**

15 WHEREFORE, Plaintiffs, Stanley, Nan and SWORD, on behalf of its members

16 and all others similarly situated, respectfully request that this Court:

17  183.   Declare Numeric Racial Targets in Federal Funding Unconstitutional

18     a. Declare that the numeric racial targets established under the 1992

19        reauthorization of the Higher Education Act—such as the 25%

20        Hispanic enrollment requirement for Hispanic-Serving Institution

21        (HSI) status under 20 U.S.C. § 1101a—are unconstitutional.

1    b. Issue a permanent injunction prohibiting Co-Defendant ED from

2        implementing, enforcing, or conditioning federal funding eligibility

3        on numeric racial targets.

4  184.  Declare Co-Defendant ED's OCR (Office of Civil Rights) Failed Its Duty

5        and Mandate Its Reform

6    a. Declare that OCR failed to properly investigate and enforce federal

7        anti-discrimination laws, including Title VI of the Civil Rights Act of

8        1964, in violation of its statutory and constitutional obligations.

9    b. Declare that OCR's failure to act constitutes arbitrary and

10       capricious agency action in violation of the Administrative

11       Procedure Act (APA), 5 U.S.C. § 706.

12   c. Issue an injunction requiring OCR to implement procedural reforms

13       ensuring timely and transparent investigations of civil rights

14       complaints.

15   d. Issue a writ of mandamus compelling OCR to enforce federal

16       anti-discrimination laws as required by statute, including taking

17       appropriate corrective actions against institutions found to be in

18       violation.

19   e. Issue an injunction requiring OCR to conduct a full, independent

20       audit of its complaint-handling process, with the results publicly

21       disclosed.

1      f.  Order the removal or disciplinary review of OCR officials

2          responsible for failing to investigate or enforce anti-discrimination

3          laws as required by Title VI.

4   185. Declare UC's Admissions and Hiring Practices Unconstitutional

5      a.  Declare that Co-Defendant UC's student admissions and faculty

6          hiring policies and practices violate:

7              i.   The Fourteenth Amendment to the U.S. Constitution,

8              ii.  Title VI of the Civil Rights Act of 1964, and

9              iii. Article I, Section 31 of the California Constitution

10                 (Proposition 209).

11     b.  Enjoin Co-Defendant UC from engaging in racially discriminatory

12         admissions and hiring practices, and order it to take all necessary

13         steps to eliminate the effects of past discrimination.

14  186. Mandate Institutional Reforms & Accountability Measures at UC

15     a.  Issue an injunction requiring Co-Defendant UC to issue a formal

16         public apology to Asian-American applicants (similar to UC

17         Berkeley's 1989 apology).

18     b.  Issue an injunction requiring Co-Defendant UC to dismiss, after a

19         full and fair public hearing, all Admissions Directors and other

20         administrators responsible for the admission cycles that are

21         determined to be racially discriminatory since 1996.

22     c.  Issue an injunction requiring Co-Defendant UC to dismiss, after a

23         full and fair public hearing, all administrators who knowingly defend

1    this lawsuit while being aware of racial preferences in admissions
2    or hiring.
3    d. Issue an injunction requiring Co-Defendant UC to dismiss, after a
4    full and fair public hearing, all administrators who knowingly
5    certified compliance with federal anti-discrimination laws while
6    being aware of racial preferences in admissions or hiring.
7    e. Refer individuals who knowingly made false certifications under
8    penalty of perjury for criminal prosecution.
9    187.    Mandate Oversight & Transparency in Admissions at UC
10    a. Issue a permanent injunction requiring Co-Defendant UC to
11    establish an independent admissions oversight board, approved by
12    this Court, with sole authority over the hiring and firing of
13    Admissions Directors at each UC campus.
14    b. Issue a permanent injunction requiring Co-Defendant UC to fund
15    recurring independent audits of its admissions process, approved
16    by this Court, including a breakdown of accepted and rejected
17    applicants' qualifications by racial group.
18    c. Issue a permanent injunction requiring Co-Defendant UC to
19    implement admissions procedures that prevent personnel from
20    accessing or inferring an applicant's race or ethnicity.
21    d. Issue a permanent injunction requiring Co-Defendant UC to
22    implement hiring procedures that prevent personnel from accessing
23    or inferring a candidate's race or ethnicity.

e. Require Co-Defendant UC to repeat its admission process independently on a small group of randomly chosen applicants for each admission cycle in order to demonstrate repeatability and self-consistency in admissions decisions.

188. Require Mandatory Training & Compliance Measures at UC

a. Require annual Proposition 209 training for all UC personnel involved in admissions or hiring.

b. Require all trained personnel to explicitly acknowledge that violating Prop 209 or failing to report violations may result in disciplinary action, including termination.

189. Declare Judicial Scrutiny of UC's Academic Policies

a. Declare that Co-Defendant UC should no longer receive traditional judicial deference as a bona fide academic institution unless it:

i. Collects standardized test scores in its admission process,

ii. Ceases prioritizing immutable characteristics over academic merit in admissions and transfers,

iii. Eliminates diversity statements from its faculty hiring process, and

iv. Censures administrators who persecuted Professor Perry Link for prioritizing academic qualifications over identity politics.

190. Mandate Legal and Ethical Accountability

a.  Issue an injunction requiring the State Bar Association to initiate disciplinary proceedings, including potential disbarment, against the authors of UC's misleading and untruthful amicus brief submitted to the U.S. Supreme Court in *SFFA v. Harvard*.

b.  Issue an injunction requiring the State Bar Association to conduct an investigation into whether Mr. Erwin Chemerinsky, Dean of UC Berkeley School of Law, has violated professional ethics rules by advocating for unlawful actions and instructing universities on how to conceal race-based admissions practices in circumvention of constitutional and statutory prohibitions. If such violations are found, the Bar Association should initiate appropriate disciplinary proceedings, including potential disbarment, in accordance with its professional responsibility rules.

191.  Award Monetary Damages & Attorney's Fees

a.  Award nominal, compensatory, and punitive damages to Plaintiffs.

b.  Award reasonable attorneys' fees and costs incurred in this action.

c.  Grant such other and further relief as this Court deems just and proper.

**VII. JURY DEMAND**

Pursuant to the Seventh Amendment to the United States Constitution and Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs hereby demand a trial by jury on all issues so triable.

---

I declare under penalty of perjury that the allegations in the complaint are true.

Respectfully submitted,

*Stanley Zhong* 2/6/2025

Stanley Zhong (Pro Se)

211 Hope St #390755

Mountain View, CA 94039

*[signature]* Feb 6, 2025

Nan Zhong (Pro Se)

Individually and as President of SWORD

211 Hope St #390755

Mountain View, CA 94039

nanzhong1@gmail.com

**Dated:** February 6, 2025

# EXHIBIT 1

1

2

**EMAIL FROM GOOGLE RECRUITER IN 2019**



3



**Stanley Zhong** ████████████████          Thu, May 23, 2019, 5:29 PM   ☆  ↩  ⋮

to ███████

I'm available next week on all of Monday and also on Tuesday after 4pm. I will also be open on Wednesday through Friday after 8pm. My resume can be found here: https://docs.google.com/document/d/████████████████████████████/edit?usp=sharing. It's also attached to this email.

Just to make sure you know, I'm 13 years old.

Stanley

📄 **Stanley Zhong's Resume**

•••

**One attachment** • Scanned by Gmail ⓘ                                                    ⬙⁺

📄 Stanley Zhong's R... ◢

████████████████████          Mon, May 27, 2019, 1:39 PM   ☆  ↩  ⋮

to me ▾

Thank you for taking the time to put together a resume Stanley! Your competitive programming accomplishments are very impressive. Thanks for being transparent about your age. Due to this factor, we won't be able to visit opportunities at Google. I've uploaded your resume to provide visibility to our intern recruiting team for future follow up. Have a great Memorial Day!

•••

1

1

# EXHIBIT 2

2

<smallcaps>Stanley's ranking in Google Code Jam</smallcaps>



1

# EXHIBIT 3

2

STANLEY'S RANKING IN META (FACEBOOK) HACKER CUP

3



1

# EXHIBIT 4

2

### STANLEY'S RANKING IN MIT BATTLECODE



3

1

# EXHIBIT 5

2

STANLEY'S RANKING IN CMU PICOCTF

3

4

## 2nd place winners! W9 needed

[redacted]@andrew.cmu.edu>    Apr 5, 2023, 8:46 AM    ☆    ☺    ↩    ⋮

to [redacted] me ▾

Hi Crusaders of redpwn jr (Stanley Zhong, [redacted])

Congrats again on your amazing picoCTF 2023 performance! crusaders of redpwn jr won 2nd place! Your team will be awarded $2,000, split between each member.

In order to receive your award money, we need each of you to please fill out and return the attached W9 form.

In addition to your prize, we are looking to host an awards ceremony on CMU's campus in Pittsburgh, sometime this summer. Could you please let me know if **June 1st** would work for you? (Flights and hotels will be paid for by picoCTF)

Best,
[redacted]

1

# EXHIBIT 6

2

## STANLEY'S RANKING IN STANFORD PROCO



3



1

# EXHIBIT 7

2  STANLEY ADVANCING TO USA COMPUTING OLYMPIAD PLATINUM IN 2021

# ⊃ USACO 2021 US OPEN, PLATINUM

The platinum division had 453 total participants, of whom 333 were pre-college students. We saw quite impressive results on the platinum problems in this contest, with several perfect scores. Results for top scorers are here. Congratulations to all of the top participants for their excellent results!

Your score on this contest was **469 (rank 104 among all pre-college participants in this division)**. Each problem contributed 1000/3 possible points, with equal points assigned to each test case; you can recall your performance on each test case by clicking on a problem below and looking at your results in analysis mode.

**1** **United Cows of Farmer John**
View problem  |  Test data  |  Solution  |  Your submission

**2** **Routing Schemes**
View problem  |  Test data  |  Solution  |  Your submission

**3** **Balanced Subsets**
View problem  |  Test data  |  Solution  |  Your submission

# ⊃ USACO 2021 US OPEN, GOLD

The gold division had 856 total participants, of whom 676 were pre-college students. All competitors who scored 750 or higher on this contest are automatically promoted to the platinum division. Detailed results for all those promoted are here.

Your score on this contest was **1000 (rank 1 among all pre-college participants in this division)**. Each problem contributed 1000/3 possible points, with equal points assigned to each test case; you can recall your performance on each test case by clicking on a problem below and looking at your results in analysis mode.

**1** **United Cows of Farmer John**
View problem  |  Test data  |  Solution  |  Your submission

**2** **Portals**
View problem  |  Test data  |  Solution  |  Your submission

**3** **Permutation**
View problem  |  Test data  |  Solution  |  Your submission

1        **EXHIBIT 8**

2        **NPR NEWS REPORT ABOUT COBOL COWBOYS**

3   https://www.npr.org/2020/04/22/841682627/cobol-cowboys-aim-to-rescue-sluggis

4   h-state-unemployment-systems



SPECIAL SERIES
## The Coronavirus Crisis

# 'COBOL Cowboys' Aim To Rescue Sluggish State Unemployment Systems

APRIL 22, 2020 · 6:17 PM ET
HEARD ON ALL THINGS CONSIDERED

 Bobby Allyn





5

1

# EXHIBIT 9

2

### STANLEY'S COBOL CODE ON GITHUB

3 https://github.com/qpwoeirut/LearningCOBOL



4

# EXHIBIT 10

### EMAIL EXCHANGE WITH COBOL COWBOYS IN 2020

On May 25, 2020, at 6:52 PM, YYY <YYY@YYY.com> wrote:

Dear COBOL Cowboys,

We hope you are having a wonderful Memorial Day.

Our names are YYY and Stanley Zhong. We are programming enthusiasts. We became interested in COBOL after learning how the current COVID-19 pandemic has caused issues with outdated COBOL programs. In the last month, we have been learning it to see if we could help. Our code can be found on GitHub here and here.

We found out about the COBOL Cowboys on the news and saw the work you are doing to help people with their COBOL programs. If possible, we would like to help. Would you be interested in us doing volunteer work for you?

As a matter of disclosure, we are both 14 years old, but ready and eager to help the world in any way we can.

YYY and Stanley

1

2 ―――――――――――――――――――――――――――――――――――――――――

3

4 From: XXX <XXX@cobolcowboys.com>

5 Date: Tue, May 26, 2020 at 12:22 PM

6 Subject: Re: Volunteers Interested in COBOL

7 To: YYY, Stanley

8

9 YYY and Stanley—

10

11 Howdy from Cobol Cowboys!

12

13 Thank you for reaching out and offering your volunteer services. We also

14 appreciate you sending us samples of your code. Good work guys.

15

16 We (Bill Hinshaw, Founder and myself) are intrigued by your interest and would

17 like to have further discussions with both of you.

18

19 An important next step, given your ages, would be to make contact with a

20 parent/guardian. I will need to talk to them on the phone and also get an OK in

21 writing (a quick email is fine) with their written approval for Cobol Cowboys, LLC,

22 to have an introductory teleconference with you both as well as follow-up emails.

23

1 YYY and Stanley, please forward this email to your parent/guardian and ask

2 them to phone me at xxx-xxx-xxxx, so we may proceed. I am available today:

3 now until 7pm and tomorrow through Friday, from 9am to 1pm.

4

5 Please let me know the name of your parent/guardian that will be calling with an

6 approximate time of their call.

7

8 Bill Hinshaw and I look forward to possible future discussions pertaining to

9 COBOL.

10

11 XXX, COO

12 Cobol Cowboys, LLC

13 Cell: xxx-xxx-xxxx

14 Email: XXX@cobolcowboys.com

15

16 not our first rodeo ...

17

18 ————————————————————————————————————————

19

20 Nan Zhong <nanzhong1@gmail.com>    Tue, May 26, 2020 at 11:31 PM

21 To: XXX <XXX@cobolcowboys.com>

22 Cc: Stanley, YYY@YYY.com

23

Hi XXX,

I am Stanley's dad. Thanks for your quick response to the boys! I know Stanley was excited to see it.

Yes, please accept this email as the written approval for Cobol Cowboys, LLC, to have an introductory teleconference with Stanley as well as follow-up emails. I am sure you will hear from YYY's parent soon as well.

BTW, summer coding job is nothing new to Stanley. He interned at my startup in 2018, and programmed (in Python) the backend service (on AWS) that automatically runs insurance quotes. These days he is very much into competitive programming (mostly in C++) and computer security contests.

YYY and Stanley are school friends. Both live the Bay Area, CA. Based on the NPR news story, I believe you live in Gainesville, Texas, 2 hours ahead of us. If that is correct, can I call you at 11am your time (9am my time) on Wednesday 5/27? I will call from my mobile number xxx-xxx-xxxx.

Looking forward to speaking with you!

Thanks,

Nan

1

2 _____

3

4 XXX <XXX@cobolcowboys.com>Wed, May 27, 2020 at 6:48 AM

5 To: Nan Zhong <nanzhong1@gmail.com>

6

7 Nan—

8

9 9am your time (11amCST) today works fine.

10

11 The work you've described that Stanley has been doing is most impressive.

12 Thanks so much for your email.

13

14 Will talk soon.

15

16 XXX, COO

17 Cobol Cowboys, LLC

18 Cell: xxx-xxx-xxxx

19 Email: XXX@cobolcowboys.com

20

21 not our first rodeo ...

22

1          # EXHIBIT 11

2              **RABBITSIGN FOUNDED BY STANLEY IN 2021**

3 <u>www.rabbitsign.com</u>



# Get Unlimited Free E-Signing

Not a free trial. Not a free tier. Completely free. Period.
See how.

Get Started



## Won Accolades from Experts

An AWS Well-Architected Review concluded that RabbitSign was "one of the most secure and efficient accounts" reviewed. RabbitSign is in the editorial pipeline to be featured in an AWS case study for its exemplary usage of AWS Serverless and compliance services.

## Audited by Trusted Third Parties

RabbitSign has achieved both SOC 2 Type II compliance with an unqualified opinion and ISO 27001:2022 compliance. Sign in to download RabbitSign's compliance reports. Verify RabbitSign's ISO 27001:2022 certification on IAF here.




4

5

6   —————————————————————————————————————

7

1  https://blog.rabbitsign.com/launching-an-unlimited-free-e-signing-service-fe77a5

2  0a66aa

**Medium**    🔍 Search                                    ✑ Write

# Launching an Unlimited Free E-Signing Service

 **RabbitSign Team** · Follow
2 min read · Jun 20, 2021

👏 56    💬                                🔖  ▶  ⬆



I'm Stanley, founder of RabbitSign.

The pandemic made e-signing essential. But I got frustrated that all the e-signing solutions had very limited free tiers (or no free tier at all) so I decided to make an unlimited free e-signing solution. This led to the creation of RabbitSign.

3

4

1                              **EXHIBIT 12**

2      **EXCERPT OF THE AWS WELL-ARCHITECTED REVIEW (WAR) FOR RABBITSIGN**

- **Reducing administrator privileges to follow IAM best practices**, protecting themselves from potential insider threats.

- **Enabling WAF for CloudFront Distributions**, which will help protect Rabbit Sign's web application from common web exploits like SQL injection and cross-site scripting.

- **Enabling server-side encryption on their SNS topics** for encryption at rest and also enabling delivery status logging, ensuring that their SNS topics are secure and that they can track the delivery status of their messages.

Overall, Cloud303 concluded that Rabbit Sign's account is one of the most efficient and secure accounts they have reviewed. The remediations that were implemented demonstrate Rabbit Sign's commitment to following AWS security best practices. They also ensure the confidentiality, integrity, and availability of data and infrastructure, protecting Rabbit Sign and its customers from potential security threats. Cloud303 believes that this account would be an ideal AWS case study to demonstrate how using serverless infrastructure can help companies operate more cost-efficiently.

3



█████████@amazon.com>                                    Fri, Mar 10, 2023, 4:51PM    ☆  ☺  ↩  ⋮

Stanley,

I am back from my 2nd ski trip now, yes. Had to head down to CO for ███'s birthday and to teach him a few things on the mountain. Glad to hear the feedback after the WAR, that's an accomplishment my man. Cloud 303 correct me if I am wrong but have done more WARs than AWS Partner ever? That's awesome. Throw some time on my calendar for next week and I'll sync up with ███ on my side. Looking forward to catching up

**Schedule 20 Min Meeting w/AWS █████████**

aws  ███████ | Account Manager
E: ████████
O:
Work hard.  Have fun.  Make history.

# EXHIBIT 13

1

2          EMAILS FROM AWS REGARDING THE RABBITSIGN CASE STUDY

3

4

███████████████@amazon.com>                    ✆ May 8, 2023, 6:24 AM    ☆    ↩    ⋮

to ███████████████████

Great news!  The blog proposal has been accepted.  @Stanley from RabbitSign I have to get RabbitSign added to our internal reference finder for us to be able to write about their journey – I have submitted this request and will let you know if there is anything I need from you for this.

1

# EXHIBIT 14

2

GOOGLE'S FULL-TIME EMPLOYMENT OFFER LETTER

3

4

# Google

Stanley Zhong

20 September 2023

**This offer supersedes and replaces any prior versions**

Dear Stanley,

Thank you for your interest in Google LLC! We are delighted to offer you the exempt position of Software Engineer  in the Sunnyvale office. We look forward to working with you!

5

# EXHIBIT 15

1

2    INDUSTRY NEWS COVERAGE FOR RABBITSIGN'S FREE HIPAA-COMPLIANT E-SIGNING

3    https://www.hipaajournal.com/rabbitsign-achieves-hipaa-compliance-for-its-free-

4    e-signing-solution/



The HIPAA Journal is the leading provider of news, updates,
and independent advice for HIPAA compliance

Become HIPAA Compliant »    HIPAA News »    HIPAA Compliance Checklist    Latest HIPAA Updates »    HIPAA Training »    About Us »

## RabbitSign Achieves HIPAA Compliance for its Free e-Signing Solution

Posted By Steve Alder on Sep 8, 2022

RabbitSign, a Palo Alto, CA-based provider of a free-to-use, unlimited e-signing solution, has been assessed by Compliancy Group's HIPAA compliance experts who determined the solution is compliant with the HIPAA Rules.

RabbitSign was devised and developed during the COVID-19 pandemic as a zero-cost e-signing solution for businesses, non-profits, and government entities, with the company providing the solution for the greater good rather than to maximize profits.

All software solutions used by HIPAA-covered entities which come into contact with the protected health information of individuals must support HIPAA compliance. Since the e-signing solution could be used in connection with electronic PHI, RabbitSign would be classed as a business associate under HIPAA if the solution was provided to HIPAA-covered entities.

To broaden its userbase and allow HIPAA-covered entities to use the solution, RabbitSign partnered with Compliancy Group and used the company's HIPAA compliance methodology to take all the necessary steps to ensure compliance with the HIPAA Privacy, Security, Breach Notification, Omnibus Rules, and the HITECH Act. The company's progress toward HIPAA compliance was tracked using Compliancy Group's HIPAA compliance tracking software solution – *The Guard*.



### Get The FREE HIPAA Compliance Checklist

Immediate Delivery of Checklist
Link To Your Email Address

Work Email *



Please Enter Correct Email Address

**Your Privacy Respected**
HIPAA Journal Privacy Policy



Get The Free
**HIPAA Compliance Checklist**

Through that process, which involved a 6-stage risk analysis and remediation program, RabbitSign demonstrated its good faith effort toward HIPAA compliance, and the company was awarded the HIPAA Seal of Compliance, which demonstrates to current and future users of the solution that the company is committed to ensuring the security of ePHI and has an effective HIPAA compliance program in place.

1

# EXHIBIT 16

2    EPISODE OF VIEWPOINT WITH DENNIS QUAID FEATURING RABBITSIGN AND STANLEY

3

4    https://www.viewpointproject.com/features-postidd3e6da7a/



5

6

1

# EXHIBIT 17

2

## STANLEY'S GPA

**Henry M. Gunn High Transcript**
School Code: 4332904   Tel: (650)354-8200   Fax: (650)493-7801
780 Arastradero Rd, Palo Alto, CA 94306

**Zhong, Stanley**
Student Number: ▮▮▮▮▮   Grade: 12
Generated on 11/27/2022 09:40:33 PM   Page 1 of 1

### Student Information

Student Number:        Grade: 12
Birthdate:
State ID:               Gender: M
Counselor:

#### GPA Summary

Cumulative GPA (Weighted)     4.4242
Cumulative GPA (Unweighted)   3.9697

Weighted 10-12 A-G GPA        4.5833

### #4332904 Henry M. Gunn High

| Course | Mark | Weight | Credit |
|---|---|---|---|
| **2019-2020 Grade 09   Term 1** | | | |
| 6205 Art Spec 1 | A | 5.0000 | 5 |
| 3115 Biology 1A | A | 5.0000 | 5 |
| 4010 Chinese 1 | A+ | 5.0000 | 5 |
| 1180 Communic | A | 5.0000 | 5 |
| 2408 Geom H | A | 5.0000 | 5 |
| 2791 PE 9/11 | A | 5.0000 | 5 |
| 1625 Wld Hist | A | 5.0000 | 5 |
| Credit: 35.000 GPA: 4.0000 U/W GPA: 4.0000 | | | |
| **2019-2020 Grade 09   Term 2** | | | |
| 6205 Art Spec 1 | CR | 5.0000 | 5 |
| 3115 Biology 1A | CR | 5.0000 | 5 |
| 4010 Chinese 1 | CR | 5.0000 | 5 |
| 2408 Geom H | CR | 5.0000 | 5 |
| 2792 PE 9/12 | CR | 5.0000 | 5 |
| 0117 Western Literature | CR | 5.0000 | 5 |
| 1625 Wld Hist | CR | 5.0000 | 5 |
| Credit: 35.000 GPA: 0.0000 U/W GPA: 0.0000 | | | |
| **2020-2021 Grade 10   Term 1** | | | |
| 2416 Alg2/TrigH | A | 5.0000 | 5 |
| 2491B APCompSci A | A | 5.0000 | 5 |
| 3625 Chemistry H | A+ | 5.0000 | 5 |
| 4020 Chinese 2 | A+ | 5.0000 | 5 |
| 1193 Lit Style | A | 5.0000 | 5 |
| 2696 PE 10 | A+ | 5.0000 | 5 |
| 1753 US Govt | A | 5.0000 | 5 |
| Credit: 35.000 GPA: 4.4286 U/W GPA: 4.0000 | | | |
| **2020-2021 Grade 10   Term 2** | | | |
| 2416 Alg2/TrigH | A | 5.0000 | 5 |
| 2491B APCompSci A | A | 5.0000 | 5 |
| 3625 Chemistry H | A | 5.0000 | 5 |
| 4020 Chinese 2 | A | 5.0000 | 5 |
| 1191 Cont Herit | B+ | 5.0000 | 5 |
| 1641 ContWld 11 | A | 5.0000 | 5 |
| 2696 PE 10 | A | 5.0000 | 5 |
| Credit: 35.000 GPA: 4.2857 U/W GPA: 3.8571 | | | |
| **2021-2022 Grade 11   Term 1** | | | |
| 2399 Analysis H | A+ | 5.0000 | 5 |
| 3824 AP Physics 1 | A | 5.0000 | 5 |
| 1699 AP US History | A | 5.0000 | 5 |
| 8638 CS Capstone | A | 5.0000 | 5 |
| 5092 Prnc Of Engr H PLTW | A | 5.0000 | 5 |
| 7662 World Classics H | A | 5.0000 | 5 |
| Credit: 30.000 GPA: 4.8333 U/W GPA: 4.0000 | | | |
| **2021-2022 Grade 11   Term 2** | | | |
| 2399 Analysis H | A | 5.0000 | 5 |
| 3824 AP Physics 1 | A | 5.0000 | 5 |
| 1699 AP US History | A- | 5.0000 | 5 |

### #4332904 Henry M. Gunn High

| Course | Mark | Weight | Credit |
|---|---|---|---|
| **2021-2022 Grade 11   Term 2** | | | |
| 8638 CS Capstone | A | 5.0000 | 5 |
| 1179 Philos Lit | A | 5.0000 | 5 |
| 5092 Prnc Of Engr H PLTW | A- | 5.0000 | 5 |
| Credit: 30.000 GPA: 4.6667 U/W GPA: 4.0000 | | | |

### #500 PAUSD Summer School

| Course | Mark | Weight | Credit |
|---|---|---|---|
| **2021-2022 Grade 11   Term 3** | | | |
| 8458 Liv Skill | CR | 5.0000 | 5 |
| Credit: 5.000 GPA: 0.0000 U/W GPA: 0.0000 | | | |

### In-Progress Courses

| Course | | |
|---|---|---|
| 1525 AnalyticCollWrit | | 5.0000 |
| 2459 AP Calculus BC | | 5.0000 |
| 1762 AP Human Geography | | 5.0000 |
| 3859 AP Physcs C: Mechanics | | 5.0000 |
| 2319 AP Statistics | | 5.0000 |
| 1811 Econ AP | | 5.0000 |
| 0676 Tchr Asst | | 5.0000 |

### Credit Summary

Curriculum Program: Gunn Graduation 2018 & Up -
Alg in Middle School

| High School | Attempted | Earned | Required | Remaining |
|---|---|---|---|---|
| Wrldh | 10.000 | 10.000 | 10.000 | 0.000 |
| USGovt | 5.000 | 5.000 | 5.000 | 0.000 |
| Contwld | 5.000 | 5.000 | 5.000 | 0.000 |
| USH | 10.000 | 10.000 | 10.000 | 0.000 |
| Econ | 0.000 | 0.000 | 5.000 | 5.000 |
| S St | 0.000 | 0.000 | 5.000 | 5.000 |
| English | 30.000 | 30.000 | 40.000 | 10.000 |
| Algebra | 0.000 | 0.000 | 0.000 | 0.000 |
| Geometry | 10.000 | 10.000 | 10.000 | 0.000 |
| Algebra 2 | 10.000 | 10.000 | 10.000 | 0.000 |
| Math | 10.000 | 10.000 | 10.000 | 0.000 |
| Biol Sci | 10.000 | 10.000 | 10.000 | 0.000 |
| Phys Sci | 20.000 | 20.000 | 10.000 | 0.000 |
| World Lang (Level 2) | 10.000 | 10.000 | 10.000 | 0.000 |
| Fine Arts | 10.000 | 10.000 | 10.000 | 0.000 |
| Career Voc Ed | 30.000 | 30.000 | 10.000 | 0.000 |
| Livng Skills | 5.000 | 5.000 | 5.000 | 0.000 |
| PE | 20.000 | 20.000 | 20.000 | 0.000 |
| Electives | 10.000 | 10.000 | 45.000 | 0.000 |
| Total | 205.000 | 205.000 | 220.000 | 20.000 |

#### Comments

This is an UNOFFICIAL transcript

3

1

# EXHIBIT 18

2      STANLEY'S QUALIFICATION FOR ELIGIBILITY FOR LOCAL CONTEXT (ELC)

3

---

## How your application is reviewed

### University of California Fall Quarter/Semester 2023 application

Application ID:1166008
Name: Stanley Zhong

Campuses review each individual application carefully and consider more than just grades. There are multiple factors that all UC campuses weigh, although campuses often apply these factors differently. To review these factors ☑ , visit UC's admission website.

You rank in the top 9 percent of California high school students, based on your A-G course totals, UC GPA and our admissions index ☑ . If you meet the minimum admission requirements and aren't admitted to any UC campus to which you applied, you will be offered a spot at another campus if space is available.

Return to "Application status"

4

1

# EXHIBIT 19

2

HIGH SCHOOL RANKINGS BY US NEWS AND WORLD REPORT

3

https://www.usnews.com/education/best-high-schools/california/districts/palo-alt

4

o-unified-school-district/henry-m-gunn-high-school-2992

5

 # Henry M. Gunn High School

780 Arastradero Rd., Palo Alto, California | (650) 354-8200 | ⚅ Award Winning ⓘ

#### #135 in National Rankings

Overall Score 99.24/100

**Overview**   Student Body   Test Scores   Map

## Overview of Henry M. Gunn High School

Henry M. Gunn High School is ranked 14th within California. Students have the opportunity to take Advanced Placement® coursework and exams. The AP® participation rate at Henry M. Gunn High School is 83%. The total minority enrollment is 72%, and 10% of students are economically disadvantaged. Henry M. Gunn High School is 1 of 4 high schools in the Palo Alto Unified School District.

## Henry M. Gunn High School 2024 Rankings

Henry M. Gunn High School is ranked #135 in the National Rankings. Schools are ranked on their performance on state-required tests, graduation and how well they prepare students for college. Read more about how we rank the Best High Schools.

**All Rankings**

- ⚑ **#135** in National Rankings
- ⚑ **#14** in California High Schools
- ⚑ **#4** in San Jose, CA Metro Area High Schools
- ⚑ **#38** in STEM High Schools

| SCORECARD | 99.24 |
|---|---|
| Took at Least One AP® Exam | **83%** |
| Passed at Least One AP® Exam | **78%** |
| Mathematics Proficiency | **82%** |
| Reading Proficiency | **87%** |
| Science Proficiency | **81%** |
| Graduation Rate | **96%** |

6

1

# EXHIBIT 20

2

## HIGH SCHOOL RANKINGS BY NICHE

3

https://www.niche.com/k12/henry-m-gunn-high-school-palo-alto-ca/



4

5



**Henry M. Gunn High School** ✓
Public • PALO ALTO, CA

♥ Add To List

Report Card
About
● Rankings
Academics
Map
Home Listings
Living in the Area
Culture & Safety
Students
Teachers
Clubs & Activities
Similar Schools
Reviews

### Henry M. Gunn High School Rankings

Niche ranks nearly 100,000 schools and districts based on statistics and millions of opinions from students and parents.

| Best Public High Schools in California | Best College Prep Public High Schools in California | Best Public High School Teachers in California |
|---|---|---|
| #4 of 2,027 | #8 of 1,598 | #18 of 1,721 |

See All Henry M. Gunn High School Rankings >

### Academics

**Percent Proficient - Reading** ❷
# 87%

**Percent Proficient - Math** ❷
# 82%

Average Graduation Rate ❷    97%

Average SAT ❷    1430
705 responses

Average ACT ❷    32
310 responses

AP Enrollment    40%

**Niche College Admissions Calculator**

**Popular Colleges**
Niche users from this school are most interested in the following colleges.

⚫ University of California - Los Angeles    483 Students

⚫ University of California - Berkeley    400 Students

⚫ University of California - San Diego    375 Students

More ⌄

1

2

1

# EXHIBIT 21

2

## STANLEY'S PSAT AND SAT SCORES





**SAT**

December 4, 2021

11th Grade

**1590**  400 to 1600

Your Evidence-Based Reading and Writing Score

**790**  200 to 800

Your Math Score

**800**  200 to 800



**PSAT/NMSQT**

October 13, 2021

11th Grade

**1520**  320 to 1520

Your Evidence-Based Reading and Writing Score

**760**  160 to 760

Your Math Score

**760**  160 to 760

3

1

# EXHIBIT 22

2

**STANLEY'S NATIONAL MERIT SCHOLARSHIP FINALIST CERTIFICATE**



**NATIONAL MERIT SCHOLARSHIP CORPORATION**
1560 Sherman Avenue, Suite 200, Evanston, Illinois 60201-4897   (847) 866-5100

February 13, 2023

STANLEY L. ZHONG

PALO ALTO CA 94306

Semifinalist ID #: **23-16372**

Selection Unit #: **05-2130**

Dear Finalist:

Congratulations!  You have advanced to Finalist standing in the 2023 National Merit® Scholarship Program, a distinction that places you in a group of more than 15,000 students, representing less than one percent of U.S. high school graduating seniors.  A *Certificate of Merit* attesting to this accomplishment has been sent to your principal for presentation to you.

The National Merit Scholarship Program is privately financed, and the majority of scholarships offered are underwritten by approximately 340 independent sponsor organizations and institutions.  Although this nationwide academic competition is the largest of its kind, scholarship funds are limited and only about 7,250 of the Finalists will receive a Merit Scholarship® award.

Three types of National Merit Scholarships will be offered in 2023; no Finalist can receive more than one award.

- All Finalists are being considered for one of the 2,500 single-payment National Merit $2500 Scholarships that will be offered on a state representational basis.

- Finalists who meet specific criteria of a company or business sponsor will be considered for one of about 950 corporate-sponsored Merit Scholarship awards.  Most of these awards are designated for Finalists who are children of a sponsor's employees, but some are offered for residents of areas where the company is located, and a limited number are reserved for students planning to enter career fields a sponsor wishes to encourage.

- Finalists who meet the three conditions *listed on the reverse side of this letter* may be considered for one of about 3,800 college-sponsored Merit Scholarship awards to be financed by U.S. colleges and universities that have made sponsor arrangements with National Merit Scholarship Corporation (NMSC®).

Every Merit Scholarship award must be used for full-time attendance at a college or university in the United States that holds accredited status with a regional accrediting commission on higher education.  Our records show that as of January 12, 2023, the regionally accredited U.S. college you reported to NMSC as your first choice is:

**Stanford University**

Please log in to NMSC's Online Scholarship Application (OSA) to keep your email and mailing addresses up to date throughout the spring.  We will begin notifying winners of National Merit Scholarship awards by email in March.  Finalists who have not been chosen to receive a Merit Scholarship award will be informed by mail in mid-May after most selections have been completed.  All of us associated with the National Merit Scholarship Program salute you for your attainments to date and offer our best wishes for the realization of the high goals you set for yourself.

Sincerely,

*James Wittenberg*

James C. Wittenberg
Director of Scholarship Administration

3

1 # EXHIBIT 23

2 **STANLEY'S ROLE AS A FOUNDING OFFICER AND PRESIDENT OF THE COMPETITIVE PROGRAMMING**

3 **CLUB AT HIS HIGH SCHOOL**



4

1

# EXHIBIT 24

2

OPENBRACKETS CO-FOUNDED BY STANLEY

3 https://www.openbrackets.us/



Get Involved

The OpenBrackets Spring Semester starts on Monday, February 3rd and end on Friday, April 11th. Click here to register your free spot today (spots are limited, so hurry)!

# Bridging the Digital Divide

## Our Mission

At OpenBrackets, we want to help bridge the digital divide. Inspired by the Black Lives Matter movement in Spring/Summer 2020, we wanted to make an immediate change in our community. Through our courses, we provide support in computer science to middle and high school kids who may not receive it at home, and encourage kids to consider tech as a career, regardless of their background. We also provide students with the opportunity to hear from Guest Speakers in the industry, to see the versatility a computer science foundation can provide. OpenBrackets is run by students, for students.

## Impact

Our students come from the following schools. Most of the schools are in low-income areas with a higher percentage of residents of color.



## Testimonials

*"All your staff were amazing and worked so well with our children considering the circumstances. My son had never done any coding before and not only did he learn so much from this experience but enjoyed his time with you all as well."*

*"I wanted to thank you all for having this class for our children. Though I know that it was difficult to navigate remotely, my son was still able to get so much out of it. All your staff were amazing and worked so well with our children considering the circumstances. My son had never done any coding before and not only did he learn so much from this experience but enjoyed his time with you all as well. Thank you again for your guidance and patience and for bringing so much joy to our son."*

*"This was my son's first experience with coding and he has really enjoyed this class. Having this opportunity at no cost was amazing and such a nice addition to a school year that is anything but normal."*

*"Thank you to everyone involved from OpenBrackets in conducting and offering this opportunity to our children FREE of charge. If it was not for your team, your program and your generosity, I would have never been able to enroll my coding enthusiast daughter in a coding program as they*

1 # EXHIBIT 25

2 **STANLEY'S PRESIDENT'S VOLUNTEER SERVICE AWARD**

3

4 For his volunteer work at OpenBrackets, Stanley received the highest level of

5 PVSA in 2021. His volunteer hours were certified by two adult advisors at

6 OpenBrackets.

# EXHIBIT 26

**NEWS REPORTS ON STANLEY'S COLLEGE ADMISSION STORY**

**ABC7 Interview of Stanley and Nan on 10/10/2023**

https://abc7news.com/stanley-zhong-college-rejected-teen-full-time-job-google-admissions/13890332/

▶️ Bay Area high school grad rejected by 16 colleges hired by Google

**ABC7 follow-up interview of Stanley on 10/13/2023**

https://abc7news.com/high-school-grad-rejected-by-colleges-stanley-zhong-schooler-lands-google-job-bay-area/13909470/

▶️ High school grad rejected by 16 colleges reveals how he got Google job

**ABC7 follow-up interview of Nan on 10/16/2023**

https://abc7news.com/stanley-zhong-google-bay-area-teen-college-admissions-transparency/13925114/

▶️ Dad of CA teen rejected by colleges but hired by Google calls for admissions trans…

**CBS 10/20/2023**

https://www.cbsnews.com/news/stanley-zhong-google-software-engineer/

**CNBC 11/8/2023**

https://www.cnbc.com/2023/11/08/dad-of-18-year-old-google-engineer-shares-his-top-parenting-rule.html

1 **People 10/20/2023**

2 https://people.com/high-school-graduate-rejected-over-dozen-colleges-lands-jobs-at-goo

3 gle-8364398

4 **USA Today 10/13/2023**

5 https://www.usatoday.com/story/news/education/2023/10/13/google-hired-high-school-gr

6 ad-colleges-rejections-stanley-zhong/71166136007/

7 **Business Today 10/17/2023**

8 https://www.businesstoday.in/technology/news/story/google-vs-college-google-hires-18-y

9 ear-old-as-software-engineer-after-16-colleges-reject-him-402101-2023-10-16

10

11 **Yahoo News 10/11/2023**

12 https://news.yahoo.com/bay-area-teen-rejected-16-204200918.html

13

14 **Palo Alto Online 10/23/2023**

15 https://www.paloaltoonline.com/news/2023/10/23/from-gunn-to-google-meet-stanley-zho

16 ng-the-18-year-old-college-reject-who-landed-every-techies-dream-job

17 **Sing Tao Daily 10/4/2023**

18 https://epaper.singtaousa.com/flippingbook/epaper_sf/2023/20231010/21/

19 **World Journal 10/13/2023**

20 https://www.worldjournal.com/wj/story/121469/7504367

21 https://www.worldjournal.com/wj/story/121472/7504474

# EXHIBIT 27

**CONGRESSIONAL HEARING CITING STANLEY'S COLLEGE ADMISSION CASE**

https://www.youtube.com/live/4Zu5cdfv9kk?si=XufizKznBZZZlnWo&t=2587



1 https://democrats-edworkforce.house.gov/imo/media/doc/mike_zhao.pdf

2 (Appendix A, page 4)

---

**Stanley Zhong, an exceptional student rejected by 16 colleges in 2023** 

- **Academic Performance:** GPA (UW/W): 3.97/4.42. SAT: 1590 & National Merit Scholarship finalist
- **Finalist of major global programing competitions:**
    - Advanced to the Google Code Jam Coding Contest semi-final
    - Led his team to the 2nd place in MIT Battlecode's global high school division (1st place in the US)
- **An innovator and entrepreneur: Created an e-signing startup (RabbitSign.com) that's**
    - Grown to tens of thousands of users organically.
    - Recognized by an Amazon Web Services Well-Architected Review as "one of the most efficient and secure accounts" they have reviewed.
    - Featured by Amazon Web Services case study for its exemplary use of AWS Serverless and compliance services.
    - Interviewed by Viewpoint with Dennis Quaid, a series of short documentaries on innovations. (past guests included President George H.W. Bush & Fortune 500 CEOs.)
- **Co-founded a non-profit that brought free coding lessons to 500+ kids in underserved communities in California, Washington, and Texas.**
- **Hired by Google (full-time) but rejected by 16 colleges** including Stanford, MIT, CMU, UC Berkeley, UCLA, UC San Diego, UC Santa Barbara, UC Davis, California Polytechnic State University, Cornell, Univ of Illinois, Univ of Michigan, Georgia Tech, CalTech, Univ of Wisconsin, and Univ of Washington.

---

Page 4        September 2023                          Copyright © Asian American Coalition for Education 2023. All rights reserved.

4

1    **EXHIBIT 28**

2    PROTESTS AGAINST **SFFA** AND RACE-NEUTRAL ADMISSIONS

3    https://www.harvardmagazine.com/2023/07/rally-against-scotus-admissions-ruli

4    ng



# Harvard Students Protest Supreme Court Ruling

With a march and speeches, students vowed to fight back.

by Ryan Doan-Nguyen



At a rally in Harvard Yard on July 1, demonstrators expressed their opposition to the Supreme Court decision ending race-conscious admissions.

5

1

2

3   https://www.youtube.com/watch?v=OFN4SeF-Lh4

4   Harvard Students Rally in Support of Affirmative Action After Supreme Court

5   Ruling



6

7

8

9

10   https://youtu.be/Ruc1BlRvsDo?si=FFkWoJiWy_gmHawn&t=89

11   University of Texas students argue over anti-affirmative action bake sale



oh yeah

1

2

3  ───────────────────────────────────────────────────

4

5  https://www.youtube.com/watch?v=61ywDq-vEZg

6  Protesters Clash in Washington After Supreme Court Ends Affirmative Action

7

8

9  ───────────────────────────────────────────────────

1

2  https://www.youtube.com/watch?v=zzeeOBthe9A

3  Affirmative action supporters rally against Supreme Court ruling in 2005



4

1    **EXHIBIT 29**

2    HARVARD THEN-PRESIDENT CLAUDINE GAY RESPONDING TO SUPREME COURT RULING

3    https://www.nbcnews.com/politics/supreme-court/supreme-court-strikes-affirmativ

4    e-action-programs-harvard-unc-rcna66770

5 At 1:46 of the video clip



6

1 # EXHIBIT 30

2 PROFESSOR JANELLE WONG AND PROFESSOR VIET THANH NGUYEN'S LA TIMES OPINION

3 PIECE

4 https://www.latimes.com/opinion/story/2023-06-14/affirmative-action-supreme-co

5 urt-harvard-case-asian-americans



≡        Los Angeles Ti        LOG IN    Q

## Opinion: Affirmative action isn't hurting Asian Americans. Here's why that myth survives

Supporters of affirmative action in higher education rally in front of the U.S. Supreme Court before oral arguments in Students for Fair Admissions vs. President and Fellows of Harvard College and Students for Fair Admissions vs. University of North Carolina on Oct. 31, 2022.  (Chip Somodevilla / Getty Images)

**By Janelle Wong and Viet Thanh Nguyen**

6

# EXHIBIT 31

1

**STATE AUDIT OF UC BERKELEY'S ADMISSIONS IN 1987**

2

3

4  https://www.auditor.ca.gov/pdfs/oag/p-722.pdf

1

# EXHIBIT 32

2

**UC BERKELEY CHANCELLOR'S APOLOGY IN 1989**

3 https://www.latimes.com/archives/la-xpm-1989-04-07-mn-1075-story.html

4

CALIFORNIA

## UC Berkeley Apologizes for Policy That Limited Asians

**L.A. Times Archives**

April 7, 1989 12 AM PT

⌁ Share

SPECIAL TO THE TIMES

OAKLAND — Seeking to put to rest a five-year dispute, UC Berkeley Chancellor Ira Michael Heyman apologized Thursday for admissions policies that caused a recent decline in Asian undergraduate enrollment and pledged to help change those entrance requirements.

"It is clear that decisions made in the admissions process indisputably had a disproportionate impact on Asians," Heyman said at a press conference here with leaders of the local Asian community. "That outcome was the product of insensitivity. I regret that that occurred."

Heyman said he could not determine whether officials who developed and implemented the admissions policies were intentionally trying to set a ceiling on Asian enrollment, as members of the Asian community have charged.

5

6

1

# EXHIBIT 33

2

**SURVEY OF COLLEGE ADMISSIONS DIRECTORS**

3

4   https://www.insidehighered.com/news/survey/pressure-build-class-2016-survey-

5   admissions-directors

6

## Admissions Directors on Asian-American Applicants

| Statement | Public % Yes | Private % Yes |
|---|---|---|
| Do you believe that some colleges are holding Asian-American applicants to higher standards? | 39% | 42% |
| At your college, do Asian-American applicants who are admitted generally have higher grades and test scores than other applicants? | 41% | 30% |

7

1

# EXHIBIT 34

2        Former Dartmouth admission officer on discrimination against Asians

3   https://www.huffpost.com/entry/the-ivy-league-asian-prob_b_10121814

From where we sit as advocates for transparency in admissions and as advocates for high school students and their parents, the complaint is valid. I've seen from the inside (as a former admissions officer at Dartmouth College) how even the so-called "holistic process" can discriminate against Asian students. I share some of this insider information here: Behind the Scenes in an Ivy League Admissions Office. Often high-scoring Asian applicants with top GPA's were seen as "passive," "robotic," and "just another violin/piano playing standout" with "lack of spark." Though I don't think discrimination was intentional, there persisted a stereotype that the majority of Asian applicants were strong in math/science, played the violin or piano at a high level, attended Chinese (or Korean) school on weekends and often did tutoring, Kumon, high level math contests and award-centered activities like Academic Decathlon or Quiz Bowl. At committee discussions, Asians students were often rejected because they "didn't stand out," were "too quiet," "low impact" or "too one-sided."

Having seen this kind of discrimination first-hand working in an Ivy League admissions office, it comes as no surprise that working with students in private consulting for the past 20 years, we've seen continued discrimination. We tell the Asian clients we work with (both US citizens and international students) that it's not good enough to have the "average" Ivy SAT scores of 730 or so - if you are Asian, you have to be well above average (a third party study proved that number was actually 140 points higher than the average for white students) to get into top US Colleges. We also focus our Asian clients on high level reading and vocabulary as the quickest way for Asians to be rejected is a low Critical Reading score on the SAT. Though 800's on the SAT math section is de rigueur, fewer Asian students excel on the Critical Reading section of the SAT. We put our younger students on a strict reading and vocabulary program for this reason. As educators first, we want our students to have college choices, of course, but we also want them to deepen their love of learning and ability to embrace and even enjoy the classics.

4

1          # EXHIBIT 35

2     EXCERPT FROM THE SFFA'S LEGAL COMPLAINT ABOUT ASIAN-AMERICAN APPLICANTS AND

3                              THEIR FAMILIES

    E.    **Asian-American Applicants And Their Families Know That They Are Being Discriminated Against By Elite Universities.**

262.  Asian Americans are not blind to the discrimination employed by Harvard and other elite colleges and universities.

263.  According to Princeton economist Uwe Reinhardt, "within the Asian community, of which I'm a part, there's this feeling that, for you to get into Harvard or Princeton, you've got to be better than everybody else."

264.  According to Kara Miller, a former Ivy League admissions officer, "Asian kids know that when you look at the average SAT for the school, they need to add 50 or 100 to it. If you're Asian, that's what you'll need to get in."

265.  For example, Iris Wang, a senior at Hunter College High School, one of the best public high schools in America, scored a 1520 SAT score and had top grades. Her

60

father is a chemist and her mother a postal worker. She was rejected by Harvard, as well as numerous other schools. According to Wang, "All the schools basically say, 'we don't discriminate.' But I went to the Columbia session and they said they value a multicultural community. If they want to be multicultural, there's only so many of one culture they can take."

266.  Daniel Golden, the Pulitzer Prize-winning reporter then of *The Wall Street Journal*, described Jamie Lee, who applied to Harvard, as well as six other elite private schools: According to Mr. Golden, "Jamie Lee was a superb student. Born in Hong

4

1

# EXHIBIT 36

2    EXCERPT FROM THE SFFA'S LEGAL COMPLAINT ABOUT COLLEGE COUNSELORS

industry knows that." Without affirmative action, "our elite campuses will look like UCLA and Berkeley," and "[t]hat wouldn't be good for Asians or for anyone else."

D.    College Counselors Acknowledge Discrimination Against Asian Americans At Elite Universities.

252. College counselors and advisors recognize that discrimination against Asian Americans occurs at elite universities such as Harvard and thus tell Asian Americans to hide their identity, to emphasize personal characteristics that avoid Asian stereotypes, and, in many cases, to lower their expectations and apply elsewhere.

253. For example, the Princeton Review, the leading guide to college admissions, gives specific recommendations for Asian-American students applying to elite schools such as Harvard on how to overcome these schools' anti-Asian-American bias. Its recommendations are both honest and discouraging.

254. According to the Princeton Review: "Asian Americans comprise an increasing proportion of college students nationwide. Many Asian Americans have been extraordinarily successful academically, to the point where some colleges now worry that there are 'too many' Asian Americans on their campuses. Being an Asian American can now actually be a distinct disadvantage in the admissions processes at some of the most selective schools in the country. Increasingly, the standard for affirmative action isn't minority status, but under-represented minority status. Since Asian American populations at many colleges exceed the proportion of Asian Americans to the population of the state or country as a whole, Asian Americans are a minority, but not an under-represented minority, at those colleges.... If you are an Asian American—or even if you simply have an Asian or Asian-sounding surname—you need to be careful about what you do and don't say in your application."

57

3

1    # EXHIBIT 37

2    **ASIAN-AMERICAN APPLICANTS TRIED TO APPEAR "LESS ASIAN"**

3    https://www.nytimes.com/2022/12/02/us/asian-american-college-applications.ht

4    ml?unlocked_article_code=1.pk4.Oskn.OpS2fQgjTg2C&smid=url-share

5

## The New York Times

# *Applying to College, and Trying to Appear 'Less Asian'*

The affirmative action lawsuit against Harvard seemed to confirm advice given for years to Asian Americans: Don't play chess, don't check the box declaring race.

6

7

8

When it came time to fill out his college application form, Max Li chose not to declare his race. Even though he knew his last name sounded Chinese, he selected "prefer not to say."

Clara Chen was advised to avoid the Advanced Placement exam for Chinese because college admissions officers might assume, based on her last name, that she already spoke the language, which could undermine the value of her score. She took the test for Advanced Placement French instead.

When Marissa Li was growing up, she loved playing competitive chess, and spent hours studying the matches of some of her favorite players, like Bobby Fischer. But on her college application, she barely mentioned her interest in the game because she was afraid that it might come across as too stereotypically Asian.

1

2

3 _____

Sasha Chada, the founder of Ivy Scholars, a college admissions counseling company based in Texas, said that while his company's Latino clients often emphasized their ethnicity and their engagement with Hispanic cultural organizations on their college applications, his company frequently gave Asian American students the opposite advice, urging them to shift away from "classically Asian activities" to improve their chances of getting into the country's elite universities.

4

5

1

# EXHIBIT 38

2      **ASIAN-AMERICAN ENROLLMENT ROSE AFTER LEGAL PRESSURE**

3

4   https://asianamericanforeducation.org/en/call_for_complaint_2017_en/

5

⬚ * After the Student for Fair Admissions filed a lawsuit in 2014 and Asian American Coalition for Education (AACE) filed a joint complaint against Harvard University in 2015, Harvard's admission rate of Asian-Americans jumped from 17% prior 2014 to 22% in 2016.

⬚ * After a few Asian-American students filed a complaint against Princeton University since 2006, its admission rate of Asian Americans increased from 14.7% in 2007 to 21.9% in 2012 and 25.4% in 2014.

6

# EXHIBIT 39

1

EXCERPT FROM CHAPTER 7 IN *THE PRICE OF ADMISSION*

2



NATIONAL BESTSELLER

# THE PRICE OF ADMISSION

**HOW AMERICA'S RULING CLASS
BUYS ITS WAY INTO ELITE COLLEGES—
AND WHO GETS LEFT OUTSIDE THE GATES**

WITH NEW REPORTING ON OPERATION VARSITY BLUES

# DANIEL GOLDEN

3



# 7

## THE

# NEW JEWS

Asian Americans
Need Not Apply

1

Americans. His parents had gone to college in Korea, ruling out legacy preference for their son in the United States, and they couldn't afford to donate to a university; in fact, Henry applied for financial aid to pay his college tuition.

His Groton guidance counselor knew the score. She discouraged Henry from applying to the Ivy League, telling him it was a long shot at best, and advised him to lower his expectations to second- and third-tier schools. When Henry disregarded her advice, he was spurned by four Ivies—Harvard, Yale, Brown, and Columbia—as well as Stanford University and Massachusetts Institute of Technology. While they rejected Henry, Ivy League universities admitted thirty-four of his Groton classmates. Brown accepted the daughter of a best-selling author; Harvard, the grandson of one of its biggest donors; Columbia, an African American candidate; and Stanford, the daughter of an oil tycoon who chaired the university's board.

"When the decisions came out, and all these other people started getting in, I was a little upset," Henry told me. "I feel I have to hold myself to a higher standard." Added his mother, Suki Park, "I was naive. I thought college admissions had something to do with academics."

Unlike Henry, Stanley Park seemed to have a special hook to bolster his academic credentials, which included a 1500 SAT score. Stanley was born and raised in California, where voters abolished affirmative action in public university admissions in 1996. In the wake of that ban, the University of California, Los Angeles, revamped its admissions criteria to favor students who had conquered "life challenges," such as family illness, being raised by a single parent, or being the first in the family to go to college.

Stanley, who graduated from University High in Irvine in 2002, had overcome more than his share of adversity. After his parents—immigrants of modest means with only high school educations and little English—divorced in 1999, he lived with his mother. When she was diagnosed with breast cancer a year later, he began tutoring children to help pay the rent.

"All the money he earned tutoring was donated to his family," his high school guidance counselor wrote in Stanley's college recommendation. "In the time I have known Stanley I have been impressed with his incredible balance. It's easy to view him as a top mathematics student, but there is so much more to this complex young man that makes him interesting. For the past three years, he has gone to the Bethel Korean Church at 6:30 a.m. every Sunday

morning. Once there, he loads vans with food, and with other church members distributes food to the homeless."

Stanley's own college application essay movingly recounted how his mother's illness had inspired him. "I have the most loving and caring mother anyone can ever have," he wrote. "I admire her so much because she works hard even after her divorce last year. She sacrificed her youth and free time so that I might have a promising future. She went as far as to giving up her whole Christmas bonus to pay for an SAT class. Then something unfair happened to my mother; she was diagnosed with breast cancer. When my mother had her breasts removed, I could visibly see the pain and shame on her face. Although I am very grateful that she is alive, I could not bear to see my mom in that kind of pain. Now that she can't work as hard as she used to, I do not want to let all my mom's past sacrifices for me to be in vain. I slowly realized that the only thing I can do to help out was to make her happy by showing her the fruits of her sacrifices. I began to study harder in school and take my volunteer work... more seriously."

Nevertheless, UCLA and the state university's other elite campus, Berkeley, rejected Stanley while admitting black and Hispanic applicants with far lower scores. Stanley learned the hard way that the "life challenge" preference at his state university was a back-door substitute for affirmative action. It was never meant for him or other Asian Americans at all.

—

ASIAN AMERICANS are the new Jews, inheriting the mantle of the most disenfranchised group in college admissions. The nonacademic admissions criteria established to exclude Jews, from alumni child status to leadership qualities, are now used to deny Asians. "Historically, at the Ivies, the situation of the Asian minorities parallels very closely the situation of the Jewish minorities a half a century earlier," said former Princeton provost Jeremiah Ostriker.

Once ostracized, Jewish students are now widely coveted for their intellectual prowess. Today, many Jewish applicants have admissions hooks, often as children of alumni, donors, or faculty. Having apologized profusely for restricting Jewish enrollment in the past,

At another mainly Hispanic high school near Los Angeles, Belmont, UCLA student and outreach worker Alex Paredes helped Rosaura Novelo edit her application essay, which appeared tailored to fit the "life challenge" criterion. "It has been difficult for my parents, Mexican immigrants who did not even get to third grade in school, to raise a family of seven," Rosaura's essay began. "My father is the only person in the family who works, getting only minimum wage....Our situation has taught me to appreciate education, learn how to overcome challenges that I have been faced with, and to take advantage of the benefits that come from all my hard work....Taking advantage of the opportunities my parents have provided me with has sometimes been difficult because of all the challenges I have had to overcome....Things have not been handed to me on a silver platter, which makes it challenging for me....My community has also been an obstacle: gangs and violence are an everyday occurrence." UCLA—which took twenty-four Belmont seniors in 2002, tripling the previous year's number—admitted Rosaura despite an SAT score of 980, 520 points below Stanley Park's.

When I dropped by University High in Irvine on the same trip, I found that its admissions to Berkeley and UCLA were plummeting. University High is one of the best public schools in California, with a mean SAT score of 1247 in 2003–4 compared with a state average of 1015. It's also 45 percent Asian American. UCLA admits from University High dropped from 112 in 1998 to 65 in 2004, and Berkeley admits from 91 to 46 over the same period, relegating more University High graduates to less selective campuses such as Riverside and Santa Cruz. As a highly ranked school, University High didn't qualify for University of California outreach, hurting its students' prospects under comprehensive review. In other words, Stanley Park's mother had moved to a cramped Irvine apartment she could barely afford to provide him a better education—and may thereby have thwarted his admission to Berkeley and UCLA.

from rural states, popularized to squelch Jewish applicants from New York City, now hurts Asian students concentrated in metropolitan areas, particularly Los Angeles.

Now as then, a lack of preferences can be a convenient guise for racism. Much as college administrators justified anti-Jewish policies with ethnic stereotypes—one Yale dean in 1918 termed the typical Jewish student a "greasy grind"—so Asians are typecast in college admissions offices as quasi-robots programmed by their parents to ace math and science tests. Asked why Vanderbilt poured resources into recruiting Jews instead of Asians, a former administrator told me, "Asians are very good students, but they don't provide the kind of intellectual environment that Jewish students provide."

Similarly, MIT dean of admissions Marilee Jones rationalized the institute's rejection of Henry Park by resorting to stereotypes. Although she wasn't able to look up his application because records for his year had been destroyed, "it's possible that Henry Park looked like a thousand other Korean kids with the exact same profile of grades and activities and temperament," she emailed me in 2003. "My guess is that he just wasn't involved or interesting enough to surface to the top." She added that she could understand why a university would take a celebrity child, legacy, or development admit over "yet another textureless math grind." College administrators who made such remarks about black or Jewish students might soon find themselves higher education outcasts.

—

**"ASIAN AMERICAN"** is not an identity deeply rooted in history or tradition. Chinese and Japanese students popularized the term in the 1970s in an effort to be included in affirmative action programs. In 1977, the federal government (which had previously counted immigrants from China, Japan, Korea, and so forth by their countries of origin) introduced "Asian or Pacific Islander" as a data collection category—defined as "a person having origins in any of the original peoples of the Far East, Southeast Asia, the Indian subcontinent, or the Pacific Islands."

The strategy worked almost too well. Soaring Asian enrollment soon provoked a backlash. In 1984, with Asian Americans accounting for more than a quarter of its freshman class,

2

1                              **EXHIBIT 40**

2              Mr. John Moores's accusation in *The Price of Admission*

on her SATs and is the daughter of a struggling Korean-immigrant pastor. "No matter how bad your situation is, someone has it worse."

Asian applicants to Berkeley or UCLA who hadn't confronted a life challenge soon rued this gap in their resumes. Albert Shin, another University High student and the son of an engineer, scored 1540 on his SAT, had a 3.9 grade point average, and could read English, Korean, and Latin. Both Berkeley and UCLA turned him down. "It would be okay to look at social disadvantage a little bit, but judging it more than academics would be wrong," Albert told me. He, Stanley Park, and Hyejin Jae enrolled at the university's San Diego campus. As of March 2006, Stanley Park was a senior bioengineering major with a 3.5 grade point average, and "pretty worried" about admission to medical school. Financial aid and a job as a nuclear medicine assistant at a San Diego hospital had helped pay his tuition.

By 2003, parental complaints that comprehensive review meant rejecting top Asian and white students caught the attention of John Moores, then chairman of the university's board of regents. Studying Berkeley's admissions records, he found that in 2002—the year Albert, Stanley and Hyejin were rebuffed—Berkeley turned down 1,421 Californians with SAT scores above 1,400, including 662 Asian Americans. Of the 359 students accepted with SAT scores of 1,000 or less, 231 were black, Hispanic, or Native American.

<u>The regents chairman accused his flagship campus of "blatantly" discriminating against Asian Americans and denounced comprehensive review as "fuzzy</u>...It's silly to pretend that very low scoring applicants should be admitted to one of America's premier universities with the expectation that somehow these students will learn material that they missed in K–12." University officials disputed Moores's contention, noting that SAT scores are an imperfect measure of academic ability. Still, in April 2004, a university study group compared a statistical model of how the UC admissions process was supposed to work with actual cases. <u>Buried deep inside its report</u> was the finding that "somewhat fewer Asian students, and more African American and Chicano/Latino students (and, in some cases, White students) were admitted" on most campuses than would have been expected. One possible explanation: "small but real racial or ethnic effects on admissions decisions."

1    # EXHIBIT 41

2    **Professor Tim Groseclose's protest**

3

4    https://youtu.be/zUsuIr1E_6s?si=c7acYOK9LykvZh8a&t=31

5    Professor Tim Groseclose talking to media about his observations of UCLA

6    violating Prop 209

7

8    _____

9

10   https://dailybruin.com/2012/11/08/submission-faculty-letter-misrepresents-mare-r

11   eports-findings

12   Professor Tim Groseclose talking about racial discriminations identified in

13   Professor Robert Mare's reports

# DAILY BRUIN   ADVERTISE DONATE SUBMIT

NEWS SPORTS ARTS OPINION THE QUAD PHOTO VIDEO ILLUSTRATIONS CARTOONS GRAPHICS THE STACK PRIME ENTERPRISE

**COMMUNITY, OPINION**

## Submission: _Faculty letter misrepresents Mare report's findings_

**By Daily Bruin Staff**
Nov. 8, 2012 11.53 p.m.

**By Tim Groseclose**

In an Oct. 30, 2012 Daily Bruin column, a group of 57 professors criticized a Daily Bruin news article

> Editor's Note: Portions of this submission have been
>
> ,
>
> specifically his analyses of tables in the Mare report.

and column, which documented evidence that UCLA is using race in admissions, a violation of Proposition 209.

The 57 faculty also criticized a report by law professor Richard Sander, who described statistical analyses showing that UCLA is using race in admissions.

The 57 professors cite a report by UCLA sociologist Robert Mare. They write that "(Mare's) report found no signs of race-based reader bias in the awarding of applicant holistic scores."

The professors either did not read the Mare report carefully, or they are intentionally trying to misrepresent its findings.

Mare analyzed two major parts of the admissions process: the scores that each applicant receives from two initial reviewers in the first round of the process, and the scores that some applicants receive in "second chance"    (Mare's term) reviews by senior admissions staff. The latter reviews include "Final Review,"    "Supplemental Review,"    and "School Review."

Sander and Mare found little, if any, evidence of racial bias in the initial reviews. However, both researchers found evidence of bias in the second-chance reviews. Sander was not given data about particular aspects of the second-chance reviews; he could therefore only conclude that the total effect of all aspects of the second-chance reviews contained racial bias. Meanwhile, Mare analyzed each aspect of the second-chance reviews separately.

With the latter analysis at least three of his statistical estimates imply racial bias.

The first of these estimates is the .391 number in column F of his Table 10. Because it is

1

The first of these estimates is the .391 number in column F of his Table 10. Because it is positive and statistically significant, this means the following: Suppose you take a black and a white student who are identical on every other variable in Professor Mare's data set. That is, they have identical grades and SAT scores, have parents with identical incomes and educational backgrounds, etc. They're also identical on the "Limits to Achievement" variable that Professor Mare created.

To construct this, Mare recorded such things as whether the applicants' life experience includes homelessness, whether their life experience includes incarceration, whether their life experience includes being a victim of discrimination, and so on.

The .391 number means that the black student has a significantly higher probability of being selected for "Supplemental Review."    Remember the two students are identical on everything but race. Thus, it indicates a violation of Prop. 209.

The second of Mare's estimates that implies racial bias is the -.706 number in column G of his Table 10. It indicates the following: suppose you take two students who have been selected for supplemental review.

Suppose one is black and one is white, but otherwise they are identical on all the variables that Professor Mare included in his analysis. The fact that the number is negative (and highly significant statistically) means that the black student is more likely to receive a lower holistic score than the white student. Lower scores are better, which means that the black student is more likely to be admitted. Once again, that's a violation of Prop. 209.

A third estimate by Mare that implies a racial bias is the -.865 number in column D of his Table 10. This number indicates that black students receive significant racial preferences in the "Final Review"    stage of the admissions process. (The latter occurs when the scores of two initial readers differ by more than 1.0. When this happens, a senior staff member conducts a third holistic review of the applicant. The applicant's final holistic score is determined by that senior staff member.)

Mare's Table 10 contains eight columns. Five do not show any statistically significant evidence that UCLA is giving racial preferences toward African Americans; however, three do. It is thus false to conclude that Mare found "no signs of race-based reader bias."

Further, when he calculates the net effect of the entire admissions process (that is, all eight aspects, represented by the eight columns of Table 10), Mare finds that the net effect is substantial. Specifically, on page 74, he writes: "Absent the adjusted disparities estimated in this analysis 121 fewer Black applicants would have been admitted, which amounts to approximately 33 percent of the actual number admitted."

The 57 professors also claim the following about Mare's report: "An extensive, independent analysis of UCLA's holistic review process concluded that it works as intended by our faculty."

1

Here, however, is what Mare actually wrote: "The holistic ranking process for freshman admissions at UCLA appears to work much as intended."   Note that the 57 professors omitted the word "much."

Again, they either did not read the report carefully, or they are intentionally trying to misrepresent its findings.

*Groseclose is a professor of political science.*

1

2

1

# EXHIBIT 42

2      **EXCERPTS FROM PROFESSOR TIM GROSECLOSE'S BOOK *CHEATING***



3





TIM GROSECLOSE

...who fell into the above category, the...
...rates of African Americans and...
...whether they were rich or poor.

Admission Rate

1

# EXHIBIT 43

UC's DENIAL OF ACCESS TO ITS ADMISSIONS DATA FOR RESEARCH PURPOSES

https://www.nbcnews.com/news/asian-america/law-professor-sues-university-cal
ifornia-admissions-data-about-race-n941416



1   https://www.nytimes.com/2018/11/15/us/university-of-california-admissions.html

*The New York Times* 

# *With Echoes of Harvard Case, University of California Faces Admissions Scrutiny*

🎁 Share full article   ↪   🔖



Students at the University of California, Berkeley. An academic is accusing the University of California system. Ben Margot/Associated Press

**By Anemona Hartocollis**
Nov. 15, 2018

An academic who studies affirmative action filed a lawsuit on Thursday against the University of California system, seeking access to a trove of records that he says could reveal whether the system defied state law by surreptitiously reintroducing race as a factor in admissions.

2

# EXHIBIT 44

UC ACADEMIC SENATE'S VOTE TO RETAIN STANDARDIZED TESTS

https://regents.universityofcalifornia.edu/regmeet/may20/b4attach2.pdf

> Assembly also strongly endorsed the STTF recommendations that UC not make standardized tests optional for applicants at this time, and that UC not adopt the Smarter Balanced Assessment (SBAC) to replace standardized tests.

The Assembly motion communicates the Senate's support for the STTF's overall recommendations, including the recommendation that the tests remain mandatory for the time being. The motion also recognizes that the conclusions regarding undergraduate admissions in the STTF report need regular evaluation, and that a re-examination of the role of the SAT/ACT tests should occur in five years, using the same analyses in the 2020 Report, to see if the results in the report are upheld with a different population of students seeking admission. The Senate is committed to taking the lead in this effort, as it has for decades as part of shared governance and our delegated authority over admissions. The thoughtful, analytical, and scholarly STTF report reflects this commitment, and represents the very best of the Academic Senate, including its commitment to the high quality educational mission of the University.

The Academic Senate delivers these recommendations to you in accordance with Bylaw 40.1, delegating to the Academic Senate authority over admissions. As the Chair of the Assembly, and in light of the Regents' expectation, I ask that you as President of the University and President of the Assembly of the Academic Senate, convey these recommendations to the Regents for consideration at their May 2020 meeting.

Please do not hesitate to contact me if you have additional questions.

Sincerely,

Kum-Kum Bhavnani, Chair
Academic Council

cc:     Assembly Members
        STTF
        BOARS
        Provost Brown
        Director Yoon-Wu
        Senate Directors

3

1          # EXHIBIT 45

2          UC BOARD OF REGENTS' OVERRULING OF ACADEMIC SENATE'S VOTE

3    https://www.universityofcalifornia.edu/press-room/university-california-board-reg

4    ents-unanimously-approved-changes-standardized-testing



Home  >  Press Room  >  University of California Board of Regents unanimously approved changes to stand undergraduates

# University of California Board of Regents unanimously approved changes to standardized testing requirement for undergraduates

UC Office of the President     May 21, 2020

*Nov. 24, 2020 **update to May 21, 2020 release**: Subsequent events have changed how the University of California will evaluate applications for Fall 2021 admissions. UC will not consider SAT or ACT test scores when making admissions decisions or awarding Regents and Chancellor's scholarships. For students who choose to submit standardized test scores as part of their applications, the University may use them to determine eligibility for the California statewide admissions guarantee, as an alternative method of fulfilling minimum requirements for eligibility, or for course placement after they enroll.*

The University of California Board of Regents today (May 21) unanimously approved the suspension of the standardized test requirement (ACT/SAT) for all California freshman applicants until fall 2024. The suspension will allow the University to create a new test that better aligns with the content the University expects students to have mastered for college readiness. However, if a new test does not meet specified criteria in time for fall 2025 admission, UC will eliminate the standardized testing requirement for California students.



"Today's decision by the Board marks a significant change for the University's undergraduate admissions," said UC President Janet Napolitano. "We are removing the ACT/SAT requirement for California students and developing a new test that more closely aligns with what we expect incoming students to know to demonstrate their preparedness for UC."

5

1

2

# EXHIBIT 46

3

UC SAN DIEGO'S POINT-BASED SYSTEM FOR SELECTIVE MAJORS

4 https://undergrad.ucsd.edu/academics/selective-major-process/for-continuing-st

5 udents.html#Point-System-for-Admission



UNDERGRADUATE EDUCATION

UC San Diego

| About Us ▾ | Academics ▾ | Advising ▾ | Colleges ▾ | Program Review & Assessment ▾ | Faculty Support ▾ | 🔍 ▾ |

Undergraduate Education    Academics    Selective Major Process    Continuing Students

**Selective Major Process**

**Continuing Students**

# Selective Major Guidance for Continuing Students

Beginning in Summer 2025, students can apply once per year between the Summer and Fall quarters. Admission will be based on a point system that considers academic performance and other factors: California residency, first-generation status and pell eligibility. Only students who have completed the required screening courses and are in good academic standing are eligible to apply.

**+ Expand All**

| Selective Major Programs | ⊕ |

| Application | ⊕ |

| Criteria for Admission | ⊕ |

| Point System for Admission | ⊖ |

**Point System for Admission:**

Admission to the selective major will be based on a point system. Points are awarded based on the following:

- **3.0 GPA or Higher** in major screening courses: 1 **point**
- **California Residency: 1 point**
- **Pell Grant Eligibility: 1 point**
- **First-Generation College Status: 1 point** (Based on initial UC San Diego application information)

**Tiebreaker:** In case of ties, students will be selected using a **random selection** process.

6

1

# EXHIBIT 47

2 **UC BERKELEY LAW SCHOOL DEAN, MR. Erwin Chemerinsky's PUBLIC TEACHING TO USE**

3 **RACE WHILE CONCEALING IT**

4 https://x.com/realchrisrufo/status/1674548940522549248



5

6

7 ————————————————————————————————

8 https://www.newyorker.com/news/our-columnists/the-sad-death-of-affirmative-acti

9 on

"What colleges ███████████ill need to do after affirmative action is eliminated is find ways to achieve diversity that can't be documented as violating the Constitution," Erwin Chemerinsky, the dean of the University of California, Berkeley, School of Law, told me. "So they can't have any explicit use of race. They have to make sure that their admissions statistics don't reveal any use of race. But they can use proxies for race."

1

1

# EXHIBIT 48

2    UC RIVERSIDE CHANCELLOR'S LETTER OF CENSURE TO PROFESSOR PERRY LINK

3    https://drive.google.com/file/d/1rlivgzTvMD1BeGMAZsFJou-5MXlhN97f/view?us

4    p=drive_link

 RIVERSIDE

**Office of the Chancellor**
4108 Hinderaker Hall
900 University Avenue
Riverside, CA 92521

**August 16, 2024**

**Professor Perry Link,**

I write to impose discipline in the form of this Letter of Censure. This is my determination after carefully reviewing and considering the Hearing Committee Report ("Hearing Report") of the Committee on Privilege and Tenure ("the Committee") dated June 21, 2024, the hearing transcripts and exhibits/evidence, including the post hearing briefs from you and the administration, and the post-Hearing Report Letter from you and the Administration's response.

As outlined in my decision letter, to which this letter is attached, I conclude that clear and convincing evidence was presented in the hearing on this matter before the Committee on Privilege and Tenure establishing that you engaged in conduct that violated APM 015, Part II, Sections D.1 and C.5.

I issue this Letter of Censure pursuant to my authority under APM 016, Section II:

> 1. Written Censure A formal written expression of institutional rebuke that contains a brief description of the censured conduct, conveyed by the Chancellor. Written censure is to be distinguished from an informal written or spoken warning, and must be delivered confidentially to the recipient and maintained in a designated personnel file or files indefinitely or for a lesser period of time specified in the writing. Informal written or spoken warning is not an official disciplinary action.

Consistent with APM 016, this Letter of Censure will remain indefinitely in a confidential personnel file maintained by the Office of the Vice Provost for Administrative Resolution and will not be subject to disclosure unless permitted by applicable privacy laws and University policy.

Sincerely,

Kim A. Wilcox
Chancellor

5

1

# EXHIBIT 49

2

## UC Riverside's persecution of Professor Perry Link

3 https://www.wsj.com/opinion/uc-riversides-dei-guardians-came-after-me-39d8e2

4 6e

 **The Wall Street Journal** ✓
December 12, 2024 at 10:07 PM · 🌐

···

From Wall Street Journal Opinion: UC Riverside's DEI guardians came after me. The university censured me after I spoke out against race taking over the faculty hiring process, writes Perry Link.



WSJ.COM
**Opinion | UC Riverside's DEI Guardians Came After Me**
The university censured me after I spoke out against race taking over the faculty hiring process.

5

6 —————————————————————————————————

7

8

1  https://en.wikipedia.org/wiki/Perry_Link

 

This article needs additional citations for verification. Please help improve this article by adding citations to reliable sources. Unsourced material may be challenged and removed.
*Find sources:* "Perry Link" – news · newspapers · books · scholar · JSTOR
*(December 2024) (Learn how and when to remove this message)*

**Perry Link**



**Eugene Perry Link, Jr.** (Chinese: 林培瑞; pinyin: *Lín Péiruì*; born 6 August, 1944 Gaffney, South Carolina) is Chancellorial Chair Professor for Innovative Teaching Comparative Literature and Foreign Languages in College of Humanities, Arts, and Social Sciences at the University of California, Riverside and Emeritus Professor of East Asian Studies at Princeton University. Link taught Chinese language and literature at Princeton University (1973-77 and 1989-2008) and UCLA (1977-1988). He specializes in modern Chinese literature and Chinese language. [1]

Link is a Harvard University alumnus who received his B.A. in philosophy in 1966 and his Ph.D. in 1976. Link has been a Board Member of the Committee for Freedom in Hong Kong (CFHK) since 2021. CFHK is a US-based non-profit organisation, which presses for the preservation of freedom, democracy, and international law in Hong Kong.[2]

| | |
|---|---|
| **Born** | 1944 (age 80–81) |
| **Nationality** | American |
| **Alma mater** | Harvard University |
| **Scientific career** | |
| **Thesis** | *The rise of modern popular fiction in Shanghai* (1976) |
| **Chinese** | 林培瑞 |
| **Transcriptions** | [show] |

## Tiananmen Square  [edit]

Link helped Chinese dissident Fang Lizhi and Fang's wife obtain refuge at the U.S. Embassy following the crackdown on the 1989 Tiananmen Square protests.[3] Fang remained at the embassy for a year until negotiations resulted in Fang's being allowed to leave and settle in the U.S.[3]

Link has translated many Chinese stories, writings and poems into English. Along with Andrew J. Nathan, he translated the *Tiananmen Papers*, which detailed the governmental response to the 1989 democracy protests. In 1996, China blacklisted Link, and he has been denied entrance ever since. In 2001, Link was detained and questioned upon arriving in Hong Kong because of his involvement in the *Tiananmen Papers*. After roughly one hour, he was allowed to enter Hong Kong, where he spoke at the Hong Kong Foreign Correspondents Club. He has been banned from the People's Republic of China since, however.[4]

## Controversy at U.C. Riverside  [edit]

From 2022 to 2024, Link faced disciplinary action at U.C. Riverside after expressing concerns in a faculty search committee about prioritizing a Black candidate's race over qualifications.

Link was removed from the search committee and subjected to a disciplinary process, including hearings resembling a trial, where termination was suggested as a penalty.

Link said his comments were intended to caution against elevating race as the "overriding criterion," and that the comments were reported to the university without his knowledge.

Although a faculty committee unanimously found that Link did not violate any conduct codes, UC Riverside chancellor Kim Wilcox issued Link a formal letter of censure.[5][6][7]

Link was recommended by the university to keep the process confidential and warned that the disclosure of any details of his disciplinary process "may result in discipline."

In December 2024, Link went public about his experience in an op-ed published in the Wall Street Journal.[8]

2

3

1        **EXHIBIT 50**

2    UC'S INITIAL SCREENING OF FACULTY CANDIDATES BASED ON DIVERSITY STATEMENTS ONLY

3    https://www.nytimes.com/2023/09/08/us/ucla-dei-statement.html

## How It Started

A decade ago, California university officials faced a conundrum.

A majority of its students were nonwhite, and officials wanted to recruit more Black and Latino professors. But California's voters had banned affirmative action in 1996. So in 2016, at least five campuses — Berkeley, Davis, Irvine, Riverside and Santa Cruz — decided their hiring committees could perform an initial screening of candidates based only on diversity statements.

Candidates who did not "look outstanding" on diversity, the vice provost at U.C. Davis instructed search committees, could not advance, no matter the quality of their academic research. Credentials and experience would be examined in a later round.

The championing of diversity at the University of California resulted in many campuses rejecting disproportionate numbers of white and Asian and Asian American applicants. In this way, the battle over diversity statements and faculty hiring carries echoes of the battle over affirmative action in admissions, which opponents said discriminated against Asians.

At Berkeley, a faculty committee rejected 75 percent of applicants in life sciences and environmental sciences and management purely on diversity statements, according to a new academic paper by Steven Brint, a professor of public policy at U.C. Riverside, and Komi Frey, a researcher for the Foundation for Individual Rights and Expression, which has opposed diversity statements.

4

According to a report by Berkeley, Latino candidates constituted 13 percent of applicants and 59 percent of finalists. Asian and Asian American applicants constituted 26 percent of applicants and 19 percent of finalists. Fifty-four percent of applicants were white and 14 percent made it to the final stage. Black candidates made up 3 percent of applicants and 9 percent of finalists.

1

1  # EXHIBIT 51

2  **UC BERKELEY'S USE OF DIVERSITY STATEMENTS IN HIRING PROCESS FOR A LIFE SCIENCES**

3  **POSITION**

4  https://math.berkeley.edu/~lott/lifesciences.pdf

**Initiative to Advance Faculty Diversity, Equity and Inclusion in the Life Science at UC Berkeley**

**Year End Summary Report: 2018-2019**

Co-Chairs for the Initiative to Advance Faculty Diversity, Equity and Inclusion in the Life Sciences:

Dr. Rebecca Heald
Regional Associate Dean, Service Center 2
Professor, Molecular and Cell Biology

Dr. Mary Wildermuth
Associate Professor, Plant and Microbial Biology

5

6

7

8

9

10

11

I. Building a Critical Mass, Faculty Searches

The Cluster Search

The Berkeley campus committed five FTE for a broad search in the Life Sciences. This open area recruitment solicited applications from outstanding early career research scientists who also demonstrated strong potential to enhance equity, inclusion and diversity. The job ad was widely distributed to highly regarded journals and societies, and through personal outreach to PPFP and Chancellor's Fellows (and other prestigious fellowship programs) and to institutions with strong academic standing. A total of 993 applications were received, of which 893 met basic qualifications. The LSI Committee conducted a first review and evaluated candidates based solely on contributions to diversity, equity and inclusion. Only candidates that met a high standard in this area were advanced for further review, narrowing the pool down to 214 for serious consideration. The remaining applications were then opened to review by the departmental ad-hoc search committees for short-list consideration. Twenty-two candidates were selected for the short list and interviewed across six departments. Five finalists were ultimately proposed for hire; two in Molecular and Cell Biology (MCB), one in Integrative Biology (IB), one in Plant and Microbial Biology (PMB), and one in Environmental Science, Policy and Management (ESPM) with several outstanding alternative candidates identified. Ultimately, the "cluster search" was one of the most successful interventions of the initiative. It will result in an increase in faculty committed to advancing faculty diversity, equity and inclusion on the campus.[1]

1

Both the 'cluster search' and the ESPM search yielded significant increases in URM candidates advanced to shortlist consideration:

Table A: Life Science Faculty (Cluster) Search Demographics:

| GENDER | Applicant Pool | Longlist | |
|---|---|---|---|
| Count | 894 | 214 | 22 |
| Female | 41.70% | 60.30% | 63.60% |
| Male | 56.50% | 39.30% | 36.40% |
| Unknown | 1.80% | 0.50% | 0.00% |
| RACE/ETHNICITY | Applicant Pool | Longlist | |
| Count | 894 | 214 | 22 |
| African American | 2.80% | 6.10% | 9.10% |
| Hispanic | 13.20% | 22.90% | 59.10% |
| Native American | 0.40% | 1.40% | 0.00% |
| Asian | 25.70% | 18.70% | 18.20% |
| White | 53.70% | 48.10% | 13.60% |
| Unknown | 4.10% | 2.80% | 0.00% |

2

# EXHIBIT 52

### Professor Yoel Inbar's rejection by UCLA

https://www.nytimes.com/2023/09/08/us/ucla-dei-statement.html?unlocked_articl

e_code=1.pk4.U7bn.nB23TQyJ0HHz&smid=url-share

---

**The New York Times**      U.S.   D.E.I. Statements Stir Debate on College Campuses       Share full article       1.2K

## The New D.E.I. Standards

These new expectations upended Dr. Inbar.

He favored affirmative action. But five years ago, he questioned diversity statements in a podcast — "Two Psychologists, Four Beers," that he hosted with another academic. He described the statements as "value signaling" that required applicants to demonstrate allegiance to a particular set of liberal beliefs.

"It's not clear that they lead to better results for underrepresented groups," he said.

On another episode in 2022, he noted that a professional society of psychologists officially opposed a Georgia law banning abortion. He favors abortion rights but argued that professional associations represent members of many ideological shades and should avoid taking political stances.

All of this angered the graduate students. "His hiring would threaten ongoing efforts to protect and uplift individuals of marginalized backgrounds," the students wrote. They argued he was not committed to a "safe, welcoming and inclusive environment." The students sent the letter to the entire psychology faculty and posted it online.

# EXHIBIT 53

**UCLA** MEDICAL SCHOOL'S ASIAN ENROLLMENT DECLINED **35%** FROM **2019** TO **2022**

https://www.latimes.com/business/story/2024-05-30/is-ucla-a-failed-medical-school-debunking-a-dumb-right-wing-meme

https://www.yahoo.com/news/column-ucla-failed-medical-school-130036473.html

(As for a case Sibarium mentions in which Lucero supposedly pushed to admit a Black student whose grades and test scores were below the UCLA average, he doesn't say whether the student was admitted.)

It's true that the entering medical school class at UCLA has become more diverse over time. Figures issued by UCLA and published by the Beacon show that from 2019 through 2022, the number of whites in the 173-member class declined to 46 from 49, the number of Black students rose to 25 from 22, Hispanic students rose from 25 to 37, a catchall "other" category grew to 20 from eight, and American Indians, Hawaiians and other Pacific Islanders went from zero to three. The number of Asian students declined to 55 from 84.

Does this validate the article's assertion, voiced by an anonymous source (of course), that "a third to a half of the medical school is incredibly unqualified"?

The math doesn't pencil out. As blogger and statistics maven Kevin Drum notes, given that the number of nonwhite and non-Asian students increased by only 30 in three years, even if "every single one of these students was woefully unqualified, that's about 17% of the class. How do you get from there to 'a third to a half'?"

By the way, the median grade-point averages and scores on the Medical College Admission Test of accepted applicants haven't declined at all since 2020 — the MCAT average in 2023 was the same as in 2020, and the GPA rose by a hair.

In emails to the medical school class, Dubinett and his fellow deans have reinforced their commitment to merit-based admissions and diversity training. "Students and faculty members are held to the highest standards of academic excellence," they wrote. "Highly qualified medical students and trainees are admitted ... based on merit in a process consistent with state and federal law." That said, "we are enriched by the diverse experiences each of you brings to our community."

UCLA, then, is standing firm against the right wing's drive to pretend that racial and ethnic discrimination doesn't exist in our society and to undermine efforts to wipe it out. Would that more institutions took that stand, instead of capitulating to a dishonest, braying mob.

This story originally appeared in Los Angeles Times.

1

1

# EXHIBIT 54

2      **UCLA** MEDICAL SCHOOL'S RACE-BASED FELLOWSHIP PROGRAM

3   The Dean of UCLA Medical School says it does not discriminate based on race.

4   His own research center runs a Fellowship program (named 'iDIVERSE') that

5   barred white and Asian researchers from applying.

6   https://freebeacon.com/campus/the-dean-of-ucla-medical-school-says-it-does-n

7   ot-discriminate-based-on-race-his-own-research-center-runs-a-minorities-only-fe

8   llowship/



9

1

# EXHIBIT 55

2             **UC Admission Reader's Opinion Piece in New York Times**

3 https://www.nytimes.com/2013/08/04/education/edlife/lifting-the-veil-on-the-holisti

4 c-process-at-the-university-of-california-berkeley.html?unlocked_article_code=1.6

5 Ew.hDKN.WtxDzNosRmxO&smid=em-share

6

≡ **The New York Times**     **EDUCATION LIFE**   Confessions of an Application Reader

       After the next training session, when I asked about an <u>Asian</u>
student who I thought was a 2 but had only received a 3, the officer
noted: "<u>Oh, you'll get a lot of them.</u>" She said the same when I
asked why a low-income student with top grades and scores, and
who had served in the Israeli army, was a 3.

7

≡ **The New York Times**     **EDUCATION LIFE**   Confessions of an Application Reader

       Officially, like all readers, I was to exclude minority background
from my consideration. I was simply to notice whether the student
came from a non-English-speaking household. I was not told what
to do with this information — except that it may be a stressor if the
personal statement revealed the student was having trouble
adjusting to coursework in English. In such a case, I could refer the
applicant for a special read.

       Why did I hear so many times from the assistant director? I think I
got lost in the <u>unspoken directives.</u> Some things can't be spelled
out, but they have to be known. Application readers must simply
pick it up by osmosis, so that the process of detecting objective
factors of disadvantage becomes tricky.

       It's an <u>extreme version of the American non-conversation about
race.</u>

8

When the invitation came to sign up for the next application cycle, I wavered. My job as an application reader — evaluating the potential success of so many hopeful students — had been one of the most serious endeavors of my academic career. But the opaque and secretive nature of the process had made me queasy. Wouldn't better disclosure of how decisions are made help families better position their children? Does Proposition 209 serve merely to push race underground? Can the playing field of admissions ever be level?

For me, the process presented simply too many moral dilemmas. In the end, I chose not to participate again.

*Ruth A. Starkman teaches writing and ethics at Stanford and, from 1992 to 1996, taught writing at the University of California, Berkeley.*

1

1

# EXHIBIT 56

2 ***HOLISTIC REVIEW IN FRESHMAN ADMISSIONS* BY UCLA PROFESSOR ROBERT**

3                                           **MARE**

4 https://asianamericanforeducation.org/wp-content/uploads/2023/10/Holistic-Revi

5 ew-in-Freshman-Admissions-at-UCLA-2009-2011-Update.pdf

ranking.  Although these factors have the largest effects on favorable ranking and admission, other factors, such as whether an applicant has an impressive profile of extracurricular activities, shows involvement in the high school or local community, or works outside of school either in a way that is academically enriching or that contributes to family finances, all contribute to favorable holistic ranking.  An applicant who has many of these assets will win out against an applicant who lacks them.  In each year, net disparities among ethnic identity groups in holistic ranking in Regular Review are very small.

2.  In Supplemental Review, UARS staff place considerable weight on socioeconomic hardship, challenges, and limits to academic achievement.  Among applicants who are otherwise similar in measured academic qualifications and challenges, African American and Latino applicants are disproportionately represented in Supplemental Review.  In both Final and Supplemental Review, African American applicants receive somewhat more favorable and "North Asian" (Chinese, Japanese, Korean, Indian/Pakistani American) applicants receive somewhat less favorable holistic read scores than applicants in other ethnic identity groups who are otherwise similar in measured academic qualifications, personal characteristics, and measured challenges and hardships.

3.  Relative to their representation in the applicant pool, White and North Asian applicants are more heavily represented among admitted students than African American, Latino, and Southeast Asian applicants.  These disparities arise principally in Regular Review and are dampened, to some degree, in Final and Supplemental reviews.  If we adjust for ethnic identity group differences in the characteristics of applicants, a different pattern of ethnic disparity emerges.

4

1

Among otherwise equivalent applicants, Whites, African Americans, and Latinos are overrepresented among those admitted and Asian American applicants are underrepresented. For Black and Latino Applicants, these disparities arise principally in Final and Supplemental Review. **The disadvantages of Asian applicants occur, with varying magnitudes, throughout the admissions process.** Relative to the entire cohort of admitted students, these disparities are quite small – none as large as 2.5 percent of applicants. Relative to group-specific totals of admitted applicants, the disparities appear larger, but this depends on the size of the admitted group.

4.  Although net disparities among ethnic identity groups persist, especially in the Final and Supplemental Review stages of the admissions process, the net advantages to African American and Latino applicants have declined somewhat over the 2007-11 period. The disadvantages experienced by some Asian applicant groups, however, have not declined over this period.

5.  An important change between 2007 and 2011 is the growth in numbers of international applicants who are admitted to UCLA. Among those who applied for freshman admission in Fall 2011, international students are admitted in higher numbers than would be expected on the basis of their measured qualifications. The net advantage of these applicants and disadvantage of some Asian American applicants are much larger than disparities for the other major ethnic identity groups (African American, Latino, and White).

5

1 ———————————————————————————————————

2

3  https://www.nytimes.com/2018/11/15/us/university-of-california-admissions.html

**The New York Times**     **U.S.**    With Echoes of Harvard Case, University of California Faces Admissions Scrut      Share full article

> The report, by Robert D. Mare, a sociology professor at U.C.L.A.,
> said that "among otherwise equivalent applicants, whites, African
> Americans and Latinos are overrepresented among those
> admitted, and Asian-American applicants are underrepresented."

1

# EXHIBIT 57

2    CALIFORNIA STATE AUDITOR'S REPORT ON UC'S ADMISSIONS IN 2020 - PUBLIC LETTER

3    https://information.auditor.ca.gov/reports/2019-113/index.html

September 22, 2020
*2019-113*

The Governor of California
President pro Tempore of the Senate
Speaker of the Assembly
State Capitol
Sacramento, California 95814

Dear Governor and Legislative Leaders:

As directed by the Joint Legislative Audit Committee, my office conducted an audit of the University of California's (university) admissions process. Our review assessed the risk for fraud and inappropriate admissions activities at four campuses and we conclude that the university has allowed for improper influence in admissions decisions, and it has not treated applicants fairly or consistently.

From academic years 2013–14 through 2018–19, we found the four campuses we reviewed—UC Berkeley, UCLA, UC San Diego, and UC Santa Barbara—unfairly admitted 64 applicants based on their personal or family connections to donors and university staff. Campuses admitted 22 of these students through their student-athlete admissions processes, even though the students did not have the athletic qualifications to compete at the university. UC Berkeley admitted the remaining 42 students, most of whom were referred to the admissions office because of their families' histories as donors or because they were related or connected to university staff, even though their records did not demonstrate competitive qualifications for admission. By admitting 64 noncompetitive applicants, the university undermined the fairness and integrity of its admissions process and deprived more qualified students of the opportunity for admission.

The university has also failed to ensure that campuses fairly and consistently treat the thousands of prospective students who apply each year. Neither UC Berkeley nor UCLA have developed methodologies for how they determine which applicants to admit. Nevertheless, both of those campuses admitted thousands of applicants whose records demonstrated that they were less qualified than other applicants who were denied admission. Applicants' chances of admission were also unfairly affected by UC Berkeley's, UCLA's, and UC San Diego's failures to properly train and monitor the staff who review and rate applications. We found that staff were sometimes overly strict or overly lenient in their review of applications, thereby making the applicants' chances of admission unduly dependent on the individual staff who rated them rather than on the students' qualifications.

The Office of the President has allowed the weaknesses in these practices to persist because it has not conducted adequate oversight of campuses' admissions processes. Although it conducted an internal review of admissions processes after the recent nationwide college admissions scandal, the Office of the President relied heavily on campuses to review themselves and did not attempt to identify inappropriate admissions activity. Stronger standards and oversight are necessary to improve the university's ability to guarantee a fair and merit-based admissions process and to detect and prevent inappropriate admissions decisions.

Respectfully submitted,

ELAINE M. HOWLE, CPA
California State Auditor

4

1    # EXHIBIT 58

2    ## CALMATTERS' REPORT ON UC AUDIT

3    https://calmatters.org/education/2020/09/state-auditor-uc-admissions-process/

The audit report found that four UC campuses "unfairly admitted 64 applicants based on their personal or family connections to donors and university staff" between 2013–14 through 2018–19. Most of the applicants were white and at least half came from families with incomes of $150,000 or more.

Of those, campus employees at UC Berkeley, UCLA, UC San Diego and UC Santa Barbara "falsely designated" 22 applicants as student-athletes "because of donations from or as favors to well-connected families." That number could be a significant undercount and actually exceed 400 students, according to the audit. In addition, UC Berkeley admitted 42 unqualified students beyond athletics, even though some of them had "the lowest possible scores on their applications." Multiple managers were involved in these inappropriate admissions decisions. These actions meant that more privileged students "took the places" of more qualified applicants.

The audit began in January, having been requested in May 2019 by Assemblymember Tasha Boerner Horvath, an Encitas Democrat. Six staff members from the state auditor's office worked on the report.

4

New UC President Michael V. Drake responded to the state audit's findings last month, writing that the system's internal audits recommendations are similar to what the state auditor found. **The state auditor disagreed**.

The UC audit "did not address significant aspects of the admissions process," the state audit team wrote in a public response. The audit team also said its recommendations are stronger and "address serious deficiencies that it did not identify."

One shortcoming the audit identified in the UC's self-scrutiny was that it did not detect how staff outside of admissions, including fundraising staff "inappropriately influenced admissions decisions at UC Berkeley." Beyond overt cases of admitting unqualified students, the state audit warned that the entire UC admissions process needs an overhaul because of inconsistent standards or practices that could result in applicants being judged for the wrong reasons.

1

2

3

Another problem, according to the audit, is that some campuses place personal data on applications that can lead to bias. At three campuses — UC Berkeley, UCLA and UC San Diego — application readers can see the students' names and native languages. Berkeley and UCSD let readers see an applicant's gender; Berkeley and UCLA allow readers to see where applicants were born. Readers could then wrongly make inferences about a student's race or ethnicity, the audit warned. The audit finds the practice strange because UC guidelines for how students are admitted do not include these details in the 14 factors for admission.

4

1

# EXHIBIT 59

2

**NPR's REPORT ON UC AUDIT**

3 https://www.npr.org/2020/09/23/916305081/audit-university-of-california-admitte

4 d-64-students-over-more-qualified-applican

Following the massive college admissions scandal that involved UCLA among many other institutions dubbed Operation Varsity Blues, the University of California underwent its own internal audit, implementing several recommendations following its own system-wide look at admission practices. This audit was released earlier this year and only identified two cases of possible improper admissions.

However, the state auditor said because campuses were allowed to evaluate themselves, that study was incomplete and there was more to be done.

"The office of the president has allowed the weaknesses in these practices to persist because it has not conducted adequate oversight of campuses' admissions processes," she wrote.

*Reese Oxner is an intern on NPR's News Desk.*

5

# EXHIBIT 60

1

2    CALIFORNIA STATE AUDITOR'S REPORT ON UC'S ADMISSIONS IN 2020 - SECTIONS

3    https://information.auditor.ca.gov/reports/2019-113/sections.html

We identified that UC Berkeley admitted 17 of the 42 applicants because of their connections to donors or potential donors. These admissions occurred after UC Berkeley's development office—which is responsible for the campus's fundraising and donations—referred the applicants to the admissions office. In most cases, the executive director of operations at the UC Berkeley Foundation within the development office made these referrals. In one case, the development office referred a potential applicant to admissions staff so that they could meet with the applicant in person. An assistant director in the admissions office then informed the former admissions director that she would meet with the "VIP student...whose family is [a] potential donor." After the applicant applied to UC Berkeley, the former admissions director was the first person to read and rate the application, assigning it a rating of *Strongly Recommend*. The former admissions director then admitted the applicant, despite the fact that the second application reader gave the applicant the lowest possible rating of *Do Not Recommend*.

Each of these 17 applicants received uncompetitive ratings from application readers such that they were unlikely to be admitted to UC Berkeley without the referral they received from the development office. In fact, five of these applicants received the lowest possible rating from both of UC Berkeley's application readers. Under normal circumstances, these application scores would have resulted in denial of admission.

UC Berkeley admitted another 11 of the 42 applicants because of their connections to campus staff, university staff, or the acquaintances of campus staff, such as the enrollment director for a private college who was a colleague of UC Berkeley's former admissions director. In one example, admissions staff requested that an applicant receive additional consideration because the applicant was the child of a director-level UC Berkeley staff member. Although the applicant had already received a *Do Not Recommend* score from both application readers, UC Berkeley admitted the applicant without any justification for doing so. In a similar example, the former associate dean of students contacted the former director of admissions through email and asked the director to conduct an additional review of an applicant. The former director of admissions responded, "Shhhh. You have to keep it a secret, but good news is coming [the applicant's] way." UC Berkeley admitted this applicant even though the applicant had received the lowest possible application rating from both readers, again without any justification. Without connections to campus staff members, these applicants almost certainly would not have been admitted.

UC Berkeley also admitted another 14 of the 42 applicants from its waitlist because of their connections to donors, staff, and influential individuals. Like other campuses, after selecting applicants for admission, UC Berkeley offers certain other applicants a place on its waitlist, from which it admits additional students as space allows. To be admitted from the waitlist, applicants must accept a waitlist offer by "opting in" to the waitlist. Only a small percentage of applicants receive a waitlist offer, and admission from the waitlist is competitive. For academic year 2018–19, UC Berkeley offered a place on the waitlist to only 10 percent of applicants who were not offered admission, and it admitted 34 percent of the applicants who opted-in to the waitlist. According to the campus's public *Frequently Asked Questions* document about the waitlist process, UC Berkeley focuses primarily on the content of the original application when making decisions about whom it will admit from the waitlist. However, it is unlikely that UC Berkeley admitted these 14 applicants because of their original applications. In all 14 cases, the applicants received uncompetitive scores from readers that gave them poor chances of being admitted. Rather, these applicants' connections to donors, staff, or influential individuals drove the decision to admit them.

One case from these 14 admissions decisions is particularly problematic. UC Berkeley appears to have admitted this student because of an inappropriate letter of support from a university Regent. University policy states that members of the Board of Regents should not seek to influence inappropriately the outcome of admissions decisions beyond sending letters of recommendation, when appropriate, through the regular admissions process. However, the Regent did not submit this letter through the regular admissions process. Rather, after the campus placed this applicant on its waitlist, the Regent wrote a letter to UC Berkeley's chancellor advocating for the applicant, and the chancellor's staff sent the letter to UC Berkeley's development office, which in turn forwarded the letter to the admissions office.

4

1

2

3

# EXHIBIT 61

4   CALIFORNIA STATE AUDITOR'S REPORT ON UC'S ADMISSIONS IN 2020 - RESPONSE

5   https://information.auditor.ca.gov/reports/2019-113/response.html

Dear Ms. Howle:

Thank you for the opportunity to review and respond to the draft audit report on the University of California's admissions practices.

The University is committed to safeguarding the integrity of its admissions practices. We hold ourselves to the highest standards (1) (2) and will take prompt action to address issues raised in the State Auditor's draft report. Many of the draft report's recommendations are similar to those that our internal audits identified and presented to the Board of Regents over the past year, and that UC campuses and the Office of the President have largely implemented. The draft report identified important issues that will help us in addressing any ongoing problems.

I have zero tolerance on matters of integrity, and will do everything I can to ensure inappropriate admissions do not happen on any of (3) our campuses. To that end, I appreciate the State Auditor's assistance in providing the relevant underlying data and information supporting the audit's conclusions. The University will then be able to take additional appropriate action as necessary and maintain the highest standards in our admissions processes.

I sincerely appreciate the time and resources the State Auditor's office has committed to helping us improve and strengthen our admissions policies and processes.

Sincerely,

Michael V. Drake, MD
President

_____

## COMMENTS

## CALIFORNIA STATE AUDITOR'S COMMENTS ON THE RESPONSE FROM THE UNIVERSITY OF CALIFORNIA

To provide clarity and perspective, we are commenting on the university's response to our audit. The numbers below correspond to the numbers we have placed in the margin of the university's response.

(1) The university's internal audit, and its recommendations, did not address significant aspects of the admissions process that we reviewed during our audit. Furthermore, our recommendations are stronger than those made by the university's internal audit and address serious deficiencies that it did not identify. Left unaddressed, these issues will continue to harm qualified applicants who apply to the university.

Although both audits addressed the potential for inappropriate influence in the admissions process, as we state earlier in the report, the university's audit did not detect the ways in which staff from the development office and other university staff inappropriately influenced admissions decisions at UC Berkeley. Further, the internal audit did not review or make any recommendations related to training and monitoring of application readers. Our review in this area—the details of which we describe earlier in the report—found the inconsistency among readers negatively affects many thousands of applicants each year. Finally, the internal audit did not include an examination of whether the Office of the President has conducted sufficient and appropriate oversight of the admissions process. Our review found that the Office of the President has not adequately safeguarded the admissions process, and we recommend that it conduct regular audits of its campuses.

(2) As we describe earlier in the report, the Office of the President has allowed campuses to respond to its internal audit recommendations by each developing their own corrective actions. Further, the Office of the President has not reviewed the campuses' implementation of those corrective actions. As a result, the actions campuses have taken have been inadequate and inconsistent. For example, our report describes how UCLA decided not to implement the Office of the President's recommendation to adopt a policy prohibiting communication between development and admissions offices about prospective students. The inadequacies in the campuses' implementation of the internal audit recommendations led us to recommend, in our report, that the Office of the President directly monitor the way campuses address those recommendations—an oversight activity it had not planned to perform.

(3) We look forward to reviewing the actions the Office of the President takes to address the deficiencies in the university's admissions process that we identify in our report. During our audit we had several discussions with each of the campuses and the Office of the President wherein we described the deficiencies we found, the information we had reviewed to come to our conclusions, and our

6

# EXHIBIT 62

1

2    CALIFORNIA STATE AUDITOR GRANT PARKS'S RESPONSE TO STATE LAWMAKER INQUIRY

3    https://drive.google.com/file/d/1RdiBcho7HELmIJKlSIgPU_XgV441FOLS/view?

4    usp=sharing

**Grant Parks** *State Auditor*

**Mike Tilden** *Chief Deputy*

July 18, 2024

Assemblymember Marc Berman
California State Assembly
1021 O Street, Suite 8130
Sacramento, CA 95814

Dear Assemblymember Berman:

I am writing in response to your letter inquiring about the status of implementation of recommendations by the University of California (UC) related to audit 2019-113 entitled "The University of California: Qualified Students Face an Inconsistent and Unfair Admissions System That Has Been Improperly Influenced by Relationships and Monetary Donations" released in September 2020. Specifically, your letter is inquiring about the status of two specific recommendations that we have made that have only been partially implemented by the UC, and whether we can provide any updates on the progress of UC in fully implementing them.

As you note in your letter, Recommendation #5 relates to UC requiring each campus to document and implement specified selection methodologies, and to develop and implement processes to document their rationale for admitting applicants who are not eligible for admission. Our report that included this recommendation was released in September 2020, and we follow up on our recommendations with auditees 60 days after the report release, 6 months after the report release, and 1 year after the report release. For any recommendations not fully implemented at that time, we follow up annually thereafter. Throughout our follow up intervals since the report release, the UC system has provided regular updates on their implementation progress. However, we have found their responses to not address weaknesses we have seen in their implementation of this recommendation.

To begin, the University of California Office of the President (UCOP) has required campuses to individually implement Recommendation #5 and document their processes and procedures. The UCOP has received documentation of compliance from all campuses and reviewed that documentation, and believes that the recommendation has been fully implemented. However, our office disagrees with that assessment. In documentation of policies that we have reviewed, some campuses provide insufficient and vague descriptions of their admission selection process, describing general characteristics that they consider when evaluating applicants, but no specific articulation of a priority order for how they decide which students to admit, particularly between similarly rated students. These vague processes do not correct the ambiguity we identified in the campuses' admissions processes during the audit and fail to provide necessary transparency in admission decisions.

The University disagrees with our assessment and believes that the level of specificity provided by the campuses is appropriate and that disclosure of more specificity has the potential to unfairly advantage well-resourced families and those in the college consulting business. However, as we have stated in

621 Capitol Mall, Suite 1200   |   Sacramento, CA 95814   |   916.445 0255   |   916 323 0913 fax     www.auditor.ca.gov

Assemblymember Berman Response
July 18, 2024
Page 3

response to the UCOP, our recommendation is not that UCOP should make the relevant criteria and processes public. Instead, we note that in our audit we found that two campuses, UCLA and UC Berkeley admitted students who the campuses had determined were less qualified for admission than other applicants who were denied admission, and that neither campus was able to explain those admission decisions. This recommendation is meant to address that finding.

Therefore, we believe that documenting a methodology for selecting students for admission, including the circumstances when lower-rated students will be admitted in place of higher rated students, will lend greater accountability and fairness to the process. Until the campuses establish those specific methodologies, which need not be public, we do not believe this recommendation will be fully implemented and the campuses will still lack an important tool for ensuring accountability and fairness in admission decisions.

In addition, Recommendation #7 asks the UC to establish application reader proficiency and training programs, and ensure that for campuses that do not admit all eligible transfer applicants, that two readers must review all transfer applications, and that second readers cannot see the ratings of first readers. Similarly for this recommendation, we have received multiple updated responses from the UCOP as to their progress, which we have found to not be adequately implementing this recommendation.

First, while the Office of the President has ensured that all campuses have required that second readers cannot see the ratings of first readers and has also established appropriate policies related to application reader proficiency training, not all campuses have also established appropriate monitoring programs to ensure continued reader proficiency, which results in a lack of adequate assurance that their application reviewers are actually consistent in their application reviews.

Additionally, some campuses have not established policies that would ensure that all transfer applications receive a second review at campuses where all eligible transfer applicants are not admitted, instead opting to only conduct a second reading for a sampling of applications due to resource constraints, arguing that this sampling is an effective statistical tool that allows campuses to ensure that transfer applications are appropriately evaluated. While this is an improvement to prior processes, it does not fully implement this recommendation because some eligible transfer applicants who are denied admission will not have the benefit of a second reading of their applications, which could affect the fairness of the evaluation of their application.

For the reasons described above, as of September 2023, we have assessed the University of California's implementation of these two specific recommendations as only partially implemented. We expect that the University of California will submit further responses and any relevant documentation by October 2024 noting their further progress, at which point we will evaluate those responses and issue an updated determination as to the implementation status of these two recommendations, which will be posted on our website.

621 Capitol Mall, Suite 1200   |   Sacramento, CA 95814   |   916.445.0255   |   916.323.0913 fax   :   www.auditor.ca.gov

Assemblymember Berman Response
July 18, 2024
Page 3

I hope this information is helpful and responsive to your inquiry, and my office will keep you updated on any developments that may arise, as well as when we have published our next annual response and assessment. In the meantime, should you need anything or have any questions, please feel free to contact my office through Kris Applegate, our Chief of Legislative and Governmental Affairs, at KrisA@auditor.ca.gov or 916-445-0255.

Sincerely,

**GRANT PARKS**
**California State Auditor**

1

# EXHIBIT 63

2

**UCLA ORTHODONTICS DEPARTMENT ADMISSIONS SCANDAL**

# DAILY BRUIN f X ⊚ ■ ■ ADVERTISE DONATE SUBMIT 🔍

NEWS SPORTS ARTS OPINION THE QUAD PHOTO VIDEO ILLUSTRATIONS CARTOONS GRAPHICS THE STACK PRIME ENTE

NEWS

## Donations influence admissions

 **By Robert Faturechi**
Nov. 12, 2007 9.54 p.m

UCLA's elite orthodontics residency program has violated University of California policy and standards governing public schools by giving special consideration in admissions to major donors and their relatives.

Hundreds of pages of e-mails and internal documents obtained during a months-long Daily Bruin investigation, along with dozens of interviews, show that the program and the officials at its helm developed a system of preferential treatment over the past five years.

In this unprecedented practice within the School of Dentistry, applicants related to donors giving six-figure gifts were automatically advanced over other students despite their lower test scores and grades.

In one case, an applicant was told by a member of the admissions board that a $60,000 gift could greatly improve his chances.

Orthodontics is arguably the most competitive of dental specialties, and the program at UCLA is regarded as one of the nation's best, typically accepting applicants with extensive research experience and top scores.

But in four of the last five years, major donors' close relatives have landed one of six highly coveted residency spots in the program.

In 2006, real estate developer David Lee pledged $1 million to the school of dentistry. His niece was admitted into the orthodontics program soon after.

In 2005, Dr. Norman Nagel pledged half a million dollars. His son was admitted the next year.

In 2004, Dr. Bruce Molen pledged $400,000. His son was admitted the next year.

In 2003 and 2005, Dr. Thomas Bales helped lead major fundraising campaigns within the School of Dentistry, and in 2001, he pledged a half million dollars as well. The orthodontics clinic is named after him. In 2003, his daughter was admitted.

3

1

# EXHIBIT 64

2

**UCLA's ROLE IN ADMISSIONS SCANDAL**



—    Jorge Salcedo arrives at the federal courthouse in Boston, on March 25, 2019.
Brian Snyder / Reuters file

 SAVE

March 19, 2021, 6:44 PM PDT
**By Phil Helsel**

A former UCLA men's soccer coach was sentenced to eight months in prison Friday for taking
$200,000 in bribes to get students admitted as athletic recruits, prosecutors said.

3

1

# EXHIBIT 65

2

### DEFINITION OF HISPANIC-SERVING INSTITUTIONS

3 https://sites.ed.gov/hispanic-initiative/hispanic-serving-institutions-hsis/

President Joe Biden signed a new Executive Order (EO) establishing at the U.S. Department of Education, the White House Initiative on Advancing Educational Equity, Excellence, and Economic Opportunity through Hispanic-Serving Institutions (HSIs) and a President's Board of Advisors for HSIs.

- Read the new EO establishing the HSIs White House Initiative and a President's Board of Advisors for HSIs, here.
- Follow our Initiative on this webpage, Facebook and X/Twitter for additional links and resources.
- Share statements of support from you/your organization by emailing whitehousehispanicinitiative@ed.gov and posting on social media, using the hashtag #WHLatinos and tagging @WhiteHouseHPI, @USEdGov, @SecCardona, @WhiteHouse and @LaCasaBlanca.

President Biden's EO marks a critical moment for the Hispanic community, which has been seeking this action for over twenty years. HSIs now number over 500 higher education campuses across the U.S. — educating over 55 percent of Latino students, 30 percent of all Pell grant recipients and more than 4.7 million students as a whole. This new EO is an important systemic action aimed at improving the federal government's capacity to more intentionally address historic equity issues faced by HSIs, Latino students and educators.

## Hispanic-Serving Institutions:

A Hispanic-Serving Institution (HSI) is **defined as** an institution of higher education that—

- is an eligible institution; and
- has an enrollment of undergraduate full-time equivalent students that is at least 25 percent Hispanic students at the end of the award year immediately preceding the date of application.

4

# EXHIBIT 66

2                               **FEDERAL GRANT MONEY MOTIVATION**

3  UCLA HSI Task Force report in Spring 2022, page 9

4  https://www.chicano.ucla.edu/files/news/Cultivating%20the%20Seeds%20of%20

5  Change%20Becoming%20a%20Hispanic-Serving%20Institution-1.pdf



**Strengthening Graduate School Access and Success**
New initiatives are needed to ensure that more Latinx students find their way into graduate and professional programs, and we provide support for students from severely underrepresented groups in particular fields of study. Graduate division data currently show Latinx enrollment is very low in some graduate programs, whereas others have increased in recent years. All programs now require a focus on providing support for Latinx graduate and professional school success. Although Latinx graduate students play a critical role in mentoring, providing instruction, and contributing to the achievement of Latinx undergraduates, many units fail to make concerted efforts to recruit, fund, and support underrepresented graduate students. Faculty must take responsibility for mentorship and provide research opportunities that will advance graduate student careers. More Latinx faculty working in diverse academic fields are also needed, as their presence attracts more diverse graduate students. Once UCLA obtains HSI designation with undergraduate enrollment, it will be poised to secure funding from specific federal agencies for initiatives to increase graduate student recruitment and career success with programs and initiatives.

**Institutional Investment**
Becoming an HSI requires revitalizing current efforts and implementing innovative strategies to not only reach federal thresholds for HSI designation, but also advance "servingness." Servingness refers to practices and initiatives implemented to achieve educational excellence and equity for Latinx, first-generation, low-income students, and other racially minoritized students on campus (Garcia, Núñez, & Sansone, 2019). The Task Force offers recommendations but also calls for innovations and equity-minded practices from academic and administrative units chiefly responsible for many of the areas indicated in this report. Together, we can do this!

This report responds to the Chancellor's charge to the HSI Task Force to provide concrete steps and a campus action plan to become an HSI (see action steps below). Recommendations address the three organizing areas of the report: Achieving HSI federal designation by Improving Enrollment Efforts, Improving Equity in Degree Completion and Student Experiences, and Strengthening Access and Graduate Career Success. Further details on each recommendation are in the full report, with concrete suggestions for improvements offered by faculty, staff and students on the Task Force.

## KEY ACTION STEPS: BECOMING AN HSI AND BEYOND

New strategies in admissions and financial aid are needed to increase the admission and yield of Latinx students to reach the 25% federal enrollment threshold and 35% Pell-grant recipient criteria.

Educate campus and stakeholder communities about the HSI goal. Study, report, and devise efforts to close equity gaps in degree completion. Mobilize collective efforts to attain UC 2030 equity goals for first-generation, low-income, and target racial groups.

Create incentives for faculty, staff, and administrators to lead innovative HSI initiatives, addressing key transition points, student learning and development,

retention, and entrance into graduate and professional programs. Some efforts will begin as HSI proposals to federal agencies, others require initial resource allocation.

When the 25% enrollment threshold is achieved, confirm federal eligibility, apply for HSI designation, and request the waiver of core expenses criteria (as other UCs have requested).

Maintain HSI designation by annually submitting waivers, reviewing federal guidelines for opportunities, and continuing to implement initiatives and evaluate efforts.

2

1 ───────────────────────────────────────

2

3 https://calmatters.org/education/higher-education/college-beat/2022/11/hispanic-

4 serving-institutions-california/

5 Sylvia Hurtado, a professor of education at UCLA, talked about access to

6 federal grant money as a motivation.

## The quest to become an HSI

At the University of California, change is also underway. In 2018, the UC launched its Hispanic-
Serving Institutions Initiative, an effort to designate all nine of its undergraduate campuses as
HSIs. Hurtado said the push stems partially from a desire to embrace the diversity of
surrounding communities – but access to federal grant money can be an important
motivating factor as well.

7

8

9 ───────────────────────────────────────

10

11 https://www.fox4now.com/news/local-news/local-university-aims-to-become-hisp

12 anic-serving-institution

13 "Achieving an HSI status allows us to become eligible for a lot of funding. That

14 then can support our students, our faculty and support our staff so it's really

15 important to have ability to have access to additional funding that is specifically

16 designated for Hispanic serving institutions," said Mitch Cordova, vice-president

17 of student success and management at Florida Gulf Coast University.

# EXHIBIT 67

**UC ENDORSED ACA 5, REPEAL OF PROP. 209**

https://www.universityofcalifornia.edu/press-room/uc-board-regents-unanimously

-endorses-aca-5-repeal-prop-209



# UC Board of Regents unanimously endorses ACA 5, repeal of Prop. 209



UC Office of the President     June 15, 2020

The University of California Board of Regents today (June 15) unanimously endorsed Assembly Constitutional Amendment 5 (ACA 5) as well as the repeal of Proposition 209, which banned the consideration of race and gender in admissions decisions a quarter-century ago. The votes from the governing board of the world's preeminent public research university underscore the proactive need to help address systemic and perpetual inequalities in public education.

"There is amazing momentum for righting the wrongs caused by centuries of systemic racism in our country. The UC Board of Regents' votes to endorse ACA 5 and to repeal Proposition 209 plays a part in that effort," said Board Chair John A. Pérez. "As we continue to explore all the University's opportunities for action, I am proud UC endorsed giving California voters the chance to erase a stain, support opportunity and equality, and repeal Proposition 209."

UC has long been committed to creating and maintaining a student body that reflects California's laudable cultural, racial, geographic and socioeconomic diversity. However, Proposition 209 has challenged the University's ardent efforts to be equitable and inclusive as it seeks to attract the best and brightest students from all backgrounds, while ensuring equal opportunity for all.

"It makes little sense to exclude any consideration of race in admissions when the aim of the University's holistic process is to fully understand and evaluate each applicant through multiple dimensions," said UC President Janet Napolitano. "Proposition 209 has forced California public institutions to try to address racial inequality without factoring in race, even where allowed by federal law. The diversity of our university and higher education institutions across California, should — and must — represent the rich diversity of our state."

1

# EXHIBIT 68

2    UC's amicus brief with the US Supreme Court in SFFA v. Harvard

3    https://www.supremecourt.gov/DocketPDF/20/20-1199/232355/2022080113493

4    1730_20-1199%20bsac%20University%20of%20California.pdf

21

student experiences on each of its campuses.  See *Annual Accountability Report 2022* at 124.  Those metrics reveal areas in which UC has not yet achieved its educational goals.

1.  At many of UC's campuses, especially the flagship campuses, there remain stark differences between the demographics of UC's enrolled student population and the demographics of the applicant pool that UC seeks to serve—that is, California public high school graduates.  To be clear, UC does not maintain any "specified" racial targets based on the demographics of high school graduates or any other baseline.  See *Fisher* v. *University of Texas at Austin*, 570 U.S. 297, 311 (2013) ("*Fisher I*") (demographic targets constitute impermissible racial balancing) (citation omitted).  Instead, UC looks at demographics to determine whether there are *substantial* demographic disparities of the sort that this Court has recognized can undermine a university's ability to provide the educational benefits of diversity.  See *Regents Policy 2102*.

Specifically, the Court has observed that the existence of stark demographic disparities reveals that a university is struggling "to enroll students who can offer underrepresented perspectives."  *Fisher II*, 579 U.S. at 383.  In a student body with few students from underrepresented minority groups, there will be few opportunities for promoting cross-racial understanding, and students will not be exposed to diverse racial perspectives.  *Grutter*, 539 U.S. at 330.  In addition, because *Grutter* recognized that a university has a compelling interest in "prepar[ing] students for an increasingly diverse workforce and society," *id.* at 330, 332 (citation omitted), *Grutter* presupposes that universities may make themselves aware of the demographics of the workforce and the community in order to determine the degree of cross-racial interaction

5

1

# EXHIBIT 69

2              **UC's pursuit of Hispanic-Serving Institutions status**

3   1.  UC Berkeley CHANCELLOR'S TASK FORCE ON BECOMING A

4     HISPANIC SERVING INSTITUTION

5     https://chancellor.berkeley.edu/sites/default/files/hsi_report-final2_updated

6     _1-2021_all_names.pdf

# Executive Summary

In May 2019, Chancellor Carol Christ charged the Chancellor's Task Force on Becoming a Hispanic Serving Institution (HSI) with creating a roadmap for UC Berkeley to achieve HSI designation by 2027. She identified this priority as one of the boldest goals in the campus' strategic plan—for at least 25 percent of enrolled undergraduate students to self-identify as Chicanx/Latinx, for the University to be a preferred destination for Pell Grant eligible students, and for every student to thrive at Berkeley and to find belonging in all dimensions of the campus towards a true exemplification of comprehensive excellence.[1]

Chancellor Christ selected Oscar Dubón, Jr., Vice Chancellor for Equity & Inclusion, and Kris Gutiérrez, Carol Liu Chair and Professor, Graduate School of Education, as co-chairs to the Task Force, which included over 30 members representing all sectors of the campus community.

**HSI Task Force charge:**
- Review of HSI application processes, eligibility criteria and timelines and collect relevant institutional data;
- Develop roadmap toward becoming an HSI, as well as related immediate, near-term, mid-term, and long-term goals;
- Create an actionable, campus-wide engagement, socialization, and communication plan (e.g., website, materials, social media, community engagement, etc.);
- Provide recommendations for investments in infrastructure, curriculum, research, and campus culture toward serving the Chicanx/Latinx community, as well as other underrepresented, underserved and/or invisibilized communities.

The HSI Task Force took a structured and comprehensive approach to addressing the charge by forming three working groups, each with their own charge:

**HSI Eligibility Work Group charge:**
- Review HSI designation application processes, timelines, eligibility criteria, and relevant institutional data;
- Identify technical aspects of successfully applying for the HSI designation;
- Engage peer institutions about anticipated challenges to the application processes and eligibility criteria;
- Review admissions and recruitment strategies that support HSI goals;
- Make recommendations for the best approaches for UC Berkeley to meet the HSI application and eligibility requirements and review of best HSI practices at comparable universities.

**HSI Investing & Serving Work Group charge:**
- Synthesize information from committee reports such as Chicanx/Latinx Standing Committee recommendations, Chicanx Latinx Task Force Report, Chicanx Latinx Community Report, Undergraduate Diversity Project reports, presentations, and recommendations, African American Recruitment & Retention Report; African American Initiative Committee Recommendations, and Independent Advisory Board on Police Accountability and Community Safety, etc.; (Appendix A-G)
- Identify and prioritize areas for immediate, short, and long-term investments in infrastructure, curriculum, research, and campus culture

[1] *Berkeley Strategic Plan*

CHANCELLOR'S TASK FORCE ON BECOMING A HISPANIC SERVING INSTITUTION **1**

7

1    2. UCLA

2    Making Strides Towards Becoming a Hispanic-Serving Institution

3    https://chancellor.ucla.edu/messages/making-strides-towards-becoming-a-

4    hispanic-serving-institution

**UCLA**

## Office of the Chancellor

About ⌄          Messages

Home · Messages

# Making Strides Towards Becoming a Hispanic-Serving Institution

**September 24, 2021**

———

Chancellor Block and Executive Vice Chancellor and Provost Carter sent the following message to the UCLA campus community.

Dear Bruin Community:

Last month, the U.S. Census Bureau released official data showing that Latinx Californians — the largest racial or ethnic group in the state — had risen to nearly 40 percent of California's population. The announcement only reaffirmed the importance of UCLA's aim to achieve federal designation as a Hispanic-Serving Institution (HSI) by 2025. As a public university, UCLA has a responsibility to ensure that our institution reflects the diversity of our state and welcomes members of our Latinx communities, honors their intellectual and cultural contributions, and empowers them to flourish both at UCLA and well past graduation.

Today we write to announce a number of new commitments in support of these goals. While we will work hard to boost enrollment of qualified Latinx students to 25 percent of all undergraduates over the next four years — a requirement to qualify for HSI status — we recognize that simply enrolling greater numbers of Latinx students is not enough. UCLA also must enable these students to succeed by investing in academic and support infrastructure dedicated to their learning and growth.

5

1      3. UCLA https://hsi.ucla.edu/about/

**UCLA**

**Hispanic-serving Institution**

About HSI ⌄      Events      Programs ⌄      Publications & Organizations      Giving      🔍

Home /

# About HSI

## Strengthening Student Access and Success

The "Hispanic-serving Institution" designation is granted to universities by the U.S. Department of Education and requires that a minimum of 25% of an institution's full-time undergraduate students identify as Latinx. Currently, approximately 21% of UCLA undergraduates are Latinx.

Achieving federal recognition as an HSI will make UCLA eligible for a range of federal grants that would bolster existing educational programs, research training and academic attainment for Latinx, low-income and other underrepresented students.

2

3

4

1    4. UCLA

2    Hispanic-serving Institution

3    https://hsi.ucla.edu/



## Read the Report

UCLA's Hispanic-Serving Institution Task Force has published its report, **Cultivating the Seeds of Change: Becoming a Hispanic-Serving Institution**, setting out seven recommendations for achieving federal HSI designation and making a strong institutional commitment to advancing undergraduate and graduate student success.

Download the Report

Read About Our Progress

### Key Recommendations

**1** Engage campus units to implement new strategies to achieve HSI federal designation and provide support for the coordination of efforts.

**2** Improve admissions and yield strategies for Latinx, low-income, and first-generation students; report admissions and enrollment results by ~~income, and first-generation status; report and monitor progress toward 25% Latinx enrollment.~~

**3** Improve financial aid and timeliness of scholarship support so that UCLA is a more affordable option for Latinx and low-income students and their families.

**4** Prioritize efforts to retain students, monitor progress, and study the institutional barriers that prevent students from earning their degrees in a timely fashion. Implement equity-minded initiatives to ensure the institution is supporting students toward retention in the major and degree completion.

**5** Improve the curriculum and advising approaches to be culturally responsive to the needs and strengths of Latinx, low-income, and first generation students.

**6** Establish a Latinx Student Resource Center that can provide culturally responsive support for students and information for campus educators. Build awareness, affirm Latinx students, and improve experiences campus-wide.

**7** Improve Latinx access to graduate and professional programs, extend opportunities for engagement in research, and ensure mentorship support.

4

5

1  ## 5. UC Office of President

2  A Blueprint for Becoming a Hispanic-Serving Research Institution (HSRI)

3  System

4  https://www.ucop.edu/hsi-initiative/_files/reimagining-the-university-of-calif

5  ornia-to-serve-latinxs-equitably.pdf

**Reimagining the University of California to Serve Latinxs Equitably**

## Executive Summary

### Introduction

Hispanic-Serving Institutions (HSIs), which are broadly defined as non-profit postsecondary institutions enrolling a minimum of 25% Latinx undergraduates, currently constitute 19% of all colleges and universities across the United States and Puerto Rico. Historically, most HSIs have been institutions with open and inclusive admissions policies. Yet, a growing number of research 1 (R1) universities, which are better known for their selective admissions processes and historical underrepresentation of Latinx students, are now meeting the enrollment thresholds for HSI designation. Despite increasing Latinx undergraduate enrollments, Latinx graduate students, faculty, staff and administrative leadership at these institutions remain severely underrepresented. This pattern is concerning given that research 1 universities play a critical role in producing the next generation of researchers and professionals. Recognizing this issue, national efforts involving R1 HSIs are aiming to boost Latinx graduate and faculty representation at these institutions. Yet, it remains uncertain to what extent these R1 HSIs are changing their structures to achieve these objectives, which points to a critical gap in educational research and policy that needs to be addressed.

As the public research university system in the state with the largest Latinx population in the nation, the University of California (UC) is similarly reflecting these broader enrollment trends. UC educates an increasingly diverse student body, including many historically underserved racial minorities and those who are first-generation and from lower socioeconomic backgrounds. Much of this diversification at the UC is due to increased enrollment of Latinx undergraduate students. Five of the nine undergraduate campuses now meet HSI eligibility criteria, while the remaining campuses are on paths to meet the 25% undergraduate enrollment threshold soon. As these institutions, which were historically predominantly attended by white students, now educate a significantly more racially diverse student population, it is essential to employ culturally responsive and asset-based approaches in serving this multicultural, multilingual, and first-generation critical mass of students. Substantial efforts are required to transform the entire UC system into a reflection of the state's population and to establish structures

and environments indicative of servingness. This presents ample opportunities for UC to actively engage in the necessary process of institutional transformation, ensuring optimal support for its students and remaining the world's leading research public university system.

### Purpose of the Report

This report explores the concept of "servingness" within the University of California (UC) system, which is on its way to becoming a collection of fully-fledged Hispanic-Serving Research 1 Institutions (HSRIs). This work stems from a UCOP Office of the Provost planning grant under the cross-campus leadership of Drs. Marcela G. Cuellar (Davis), Frances Contreras (Irvine), and Juan Poblete (Santa Cruz). The report begins with an introductory section, outlining the increasing presence of HSRIs across higher education overall and, more specifically, within the UC system. Following this, three papers explore how servingness can be operationalized within UC, given existing inequities in outcomes. Finally, the report concludes by offering a series of recommendations aimed at establishing frameworks, structures, and environments that truly embody the notion of servingness throughout the entire UC system.

### Paper Summaries

In the first paper, Dr. Juan Poblete proposes that the arrival of Latinx students into the University of California marks a progressive development, democratizing access and potentially paving the way for greater educational equity within the state. However, this development takes place against the backdrop of substantial student enrollment growth and a series of regressive dynamics that have so far limited the positive social impact of that access. These dynamics encompass factors such as reduced per-student spending, decreased state funding for public education, and the imposition of tuition increases that place a burden on students' families. Within this context, two contradictory dynamics become evident: the expansion of public education's reach and the concurrent privatization of the concept of public education. The attainment of Hispanic-Serving Institution (HSI) status across the University of California system presents a notable opportunity. By reconsidering the meaning of "servingness," this status can potentially initiate a shift

---

2 | A Blueprint for Becoming a Hispanic-Serving Research Institution (HSRI) System

6

1    # EXHIBIT 70

2    ### ASIAN POPULATION GROWTH IN CALIFORNIA

3    https://apnews.com/article/california-race-and-ethnicity-census-2020-4209eebb8

4    20f00e9238e0dba0a35a1e3



1 of 2 | FILE - In this Jan. 21, 2006, file photo, Chinese lion dancers perform in Oakland's Chinatown in Oakland, Calif. According to new data from the U.S. Census Bureau released Thursday, Aug. 12, 2021, California's Asian population grew by 25% in the past decade, making them the fastest growing ethnic group in the nation's most populous state  (AP ...)          Read More



BY ADAM BEAM
Published 5:26 PM PST, August 12, 2021                                        Share

SACRAMENTO, Calif. (AP) — California's Asian population grew by 25% in the past
decade, making it the fastest growing ethnic group in the nation's most populous state,
according to new data from the U.S. Census Bureau released Thursday.

5

# EXHIBIT 71

1

2

UC UNDERGRADUATES BY RACE

3 https://www.universityofcalifornia.edu/press-room/uc-statement-scotus-decision-

4 regarding-use-race-college-admissions



**UC undergraduates by race and ethnicity**

- Fall 2022:
  - 32.2% Asian
  - 22.5% Hispanic/Latino
  - 22.2% White
  - 4.5% African American
  - 0.5% American Indian
  - 0.3% Pacific Islander
  - 2.8% Domestic unknown
  - 15% international
- 2002 (post Prop. 209)
  - 38% Asian
  - 14% Hispanic/Latino
  - 36% White
  - 3% African American
  - 1% American Indian
  - 1% Pacific Islander
  - 8% Domestic unknown
  - 1% International
- 1994 (pre-Prop. 209):
  - 37% Asian
  - 15% Hispanic/Latino
  - 36% White
  - 4% African American
  - 1% American Indian

5

1 # EXHIBIT 72

2 ## UC STUDENT DISAGGREGATED RACE AND ETHNICITY DATA

3 https://www.universityofcalifornia.edu/about-us/information-center/disaggregated

4 -data

# UC student disaggregated race and ethnicity data

Updated January 7, 2025

These tables show counts by disaggregated race/ethnicity category. "Unknown" race/ethnicity students are not shown. Student ethnicity collection and reporting at UC is detailed here.

Enrollment    Degree Recipients    Undergrad Admissions    UG Graduation    Notes    UG Adm Ordering

### Fall duplicated enrollments by disaggregated race/ethnicity
(Unduplicated official counts are here: https://www.universityofcalifornia.edu/infocenter/fall-enrollment-headcounts )

| Campus | | Fall term | | First generation status (UG only) | Student level | | Enrollment status | |
|---|---|---|---|---|---|---|---|---|
| (All) | ▼ | (Multiple values) | ▼ | (All) ▼ | (All) | ▼ | (All) | ▼ |

| Gender identity | | Sexual orientation | | Residency | | Pell recipient (UG only) | | Undergraduate entry level | |
|---|---|---|---|---|---|---|---|---|---|
| (All) | ▼ | (All) | ▼ | (All) | ▼ | (All) | ▼ | (All) | ▼ |

### *Broad category subtotals (duplicated)*

| | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|---|---|
| African American and Black | 11,659 | 12,099 | 12,659 | 13,414 | 13,727 | 14,339 | 14,918 |
| American Indian/Alaska Native | 3,296 | 3,277 | 3,380 | 3,705 | 4,327 | 4,904 | 5,325 |
| Asian | 119,087 | 121,112 | 122,520 | 126,654 | 128,297 | 129,199 | 130,539 |
| Hispanic/Latinx | 64,635 | 66,854 | 68,225 | 70,199 | 70,217 | 72,533 | 74,924 |
| Native Hawaiian and Pacific Islander | 2,120 | 2,269 | 2,369 | 2,413 | 2,378 | 2,443 | 2,439 |
| Southwest Asian/North African | 12,224 | 12,688 | 12,969 | 13,730 | 14,137 | 14,990 | 15,443 |
| White | 89,971 | 90,437 | 89,765 | 94,745 | 93,605 | 95,488 | 95,845 |

### *Detailed counts (duplicated)*

| Broad category | Category | Collection Status | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|---|---|---|---|
| | African American/Black | A | 9,102 | 9,362 | 9,695 | 10,348 | 10,814 | 11,287 | 11,855 |
| African American and Black | African | B | 2,203 | 2,246 | 2,486 | 2,716 | 2,828 | 3,110 | 3,259 |
| | Other African American/Black | B | 1,375 | 1,420 | 1,494 | 1,598 | 1,489 | 4,354 | 4,538 |
| | Caribbean | B | 897 | 990 | 1,056 | 1,126 | 1,172 | 1,267 | 1,375 |
| Amazigh | Amazigh | Null | | | | | | 41 | 32 |
| American Indian/Alaska Native | American Indian/Alaska Native | A | 3,296 | 3,277 | 3,380 | 3,705 | 4,327 | 4,904 | 5,325 |
| | Chinese | A | 53,040 | 53,842 | 53,684 | 53,752 | 52,650 | 51,230 | 50,858 |
| | Other Asian | A | 11,869 | 11,877 | 12,001 | 10,899 | 10,683 | 30,300 | 31,178 |
| | Asian Indian | B | 12,730 | 13,728 | 14,686 | 16,419 | 18,194 | 20,379 | 21,566 |
| | Vietnamese | A | 13,933 | 14,377 | 15,048 | 15,715 | 15,800 | 15,975 | 16,281 |
| 5 | Filipino | A | 13,008 | 13,233 | 13,425 | 13,923 | 14,231 | 14,628 | 14,995 |

1

# EXHIBIT 73

2

## Asian Admits at UC Berkeley

3  UC Berkeley's admission of Asian applicants declined in recent years.

4  https://www.universityofcalifornia.edu/about-us/information-center/admissions-re

5  sidency-and-ethnicity

**Fall freshman applicants, admits, and enrollees**

| | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|---|---|---|---|---|---|
| Applicants | 44,622 100% | 45,702 100% | 45,748 100% | 49,282 100% | 51,924 100% | 50,148 100% | 50,286 100% | 62,191 100% | 72,466 100% | 72,697 100% |
| African American | 2,525 6% | 2,667 6% | 2,783 6% | 2,988 6% | 3,205 6% | 2,943 6% | 2,958 6% | 4,036 6% | 4,654 6% | 4,580 6% |
| American Indian | 307 1% | 290 1% | 277 1% | 272 1% | 260 1% | 234 0% | 198 0% | 230 0% | 364 1% | 392 1% |
| Asian | 16,866 38% | 17,162 38% | 16,509 36% | 17,824 36% | 20,108 39% | 19,775 39% | 20,176 40% | 23,946 39% | 27,925 39% | 27,875 38% |
| Hispanic/Latino(a) | 11,685 26% | 12,095 26% | 12,700 28% | 13,959 28% | 14,241 27% | 13,890 28% | 13,887 28% | 18,210 29% | 22,386 31% | 22,645 31% |
| Pacific Islander | 160 0% | 144 0% | 157 0% | 167 0% | 182 0% | 158 0% | 154 0% | 203 0% | 194 0% | 216 0% |
| White | 11,677 26% | 11,609 25% | 11,665 25% | 12,409 25% | 11,924 23% | 11,481 23% | 11,052 22% | 13,498 22% | 14,846 20% | 14,747 20% |
| Unknown | 1,402 3% | 1,735 4% | 1,657 4% | 1,663 3% | 2,004 4% | 1,667 3% | 1,861 4% | 2,068 3% | 2,117 3% | 2,242 3% |
| Admits | 7,267 100% | 8,734 100% | 9,505 100% | 8,992 100% | 8,761 100% | 9,336 100% | 10,143 100% | 10,452 100% | 10,483 100% | 10,976 100% |
| African American | 233 3% | 344 4% | 389 4% | 359 4% | 369 4% | 380 4% | 509 5% | 495 5% | 546 5% | 523 5% |
| American Indian | 58 1% | 53 1% | 60 1% | 66 1% | 30 0% | 64 1% | 45 0% | 69 1% | 63 1% | 79 1% |
| Asian | 3,188 44% | 3,904 45% | 4,134 43% | 3,866 43% | 3,855 44% | 4,155 45% | 4,307 42% | 4,262 41% | 4,319 41% | 4,416 40% |
| Hispanic/Latino(a) | 1,431 20% | 1,656 19% | 1,746 18% | 1,832 20% | 1,894 22% | 2,048 22% | 2,932 29% | 2,980 29% | 2,973 28% | 3,319 30% |
| Pacific Islander | 9 0% | 19 0% | 22 0% | 22 0% | 18 0% | 26 0% | 19 0% | 35 0% | 15 0% | 32 0% |
| White | 2,013 28% | 2,273 26% | 2,632 28% | 2,410 27% | 2,121 24% | 2,208 24% | 1,881 19% | 2,160 21% | 2,159 21% | 2,132 19% |
| Unknown | 335 5% | 485 6% | 522 5% | 437 5% | 474 5% | 455 5% | 450 4% | 451 4% | 408 4% | 475 4% |

Academic Yr
(Multiple values) ▼

Campus
Berkeley ▼

Select breakdown
By race/ethnicity ▼

Filter
By residency ▼

Select category
☑ California resident
  Domestic nonresident
  International resident

6

# EXHIBIT 74

## 1. <u>Comment 1</u> to UC Board of Regents

**Subject**: College Admission Transparency - Public comment for the UC Board of Regents meeting on Nov 16

**From**: Nan Zhong <nanzhong1@gmail.com>  Fri, Nov 10, 2023 at 10:03 PM

**To**: regentsoffice@ucop.edu

Honorable members of the UC Board of Regents,

On behalf of thousands of Californians, I am writing to you to address a matter of great importance – the need for more transparency in college admission. To begin, I would like to draw your attention to my son Stanley's college application story. It is so bizarre that it was reported by ABC, CBS, CNBC, USA Today, and other media channels. It was also presented at a congressional hearing on September 28.

In addition to an excellent academic record and strong leadership both in and out of his school, as a high schooler, Stanley achieved multiple recognitions that made him stand out even among professional software developers around the world. For example,

- He advanced to the Google Code Jam Coding Contest semi-final.

1  ●      His e-signing startup is featured in an Amazon Web Services case study,

2  an honor received by only a handful startups in the world.

3  ●      He won 2nd place in MIT Battlecode's high school division.

4  In 2019, not knowing he was only 13 years old, a Google recruiter invited him to

5  interview for a full-time job. Shortly after turning 18, in September 2023, he was

6  hired by Google as an L4 software engineer, a position that typically requires

7  multiple years of professional experience as well as a college degree.

8

9  In contrast, despite citing the awards above (and a lot more, including the Gold

10  Level President's Volunteer Service Award), his college application was rejected

11  by all five UC schools he applied to, namely UC Davis, UC Santa Barbara, UC

12  San Diego, UCLA and UC Berkeley. As a California taxpayer, I was rattled by

13  the fact that he had no UC schools to choose from. After Stanley's story went

14  public, I received numerous emails, complaining about similarly unfathomable

15  application results with the UC schools. So Stanley's case is not alone.

16

17  The Varsity Blues scandal already eroded public trust in college admissions. The

18  2020 audit report by the California State Auditor further underscored

19  deficiencies in UC's admissions practices. Its summary says,

20      "The university has also failed to ensure that campuses fairly and

21      consistently treat the thousands of prospective students who apply each

22      year. Neither UC Berkeley nor UCLA have developed methodologies for

23      how they determine which applicants to admit. Nevertheless, both of those

1    campuses admitted thousands of applicants whose records demonstrated

2    that they were less qualified than other applicants who were denied

3    admission. Applicants' chances of admission were also unfairly affected by

4    UC Berkeley's, UCLA's, and UC San Diego's failures to properly train and

5    monitor the staff who review and rate applications. We found that staff were

6    sometimes overly strict or overly lenient in their review of applications,

7    thereby making the applicants' chances of admission unduly dependent on

8    the individual staff who rated them rather than on the students'

9    qualifications."

10

11 UCLA's late distinguished sociologist, Prof Robert D. Mare also documented

12 anti-Asian bias in UCLA's admissions process in his report titled "Holistic Review

13 in Freshman Admissions at the University of California—Los Angeles 2009-2011

14 Update." Its summary says,

15    "In both Final and Supplemental Review, African American applicants

16    receive somewhat more favorable and 'North Asian' (Chinese, Japanese,

17    Korean, Indian/Pakistani American) applicants receive somewhat less

18    favorable holistic read scores than applicants in other ethnic identity groups

19    who are otherwise similar in measured academic qualifications, personal

20    characteristics, and measured challenges and hardships."

21

1  In line with the reports by the California State Auditor and Prof Mare, as

2  students and parents, we are seeing nonsensical admission results again and

3  again.

4

5  As a basic democratic principle, we should have checks and balances for every

6  power, including the power of the admission offices. Holistic reviews should not

7  be construed as black box reviews. I think college admission transparency is not

8  a blue/red issue. It's a common sense issue about our kids' education and their

9  mental health. It's a common sense issue about America's competitiveness in

10  the global economy. It's also a common sense issue about UC's reputation. To

11  rebuild public trust and uphold the values of the UC system, I urge you to take

12  immediate actions to increase transparency of the admission process. I hope we

13  can transcend political pettiness. Let's create a partnership across students,

14  parents, colleges, governments, education and legal experts. Let's work

15  together to increase college admission transparency in a judicious, systematic,

16  cost-effective and privacy-preserving way. Let's do something for our kids.

17

18  Thank you for your time and consideration.

19

20  Sincerely,

21  Nan Zhong

22  ───────────────────────────────────────────────

23

1    ## 2. **Response 1** from UC

# UNIVERSITY OF CALIFORNIA

BERKELEY • DAVIS • IRVINE • LOS ANGELES • MERCED • RIVERSIDE • SAN DIEGO • SAN FRANCISCO        SANTA BARBARA • SANTA CRUZ

GRADUATE, UNDERGRADUATE AND EQUITY AFFAIRS
UNDERGRADUATE ADMISSIONS

OFFICE OF THE PRESIDENT
1111 Franklin Street, 10ᵗʰ Floor
Oakland, California 94607-5200

November 20, 2023

Ms. Nan Zhong
Email: nanzhong1@gmail.com

Dear Ms. Zhong,

I am writing in response to your communication to the UC Board of Regents regarding transparency in the undergraduate admission process for the University of California.

Given both the extraordinary quality of the applicants and the large number of applications received, all our campuses are faced with making difficult admission decisions; unfortunately, this means that many very talented and deserving students like Stanley Zhong are disappointed by the outcomes of the admission process.

Each of our campuses select their class using various forms of comprehensive review. There is no formula for gaining admission to UC; the full extent of each applicant's academic and personal accomplishments is taken into consideration within the context of the opportunities that were available to that student. There is no single deciding factor in any admission decision.

We have many public-facing resources that provide information about the admission process and how applications are reviewed. Links to the campus specific processes are also provided.
https://admission.universityofcalifornia.edu/how-to-apply/applying-as-a-freshman/how-applications-are-reviewed.html

In response to the 2020 California State Audit, documentation and transparency have been improved. In addition to the information that is provided in our admissions website note above, the Academic Senate's systemwide committee on undergraduate admissions publishes an annual report on Undergraduate Admissions Requirements and Comprehensive Review which includes a summary of the selection processes for each campus.
https://senate.universityofcalifornia.edu/_files/committees/boars/boars-cr-report-june-2023.pdf

As a public institution, the University takes seriously its obligation to equitably serve all California residents who are qualified and interested in earning a degree at one of our campuses. As required by State law and Regental policy, the University does not grant preferential treatment in its admissions processes to any applicant on the basis of race, sex, color, ethnicity, or national origin. It is also Regental policy that the University seek to enroll a student body that encompasses the broad diversity of cultural, racial, geographic, and socioeconomic backgrounds characteristic of California. Further details on undergraduate admission outcomes can be found in several dashboards on the UC Information Center:
https://www.universityofcalifornia.edu/about-us/information-center

Although the University cannot guarantee admission to our most selective campuses, UC is proud to be able to continue its commitment to the best students in the state with the opportunity to enroll within the UC system. It is the students' choice whether to accept that opportunity or not.

On behalf of the UC Board of Regents, I thank you for taking the time to share your thoughts and concerns.

Sincerely,

Han Mi Yoon-Wu
Associate Vice Provost and
Executive Director, Undergraduate Admissions
University of California Office of the President

2 ——————————————————————————————————————————

3

3. **Comment 2** to UC Board of Regents

**Subject**: UC Admission Transparency - Public comment for the UC Board of Regents meeting on Jan 25

**From**: Nan Zhong <nanzhong1@gmail.com>   Thu, Jan 18, 2024 at 10:30 AM

**To**: regentsoffice@ucop.edu

Honorable members of the UC Board of Regents,

I'd like to follow up on the comment I made on Nov 16 in front of this board regarding the need for more transparency in UC admission. As mentioned, my son Stanley's college application story was so bizarre that it was reported by ABC, CBS, CNBC and USA Today. To highlight the absurdity, he was hired by Google as an L4 software engineer. It means that Google sent five experienced software engineers, all specifically trained to interview candidates, to assess his proficiency in Computer Science. Together they spent over 10 hours interviewing Stanley and discussing his interview performance. They concluded that his proficiency was at the same level as applicants with Ph.D. degrees from colleges like UCLA or UC Berkeley.

Yet, five UC schools rejected his college application, considering him not qualified enough for their undergraduate programs. The gap between Google and UC's assessments defies common sense and naturally invites the question:

1  How could such a ridiculous thing happen? That's why, in 3 days, over 3000

2  Californians endorsed my letter to this board in November.

3

4  On November 21, I received a response (attached) from Han Mi Yoon-Wu,

5  Associate Vice Provost and Executive Director of Undergraduate Admissions.

6  (Thank you for forwarding my comment to the admission office.) However, I was

7  extremely disappointed by the response. It was a 2-page letter filled with words,

8  but no meaningful information. It insisted that Stanley was not qualified enough

9  with no specifics. I understand that college admission is a difficult operation. The

10 application readers can spend only a few minutes per application and they aren't

11 necessarily equipped with domain-specific knowledge. So things can fall through

12 cracks. However, given the public outcry and obvious absurdity, with ample time

13 to re-examine the case, the dismissive nature of the letter is insulting to the

14 public and it was a great disservice to this world-renowned institution.

15 Dismissing the previous mistake offhandedly as a non-issue is a mistake worse

16 than the original one. It is no longer in the realm of honest mistakes that we all

17 make sometimes. Instead, it speaks volumes about whether they care. The

18 longer the admission office remains dismissive, the more damage it will bring to

19 the UC's reputation. With UC's role in the Varsity Blues scandal and the 2020

20 audit report by the California State Auditor, the burden is on the UC admission

21 office to prove that they deserve the public's trust. In 1989, UC Berkeley

22 apologized for a policy that limited Asians after the state audit in 1987. Things

1 moved on. **Today I ask for the board's leadership in demanding**

2 **accountability in the admission office so we can move on again.**

3

4 I'm glad to share that we received a lot of support as our coalition of several

5 thousand Californians brought this issue to the state lawmakers over the past

6 few months. We talked to multiple Assemblymembers and Senators. Democrats

7 and Republicans, across the political spectrum, expressed their surprise by

8 Stanley's case. They described this case as "alarming" and "extremely

9 disturbing". The legislative proposal being discussed is conducting recurring

10 audits for UC's admission. While the state's current budget constraint may

11 render it difficult to implement immediately, I hereby ask UC admission offices to

12 retain all admission related records for potential future audits by the state.

13

14 Parallel to the legislative discussion, here is another proposal on how we can

15 move forward together. I emailed the chairs of the Computer Science

16 department of the five UC schools. Some of them already replied with interest to

17 examine Stanley's application. I propose we ask interested Computer Science

18 faculty members to examine the case as a 3rd-party independent from the

19 admission office. The result won't matter for Stanley anymore since he is

20 enjoying his high-paying full-time job at Google. But it remains important for

21 other kids since most kids won't be as lucky as Stanley.

22

1 To reiterate from two months ago, as a basic democratic principle, we should

2 have checks and balances for every power, including the power of the

3 admission offices. Holistic reviews should not be construed as black box

4 reviews. Interestingly, after the resignation of President Magill at the Univ of

5 Pennsylvania, 1200 faculty members signed the new constitution proposal,

6 which calls out admission transparency explicitly. It says, "Admission policies

7 should prioritize the fair treatment of each individual applicant, and criteria must

8 be objective, transparent, and clearly communicated to all community

9 members." I hope UC's admission office adopts a similar principle as soon as

10 possible.

11

12 Let's work together to increase college admission transparency in a judicious,

13 systematic, cost-effective and privacy-preserving way. Let's do something for

14 our kids.

15

16 Thank you for your time and consideration.

17

18 Sincerely,

19 Nan

20

21 ———————————————————————————————————

22

23

1    **4.  <u>Response 2</u> from UC**

# UNIVERSITY OF CALIFORNIA

BERKELEY • DAVIS • IRVINE • LOS ANGELES • MERCED • RIVERSIDE • SAN DIEGO • SAN FRANCISCO    SANTA BARBARA • SANTA CRUZ



GRADUATE, UNDERGRADUATE AND EQUITY AFFAIRS
UNDERGRADUATE ADMISSIONS

OFFICE OF THE PRESIDENT
1111 Franklin Street, 10ᵗʰ Floor
Oakland, California 94607-5200

January 29, 2024

Mr. Nan Zhong
Email: nanzhong1@gmail.com

Dear Mr. Zhong,

I am writing in response to your most recent communication on January 18, 2024 to the UC Board of Regents regarding transparency in the undergraduate admission process for the University of California.

I assure you that we share the goal of ensuring a transparent and level playing field for every applicant. Since the 2020 state audit, our campuses have undertaken an extensive amount of work to improve and strengthen the policies that govern UC's admissions processes.

On behalf of the UC Board of Regents, thank you for sharing your views and continuing to advocate on behalf of all Californians.

Sincerely,

Han Mi Yoon-Wu
Associate Vice Provost and
Executive Director, Undergraduate Admissions
University of California Office of the President

3

4

**5. Email exchanges after response 2**

**From**: Nan Zhong <nanzhong1@gmail.com>  Sun, Feb 4, 2024 at 12:00 PM

**To**: GUEA-Admissions-SHD <Admissions@ucop.edu>

**Cc**: College Admission Transparency

<college-admission-transparency@googlegroups.com>

Dear Ms. Yoon-Wu,

Thanks for your response. I don't doubt that you share the goal of ensuring a transparent and level playing field for every applicant. However, the results produced by the UC admission office are not pointing in that direction. The fact that over three thousand Californians endorsed my letter to the Board of Regents in three days, and the fact that the state lawmakers are calling Stanley's case "alarming" and "extremely disturbing" indicate the level of public's frustration and distrust. We need concrete actions, not empty words or promises. Could you share the concrete steps that the UC admission office has taken to ensure transparency? Perhaps we can help you enhance or accelerate them.

Best,

Nan

1 _____

2

3 **From**: GUEA-Admissions-SHD <Admissions@ucop.edu>    Mon, Feb 12, 2024

4 at 9:46 AM

5 **To**: Nan Zhong <nanzhong1@gmail.com>

6

7 Dear Mr. Zhong,

8

9 In response to your recent communication from February 4, please refer to my

10 response and the multiple links that I provided in my November communication.

11 A copy is attached for your convenience.

12

13 Sincerely,

14 Han Mi Yoon-Wu

15 Associate Vice Provost and

16 Executive Director, Undergraduate Admissions

17 University of California Office of the President

18

19 _____

20

21 **From**: Nan Zhong <nanzhong1@gmail.com>   Fri, Mar 8, 2024 at 2:23 PM

22 **To**: GUEA-Admissions-SHD <Admissions@ucop.edu>

**Cc**: College Admission Transparency

<college-admission-transparency@googlegroups.com>

Dear Ms. Yoon-Wu,

Thanks for your response. I've studied all the links provided in the November communication. But they provide very little insight into why the UC rejects highly qualified applicants to the point of being absurd in the eyes of the public. That's exactly why thousands of Californians are asking for more transparency.

Also, could you please acknowledge the receipt of the request to keep all admission related records for potential future audits?

Finally, what are your thoughts on the idea of inviting CS faculty members to examine the applications?

I look forward to an honest and productive discussion in good faith. Have a great weekend!

Best,

Nan

—————————————————————————————

6. **Comment 3** to UC Board of Regents

**Subject**: UC Admission Transparency - Public comment for the UC Board of Regents meeting on March 20

**From**: Nan Zhong <nanzhong1@gmail.com>  Thu, Mar 14, 2024 at 11:26 AM

**To**: "regentsoffice@ucop.edu" <regentsoffice@ucop.edu>

**Cc**: GUEA-Admissions-SHD <Admissions@ucop.edu>

Honorable members of the UC Board of Regents,

I'd like to follow up on the comment I made in January and November regarding the need for more transparency in UC admissions. After my November comment, I received a 2-page letter with no meaningful information from Han Mi Yoon-Wu, Associate Vice Provost and Executive Director of Undergraduate Admissions. After my January comment, I received a half-page letter with no meaningful information.

While the UC admissions office is doing nothing to increase its transparency, we compiled our own data. So let's not ignore the elephant in the room: race. All the highly qualified applicants rejected by the UC are Asians. It's clear to me that the UC admissions office is practicing identity politics, just like the far right. Both the UC and the far right single out a group based on their identity, then direct hatred or penalty towards them. What UC is doing is another form of Asian hate, only

1 more hidden and systematic, thus more hateful, hurtful and harmful than a

2 comment like Trump's stupid "kung flu."

3

4 This form of Asian hate takes its toll on the Asian community. It creates a sense

5 of helplessness among Asian kids. For a student who received the highest level

6 of Presidential Volunteer Service Award, beat the world's top professional

7 programmers in competitions and was hired by Google for a position typically

8 offered to Ph.D graduates, if he is rejected by UC's undergraduate programs, do

9 you realize how absurd that is? Do you understand how one absurd story like

10 this after another leads to a sense of helplessness that is detrimental to Asian

11 kids' mental health? When a Palo Alto School District board member and I sadly

12 discussed local high school suicide cases, we agreed college admission and its

13 blackbox nature very likely contributed to the crisis. There is only so much the

14 high schools can do unless universities become more transparent in their

15 admissions and alleviate the sense of helplessness.

16

17 After being stonewalled by the UC admissions office for the past four months,

18 my hope for an honest, scientific, constructive and good-faith discussion has

19 faded, replaced by disappointment, frustration and anger. I am disappointed

20 because I thought UC would proudly open its admissions practice instead of

21 hiding it in a black box, but I was wrong. I am frustrated because I thought UC is

22 a great public institution that would listen to the public and could be reasoned

23 with instead of ignoring the public outcry, but I was wrong. I am angry because

1 more Asian kids will suffer, yet nobody seems to care, even those

2 self-proclaimed anti-racists. If UC thinks its admissions practice is countering the

3 far right, you got it wrong. Absurd far left policies are only going to exacerbate

4 people's distrust of public institutions and feed the narratives of the far right. To

5 counter the far right, don't move to the far left. Stay in the center and stick with

6 common sense.

7

8 If the admissions office somehow is wishing that stonewalling would tire us out

9 and stop us challenging the absurd status quo, I have news to share. We shall

10 bring the case to the wider public and political debates. We shall expose the

11 "Asian Hate" nature of the far left admissions practice. We shall fight through

12 protests. We shall fight in court. We shall fight in the legislature. We shall fight in

13 the elections. We shall demand accountability. We shall be noisy, annoying and

14 a pain in the butt. We shall fight to the end. Whatever it takes. However many

15 decades it takes. If that shatters the "model minority" stereotype, so be it.

16

17 Dear members of the Board, as the leaders of the UC, the buck stops with you.

18 This time, please do more than just forwarding the letter to the admissions

19 office. It's time to show us your leadership.

20

21 Sincerely,

22 Nan

23 _____

1   7.  **Response 3** from UC

# UNIVERSITY OF CALIFORNIA

BERKELEY • DAVIS • IRVINE • LOS ANGELES • MERCED • RIVERSIDE • SAN DIEGO • SAN FRANCISCO                    SANTA BARBARA • SANTA CRUZ



GRADUATE, UNDERGRADUATE AND EQUITY AFFAIRS
UNDERGRADUATE ADMISSIONS

OFFICE OF THE PRESIDENT
1111 Franklin Street, 10ᵗʰ Floor
Oakland, California 94607-5200

March 25, 2024

Mr. Nan Zhong
Email: nanzhong1@gmail.com

Dear Mr. Zhong,

I am responding to your email of March 8 as well as your public comment submission to the UC Board of Regents on March 14.

While I appreciate you writing to express your views once again, respectfully, it seems we will have to agree to disagree about the usefulness and transparency of the information that I have previously provided in response to your prior communications. I acknowledge receipt of your request to keep admissions records and will preserve records based on the university's records retention schedule.

The data in the UC Information Center provides a wealth of information, including admission outcomes for Asian American students. Not only are Asian Americans well-represented at UC, the proportion of Asian Americans in the California admit pool has remained stable over the past several years. In fact, Asian Americans represented the highest proportion, almost 40 percent, of the University's 2023 incoming California freshman class.

As required by law and Regental policy, the University does not grant preferential treatment in its admissions processes to any applicant on the basis of race, sex, color, ethnicity, or national origin, so your assertion that UC plays identity politics is unsupported.

UC has the enviable position of having an abundance of highly-qualified students seeking admission to our campuses. Our comprehensive review policy recognizes that students are more than grades earned and considers multiple factors when making decisions. Nevertheless, selecting from among such a high achieving pool of applicants undoubtedly results in each campus having to deny excellent students. As you have suggested, some campus processes do include a review by faculty particularly for engineering and computer science majors.

Again, I thank you for taking the time to write and express your concerns.

Sincerely,

Han Mi Yoon-Wu
Associate Vice Provost and
Executive Director, Undergraduate Admissions
University of California Office of the President

1   **8.  Rebuttal to response 3**

2

3   **From**: Nan Zhong <nanzhong1@gmail.com>   Fri, May 10, 2024 at 10:26 PM

4   **To**: GUEA-Admissions-SHD <Admissions@ucop.edu>

5   **Cc**: "regentsoffice@ucop.edu" <regentsoffice@ucop.edu>,

6   president@ucop.edu, Provost@ucop.edu, Todd Millstein <todd@cs.ucla.edu>,

7   Glenn Reinman <reinman@cs.ucla.edu>, agrawal@cs.ucsb.edu,

8   coms-chair@ucsb.edu, ghosal@cs.ucdavis.edu, cschair@ucdavis.edu,

9   tomlin@eecs.berkeley.edu, malik@berkeley.edu, lerner@cs.ucsd.edu,

10  minnes@eng.ucsd.edu, College Admission Transparency

11  <college-admission-transparency@googlegroups.com>

12

13  Hi Ms. Yoon-Wu,

14

15  There are several logical mistakes in your reply.

16

17  Your points about Asian American admissions staying stable and representing

18  the highest proportion do not in any way prove that there is no discrimination

19  against Asian Americans. It is logically possible for UC to reject some Asian

20  applicants based on race and still end up with more Asian students than other

21  races. Instead, what you can provide to help is a comparison between admitted

22  students across races and a comparison of rejected Asian applicants (e.g.

23  Stanley) against admitted students of other races. UC doesn't have to open any

privacy-sensitive data to the public. An examination by a 3rd party in an isolated room is what I am suggesting.

I also found this statement amusing. "As required by law and Regental policy, the University does not grant preferential treatment in its admissions processes to any applicant on the basis of race, sex, color, ethnicity, or national origin, so your assertion that UC plays identity politics is unsupported." Are you saying that, since there is a law, there must be no violation? Are you not aware of anyone that knew the law yet broke it and claimed innocence? More specifically, have you not heard of "unstated Affirmative Action"?

Thanks,

Nan

P.S. I assume everyone cc'd is interested in an academic discussion of data analysis of the admissions data. If not, please let me know and I will leave you out.

—————————————————————————————————————————

**From**: GUEA-Admissions-SHD <Admissions@ucop.edu>     Mon, May 20, 2024 at 9:53 AM

**To**: Nan Zhong <nanzhong1@gmail.com>

1

2 Dear Mr. Zhong,

3

4 I write in response to your correspondence from May 10. As I stated in an earlier

5 response, the data in the UC Information Center provides a wealth of

6 information, including admission outcomes for Asian American students, that

7 can be downloaded for further analysis. If you feel the university has engaged in

8 discrimination, I refer you to the Systemwide Office of Civil Rights.

9

10 Respectfully,

11 Han Mi

12

13 _____

14

15 **From**: Nan Zhong <nanzhong1@gmail.com>  Fri, May 24, 2024 at 4:41 PM

16 **To**: GUEA-Admissions-SHD <Admissions@ucop.edu>

17 **Cc**: "regentsoffice@ucop.edu" <regentsoffice@ucop.edu>,

18 president@ucop.edu, Provost@ucop.edu, Todd Millstein <todd@cs.ucla.edu>,

19 Glenn Reinman <reinman@cs.ucla.edu>, agrawal@cs.ucsb.edu,

20 coms-chair@ucsb.edu, ghosal@cs.ucdavis.edu, cschair@ucdavis.edu,

21 tomlin@eecs.berkeley.edu, malik@berkeley.edu, lerner@cs.ucsd.edu,

22 minnes@eng.ucsd.edu, College Admission Transparency

23 <college-admission-transparency@googlegroups.com>

1

2  Hi Han Mi,

3

4  Thanks for pointing to the data again. At the risk of sounding like a broken

5  record, I found the data utterly inadequate to answer questions such as "why

6  applicants like Stanley were rejected". If you could enlighten me, I'd appreciate

7  it.

8

9  Alternatively, if any of the CS chairs cc'd is willing to put their academic

10  reputation on the line, and vouch that all admitted non-Asian students are

11  reasonably equally or more qualified than the rejection cases we compiled, that

12  would move the conversation forward in a meaningful way too. Feel free to use

13  Stanley's case as an example rejection case.

14

15  I look forward to having discussions in a dive-deep data-driven academic way. I

16  won't accept silence or stonewalling.

17

18  Have a great long weekend!

19

20  Best,

21  Nan

22

1  P.S. I assume everyone cc'd is interested in an academic discussion of data

2  analysis of the admissions data. If not, please let me know and I will leave you

3  out.

4

5  _____

6

7  As of the filing of the lawsuit, there has been no further communication from UC

8  after this email.

9  _____

10

11

**9. <u>Comment 4</u> to UC Board of Regents**

**Subject**: UC Admission Transparency - Public comment for the UC Board of Regents meeting on May 16

**From**: Nan Zhong <nanzhong1@gmail.com>  Fri, May 10, 2024 at 7:24 AM

**To**: "regentsoffice@ucop.edu" <regentsoffice@ucop.edu>

**Cc**: GUEA-Admissions-SHD <Admissions@ucop.edu>, president@ucop.edu, Provost@ucop.edu, Todd Millstein <todd@cs.ucla.edu>, Glenn Reinman <reinman@cs.ucla.edu>, agrawal@cs.ucsb.edu, coms-chair@ucsb.edu, ghosal@cs.ucdavis.edu, cschair@ucdavis.edu, tomlin@eecs.berkeley.edu, malik@berkeley.edu, lerner@cs.ucsd.edu, minnes@eng.ucsd.edu

Honorable members of the UC Board of Regents,

I'd like to follow up on the comments I made in March, January, and last November regarding the need for more transparency in UC admissions.

In March, I specifically asked this board to directly weigh in on this issue. Two months later, I'm still waiting for a response. As an engineer by training, I can easily be persuaded by reasoning. If I got anything wrong, tell me and show me concrete data. However, since I brought up this issue last November, my attempts to engage UC for discussions have consistently been met with silence or stonewalling as if I touched on a taboo associated with illegal activities.

1

2 Over time, I learned that my experience fits in a long standing pattern. In 2007,

3 Prof Tim Groseclose, a faculty member on UCLA admissions committee, asked

4 for anonymized sample data from the admissions office. He was rejected. Yes,

5 UCLA hid its admissions data from its own admissions committee! He was told

6 that "we should not study or do any analysis of holistic admissions at UCLA until

7 we have at least four or five years of the outcome to avoid normal annual

8 fluctuations". Now, 17 years later, where is the data? What's the excuse now?

9 Where is the basic intellectual honesty and decency? Where are the academic

10 traditions of open discussions and peer reviews? I can't believe I have to preach

11 such fundamental principles to an academic institution. UC's efforts to keep its

12 admission a black box is an assault on reason and academic integrity.

13

14 Recently, someone shared with me a video of Prof Erwin Chemerinsky, Berkeley

15 Law School Dean, describing the "unstated" racial preferences in faculty hiring.

16 Really? A law professor teaching students to break laws and hide the evidence?

17 It's a disgrace! It's legally and morally indefensible! No wonder I got the

18 impression that there are institutionalized illegal activities. No wonder UC tightly

19 guards its admissions data because it's incriminating. It starts to make sense.

20

21 Finally, I have a message to a Regent not present in the meetings, Governor

22 Newsom. Mr. Newsom, last November, over 3,000 Californians sent you a letter

23 regarding UC admissions. Half a year later, we still haven't heard from you. Your

1 silence and indifference violates your duty as an elected official. Perhaps you

2 consider yourself the governor for some Californians only, not the 3,000 who

3 signed the letter. I'm deeply disappointed as a voter and regret my votes for you

4 in the past. You don't deserve my vote anymore.

5

6 Sincerely,

7 Nan

8 ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

9

10

1  **10. <u>Comment 5</u> to UC Board of Regents**

2

3  **Subject**: Racial Discrimination Lawsuit against UC - Public comment for the UC

4  Board of Regents meeting on Nov 14

5  **From**: Nan Zhong <nanzhong1@gmail.com>  Tue, Nov 12, 2024 at 10:24 PM

6  **To**: "regentsoffice@ucop.edu" <regentsoffice@ucop.edu>

7  **Cc**: GUEA-Admissions-SHD <admissions@ucop.edu>, president@ucop.edu,

8  Provost@ucop.edu, Todd Millstein <todd@cs.ucla.edu>, Glenn Reinman

9  <reinman@cs.ucla.edu>, agrawal@cs.ucsb.edu, coms-chair@ucsb.edu,

10 ghosal@cs.ucdavis.edu, cschair@ucdavis.edu, tomlin@eecs.berkeley.edu,

11 malik@berkeley.edu, lerner@cs.ucsd.edu, minnes@eng.ucsd.edu, College

12 Admission Transparency

13 <college-admission-transparency@googlegroups.com>

14

15 Honorable members of the UC Board of Regents,

16

17 I'd like to follow up on the comments I made in May, March, January, and last

18 November regarding racial discrimination in UC admissions. By Berkeley Law

19 School Dean's own admission, it's obvious that UC has institutionalized hidden

20 racial discrimination and it's lying to hide it.

21

22 In March, I specifically asked this board to directly weigh in on this issue. Eight

23 months later, I still haven't got a response. It's consistent with the pattern from

1 all parts of UC that I reached out to, silence or stonewalling, even for a case that

2 has been reported in national news and cited in a congressional hearing. If UC

3 is using prolonged silence to make this challenge go away, I have bad news for

4 you. I warned eight months ago that we'd fight in court if necessary. That day

5 has arrived. We have formed a nonprofit named SWORD (Students Who

6 Oppose Racial Discrimination). Our position is published at

7 https://sword.education. We are ready to fight it all the way to the Supreme

8 Court. A Litigation Hold Notice has been served to you. We'll watch out for

9 perjuries and obstructions of justice carefully and pursue offenders aggressively.

10 For transparency, we'll publish all the past and future correspondence with UC

11 and its lawyers on our website for the public to judge.

12

13 As I said in the ABC7 interview last year, as a taxpayer, I hate the idea for UC to

14 use taxpayer money to defend its illegal activities. So we made a good-faith

15 effort to start a dialogue, assuming that an academic institution would naturally

16 engage in open discussions and encourage peer reviews on its data in the spirit

17 of intellectual honesty, particularly given UC's poor track records documented by

18 the California State Auditor. However, I have been utterly disappointed,

19 dismayed, and outraged by how UC conducts itself. It seems groupthink and

20 moral cowardice at UC have made seeking the truth taboo.

21

22 In the letter dated March 25, UC's Admissions Director claimed that my

23 assertion of racial discrimination was unsupported because there are laws

prohibiting it. For a moment, I had to question my own sanity. Did a

world-renowned academic institution tell me that having a law means there must

be no violation? By that logic, there must be no theft or murder because they are

prohibited by law. Is that the best defense you've got? Last year, while I still

harbored the hope for an honest conversation, I resisted calls for the

resignations of UC admission officers. After seeing how they flouted the law and

ignored the public outcry, now I think the calls are justified. Once we prevail in

court, we will demand the dismissal of UC admission officers and other

responsible administrators.

See you in court!

Sincerely,

Nan

# EXHIBIT 75

### EMAIL EXCHANGE WITH THE DEPARTMENT OF EDUCATION OCR

This is the complaint filed for Stanley to the San Francisco Office for Civil Rights

(OCR). OCR received the complaint on September 26, 2023.

OCR Case No. 09-23-2699

―――――――――――――――――――――――――――――――――――

# Office for Civil Rights

# Discrimination Complaint Form

Thank you for submitting your complaint to the Office for Civil Rights (OCR).

To facilitate the processing of your complaint, **please submit your signed consent form within 20 calendar days of the date of this email**. If you checked the box on the complaint form requesting early mediation, you **MUST** submit a signed consent form to participate.

You may submit your signed consent form in one of these three ways:

1.  Email a scanned PDF file or photo/jpeg file of your consent form to the email address below; or

2.  Fax your consent form to the fax number below; or

3.  Mail your consent form to the office address below. Please notify OCR using the email address or phone number below that you are mailing your consent form. In your e-mail or voicemail message, please include your case number, the name of the recipient, and the date that you mailed your signed consent form.

A copy of the consent form is available for your convenience at OCR Complaint Consent Form. If you do not have access to a printer, please email or call the OCR Regional Office

1 identified below to request a blank consent form. For more information about how OCR may

2 use personal information with written consent, please see OCR's "Notice About Investigatory

3 Uses of Personal Information."

4 **Your complaint has been automatically forwarded to the following OCR Regional**

5 **Office for review:**

| | |
|---|---|
| Office for Civil Rights/ED | **Phone:** 415-486-5555 |
| San Francisco Office | **TDD:** 800-877-8339 |
| 50 United Nations Plaza | **Fax:** 415-486-5570 |
| Mail Box 1200, Room 1545 | |
| San Francisco, CA, 94102 | **Email:** ocr.sanfrancisco@ed.gov |

6

7 The Regional Office will contact you if it needs more information about your complaint. If you

8 need to communicate with OCR or submit additional information regarding your complaint,

9 **please do not reply to this message.** Instead, please direct your correspondence to the

10 above office.

11 **We recommend that you print a copy of this message and retain it for your records.**

12 _____

13 **The following information has been sent to the specified office:**

14 1. Enter information about yourself

15 <redacted>

1 2. Who else can we call if we cannot reach you?

2 **Contact's Name:** Nan Zhong

3 **Daytime Phone Number:** <redacted>

4 **Relationship to you:** Spouse

5 3. Who was discriminated against?

6 **Yourself or Someone else** Someone else

7 If someone other than yourself please include:

8 **Injured Person's Name:** Stanley Zhong

9 **Daytime Phone Number:** <redacted>

10 **Relationship to You**

11 **(eg. son or daughter)** son

12 **Injured Person's Address:** <redacted>

13 **City:** Palo Alto

14 **State:** California

15 **Zip Code:** 94306

16 4. What institution discriminated?

17 **Institution Name:** UC Berkeley, UCLA, UC San Diego, UC Santa Barbara

18 **State:** California

19 5. Have you tried to resolve the complaint through the institution's grievance

20 process, due process hearing, or with another agency?

1 **Have you tried to resolve the complaint?** No

2 6. Describe the discrimination

3 OCR enforces regulations that prohibit discrimination on the basis of race, color, national

4 origin; sex; disability; and/or age.

5 (You may select more than one.)

6 **On what basis were you discriminated against?** race or color, sex

7 **In the space provided below please describe each discriminatory action separately.**

8 **For each action, you need to provide the following information:**

9 High school graduate hired by Google after being rejected by colleges

10 --------------------------------------------------------------------------------

11 To whom it may concern,

12

13 I am filing a civil rights discrimination complaint on behalf of my son Stanley Zhong for the

14 discrimination during his college application process.

15

16 Stanley Zhong graduated from high school in June 2023. Shortly after he turned 18, Google

17 hired him as an L4 software engineer, a position typically offered to candidates with multiple

18 years of professional experience as well as a college degree.

19

20 In contrast, his college application results were underwhelming. He applied to the Computer

21 Science programs. All the colleges listed below rejected his application.

1

2 MIT

3 CMU

4 Stanford

5 UC Berkeley

6 UC LA

7 UC San Diego

8 UC Santa Barbara

9 UC Davis

10 California Polytechnic State University

11 Cornell University

12 Univ of Illinois

13 Univ of Michigan

14 Georgia Tech

15 Cal Tech

16 Univ of Wisconsin

17 Univ of Washington


18 Here are some highlights of his application.


19 * Advanced to the Google Code Jam Coding Contest semi-final.


20 * Led his team to the 2nd place in MIT Battlecode's global high school division (1st place in

21 the US). Invited to MIT with expenses paid.


22 * Won 3rd place in CMU's picoCTF cybersecurity competition (across all age groups). Invited

23 to CMU with expenses paid.

1 * Created an e-signing startup (RabbitSign.com) that has grown to tens of thousands of

2 users organically.

3 + An Amazon Web Services Well-Architected Review concluded that it "is one of the most

4 efficient and secure accounts" they have reviewed.

5 + Amazon Web Services is publishing a case study featuring RabbitSign for its exemplary

6 use of AWS Serverless and compliance services.

7 + Negotiated a 90% discount (worth $40K+) for compliance audits. After working with the

8 auditors over several quarters, RabbitSign is now the world's only provider of unlimited free

9 SOC 2-, ISO 27001- and HIPAA-compliant e-signing.

10 + Interviewed by Viewpoint with Dennis Quaid

11 (https://www.viewpointproject.com/features-postidd3e6da7a/), a series of short

12 documentaries on innovations. Their past guests included President George H.W. Bush,

13 Secretary Colin Powell, and Fortune 500 CEOs.

14 * Co-founded a non-profit (http://openbrackets.us) that has brought free coding lessons to

15 500+ kids in underserved communities in California, Washington and Texas.

16 * National Merit Scholarship finalist

17 * SAT: 1590

18 * GPA (UW/W): 3.97/4.42

1 * Served as the founding officer and president of the competitive programming club at his
2 high school

3 * His personal statement (essay) was pretty much captured in the Viewpoint interview. It was
4 about why Stanley created RabbitSign, how he struggled but eventually found a partner to
5 enable the free HIPAA-compliant e-signing that can help lower America's healthcare cost,
6 and how RabbitSign is the first Activism Corporation designed to counter corporate greed in
7 favor of social good.

8 Apparently, his profile above was enough to interest Google to interview and hire him, but
9 failed to get his application accepted by the colleges listed above. I strongly suspect that his
10 college application results were a result of discrimination based on race or sex or both.

11 Thanks for your attention! If you have any questions, please let me know.

12 Best,

13 <redacted>

14 Do you have written information that you think will help us understand your complaint?

15 **yes or no** No

16 7. Your complaint must be filed within 180 days of the discriminatory action

17 The laws that we enforce require that complaints be filed with our office within 180 days of
18 the alleged discriminatory event. If any of the alleged discriminatory actions took place more
19 than 180 days before the postmark or receipt date of this complaint, you may request a
20 waiver of the 180-day limit.When did the last act of discrimination occur?

1 When did the last act of discrimination occur?

2 **Enter the date:** Fri, 03/31/2023 - 00:00

3 Are you requesting a waiver of the 180-day filing time limit for discrimination that occurred

4 more than 180 days before the filing of this complaint?

5 Are you requesting a waiver of the 180-day filing time limit for discrimination that

6 occurred more than 180 days before the filing of this complaint?

7 **yes or no** No

8 8. What would you like the institution to do as a result of your complaint?

9 **What remedy are you seeking?** I'd like the institution to provide an explanation of their

10 rejection of Stanley's application.

11 9. Option to Participate in OCR's Early Mediation Process

12 **I am interested in participating in early mediation:** No

13    U.S. Department of Education's Office for Civil Rights Complaint Assessment System (CAS)

14

15

16

1 This is the assignment of the case number.



**UNITED STATES DEPARTMENT OF EDUCATION**
**OFFICE FOR CIVIL RIGHTS**

50 UNITED NATIONS PLAZA
MAIL BOX 1200, ROOM 1545
SAN FRANCISCO, CA 94102

REGION IX

CALIFORNIA

September 26, 2023

By email only to: ███████████

Re:    University of California, Berkeley
       OCR Case No. 09-23-2699

Dear ███████:

This is to acknowledge that the U.S. Department of Education, San Francisco Office for Civil Rights (OCR), received your complaint on September 26, 2023. We are evaluating your complaint to determine whether OCR will open your allegation(s) for investigation. We will send you a letter notifying you of our determination.

To facilitate the processing of your complaint, please submit any additional correspondence via email to ocr.sanfrancisco@ed.gov. A scanned PDF file or photo/jpeg file are both acceptable. You also may submit your correspondence via fax to 415-486-5570 (ATTN: OCR SF and include the case number at the top of this page).

If the above electronic submission options are not available to you, additional correspondence may be mailed to the 50 United Nations Plaza address indicated at the top of this letter. If you must return documents to OCR by postal mail, please notify us of this by contacting ocr.sanfrancisco@ed.gov or calling (415) 486-5555 as soon as possible. In your e-mail message or voice message, please include your case number, the name of the recipient, and the date that you have mailed your completed consent form or other documents to OCR San Francisco.

A copy of OCR's Case Processing Manual is available at https://www2.ed.gov/about/offices/list/ocr/docs/ocrcpm.pdf. If you have any questions concerning this correspondence, please call our office at (415) 486-5555 and refer to your case number listed above.

Sincerely,

James M. Wood
Team Leader

*The Department of Education's mission is to promote student achievement and preparation for global competitiveness by fostering educational excellence and ensuring equal access.*

*www.ed.gov*

1

2 _____

3 **From**: Isaac Quinn, Dana <Dana.IsaacQuinn@ed.gov>

4 Wed, Oct 25, 2023 at 5:05 PM

5

6 Dear XXX,

7

8 The U.S. Department of Education Office for Civil Rights (OCR) recently emailed

9 you an acknowledgement letter regarding your complaint against the University

10 of California, Berkeley (case number 09-23-1782). Thank you for returning the

11 Privacy Act Consent Form. OCR is in the process of reviewing your complaint to

12 determine whether we can investigate any of your allegations. Please respond

13 to the following questions. Please note that failure to respond to the below

14 questions within 14 days may result in the dismissal of your complaint:

15

16 1.Can you tell me more about why you believe Stanley was denied admission at

17 the University of California because of his race or national origin?

18 2.Why do you believe that Stanley was denied admission based on sex?

19 3.When did you learn that he was denied admission?

20 4.Do you know of other students with the same qualifications who were denied

21 admission, but are of different races or of a different national origin?

22 5.Do you know of other students with the same qualifications who were denied

23 admission, but are of a different sex?

6.Was Stanley accepted to any schools within the University of California

system? If so, which ones?

Thank you-

Dana Isaac

Dana Isaac Quinn

Civil Rights Attorney

US Department of Education

(t)415.486.5596 // (f)415.486.5570

_____

Thu, Nov 2, 2023 at 9:58 PM

**To**: "Isaac Quinn, Dana" <Dana.IsaacQuinn@ed.gov>

Dear Dana,

Thanks for reviewing the complaint.

First, please let me summarize Stanley's college application story. It is so bizarre that it was reported by ABC, CBS, CNBC, USA Today, and other media channels. It was also presented at a congressional hearing on September 28.

In addition to an excellent academic record and strong leadership both in and outside his school, as a high schooler, Stanley achieved multiple recognitions that made him stand out even among professional software developers around the world. For example,

He advanced to the Google Code Jam Coding Contest semi-final.

His e-signing startup is featured in an Amazon Web Services case study, an honor received by only a handful startups in the world.

He won 2nd place in MIT Battlecode's high school division.

In 2019, not knowing he was only 13 years old, a Google recruiter invited him to interview for a full-time job. Shortly after turning 18, in September 2023, he was hired by Google as an L4 software engineer, a position that typically requires multiple years of professional experience as well as a college degree.

In contrast, despite citing the awards above (and a lot more), his college application (more details published here) was rejected by all five UC schools he

1  applied to. So our complaint is not limited to UC Berkeley, but also UCLA, UC

2  San Diego, UC Santa Barbara and UC Davis. After Stanley's story went public, I

3  received numerous emails, complaining about similarly unfathomable

4  application results with the UC schools. So Stanley's case is not alone.

5

6  The Varsity Blues scandal already eroded public trust in college admissions. The

7  2020 audit report by the California State Auditor further underscored

8  deficiencies in UC's admissions practices. Its summary says,

9

10  "The university has also failed to ensure that campuses fairly and consistently

11  treat the thousands of prospective students who apply each year. Neither UC

12  Berkeley nor UCLA have developed methodologies for how they determine

13  which applicants to admit. Nevertheless, both of those campuses admitted

14  thousands of applicants whose records demonstrated that they were less

15  qualified than other applicants who were denied admission. Applicants' chances

16  of admission were also unfairly affected by UC Berkeley's, UCLA's, and UC San

17  Diego's failures to properly train and monitor the staff who review and rate

18  applications. We found that staff were sometimes overly strict or overly lenient in

19  their review of applications, thereby making the applicants' chances of

20  admission unduly dependent on the individual staff who rated them rather than

21  on the students' qualifications."

22

1  UCLA's late distinguished sociologist, Prof Robert D. Mare also documented

2  anti-Asian bias in UCLA's admissions process in his report titled "Holistic Review

3  in Freshman Admissions at the University of California—Los Angeles 2009-2011

4  Update." Its summary says,

5

6  "In both Final and Supplemental Review, African American applicants receive

7  somewhat more favorable and 'North Asian' (Chinese, Japanese, Korean,

8  Indian/Pakistani American) applicants receive somewhat less favorable holistic

9  read scores than applicants in other ethnic identity groups who are otherwise

10 similar in measured academic qualifications, personal characteristics, and

11 measured challenges and hardships."

12

13 In line with the reports by the California State Auditor and Prof Mare, as

14 students and parents, we are seeing nonsensical admission results again and

15 again. The implied discrimination is alarming.

16

17 As a basic democratic principle, we should have checks and balances for every

18 power, including the power of the admission offices. Holistic reviews should not

19 be construed as black box reviews. Therefore I filed the complaint as an attempt

20 to open up the admission process black box in order to investigate potential

21 discriminations.

22

23 For your questions, here is the best information I have.

1

2 1.Can you tell me more about why you believe Stanley was denied admission at

3 the University of California because of his race or national origin?

4 Like most people who heard Stanley's story, I found the rejections by five UC

5 schools nonsensical. The only plausible reason I can think of is his race or sex

6 or both.

7

8 2.Why do you believe that Stanley was denied admission based on sex?

9 Please see the answer above.

10

11 3.When did you learn that he was denied admission?

12 March 31, 2023. That was when the UC schools released their admission

13 decisions.

14

15 4.Do you know of other students with the same qualifications who were denied

16 admission, but are of different races or of a different national origin?

17 I heard some cases anecdotally. But I have no legal standing to investigate on

18 my own. That's why I filed the complaint, requesting an investigation by the

19 Department of Education.

20

21 5.Do you know of other students with the same qualifications who were denied

22 admission, but are of a different sex?

23 Please see the answer above.

1

2 6.Was Stanley accepted to any schools within the University of California

3 system? If so, which ones?

4 Stanley applied to five UC schools (UC Berkeley, UCLA, UC San Diego, UC

5 Santa Barbara and UC Davis) and was rejected by all of them. Because of the

6 ELC program, he did receive an admission from UC Merced, which he didn't

7 apply to. In addition, his application was also rejected by California Polytechnic

8 State University, Univ of Wisconsin, Univ of Washington, Univ of Illinois, Univ of

9 Michigan, Georgia Tech, Cal Tech, Cornell University, MIT, CMU and Stanford.

10 Only Univ of Texas and Univ of Maryland accepted his application.

11

12 If you need any additional information, please let me know. Once again, thanks

13 for your attention on this matter.

14

15 Best,

16

17 ——————————————————————————————————

18 **From**: Isaac Quinn, Dana <Dana.IsaacQuinn@ed.gov>

19 Mon, Nov 6, 2023 at 3:56 PM

20

21 Thank you XXX- I am confirming receipt of the below information.

22

23 ——————————————————————————————————

1

2

3 **From**: Isaac Quinn, Dana <Dana.IsaacQuinn@ed.gov>

4 Mon, Nov 27, 2023 at 12:27 PM

5

6 Dear XXX,

7

8 In order to help protect the environment, reduce operating costs, and provide

9 more immediate communications to you, please find the attached letter in PDF

10 delivered via email. If you require a letter sent by postal service mail, please

11 inform us of this fact, and we will be happy to accommodate you.

12

13

14 Dana Isaac Quinn

15 Civil Rights Attorney

16 US Department of Education

17 (t)415.486.5596 // (f)415.486.5570

18

19 ——————————————————————————————————————

20

21 Here is the attached PDF from Dana Isaac Quinn.

22



**UNITED STATES DEPARTMENT OF EDUCATION**
**OFFICE FOR CIVIL RIGHTS**

REGION IX
CALIFORNIA

50 UNITED NATIONS PLAZA
MAIL BOX 1200, ROOM 1545
SAN FRANCISCO, CA 94102

November 27, 2023



*By email only to:* 

Re:    University of California Berkeley, Los Angeles, San Diego, and Santa Barbara
        OCR Case No. 09-23-2699

Dear ▮▮▮▮:

On September 26, 2023, the U.S. Department of Education (Department), Office for Civil Rights (OCR), received your complaint against the University of California (UC) Berkeley, UC Los Angeles, UC San Diego and UC Santa Barbara (collectively, the Universities). OCR understands your allegation to be that the Universities discriminated against your son (Student) on the basis of race and sex when the Universities denied the Student admission.

For the reasons explained below, OCR is dismissing your complaint.

OCR enforces Title VI of the Civil Rights Act of 1964 (Title VI), 42 U.S.C. §§ 2000d-2000d-7, and its implementing regulations, 34 C.F.R. Part 100, which prohibit discrimination on the basis of race, color, or national origin under any program or activity receiving federal financial assistance. OCR also enforces Title IX of the Education Amendments of 1972 (Title IX), 20 U.S.C. §§ 1681-1688, and its implementing regulations at 34 C.F.R. Part 106, which prohibit discrimination on the basis of sex in any education program or activity operated by a recipient of federal financial assistance. As a recipient of federal financial assistance from the Department, the Universities are subject to Title VI and Title IX.

You informed OCR that the Student graduated from high school in June of 2023. You stated that the Student applied to several universities in the University of California system; the Student was denied admission to the Universities. In support of your allegation, you stated that the Student, however, was hired by Google as a software engineer, which is a position that is normally offered to candidates with multiple years of professional experience and to those who have a college degree. You noted that because of his accomplishments, and job offer from Google, you

*The Department of Education's mission is to promote student achievement and preparation for global competitiveness by fostering educational excellence and ensuring equal access.*

*www.ed.gov*

Page 2 – (09-23-2699)

strongly suspected that his denial was because of his race, sex or both. In email correspondence with OCR you provided additional details. You stated that the Student's admissions denial were "nonsensical" and that the only plausible reason you could think of was the Student's race and sex. You informed OCR that you have heard annectodal stories of students with similar qualifications as the Student, but who are of a different race and sex, who were also denied admission to the Universities. You also provided OCR with links to two reports related to race and admissions to support your allegation. First, you linked to a 2022 audit report prepared by the California State Auditor, who noted that UC Berkeley and UC Los Angeles did not have methodologies for determining what students to admit and that as a result a student's admission could be based solely on who reviewed their application. The audit did not include a discussion of race or sex. The second was a report prepared by a sociologist at UC Los Angeles who reviewed admissions data from 2009-2011. The report stated that "North Asian" applicants had less favorable admissions "read scores" than applicants in other ethnic identity groups.

Pursuant to OCR's Case Processing Manual (CPM) Section 108(d), OCR will dismiss an allegation if the allegation lacks sufficient detail for OCR to infer that discrimination or retaliation may have been occurring or is occurring. [1] While you stated that you believe that the Student was denied admission to the Universities because of his race and/or sex, your reason for this belief was based off of the fact that the Student was offered a job at Google which would suggest that he should have been admitted to the Universities. You also stated that you have heard of students with similar qualifications who were similarly denied admission, however you also noted that these students were of different races and sexes than the Student which would not suggest that the Student was treated differently based on race or sex. Additionally, while you provided two articles in support of your allegation, one is from 2009-2011, and the other does not include an analysis regarding race in admissions. Neither article discussed the impact of sex in admission at the Universitites. As such, you did not provide sufficient facts from which OCR could infer that the Student's admission denials were based on race, and OCR is dismissing your complaint.

This concludes OCR's consideration of your complaint. Please note that OCR has not informed the Universities of your complaint.

This letter sets forth OCR's determination in an individual OCR case. This letter is not a formal statement of OCR policy and should not be relied upon, cited, or construed as such. OCR's formal policy statements are approved by a duly authorized OCR official and made available to the public.

OCR would like to make you aware that individuals who file complaints with OCR may have the right to file a private suit in federal court whether or not OCR finds a violation.

Under the Freedom of Information Act (FOIA), it may be necessary to release this document and related correspondence and records upon request. If OCR receives such a request, OCR will seek to protect, to the extent provided by law, personally identifiable information that could reasonably be expected to constitute an unwarranted invasion of personal privacy if released.

---

[1] *Case Processing Manual* (Jul. 18, 2022), https://www2.ed.gov/about/offices/list/ocr/docs/ocrcpm.pdf.

Page 3 – (09-23-2699)

If you have any questions about this letter, please call our office at 415-486-5555.

Sincerely,

Sara Berman
Team Leader

1 Tue, Nov 28, 2023 at 10:18 AM

2 **To**: "Isaac Quinn, Dana" <Dana.IsaacQuinn@ed.gov>

3

4 Dear Dana Isaac Quinn,

5

6 Thanks for your letter! Apparently there was a major misunderstanding. In

7 response to the question "Do you know of other students with the same

8 qualifications who were denied admission, but are of different races or of a

9 different national origin?", my answer was "I heard some cases anecdotally."

10 What I meant was that I heard some cases anecdotally where similarly strong

11 applicants of the same race were denied admission. To the best of my

12 knowledge, I am NOT aware of students of different races with the same

13 qualifications who were denied admission. With that clarification, could you

14 reopen the investigation?

15

16 ————————————————————————————————————————

17

18 **From**: Isaac Quinn, Dana <Dana.IsaacQuinn@ed.gov>

19 Fri, Dec 15, 2023 at 10:13 AM

20

21 Dear XXX,

22

Thank you for the clarification. This does not change OCR's disposition of your complaint, but we are adding your below email to the case file.

Best-

Dana Isaac

———————————————————————————————

Wed, Dec 27, 2023 at 10:10 AM

**To**: "Isaac Quinn, Dana" <Dana.IsaacQuinn@ed.gov>

Dear Dana,

Hope you had a great Christmas.

With the clarification, can you issue an updated disposition letter? Is there an appeal process?

BTW, it seems OCR considers Prof Robert Mare's report in 2011 outdated. If you wonder why there was no follow-up report after 2011, that is because UCLA discontinued providing the data to researchers, rendering similar research impossible. We have to question what they may be trying to hide.

Thanks,

1

2  ————————————————————————————————

3

4  **From**: Isaac Quinn, Dana <Dana.IsaacQuinn@ed.gov>

5  Tue, Jan 2, 2024 at 2:21 PM

6

7  Hi XXX,

8

9  My apologies for the delayed response. There is no updated disposition letter.

10  The letter that was sent on November 27, 2023 is the final disposition; I have

11  attached it again to this email. We do not have an appeal process, however if

12  there is new or additional information that OCR was not provided with in your

13  initial complaint, you can refile a new complaint with our office. Please make

14  sure that the complaint is filed within 180 of the alleged discrimination.

15

16  Thank you-

17  Dana

18

19  Dana Isaac Quinn

20  Civil Rights Attorney

21  US Department of Education

22

23  (t)415.486.5596 // (f)415.486.5570

Tue, Jan 2, 2024 at 9:06 PM

**To**: "Isaac Quinn, Dana" <Dana.IsaacQuinn@ed.gov>

Hi Dana,

Hope you had a great holiday!

Would you at least consider removing from the disposition letter the information that you know as wrong?

Thanks,

Thu, Apr 11, 2024 at 9:47 PM

**To**: "Isaac Quinn, Dana" <Dana.IsaacQuinn@ed.gov>

Hi Dana,

Bumping this email thread up.

1 Would you at least consider removing from the disposition letter the information

2 that you know as wrong?

3

4 Thanks,

5

6 ―――――――――――――――――――――――――――――――――――――――――――――――

7

8 **From**: Isaac Quinn, Dana <Dana.IsaacQuinn@ed.gov>

9 Mon, Apr 22, 2024 at 5:33 PM

10

11 Hi XXX,

12

13 My apologies for not responding to the previous messages. Unfortunately OCR

14 does not update the disposition letters- the letter that we issued was based on

15 the information that you provided us at that time. You are welcome to contact my

16 supervisor, Sara Berman, at sara.berman@ed.gov if you have any additional

17 questions.

18

19 Dana

20

21 ―――――――――――――――――――――――――――――――――――――――――――――――

22

23 Sun, May 5, 2024 at 4:35 PM

1 **To**: sara.berman@ed.gov

2 **Cc**: "Isaac Quinn, Dana" <dana.isaacquinn@ed.gov>

3

4 Hi Sara,

5

6 Following up on Dana's message, I am contacting you regarding the complaint I

7 filed against the University of California. Summarizing the email thread below,

8 Dana misunderstood my answer to be the opposite of what I meant. Based on

9 that wrong understanding, Dana closed the case. I clarified my answer with

10 Dana. However, Dana insisted the case should be closed. I found that very

11 strange and concerning.

12

13 Could you look into this case?

14

15 Thanks,

16

17 _____

18

19 **From**: Berman, Sara <Sara.Berman@ed.gov>Mon, May 13, 2024 at 11:22 AM

20 **Cc**: "Isaac Quinn, Dana" <Dana.IsaacQuinn@ed.gov>

21

22 Dear Mr. XXX,

23

1 Thank you for your email. Dana and I reviewed the correction you made and

2 determined it would not change the outcome of our dismissal, meaning that your

3 complaint is still dismissed. As such, we did not issue a new letter. You may

4 choose to file a new complaint if you have additional or different information you

5 would like to provide; however, based on the information provided at this time,

6 your complaint is closed. As Dana noted earlier to you, should you file a new

7 complaint, please be sure that the information you provide pertains to actions

8 that have occurred within the 180 days prior to your filing.

9

10 Thank you,

11 Sara Berman

12

13 Sara Berman

14 Supervisory Attorney

15 U.S. Department of Education

16 Office for Civil Rights

17 (ph) 415-486-5504

18 (fax) 415-486-5570

19

20 _____

21

22 Thu, May 16, 2024 at 9:17 AM

23 **To**: "Berman, Sara" <Sara.Berman@ed.gov>

Cc: "Isaac Quinn, Dana" <Dana.IsaacQuinn@ed.gov>

Hi Sara,

Thanks for your reply. Could you please provide the updated reason for the dismissal?

Best regards,

———————————————————————————————————

**From**: Berman, Sara <Sara.Berman@ed.gov>Thu, May 16, 2024 at 11:01 AM

**Cc**: "Isaac Quinn, Dana" <Dana.IsaacQuinn@ed.gov>

Hi Mr. XXX,

As stated before, there are no updates.  You may file a new complaint if you want to include information that was not previously considered that would support your complaint.  However, keep in mind that in order to be timely, the alleged discrimination would need to have occurred within 180 days from filing your complaint.

Best,

Sara

_____

Sat, May 18, 2024 at 11:33 AM

**To**: "Berman, Sara" <Sara.Berman@ed.gov>

**Cc**: "Isaac Quinn, Dana" <Dana.IsaacQuinn@ed.gov>

Hi Sara,

I am confused now on the reason for the dismissal. Could you please provide the reason for the dismissal?

Thank you!

_____

**From**: Berman, Sara <Sara.Berman@ed.gov>Mon, May 20, 2024 at 1:00 PM

**Cc**: "Isaac Quinn, Dana" <Dana.IsaacQuinn@ed.gov>

Dear Mr. XXX,

As stated in OCR's November 27, 2023 letter to you, pursuant to OCR's Case Processing Manual (CPM) Section 108(d), OCR will dismiss an allegation if the

1 allegation lacks sufficient detail for OCR to infer that discrimination or retaliation

2 may have been occurring or is occurring, and OCR determined that your

3 complaint lacked sufficient detail for OCR to infer discrimination or retaliation.

4 As such, your complaint was dismissed, and your clarification did not change

5 the basis for the dismissal.  As you were informed below, you could file a new

6 complaint if you wanted additional information considered that had not

7 previously been provided.

8

9 Thank you,

10 Sara Berman

# EXHIBIT 76

EMAIL EXCHANGE WITH CALIFORNIA ASSEMBLYMEMBER MR. MARC BERMAN AND HIS STAFF

———————————————————————————————————————————————————

**Subject:** Webform submission from: Meeting Request

Submitted on Sat, 11/04/2023 - 22:02

Dear Assemblymember Berman,

On behalf of hundreds of residents in your district, I am writing to you to address a matter of great importance – the need for more transparency in college admission. To begin, let me share my son Stanley's college application story (https://docs.google.com/document/d/e/2PACX-1vSQykM8hkz9Irdn3GM8DOxO D4H0Z1hkLAFS37bXDJToVATFXKFSyDkTR64_qG1NnL__mJ8ebA73a9sA/pub ). It is so bizarre that it was reported by ABC, CBS, CNBC, USA Today, and other media channels. It was also presented at a congressional hearing on September 28 (https://www.youtube.com/watch?v=4Zu5cdfv9kk&t=2587s).

In addition to an excellent academic record and strong leadership both in and outside his school, as a high schooler, Stanley achieved multiple recognitions that made him stand out even among professional software developers around the world. For example,

* He advanced to the Google Code Jam Coding Contest semi-final.

* His e-signing startup is featured in an Amazon Web Services case study, an

honor received by only a handful startups in the world.

* He won 2nd place in MIT Battlecode's high school division.

In 2019, not knowing he was only 13 years old, a Google recruiter invited him to interview for a full-time job. Shortly after turning 18, in September 2023, he was hired by Google as an L4 software engineer, a position that typically requires multiple years of professional experience as well as a college degree.

In contrast, despite citing the awards above (and a lot more), his college application was rejected by all five UC schools he applied to. As a California taxpayer, I was rattled by the fact that he had no UC schools to choose from. After Stanley's story went public, I received numerous emails, complaining about similarly unfathomable application results with the UC schools. So Stanley's case is not alone.

The Varsity Blues scandal already eroded public trust in college admissions. The 2020 audit report (https://www.auditor.ca.gov/reports/2019-113/index.html) by the California State Auditor further underscored deficiencies in UC's admissions practices. Its summary says,

"The university has also failed to ensure that campuses fairly and consistently treat the thousands of prospective students who apply each year. Neither UC Berkeley nor UCLA have developed methodologies for how they determine which applicants to admit. Nevertheless, both of those campuses admitted

1 thousands of applicants whose records demonstrated that they were less

2 qualified than other applicants who were denied admission. Applicants' chances

3 of admission were also unfairly affected by UC Berkeley's, UCLA's, and UC San

4 Diego's failures to properly train and monitor the staff who review and rate

5 applications. We found that staff were sometimes overly strict or overly lenient in

6 their review of applications, thereby making the applicants' chances of

7 admission unduly dependent on the individual staff who rated them rather than

8 on the students' qualifications."

9

10 UCLA's late distinguished sociologist, Prof Robert D. Mare also documented

11 anti-Asian bias in UCLA's admissions process in his report titled "Holistic Review

12 in Freshman Admissions at the University of California—Los Angeles 2009-2011

13 Update." Its summary says,

14

15 "In both Final and Supplemental Review, African American applicants receive

16 somewhat more favorable and 'North Asian' (Chinese, Japanese, Korean,

17 Indian/Pakistani American) applicants receive somewhat less favorable holistic

18 read scores than applicants in other ethnic identity groups who are otherwise

19 similar in measured academic qualifications, personal characteristics, and

20 measured challenges and hardships."

21

22 In line with the reports by the California State Auditor and Prof Mare, as

23 students and parents, we are seeing nonsensical admission results again and

1  again.

2

3  As a basic democratic principle, we should have checks and balances for every

4  power, including the power of the admission offices. Holistic reviews should not

5  be construed as black box reviews. I think college admission transparency is not

6  a blue/red issue. It's a common sense issue about the next generation's

7  education and their mental health.

8

9  I kindly request your support and advocacy for more transparency in college

10  admission. Your leadership in the California State Assembly has the potential to

11  not only make a significant difference in the lives of countless students and their

12  families but also strengthen our communities and our state as a whole.

13

14  Thank you for your dedication to public service and for considering this

15  important issue. I would appreciate the opportunity to discuss this matter further

16  with you and offer my support in any way I can. Please let me know if there is a

17  convenient time for us to connect.

18

19  Sincerely,

20  Nan Zhong

21

22  **Issue to be Discussed-include position represented by attendees:**

23  Demanding UC Admission Transparency

**Attendees (Name, title, whom they represent):**

Nan Zhong, College Admission Transparency Advocate, representing hundreds

of parents in Palo Alto and surrounding areas

---

On Thu, Nov 30, 2023 at 9:28AM Berman Scheduler

<BermanScheduler@asm.ca.gov> wrote:

Hi Nan,

I hope this email finds you well. Thank you for your patience and for requesting

to meet with Assemblymember Marc Berman. Unfortunately, Assemblymember

Berman is not available to meet. However, our Legislative Director, Ellen Green,

is available to meet with you, and is copied on this email. I will ask that you work

directly with the staff member to schedule your meeting.

Kind regards,

Indelize Zendejas

Scheduler

---

1 **From**: Nan Zhong <nanzhong1@gmail.com>

2 Sent: Thursday, November 30, 2023 1:58 PM

3 To: Berman Scheduler <BermanScheduler@asm.ca.gov>

4 Cc: Green, Ellen <Ellen.Green@asm.ca.gov>

5 Subject: Re: Webform submission from: Meeting Request

6

7 Hi Indelize, thanks for your reply!

8

9 Hi Ellen, nice to e-meet you! Here is the agenda doc we prepared for other CA

10 lawmakers. Would love to have a discussion with you. Thanks!

11

12 ————————————————————————————————

13

14 On Fri, Dec 1, 2023 at 10:45AM Green, Ellen <Ellen.Green@asm.ca.gov>

15 wrote:

16

17 Hi Nan,

18

19 Thank you for reaching out to our office.  I am located in our Sacramento Capitol

20 Office, so I would be happy to meet with you virtually.  Do you have availability

21 next week?  I am pretty open 12/7 and 12/8.  Please let me know what works

22 best for you and I will send you a Zoom link.

23

1  Thank you again,

2  Ellen Hou Green | Legislative Director

3

4  ——————————————————————————————————————————

5

6  From: Nan Zhong <nanzhong1@gmail.com>   Fri, Dec 1, 2023 at 12:19 PM

7  To: "Green, Ellen" <Ellen.Green@asm.ca.gov>

8

9  Hi Ellen,

10

11  12/7 would be great. Any time except 10:30-11am or 2-2:30pm works for me.

12  Looking forward to it!

13

14  Thanks,

15  Nan

16

17  ——————————————————————————————————————————

18

19  From: Green, Ellen <Ellen.Green@asm.ca.gov>   Fri, Dec 1, 2023 at 4:57 PM

20  To: Nan Zhong <nanzhong1@gmail.com>

21  Hi Nan,

22

1  Would 11:00 – 11:30am on 12/7 work for you?  If so, I will send a Zoom link on

2  Monday.

3

4  Thank you,

5

6  _____

7

8  From: Nan Zhong <nanzhong1@gmail.com>   Fri, Dec 1, 2023 at 5:47 PM

9  To: "Green, Ellen" <Ellen.Green@asm.ca.gov>

10

11  Yes, that works for me. Thanks!

12

13  Have a nice weekend!

14

15  _____

16

17  On Mon, Dec 4, 2023 at 1:09 PM Green, Ellen <Ellen.Green@asm.ca.gov>

18  wrote:

19

20  Hi Nan,

21

22  Glad the timing works.  Here is the Zoom link for our meeting from 11:00 –

23  11:30am on 12/7: https://caasm.zoom.us/j/xxxxx

1

2 I also wanted to check in with you since our District Office has heard from 12

3 others requesting a meeting on this topic.  Since we already have scheduled the

4 meeting, would you like others join?  Another option is that we can relay that we

5 are meeting with you.

6

7 Thank you,

8 Ellen Hou Green | Legislative Director

9

10 _____

11

12 On Mon, Dec 4, 2023 at 9:18 PM Nan Zhong <nanzhong1@gmail.com> wrote:

13

14 Hi Ellen,

15

16 Thanks for setting up the Zoom link. Please feel free to invite the others to join.

17

18 Also, I prepared this doc to provide some context and hopefully it helps us get

19 more out of the 30 minutes.

20

21 I look forward to our meeting on Thursday!

22

23 Best,

1 Nan

2

3 _____

4    .

5 From: Nan Zhong <nanzhong1@gmail.com>

6 Sent: Friday, January 19, 2024 3:20 PM

7 To: Green, Ellen <Ellen.Green@asm.ca.gov>

8 Cc: College Admission Transparency

9 <college-admission-transparency@googlegroups.com>

10 Subject: Drafting legislatures for UC admission transparency

11

12 Hi Ellen,

13

14 Hope you had a great holiday break!

15

16 Following up on our conversation on UC admission transparency, we had a

17 productive meeting with the following legislative staffers on Wednesday.

18

19 ● Mónica Henestroza, Policy Consultant on Higher Education for Speaker

20 Robert Rivas

21 ● Sophia Kwong Kim, Chief of Staff to the Assembly's Higher Education

22 Committee Chair Mike Fong

1 ●     Jeanice Warden, Chief Consultant of the Assembly's Higher Education

2 Committee

3

4 They are supportives of our efforts to increase UC admission transparency. In

5 fact, they invited us and other lawmakers not on the Higher Ed committee to

6 submit legislative proposals. Would you and Assemblymember Berman be

7 interested in drafting one? Our coalition of thousands of Californians (a lot of

8 them in Mr. Berman's district) would applaud and support it by writing to other

9 lawmakers and Governor Newsom.

10

11 To summarize our interaction with the UC admission office on this issue, it is

12 disappointing to say the least. Given that Google spent 10+ hours interviewing

13 Stanley and concluded that his Computer Science proficiency reached the same

14 level as those with Ph.D. degrees from colleges like UCLA and UC Berkeley, it is

15 strange that the UC admission office continues to insist that Stanley was not

16 qualified enough for their undergraduate programs. I understand that college

17 admission is a difficult operation. The application readers can spend only a few

18 minutes per application and they aren't necessarily equipped with

19 domain-specific knowledge. So things can fall through cracks. However, given

20 the public outcry and obvious absurdity, with ample time to re-examine the case,

21 the dismissive nature of the UC admission office's response letter is insulting to

22 the public and it was a great disservice to this world-renowned institution.

23 Dismissing the previous mistake offhandedly as a non-issue is a mistake worse

1  than the original one. It is no longer in the realm of honest mistakes that we all

2  make sometimes. Instead, it speaks volumes about whether they care. With

3  UC's role in the Varsity Blues scandal and the 2020 audit report by the California

4  State Auditor, the burden is on the UC admission office to prove that they

5  deserve the public's trust. In 1989, UC Berkeley apologized for a policy that

6  limited Asians after the state audit in 1987. Things moved on. Now it's time to

7  demand accountability in the admission office so we can move on again.

8

9  Interestingly, after the resignation of President Magill at the Univ of

10 Pennsylvania, 1200 faculty members signed the new constitution proposal,

11 which calls out admission transparency explicitly. It says, "Admission policies

12 should prioritize the fair treatment of each individual applicant, and criteria must

13 be objective, transparent, and clearly communicated to all community

14 members." I hope UC's admission office adopts a similar principle as soon as

15 possible.

16

17 Would love to hear your thoughts and hopefully move towards actual

18 legislatures.

19

20 Thanks,

21 Nan

22

23 ───────────────────────────────────────────────

1

2 On Fri, Jan 26, 2024 at 6:32 PM Green, Ellen <Ellen.Green@asm.ca.gov>

3 wrote:

4

5 Hi Nan,

6

7 Hope you had a great holiday break as well!

8

9 Thank you for the updates.  I recall in our previous meeting that other offices

10 expressed interest and thought they may want to introduce legislation.

11

12 Not sure if you were aware, but last Friday was the legislative deadline to submit

13 bill ideas to our Legislative Counsel for drafting.  This means that in order for bill

14 language to be introduced by the bill introduction deadline next month bill

15 language needed to be submitted by last Friday.  I have submitted language for

16 bill proposals we are considering and am not able to submit new requests since

17 the deadline has passed.  Sorry if this is new information to you, but glad to hear

18 you have been having productive meetings.

19

20 Thank you,

21 Ellen Hou Green | Legislative Director

22

23 ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

1

2 On Fri, Jan 26, 2024 at 7:19 PM Nan Zhong <nanzhong1@gmail.com> wrote:

3

4 Hi Ellen,

5

6 Thanks for the info! When will the submission window be open again? Given a

7 high percentage of our coalition is in Mr. Berman's district, I thought it would be

8 appropriate for Mr. Berman's office to lead the drafting process. Would love to

9 hear your thoughts.

10

11 Best,

12 Nan

13

14 ⸻

15

16 From: Nan Zhong <nanzhong1@gmail.com>

17 Sent: Tuesday, February 20, 2024 10:02 AM

18 To: Green, Ellen <Ellen.Green@asm.ca.gov>

19 Cc: Assemblymember Berman <Assemblymember.Berman@assembly.ca.gov>;

20 College Admission Transparency

21 <college-admission-transparency@googlegroups.com>

22 Subject: Re: Drafting legislations for UC admission transparency

23

Hi Ellen,

As a grassroots organization of several thousand Californians, we are in for a long fight. So I am not concerned that the current legislative drafting window is closed. I am more interested in getting a good draft ready for the next session. Could you help us with that? Given a high percentage of our coalition is in Mr. Berman's district, I thought it would be appropriate for Mr. Berman's office to lead the drafting process. Would love to hear your thoughts.

Thanks,

Nan

_____

From: Green, Ellen <Ellen.Green@asm.ca.gov>   Tue, Feb 20, 2024 at 11:17 AM

To: Nan Zhong <nanzhong1@gmail.com>

Hi Nan,

So sorry for missing your previous email.

As it relates to your question in that email, the window opens again in the 2025

Legislative Session.  They have not identified the legislative deadlines, but I

anticipate the deadline to submit language to counsel will again be sometime in

January next year.

Let me circle back with you on your email from today.  This past Friday was the

bill introduction deadline so I am still in the middle of all that.

Thank you,

Ellen Hou Green | Legislative Director

————————————————————————————————————————

From: Nan Zhong <nanzhong1@gmail.com>   Mon, Mar 18, 2024 at 12:44 PM

To: "Green, Ellen" <Ellen.Green@asm.ca.gov>

Cc: assemblymember.berman@assembly.ca.gov, College Admission

Transparency <college-admission-transparency@googlegroups.com>

Hi Ellen, here is my statement to the UC Board of Regents at their March 20

meeting. I am becoming angry at the UC admissions office's continued

stonewalling while systematically hurting Asian kids. It has been a month since

our last communication. Again, since a high percentage of our coalition is in Mr.

1 Berman's district, I thought it would be appropriate for Mr. Berman's office to

2 lead the drafting process. I'd appreciate your response. Thanks!

3

4 Honorable members of the UC Board of Regents,

5

6 I'd like to follow up on the comment I made in January and November regarding

7 the need for more transparency in UC admissions. After my November

8 comment, I received a 2-page letter with no meaningful information from Han Mi

9 Yoon-Wu, Associate Vice Provost and Executive Director of Undergraduate

10 Admissions. After my January comment, I received a half-page letter with no

11 meaningful information.

12

13 While the UC admissions office is doing nothing to increase its transparency, we

14 compiled our own data. So let's not ignore the elephant in the room: race. All the

15 highly qualified applicants rejected by the UC are Asians. It's clear to me that the

16 UC admissions office is practicing identity politics, just like the far right. Both the

17 UC and the far right single out a group based on their identity, then direct hatred

18 or penalty towards them. What UC is doing is another form of Asian hate, only

19 more hidden and systematic, thus more hateful, hurtful and harmful than a

20 comment like Trump's stupid "kung flu."

21

22 This form of Asian hate takes its toll on the Asian community. It creates a sense

23 of helplessness among Asian kids. For a student who received the highest level

1 of Presidential Volunteer Service Award, beat the world's top professional

2 programmers in competitions and was hired by Google for a position typically

3 offered to Ph.D graduates, if he is rejected by UC's undergraduate programs, do

4 you realize how absurd that is? Do you understand how one absurd story like

5 this after another leads to a sense of helplessness that is detrimental to Asian

6 kids' mental health? When a Palo Alto School District board member and I sadly

7 discussed local high school suicide cases, we agreed college admission and its

8 blackbox nature very likely contributed to the crisis. There is only so much the

9 high schools can do unless universities become more transparent in their

10 admissions and alleviate the sense of helplessness.

11

12 After being stonewalled by the UC admissions office for the past four months,

13 my hope for an honest, scientific, constructive and good-faith discussion has

14 faded, replaced by disappointment, frustration and anger. I am disappointed

15 because I thought UC would proudly open its admissions practice instead of

16 hiding it in a black box, but I was wrong. I am frustrated because I thought UC is

17 a great public institution that would listen to the public and could be reasoned

18 with instead of ignoring the public outcry, but I was wrong. I am angry because

19 more Asian kids will suffer, yet nobody seems to care, even those

20 self-proclaimed anti-racists. If UC thinks its admissions practice is countering the

21 far right, you got it wrong. Absurd far left policies are only going to exacerbate

22 people's distrust of public institutions and feed the narratives of the far right. To

1 counter the far right, don't move to the far left. Stay in the center and stick with
2 common sense.

3

4 If the admissions office somehow is wishing that stonewalling would tire us out
5 and stop us challenging the absurd status quo, I have news to share. We shall
6 bring the case to the wider public and political debates. We shall expose the
7 "Asian Hate" nature of the far left admissions practice. We shall fight through
8 protests. We shall fight in court. We shall fight in the legislature. We shall fight in
9 the elections. We shall demand accountability. We shall be noisy, annoying and
10 a pain in the butt. We shall fight to the end. Whatever it takes. However many
11 decades it takes. If that shatters the "model minority" stereotype, so be it.

12

13 Dear members of the Board, as the leaders of the UC, the buck stops with you.
14 This time, please do more than just forwarding the letter to the admissions
15 office. It's time to show us your leadership.

16

17 Sincerely,

18 Nan

19 Palo Alto, CA

20

21 —————————————————————————————————————————

22

23 From: Nan Zhong <nanzhong1@gmail.com>  Tue, Mar 26, 2024 at 8:00 AM

1 To: "Green, Ellen" <Ellen.Green@asm.ca.gov>

2 Cc: assemblymember.berman@assembly.ca.gov, College Admission

3 Transparency <college-admission-transparency@googlegroups.com>

4

5 Hi Ellen and Asm Berman,

6

7 We'd appreciate your response on this issue.

8

9 Thanks,

10 Nan

11

12 ——————————————————————————————————————————————————————

13

14 From: Nan Zhong <nanzhong1@gmail.com>   Thu, Apr 4, 2024 at 5:48 PM

15 To: "Green, Ellen" <Ellen.Green@asm.ca.gov>,

16 assemblymember.berman@assembly.ca.gov

17 Cc: College Admission Transparency

18 <college-admission-transparency@googlegroups.com>

19

20 Hi Asm Berman and Ellen,

21

22 When can we expect a response from you?

23

1  Thanks,

2  Nan

3

4  ─────────────────────────────────────────────

5

6  From: Nan Zhong <nanzhong1@gmail.com>   Fri, Apr 12, 2024 at 11:18 AM

7  To: "Green, Ellen" <Ellen.Green@asm.ca.gov>,

8  assemblymember.berman@assembly.ca.gov

9  Cc: College Admission Transparency

10  <college-admission-transparency@googlegroups.com>

11

12  Hi Asm Berman and Ellen,

13

14  Are you receiving our emails? I certainly hope we are not being ghosted

15  intentionally.

16

17  Thanks,

18  Nan

19

20  ─────────────────────────────────────────────

21

22  From: Green, Ellen <Ellen.Green@asm.ca.gov>   Fri, Apr 12, 2024 at 10:35 PM

23  To: Nan Zhong <nanzhong1@gmail.com>

1

2 Hi Nan,

3

4 Now that I have had an opportunity to dig into this, I am able to circle back. As

5 you know, the California State Auditor's office conducted an audit of the UC's

6 admissions process and released a report in 2020. The 82-page report

7 contained recommendations, which included recommending actions each

8 campus should take to ensure that the university maintains a fair and consistent

9 admissions process and ensure that the university maintains a fair and unbiased

10 admissions process. These recommendations are only partially implemented.

11 As a result, Assemblymember Berman will be sending a letter to the State

12 Auditor and sending a letter to UC inquiring on the status of the audit

13 recommendations and emphasizing the importance of following through on fully

14 implementing the recommendations with fidelity to ensure that UC maintains a

15 fair, consistent, and unbiased admissions process.

16

17 Thank you,

18 Ellen Hou Green | Legislative Director

19

20 _____

21

22 From: Nan Zhong <nanzhong1@gmail.com>  Fri, Apr 12, 2024 at 11:18 PM

23 To: "Green, Ellen" <Ellen.Green@asm.ca.gov>

1 Cc: assemblymember.berman@assembly.ca.gov, College Admission

2 Transparency <college-admission-transparency@googlegroups.com>

3

4 Hi Ellen,

5

6 Thanks for digging into this! We appreciate the initiative that Mr. Berman is

7 taking to inquire on the status of the audit recommendations. From our

8 perspective, regardless of what UC has implemented in response to the 2020

9 audit, they continue to produce absurd admission results and fall far below the

10 public's expectations. I made three public comments at the UC Board of

11 Regents meetings. So far, the three responses from the UC admissions office

12 were dismissive of the issue. Here are the links to my comments and their

13 responses.

14 * comment 1

15 * response 1

16 * comment 2

17 * response 2

18 * comment 3

19 * response 3

20

21 We look forward to working with state lawmakers to force UC to improve their

22 admissions practice.

23

1 Thanks again for your efforts!

2

3 Best,

4 Nan

5

6 _____

7

8 From: Nan Zhong <nanzhong1@gmail.com>   Sat, May 11, 2024 at 8:34 AM

9 To: "Green, Ellen" <Ellen.Green@asm.ca.gov>

10 Cc: assemblymember.berman@assembly.ca.gov, College Admission

11 Transparency <college-admission-transparency@googlegroups.com>

12

13 Hi Ellen,

14

15 Has Mr. Berman received any response from the State Auditor and UC?

16

17 Recently, someone shared with me a video of Prof Erwin Chemerinsky, Berkeley

18 Law School Dean, describing the "unstated" racial preferences in faculty hiring.

19 It's eye-opening to see a law professor teaching students to break laws and hide

20 the evidence. Even if UC claims they have the right policies in place, it is clear

21 that they are violating Prop 209 in practice, possibly in an organized yet hidden

22 fashion. So there must be independent oversight.

23

Thanks again for your efforts!

Best,

Nan

———————————————————————————————————————

From: Nan Zhong <nanzhong1@gmail.com>   Thu, May 16, 2024 at 1:20 PM

To: "Green, Ellen" <Ellen.Green@asm.ca.gov>

Cc: assemblymember.berman@assembly.ca.gov, College Admission

Transparency <college-admission-transparency@googlegroups.com>

HI Ellen,

Has Mr. Berman received any response from the State Auditor and UC? Below

is the letter I sent to the UC Board of Regents for the Board meeting held today.

Once again, thanks for your efforts!

Best,

Nan

Honorable members of the UC Board of Regents,

1

2 I'd like to follow up on the comments I made in March, January, and last

3 November regarding the need for more transparency in UC admissions.

4

5 In March, I specifically asked this board to directly weigh in on this issue. Two

6 months later, I'm still waiting for a response. As an engineer by training, I can

7 easily be persuaded by reasoning. If I got anything wrong, tell me and show me

8 concrete data. However, since I brought up this issue last November, my

9 attempts to engage UC for discussions have consistently been met with silence

10 or stonewalling as if I touched on a taboo associated with illegal activities.

11

12 Over time, I learned that my experience fits in a long standing pattern. In 2007,

13 Prof Tim Groseclose, a faculty member on UCLA admissions committee, asked

14 for anonymized sample data from the admissions office. He was rejected. Yes,

15 UCLA hid its admissions data from its own admissions committee! He was told

16 that "we should not study or do any analysis of holistic admissions at UCLA until

17 we have at least four or five years of the outcome to avoid normal annual

18 fluctuations". Now, 17 years later, where is the data? What's the excuse now?

19 Where is the basic intellectual honesty and decency? Where are the academic

20 traditions of open discussions and peer reviews? I can't believe I have to preach

21 such fundamental principles to an academic institution. UC's efforts to keep its

22 admission a black box is an assault on reason and academic integrity.

23

Recently, someone shared with me a video of Prof Erwin Chemerinsky, Berkeley Law School Dean, describing the "unstated" racial preferences in faculty hiring. Really? A law professor teaching students to break laws and hide the evidence? It's a disgrace! It's legally and morally indefensible! No wonder I got the impression that there are institutionalized illegal activities. No wonder UC tightly guards its admissions data because it's incriminating. It starts to make sense.

Finally, I have a message to a Regent not present in the meetings, Governor Newsom. Mr. Newsom, last November, over 3,000 Californians sent you a letter regarding UC admissions. Half a year later, we still haven't heard from you. Your silence and indifference violates your duty as an elected official. Perhaps you consider yourself the governor for some Californians only, not the 3,000 who signed the letter. I'm deeply disappointed as a voter and regret my votes for you in the past. You don't deserve my vote anymore.

Sincerely,

Nan

———————————————————————————————————

From: Green, Ellen <Ellen.Green@asm.ca.gov>    Tue, Jun 4, 2024 at 10:05 AM
To: Nan Zhong <nanzhong1@gmail.com>

Hi Nan,

Thanks for following up.  Sorry for the delay.  You caught me during one of our busiest deadlines.  Now that things have slowed down a little bit, I submitted the letter to the State Auditor and the letter to UC last week.  I am happy to let you know once my office receives responses.

Thank you,

Ellen Hou Green | Legislative Director

---

From: Nan Zhong <nanzhong1@gmail.com>    Tue, Jun 4, 2024 at 10:30 AM
To: "Green, Ellen" <Ellen.Green@asm.ca.gov>

Thank you very much!

---

From: Green, Ellen <Ellen.Green@asm.ca.gov>    Fri, Jul 26, 2024 at 5:07 PM
To: Nan Zhong <nanzhong1@gmail.com>

Hi Nan,

1

2 I wanted to follow up and share the attached response letter from the State

3 Auditor that we received in the mail this week.  I will also let you know once my

4 office receives a response from UC.

5

6 Thank you,

7 Ellen Hou Green | Legislative Director

8

9 ———————————————————————————————

10

11 From: Nan Zhong <nanzhong1@gmail.com>   Fri, Jul 26, 2024 at 11:30 PM

12 To: "Green, Ellen" <Ellen.Green@asm.ca.gov>

13

14 Hi Ellen,

15

16 Thank you very much for following up on this! Is it OK for me to share this letter

17 publicly?

18

19 Best,

20 Nan

21

22 ———————————————————————————————

23

1 From: Green, Ellen <Ellen.Green@asm.ca.gov>   Thu, Aug 22, 2024 at 2:30 PM

2 To: Nan Zhong <nanzhong1@gmail.com>

3

4 Hi Nan,

5

6 Thank you for your patience during our busiest time of year.

7

8 I reached out to the State Auditor's office inquiring whether this letter can be

9 shared publicly. I just heard back that the information in the letter is available

10 publicly on their website, so this letter is a public document.

11

12 Thanks again,

13 Ellen Hou Green | Legislative Director

14

15 _____

16

17 From: Nan Zhong <nanzhong1@gmail.com>   Thu, Aug 22, 2024 at 2:54 PM

18 To: "Green, Ellen" <Ellen.Green@asm.ca.gov>

19

20 Thank you!

21

22 _____

23

1  From: Green, Ellen <Ellen.Green@asm.ca.gov>   Fri, Sep 13, 2024 at 4:14 PM

2  To: Nan Zhong <nanzhong1@gmail.com>

3

4  Hi Nan,

5

6  I wanted to follow up and share the attached response letter from UC that we

7  received this week.

8

9  Thank you,

10 Ellen Hou Green | Legislative Director

11

12 —————————————————————————————————————————————————

13

14 From: Nan Zhong <nanzhong1@gmail.com>   Tue, Sep 17, 2024 at 10:17 AM

15 To: "Green, Ellen" <Ellen.Green@asm.ca.gov>

16 Cc: College Admission Transparency

17 <college-admission-transparency@googlegroups.com>

18

19 Hi Ellen,

20

21 Thank you and Asm Berman for following up on this matter!

22

1 Regardless of what UC claims in general, can you ask them to explain why all

2 five UC campuses Stanley applied to rejected him? If they dodge specific

3 questions and associated accountability, they can always claim one thing on

4 paper while doing another in reality.

5

6 Best,

7 Nan

8

9 ————————————————————————————————————————————

10

11 From: Nan Zhong <nanzhong1@gmail.com>   Tue, Sep 24, 2024 at 11:20 PM

12 To: "Green, Ellen" <Ellen.Green@asm.ca.gov>

13 Cc: College Admission Transparency

14 <college-admission-transparency@googlegroups.com>

15

16 Hi Ellen,

17

18 What is the next step going to be? Since President Drake said he "will do

19 everything I can to ensure inappropriate admissions do not happen on any of

20 our campuses", can Mr Berman ask him to look into Stanley's case? Please

21 keep in mind that my communication with UC was cc'd to President Drake. So

22 far, he has been completely silent on this matter. Maybe Mr Berman can get him

23 to address it.

1

2 I appreciate your continued efforts.

3

4 Best,

5 Nan

6

7 _____

8

9 From: Green, Ellen <Ellen.Green@asm.ca.gov>   Tue, Oct 1, 2024 at 5:13 PM

10 To: Nan Zhong <nanzhong1@gmail.com>

11

12 Hi Nan,

13

14 For next steps, the State Auditor expects UC will submit further responses and

15 any relevant documentation later this year noting their further progress in

16 implementing the two recommendations.  The State Auditor's office will then

17 evaluate those responses and issue an updated determination as to the

18 implementation status, which will be posted on their website.  The State

19 Auditor's office said that they will keep my office updated on any developments

20 that may arise.

21

22 Thank you,

23 Ellen Hou Green | Legislative Director

1

2 ———————————————————————————————————

3

4 From: Nan Zhong <nanzhong1@gmail.com>   Wed, Oct 2, 2024 at 8:47 AM

5 To: "Green, Ellen" <Ellen.Green@asm.ca.gov>

6 Cc: College Admission Transparency

7 <college-admission-transparency@googlegroups.com>,

8 assemblymember.berman@assembly.ca.gov

9

10 Hi Ellen,

11

12 Thanks for following up on this matter. Can Asm Berman directly inquire to UC

13 about Stanley's case? Without specificity, there can hardly be accountability. UC

14 has been stonewalling Stanley's case for a year despite my repeated inquiries to

15 the Board of Regents, the Admissions Office and the Departments of Computer

16 Science.

17

18 Best,

19 Nan

20

21 ———————————————————————————————————

22

23 From: Nan Zhong <nanzhong1@gmail.com>   Thu, Oct 3, 2024 at 8:10 PM

1  To: assemblymember.berman@assembly.ca.gov

2  Cc: College Admission Transparency

3  <college-admission-transparency@googlegroups.com>, "Green, Ellen"

4  <ellen.green@asm.ca.gov>

5

6  Dear Asm Berman,

7

8  I read the newsletter you issued today titled "17 for 17: the Governor signed

9  every bill I sent to him". When it touted "no Gubernatorial vetoes" as an

10  achievement, I was very disappointed.

11

12  Here is some context. Given that Governor Newsom is an ex officio Regent of

13  UC, we sent a letter signed by 4000+ people to him last November regarding

14  UC admissions. However, he didn't respond at all. To me, his silence and

15  indifference violated his basic duty as an elected official. As a voter that voted

16  for Obama, Clinton and Biden for President and Newsom for Governor multiple

17  times, I will never vote for Newsom again. I am pretty sure most of our grassroot

18  organization members would share the same sentiment. I hope he is not running

19  for public office again. Otherwise, I feel obligated to share our story with other

20  voters.

21

22  With a governor that is failing his basic duty, I am not sure why alignment with

23  him is something to be proud of. I hope your priority is voter first, not governor

1  first or party line first. A concrete way to do that is by sponsoring legislation to

2  increase UC admission transparency and hold UC accountable for their

3  rejections of highly qualified applicants like Stanley.

4

5  I look forward to your reply.

6

7  Best,

8  Nan

9

10  ——————————————————————————————————————————————

11

12  From: Green, Ellen <Ellen.Green@asm.ca.gov>    Wed, Oct 9, 2024 at 12:02

13  PM

14  To: Nan Zhong <nanzhong1@gmail.com>

15

16  Hi Nan,                                                    .

17

18  Happy to share updates on any developments from the State Auditor's office on

19  this matter.  Assemblymember Berman asked me to continue to monitor this and

20  UC admissions broadly.  Unfortunately, our office does not pursue inquires on

21  individual admissions cases.

22

23  Thank you,

1 Ellen Hou Green | Legislative Director

2

3 ——————————————————————————————————————————————

4

5 From: Nan Zhong <nanzhong1@gmail.com>   Wed, Oct 9, 2024 at 12:06 PM

6 To: "Green, Ellen" <Ellen.Green@asm.ca.gov>

7 Cc: College Admission Transparency

8 <college-admission-transparency@googlegroups.com>

9

10 Why not?

11

12 ——————————————————————————————————————————————

13

14 From: Nan Zhong <nanzhong1@gmail.com>   Wed, Oct 9, 2024 at 11:55 PM

15 To: assemblymember.berman@assembly.ca.gov

16 Cc: College Admission Transparency

17 <college-admission-transparency@googlegroups.com>, "Green, Ellen"

18 <ellen.green@asm.ca.gov>

19

20 Dear Asm Berman,

21

22 Is there a law prohibiting your office from pursuing inquiries on individual

23 admissions cases? Or is your choice not to pursue it?

1

2 Can I hear from you directly at least once?

3

4 Thanks,

5 Nan

6

7 _____

8

9 From: Nan Zhong <nanzhong1@gmail.com>   Thu, Oct 17, 2024 at 11:30 AM

10 To: assemblymember.berman@assembly.ca.gov

11 Cc: College Admission Transparency

12 <college-admission-transparency@googlegroups.com>, "Green, Ellen"

13 <ellen.green@asm.ca.gov>

14

15 Dear Asm Berman,

16

17 It has been a week since my last email to you that asked for a response. I'd

18 appreciate an indicator whether you plan to reply. It has been a year since I

19 initially contacted you about UC admissions. I never got anything from you

20 directly. I have been very disappointed at how little you've done over a year. To

21 be clear, UC admissions is an issue that a lot of your constituents care about

22 deeply. Among the 4000+ signatures on the letter we sent to Governor Newsom,

23 which he completely ignored, at least a few hundred were from Palo Alto and

1 the cities in District 23. You can disagree with us. But we won't accept being

2 ignored. That is not how democracy works.

3

4 In my observation, there are two types of politicians, one to serve their

5 constituents and the other to serve their own political careers. Your action (or

6 inaction) on this issue will tell us which type you are.

7

8 Regards,

9 Nan

10

11 PS. Circling back to your newsletter titled "17 for 17: the Governor signed every

12 bill I sent to him", here is a bit of history lesson. The makers of our Constitution

13 created three branches of government to ensure checks and balances. Each

14 branch was designed to be independent. Please keep that in mind.

15

16 _____

17

18 From: Assemblymember Berman

19 <Assemblymember.Berman@assembly.ca.gov>    Tue, Nov 5, 2024 at 4:00 PM

20 To: Nan Zhong <nanzhong1@gmail.com>

21

22 Dear Mr. Zhong,

23

Thank you for reaching out to my office and sharing your concerns regarding UC admissions. I appreciate you working with my staff since your first meeting last December. Since that initial meeting, my staff has corresponded with you on numerous occasions throughout the past year. During this time, I also personally sent letters to both the California State Auditor and the University of California (UC) to inquire on the status of the 2020 audit recommendations and emphasize the importance of following through on fully implementing the recommendations with fidelity to ensure that UC maintains a fair, consistent, and unbiased admissions process. My staff also followed up with you and shared the responses from both the California State Auditor and UC President Drake.

Additionally, my staff shared that the State Auditor's office expects UC will submit further responses and any relevant documentation later this year noting their further progress in implementing the two recommendations and that the State Auditor's office will then evaluate those responses and issue an updated determination as to the implementation status, which will be posted on their website. The State Auditor's office also said that they will keep my office updated on any developments that may arise and my staff is happy to share those updates with you.

I have instructed my staff to continue to monitor this and UC admissions broadly. Given all of the above, I was disappointed to read your email and accusation about how little I have done over this time. My office does not pursue inquires on

1 individual admissions cases. If we did, UC would invoke privacy laws that would

2 prevent them from commenting on an individual case.

3

4 I understand your frustration with UC admissions and support advocating for

5 more transparency, which is why I took action and sent those letters. In your first

6 meeting with my staff, as well as your correspondence with the UC Board of

7 Regents that you shared with my office, you emphasized that you are

8 advocating for the need for more transparency in UC admissions. I took you at

9 your word, and my office has been assisting you in that effort for the last year.

10 However, if you are now only interested in your son's individual case, I am

11 unable to assist you on that matter.

12

13 Regards,

14 Marc Berman

15 Assemblymember, 23rd District

16

17 _____

18

19 From: Nan Zhong <nanzhong1@gmail.com>  Tue, Nov 5, 2024 at 6:17 PM

20 To: Assemblymember Berman <Assemblymember.Berman@assembly.ca.gov>

21 Cc: College Admission Transparency

22 <college-admission-transparency@googlegroups.com>, "Green, Ellen"

23 <ellen.green@asm.ca.gov>

1

2 Dear Mr Berman,

3

4 I am glad to finally hear from you directly. Like I said, without specificity, it is

5 easy for UC to dodge accountability. Transparency and specificity aren't

6 mutually exclusive. In fact, they go hand in hand.

7

8 You don't have to worry about how UC is going to respond to your inquiries.

9 Whatever response they come up with, we will deal with it. But if you choose not

10 to send the inquiry, the responsibility is on you. I am not just speaking for myself.

11 I am speaking on behalf of hundreds of your constituents.

12

13 Best,

14 Nan

15

16 ─────────────────────────────────────────────────────────

17

18 As of the filing of the lawsuit, there has been no reply from Mr. Berman after the

19 email on Nov 5, 2024.

1    # EXHIBIT 77

2    **LETTER TO GOVERNOR NEWSOM (AN EX OFFICIO REGENT OF THE UC) IN NOVEMBER 2023.**

3    **HE NEVER REPLIED.**

4    Dear Governor Newsom,

5

6    On behalf of thousands of Californians, I am writing to you to address a matter of great

7    importance – the need for more transparency in college admission. To begin, let me

8    share my son Stanley's college application story. It is so bizarre that it was reported by

9    ABC, CBS, CNBC, USA Today, and other media channels. It was also presented at a

10   congressional hearing on September 28.

11

12   In addition to an excellent academic record and strong leadership both in and out of his

13   school, as a high schooler, Stanley achieved multiple recognitions that made him stand

14   out even among professional software developers around the world. For example,

15   ●      He advanced to the Google Code Jam Coding Contest semi-final.

16   ●      His e-signing startup is featured in an Amazon Web Services case study, an

17   honor received by only a handful startups in the world.

18   ●      He won 2nd place in MIT Battlecode's high school division.

19   In 2019, not knowing he was only 13 years old, Google invited him to interview for a

20   full-time job. Shortly after turning 18, in September 2023, he was hired by Google as an

21   L4 software engineer, a position that typically requires either a Ph.D degree in computer

22   science or multiple years of professional experience plus a Bachelor/Master's degree.

23

24   In contrast, despite citing the awards above (and a lot more, including the Gold Level

25   President's Volunteer Service Award), his college application was rejected by all five UC

1 schools he applied to, namely UC Davis, UC Santa Barbara, UC San Diego, UCLA and

2 UC Berkeley.  As a taxpayer, I was rattled by the fact that he had no UC schools to

3 choose from. After Stanley's story went public, I received numerous emails,

4 complaining about similarly unfathomable application results with the UC schools. So

5 Stanley's case is not alone.

6

7 The Varsity Blues scandal already eroded public trust in college admissions. The 2020

8 audit report by the California State Auditor further underscored deficiencies in UC's

9 admissions practices. Its summary says,

10

11 "The university has also failed to ensure that campuses fairly and consistently

12 treat the thousands of prospective students who apply each year. Neither UC

13 Berkeley nor UCLA have developed methodologies for how they determine which

14 applicants to admit. Nevertheless, both of those campuses admitted thousands

15 of applicants whose records demonstrated that they were less qualified than

16 other applicants who were denied admission. Applicants' chances of admission

17 were also unfairly affected by UC Berkeley's, UCLA's, and UC San Diego's

18 failures to properly train and monitor the staff who review and rate applications.

19 We found that staff were sometimes overly strict or overly lenient in their review

20 of applications, thereby making the applicants' chances of admission unduly

21 dependent on the individual staff who rated them rather than on the students'

22 qualifications."

23

24 UCLA's late distinguished sociologist, Prof Robert D. Mare also documented anti-Asian

25 bias in UCLA's admissions process in his report titled "Holistic Review in Freshman

1   Admissions at the University of California—Los Angeles 2009-2011 Update." Its

2   summary says,

3

4        "In both Final and Supplemental Review, African American applicants receive

5        somewhat more favorable and 'North Asian' (Chinese, Japanese, Korean,

6        Indian/Pakistani American) applicants receive somewhat less favorable holistic

7        read scores than applicants in other ethnic identity groups who are otherwise

8        similar in measured academic qualifications, personal characteristics, and

9        measured challenges and hardships."

10

11  In line with the reports by the California State Auditor and Prof Mare, as students and

12  parents, we are seeing nonsensical admission results again and again.

13

14  On November 16, representing thousands of Californians, I delivered a public statement

15  during the UC Board of Regents meeting, urging them to increase transparency in UC

16  admissions. Unfortunately, UC's admission office's response was a boilerplate without

17  much meaningful information.

18

19  As a basic democratic principle, we should have checks and balances for every power,

20  including the power of the admission offices. Holistic reviews should not be construed

21  as black box reviews. I think college admission transparency is not a blue/red issue. It's

22  a common sense issue about the next generation's education and their mental health.

23  It's a common sense issue about America's competitiveness in the global economy. It's

24  also a common sense issue about UC's reputation.

25

1  I respectfully seek your support and advocacy for greater transparency in college

2  admission. Your leadership as the Governor and an ex officio Regent can not only

3  significantly impact the lives of countless students and their families but also strengthen

4  our communities and our state as a whole.

5

6  With your leadership, we can transcend political pettiness. Let's create a partnership

7  across students, parents, colleges, governments, education and legal experts. Let's

8  work together to increase transparency in college admissions in a judicious, systematic,

9  cost-effective, and privacy-preserving manner.

10

11  Let's do something for our kids.

12

13  Sincerely,

14  Nan Zhong

15

# EXHIBIT 78

LETTER TO LT GOVERNOR KOUNALAKIS (AN EX OFFICIO REGENT OF THE UC) IN NOVEMBER

2023. SHE NEVER REPLIED.

Dear Lt. Governor Kounalakis,

On behalf of thousands of Californians, I am writing to you to address a matter of great

importance – the need for more transparency in college admission. To begin, let me

share my son Stanley's college application story. It is so bizarre that it was reported by

ABC, CBS, CNBC, USA Today, and other media channels. It was also presented at a

congressional hearing on September 28.

In addition to an excellent academic record and strong leadership both in and out of his

school, as a high schooler, Stanley achieved multiple recognitions that made him stand

out even among professional software developers around the world. For example,

- He advanced to the Google Code Jam Coding Contest semi-final.

- His e-signing startup is featured in an Amazon Web Services case study, an

honor received by only a handful startups in the world.

- He won 2nd place in MIT Battlecode's high school division.

In 2019, not knowing he was only 13 years old, Google invited him to interview for a

full-time job. Shortly after turning 18, in September 2023, he was hired by Google as an

L4 software engineer, a position that typically requires either a Ph.D degree in computer

science or multiple years of professional experience plus a bachelor/master's degree.

In contrast, despite citing the awards above (and a lot more, including the Gold Level

President's Volunteer Service Award), his college application was rejected by all five UC

schools he applied to, namely UC Davis, UC Santa Barbara, UC San Diego, UCLA and UC Berkeley.  As a taxpayer, I was rattled by the fact that he had no UC schools to choose from. After Stanley's story went public, I received numerous emails, complaining about similarly unfathomable application results with the UC schools. So Stanley's case is not alone.

The Varsity Blues scandal already eroded public trust in college admissions. The 2020 audit report by the California State Auditor further underscored deficiencies in UC's admissions practices. Its summary says,

> "The university has also failed to ensure that campuses fairly and consistently treat the thousands of prospective students who apply each year. Neither UC Berkeley nor UCLA have developed methodologies for how they determine which applicants to admit. Nevertheless, both of those campuses admitted thousands of applicants whose records demonstrated that they were less qualified than other applicants who were denied admission. Applicants' chances of admission were also unfairly affected by UC Berkeley's, UCLA's, and UC San Diego's failures to properly train and monitor the staff who review and rate applications. We found that staff were sometimes overly strict or overly lenient in their review of applications, thereby making the applicants' chances of admission unduly dependent on the individual staff who rated them rather than on the students' qualifications."

UCLA's late distinguished sociologist, Prof Robert D. Mare also documented anti-Asian bias in UCLA's admissions process in his report titled "Holistic Review in Freshman

1 Admissions at the University of California—Los Angeles 2009-2011 Update." Its

2 summary says,

3

4　　　"In both Final and Supplemental Review, African American applicants receive

5　　　somewhat more favorable and 'North Asian' (Chinese, Japanese, Korean,

6　　　Indian/Pakistani American) applicants receive somewhat less favorable holistic

7　　　read scores than applicants in other ethnic identity groups who are otherwise

8　　　similar in measured academic qualifications, personal characteristics, and

9　　　measured challenges and hardships."

10

11 In line with the reports by the California State Auditor and Prof Mare, as students and

12 parents, we are seeing nonsensical admission results again and again.

13

14 On November 16, representing thousands of Californians, I delivered a public statement

15 during the UC Board of Regents meeting, urging them to increase transparency in UC

16 admissions. Unfortunately, UC's admission office's response was a boilerplate without

17 much meaningful information.

18

19 As a basic democratic principle, we should have checks and balances for every power,

20 including the power of the admission offices. Holistic reviews should not be construed

21 as black box reviews. I think college admission transparency is not a blue/red issue. It's

22 a common sense issue about the next generation's education and their mental health.

23 It's a common sense issue about America's competitiveness in the global economy. It's

24 also a common sense issue about UC's reputation.

25

1 I respectfully seek your support and advocacy for greater transparency in college

2 admission. Your leadership as the Lieutenant Governor and an ex officio Regent can

3 not only significantly impact the lives of countless students and their families but also

4 strengthen our communities and our state as a whole.

5

6 With your leadership, we can transcend political pettiness. Let's create a partnership

7 across students, parents, colleges, governments, education and legal experts. Let's

8 work together to increase transparency in college admissions in a judicious, systematic,

9 cost-effective, and privacy-preserving manner.

10

11 Let's do something for our kids.

12

13 Sincerely,

14 Nan Zhong

1        **CORPORATE DISCLOSURE STATEMENT**

2

3    Pursuant to Rule 7.1 of the Federal Rules of Civil Procedure, Co-Plaintiff **Students**

4    **Who Oppose Racial Discrimination ("SWORD")** makes the following disclosures:

5    1.    SWORD was incorporated under the laws of the state of California, with no

6    parent corporation, subsidiaries, or corporate affiliates.

7    2.    SWORD is a nonprofit organization that advocates for equal educational

8    opportunities. Its mission is to stop racial discrimination in college admissions.

9    3.    SWORD has no shareholders or equity interests.

10   4.    SWORD does not issue stock, and no publicly held corporation owns 10% or

11   more of any interest in SWORD.

12   Respectfully submitted,

13

14   Nan Zhong (Pro Se)

15   211 Hope St #390755

16   Mountain View, CA 94039

17   nanzhong1@gmail.com

18   Dated: February 7, 2025