1        UNITED STATES DISTRICT COURT

2      FOR THE EASTERN DISTRICT OF CALIFORNIA

3



**FILED**

JUL 29 2025

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
          DEPUTY CLERK

**Stanley Zhong; Nan Zhong,** individually and as next friend of his **Minor Son,**

                    Plaintiffs,

v.

**The Regents of the University of California; Maria Anguiano, Elaine E. Batchlor, Josiah Beharry, Carmen Chu, Michael Cohen, Gareth Elliott, Howard "Peter" Guber, Jose M. Hernandez, Nancy Lee, Richard Leib, Hadi Makarechian, Ana Matosantos, Robert Myers, Lark Park, Janet Reilly, Mark Robinson, Gregory Sarris, Jonathan "Jay" Sures,** each in their personal capacity and their official capacities as regents of the University of California; **The University of California; Michael V. Drake,** in their personal capacity and their official capacity as President of the University of California; **Katherine S. Newman,** in their personal capacity and their official capacity as Provost and Executive Vice President of Academic Affairs of the University of California; **Han Mi Yoon-Wu,** in their personal capacity and official capacity as Associate Vice Provost and Executive Director of Undergraduate Admissions of the University of California; **Erwin Chemerinsky,** in their personal capacity and official capacity as Dean of the Law School of the University of California at Berkeley; **The University of California at Davis; Gary S. May,** in their personal capacity and their official capacity as Chancellor of the University of California at Davis; **Robert Penman,** in their personal capacity and their official capacity as Executive Director of Undergraduate Admissions

Case No.

2:25-cv-00495-DJC-CSK

FIRST AMENDED COMPLAINT

JURY TRIAL DEMANDED

---

of the University of California at Davis; **Dipak Ghosal**, in their personal capacity and their official capacity as Chair of the Department of Computer Science of the University of California at Davis; **The University of California at Berkeley; Rich Lyons,** in their personal capacity and their official capacity as Chancellor of the University of California at Berkeley; **Carol Christ,** in their personal capacity and their official capacity as former Chancellor of the University of California at Berkeley; **Olufemi Ogundele**, in their personal capacity and their official capacity as Director of Undergraduate Admissions of the University of California at Berkeley; **Claire J. Tomlin**, in their personal capacity and their official capacity as Chair of the Department of Computer Science of the University of California at Berkeley; **The University of California at Santa Barbara; Henry T. Yang,** in their personal capacity and their official capacity as Chancellor of the University of California at Santa Barbara; **Lisa Przekop**, in their personal capacity and in their official capacity as Executive Director of Admissions of the University of California at Santa Barbara; **Divyakant Agrawal**, in their official capacity as Chair of the Department of Computer Science of the University of California at Santa Barbara; **The University of California at Los Angeles; Gene Block,** in their personal capacity and their official capacity as Chancellor of the University of California at Los Angeles; **Gary Clark**, in their personal capacity and their official capacity as Director of Undergraduate Admissions of the University of California at Los Angeles; **Todd Millstein**, in their official capacity as Chair of the Department of Computer Science of the University of California at Los Angeles; **The University of California at San Diego; Pradeep K. Khosla,** in their personal capacity and their official capacity as Chancellor of the University of California at San Diego; **Blia Yang**, in their personal capacity and their official

capacity as Executive Director of Undergraduate
Admissions of the University of California at San
Diego; **Sorin Lerner**, in their personal capacity
and their official capacity as Chair of the
Department of Computer Science of the University
of California at San Diego; **Other persons Does
1-20** acting in concert with those named above;
**The U.S. Department of Education** and **Linda
McMahon**, in her official capacity as the U.S.
Secretary of Education,

Defendants.

1    **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES**

2 **I. INTRODUCTION**

3    1. Plaintiffs Stanley Zhong ("Stanley") and Nan Zhong ("Nan"), individually and

4       acting on behalf of his Minor Son ("Minor Son"), pursuant to Federal Rule of Civil

5       Procedure 5.2(a), collectively referred to as "Plaintiffs," bring this civil rights

6       action against the University of California ("UC") and the named UC officials

7       (collectively, "Co-Defendant UC").

8    2. Plaintiffs allege that the University of California and its officials discriminated

9       against highly qualified Asian-American applicants, including Stanley, in the

10      admissions, and, by maintaining the same race-conscious policies, place the

11      Minor Son under an imminent threat of similar discrimination. That conduct

12      violates: (1) the Equal Protection Clause of the Fourteenth Amendment to the

13      U.S. Constitution; (2) Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et

1    seq.; (3) 42 U.S.C. § 1981, which guarantees equal contractual rights regardless

2    of race; and (4) Article I, Section 31 of the California Constitution, which prohibits

3    racial discrimination or preference in public education.

4    3. Plaintiffs also bring claims against the U.S. Department of Education ("ED") and

5    Secretary Linda McMahon (collectively, "Co-Defendant ED"), challenging the

6    constitutionality of the numerical racial targets embedded in federal grant

7    programs, including the Hispanic-Serving Institutions (HSI) program. These

8    targets not only violate the Fifth Amendment but also incentivize violations of the

9    Fourteenth Amendment, Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 1981,

10   and state anti-discrimination laws.

11   4. Plaintiffs further assert that Co-Defendant ED has violated the Administrative

12   Procedure Act (APA) by failing to properly investigate and address the racially

13   discriminatory admissions and hiring practices of UC and other institutions of

14   higher education.

15   5. This case is about the most basic of American promises: to give meaning to the

16   Declaration of Independence's promise that *all human beings are created equal.*

17   Especially over the past half-century, the nation has made a concerted effort to

18   transform this ideal from a lofty aspiration to enforceable guarantee. At the heart

19   is the simple but profound rule: that racial discrimination is more than unfair—it is

20   illegal and indeed, unconstitutional.

21   6. And yet, in one of the most competitive and consequential domains of American

22   life, college admissions, our elite public universities like UC—and the government

1    actors who fund and partner with them—proudly discriminate against Asian

2    American applicants based on their race and have done so for decades. UC

3    operates as though anti-discrimination law protects only *certain* minorities of their

4    preference. Under this conception, Asian Americans are treated not as

5    beneficiaries of civil rights, but as exceptions who are not entitled to civil rights.

6    7.    UC does not openly call these policies what they are—racial discrimination.

7    Instead, UC uses euphemistic language like "affirmative action" and "holistic

8    review." Racial favoritism is rebranded as "progress," and UC reframes race

9    preferences as somehow desirable. But discrimination by another name is still

10    discrimination. Focusing on the benefit to some rather than the burden on others

11    is a rhetorical sleight of hand. Forcing one competitor to begin a race far behind

12    the starting line is no different than giving his rival a head start. In a zero-sum

13    admissions process, selecting winners based on race necessarily predetermines

14    losers. UC's rhetoric obscures the harm, but does not erase it.

15    8.    The results speak for themselves. For years, UC's college admissions

16    systemically penalized hard-working Asian American students—not because they

17    lack merit, but because they don't fit the racial preferences that UC wants to

18    engineer. In the name of vague notions of restitution for past racial injustice,

19    universities like UC have simply created new victims.

20    9.    Stanley and the Minor Son of Nan Zhong do not ask for special treatment.  They

21    ask only for what the Constitution guarantees: an equal shot. A chance to be

22    evaluated on the strength of their character, their intellect, and their

23    achievements, without penalty for race. The Constitution demands nothing less.

FIRST AMENDED COMPLAINT                                        Page 5 of 118

1    10. Plaintiffs seek declaratory and injunctive relief to ensure that UC's admissions

2    policies comply with federal and state law and to allow Asian Americans

3    applicants like Stanley Zhong and the Minor Son an equal opportunity to

4    compete for admission on the basis of merit, free from discrimination. Plaintiffs

5    also seek nominal damages and other appropriate relief for the injuries suffered

6    to their civil rights.

7 **II. PARTIES**

8 **A. Plaintiffs**

9    11. Plaintiff Stanley Zhong is a second-generation Asian American student who at all

10    relevant times was a resident of the state of California. Stanley was denied

11    admission to UC despite extraordinary credentials. Stanley Zhong is a US citizen.

12    12. Like his older brother, Nan Zhong's Minor Son is an Asian American student and

13    a minor child with strong academic ambitions and performance to match. He

14    intends to apply to UC. Because he faces a credible and imminent harm of being

15    subjected to the same discriminatory admissions policies, the Minor Son has

16    standing to seek prospective relief as recognized by the Supreme Court in *Gratz*

17    *v. Bollinger,* 539 U.S. 244 (2003), and *Northeastern Fla. Chapter of the*

18    *Associated Gen. Contractors of America v. Jacksonville*, 508 U.S. 656 (1993). He

19    is a resident of the state of California.

20    13. Plaintiff Nan Zhong proceeds on behalf of and as next friend of his Minor Son

21    pursuant to Fed. R. Civ. P. 17(c); he is a first-generation immigrant from China

22    and a permanent resident of California. He is also the father of Stanley Zhong.

FIRST AMENDED COMPLAINT                                    Page 6 of 118

1    14. The 2024 decision of the Second Circuit Court of Appeals in *Chinese American*

2    *Citizens Alliance of Greater New York (CACAGNY) v. Adams*, 116 F.4th 161,

3    affirms that an "equal protection claim can be asserted by individuals alleging

4    they suffered harm from the discriminatory policy or law, as well as other

5    individuals (such as a parent or guardian) or organizations that also have

6    standing to sue."

7    15. Plaintiff Nan Zhong also proceeds individually because he personally suffers

8    concrete injury due to emotional distress, financial impact, and denial of equal

9    opportunity for his children.

10    16. Nan suffered a direct financial injury in the form of non-refundable application

11    fees paid to institutions that engaged in discriminatory practices, which the ED's

12    policies incentivize and its inaction fails to prevent or remedy. Nan suffered

13    additional financial loss as a result of UC's rejection of Stanley's applications. In

14    anticipation of the significantly higher out-of-state tuition at alternative institutions,

15    Nan was forced to liquidate stock holdings, thereby forfeiting substantial gains as

16    their value later increased. These are concrete, personal financial losses—not

17    merely generalized grievances. Directly attributable to the discriminatory policies

18    and programs of UC and ED, these losses further support Nan's individual

19    standing to bring this claim.

20    17. Nan also faces imminent harm in the form of non-refundable application fees and

21    the potential obligation to pay out-of-state tuition for his Minor Son. This

22    prospective injury—directly traceable to the discriminatory policies and programs

23    of UC and ED—further establishes his individual standing to seek

1    forward-looking relief, as recognized by the Supreme Court in *Gratz v. Bollinger*

2    and *Northeastern Fla. Chapter*.

3    18. Stanley and Nan reached out to multiple legal resources and entities for

4    representation. However, these entities either declined to take the case or failed

5    to respond. Consequently, Stanley and Nan are compelled to represent

6    themselves as pro se litigants.

7    **B. Defendants**

8    19. Defendant the Regents of the University of California is a non-profit educational

9    institution organized under the laws of the state of California.

10   20. Defendants Maria Anguiano, Elaine E. Batchlor, Josiah Beharry, Carmen Chu,

11   Michael Cohen, Gareth Elliott, Howard "Peter" Guber, Jose M. Hernandez, Nancy

12   Lee, Richard Leib, Hadi Makarechian, Ana Matosantos, Robert Myers, Lark Park,

13   Janet Reilly, Mark Robinson, Gregory Sarris, and Jonathan "Jay" Sures are

14   appointed regents of the University of California system. Collectively, they are the

15   governing board of UC. Each appointed regent is sued in their personal and

16   official capacities.

17   21. Defendant the University of California is a public educational institution and a

18   recipient of federal financial assistance, subject to Title VI of the Civil Rights Act

19   of 1964. The University's undergraduate admissions office, operating under the

20   direction of senior administrators and the Regents, is directly responsible for

21   implementing the discriminatory policies and practices challenged in this action.

22. Defendant Michael V. Drake is the President of the University of California during the relevant admissions cycles and currently exercises authority over the University's operations and enforcement of admissions policies. He is sued in his personal and official capacity.

23. Defendant Katherine S. Newman is the Provost and Executive Vice President of Academic Affairs of the University of California during the relevant admissions cycles and currently exercises authority over the University's operations and enforcement of admissions policies. She is sued in her personal and official capacity.

24. Defendant Han Mi Yoon-Wu is the Associate Vice Provost and Executive Director of Undergraduate Admissions for the University of California. In this capacity, she oversees admissions policies and practices systemwide and has ultimate authority over the implementation of UC's "holistic review" framework. Her office approved and enforced admissions practices that systematically disadvantaged Asian-American applicants such as Stanley Zhong. She repeatedly dismissed Plaintiff's complaint offhandedly with an absurd logic. She is sued in her personal and official capacities.

25. Defendant Erwin Chemerinsky is the Dean of the University of California, Berkeley School of Law. In that role, he has publicly defended the use of race-conscious admissions policies and advised other UC departments on strategies to preserve such practices. While serving in leadership and advisory roles, Chemerinsky made statements encouraging circumvention of Proposition 209, which Plaintiffs allege contributed to a culture of noncompliance within UC.

FIRST AMENDED COMPLAINT

1    As a prominent legal voice in the UC system with administrative influence, his

2    statements reflect UC's institutional commitment to racial preferences in violation

3    of federal and state law. He is sued in his personal and official capacity.

4    26. Defendants the University of California at Davis, the University of California at

5    Berkeley, the University of California at Santa Barbara, the University of

6    California at Los Angeles, and the University of California at San Diego are five

7    campuses of the University of California. Each of them rejected Stanley's

8    undergraduate application for Fall 2023 enrollment.

9    27. Defendant Gary S. May is the Chancellor of the University of California at Davis

10    during the relevant admissions cycles and currently exercises authority over the

11    University's operations and enforcement of admissions policies. He is sued in his

12    personal and official capacity.

13    28. Defendant Robert Penman is the Executive Director of Undergraduate

14    Admissions of the University of California at Davis. In that role, he oversees

15    undergraduate admissions and related policies. He is a principal architect and

16    enforcer of the admissions system challenged in this lawsuit, including the

17    purportedly "holistic" review process which incorporates racial considerations in a

18    manner inconsistent with federal and state law. He is sued in his personal and

19    official capacity.

20    29. Defendant Dipak Ghosal is the Chair of the Department of Computer Science of

21    the University of California at Davis. In that role, he oversees the department's

1    undergraduate admissions and related policies. He is sued in his personal and

2    official capacity.

3    30. Defendant Rich Lyons is the Chancellor of the University of California at Berkeley

4    and currently exercises authority over the University's operations and

5    enforcement of admissions policies. He is sued in his personal and official

6    capacity.

7    31. Defendant Carol Christ is the former Chancellor of the University of California at

8    Berkeley during the relevant admissions cycles and exercised authority over the

9    University's operations and enforcement of admissions policies. She is sued in

10    her personal and official capacity.

11    32. Defendant Olufemi Ogundele is the Director of Undergraduate Admissions of the

12    University of California at Berkeley. In that role, he oversees undergraduate

13    admissions and related policies. He is a principal architect and enforcer of the

14    admissions system challenged in this lawsuit, including the purportedly "holistic"

15    review process which incorporates racial considerations in a manner inconsistent

16    with federal and state law. He is sued in his personal and official capacity.

17    33. Defendant Claire J. Tomlin is the Chair of the Department of Computer Science

18    of the University of California at Berkeley. In that role, she oversees the

19    department's undergraduate admissions and related policies. She is sued in her

20    personal and official capacity.

21    34. Defendant Henry T. Yang is the Chancellor of the University of California at Santa

22    Barbara during the relevant admissions cycles and currently exercises authority

FIRST AMENDED COMPLAINT

1     over the University's operations and enforcement of admissions policies. He is

2     sued in his personal and official capacity.

3     35. Defendant Lisa Przekop is the Executive Director of Admissions of the University

4          of California at Santa Barbara. In that role, she oversees undergraduate

5          admissions and related policies. She is a principal architect and enforcer of the

6          admissions system challenged in this lawsuit, including the purportedly "holistic"

7          review process which incorporates racial considerations in a manner inconsistent

8          with federal and state law. She is sued in her personal and official capacity.

9     36. Defendant Divyakant Agrawal is the Chair of the Department of Computer

10        Science of the University of California at Santa Barbara. In that role, he oversees

11        the department's undergraduate admissions and related policies. Plaintiff Nan

12        Zhong contacted Dr. Agrawal following Stanley's rejection, and Agrawal

13        expressed concerns about the outcome. His involvement supports Plaintiffs'

14        claim that even departmental leadership recognized inconsistencies in the

15        admissions process. He is sued in his official capacity.

16    37. Defendant Gene Block is the Chancellor of the University of California at Los

17        Angeles during the relevant admissions cycles and currently exercises authority

18        over the University's operations and enforcement of admissions policies. He is

19        sued in his personal and official capacity.

20    38. Defendant Gary Clark is the Director of Undergraduate Admissions of the

21        University of California at Los Angeles. In that role, he oversees undergraduate

22        admissions and related policies. He is a principal architect and enforcer of the

1    admissions system challenged in this lawsuit, including the purportedly "holistic"

2    review process which incorporates racial considerations in a manner inconsistent

3    with federal and state law. He is sued in his personal and official capacity.

4    39. Defendant Todd Millstein is the Chair of the Department of Computer Science of

5    the University of California at Los Angeles. In that role, he oversees the

6    department's undergraduate admissions and related policies. Plaintiff Nan Zhong

7    contacted Dr. Millstein following Stanley's rejection, and Millstein expressed

8    concerns about the outcome. His involvement supports Plaintiffs' claim that even

9    departmental leadership recognized inconsistencies in the admissions process.

10    He is sued in his official capacity.

11    40. Defendant Pradeep K. Khosla is the Chancellor of the University of California at

12    San Diego during the relevant admissions cycles and currently exercises

13    authority over the University's operations and enforcement of admissions

14    policies. He is sued in his personal and official capacity.

15    41. Defendant Blia Yang is the Executive Director of Undergraduate Admissions of

16    the University of California at San Diego. In that role, she oversees

17    undergraduate admissions and related policies. She is a principal architect and

18    enforcer of the admissions system challenged in this lawsuit, including the

19    purportedly "holistic" review process which incorporates racial considerations in a

20    manner inconsistent with federal and state law. She is sued in her personal and

21    official capacity.

1    42. Defendant Sorin Lerner is the Chair of the Department of Computer Science of

2         the University of California at San Diego. In that role, he oversees the

3         department's undergraduate admissions and related policies. He is sued in his

4         personal and official capacity.

5    43. Defendants Doe 1 through 20 are individuals whose identities are currently

6         unknown but who acted in concert with the named Defendants in formulating or

7         implementing the discriminatory admissions policies described in this Complaint.

8         Plaintiffs will amend this Complaint to identify these individuals once their

9         identities are discovered through formal proceedings.

10   44. All Defendants associated with UC can be served at the Office of the General

11        Counsel, 1111 Franklin Street, 8th Floor, Oakland, California 94607.

12   45. Defendant the U.S. Department of Education is an executive agency of the

13        federal government responsible for the enforcement and administration of the

14        Higher Education Act and the HSI program. Defendant ED's OCR (Office of Civil

15        Rights) is responsible for enforcing federal anti-discrimination laws in colleges.

16   46. Defendant Linda McMahon is the Secretary of the U.S. Department of Education.

17        The Secretary is responsible for the administration and enforcement of the

18        Higher Education Act and the HSI program. *See, e.g.*, 20 U.S.C. §§1003(17),

19        1067q(b)(1)(A), 1101(c), 1102a(a). She is sued in her official capacity.

# III. JURISDICTION AND VENUE

47. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, as the claims arise under the Constitution and laws of the United States. The Court also has jurisdiction under 28 U.S.C. § 1343(a)(3) because Plaintiffs seek to redress the deprivation of civil rights under color of state law.

48. The Court has supplemental jurisdiction over Plaintiffs' state-law claims—including the claim under the California Constitution, Art. I, § 31—pursuant to 28 U.S.C. § 1367, because those claims form part of the same case or controversy as the federal claims. Plaintiffs further seek declaratory relief under 28 U.S.C. §§ 2201–2202.

49. Venue is proper for Co-Defendant UC because a substantial part of the events or omissions giving rise to the claim occurred, and will occur, in this judicial district and division. *See* 28 U.S.C. § 1391(b)(2). Venue is additionally proper because at least one of the defendants resides in this judicial district and division and all the defendants associated with UC reside in California. *See* 28 U.S.C. § 1391(b)(1).

50. Venue is also proper for ED and Secretary Linda McMahon because they are United States agencies and officers sued in their official capacities. So this action can be brought in any judicial district in which a substantial part of the events or omissions giving rise to the claim occurred. *See* 28 U.S.C. §1391(e)(1).

51. The U.S. Department of Education cannot invoke sovereign immunity because the Administrative Procedure Act's waiver of sovereign immunity extends to

1    constitutional claims. *See Muniz-Muniz v. U.S. Border Patrol*, 741 F.3d 668, 673

2    (6th Cir. 2013).

## 3 IV. FACTUAL ALLEGATIONS

### 4 A. The Legacy of Anti–Asian Discrimination and Widespread Culture of Anti-Asian

### 5 Discrimination at Elite Universities

6    52. The Zhongs belong to an oppressed minority given the history of the United

7    States. Asian Americans have long faced systemic exclusion and discrimination

8    in the United States. The Chinese Exclusion Act of 1882 barred Chinese

9    immigrants from entering the country or obtaining citizenship—a policy so

10   discriminatory that Congress formally apologized in 2012. Other Asian

11   communities have faced similar patterns of xenophobia, violence, and exclusion

12   throughout U.S. history. During World War II, over 120,000 Japanese Americans

13   were forcibly incarcerated based solely on their ancestry.

14   53. In recent decades, UC along with this nation's most elite educational institutions

15   has continued this sad history. These institutions of higher education, including

16   UC, subject Asian Americans to a quiet but no less insidious form of

17   discrimination. Cloaked in the language of "affirmative action" and "holistic

18   review," UC and other institutions of higher education hold Asian American

19   applicants to higher standards than applicants of other races, penalizing Asian

20   applicants specifically because they were born with the wrong skin color.

21   54. Across the country, defenders of race-conscious admissions have downplayed or

22   outright denied the existence of anti–Asian American discrimination. These

23   denials, however, are untenable. Within the world of college admissions,

1    discrimination against Asian Americans has become the worst-kept secret:

2    admissions officers, consultants, and students alike understand that being Asian

3    is a major disadvantage because these institutions discriminate on the basis of

4    race behind closed doors.

5    55. On September 22, 2016, *Inside Higher Education* <u>released</u> a survey of admission

6    officers. It revealed that 42% of private college admissions officers and 39% of

7    their public counterparts acknowledged that Asian American applicants are held

8    to higher standards than students of other races.

9    56. Together with many elite universities, Harvard openly gave preferential treatment

10   to some racial groups at the expense of Asian-American applicants until its

11   practice was ruled illegal by the Supreme Court in *SFFA v. Harvard* in 2023.

12   Notably, following the Supreme Court's ruling in *SFFA*, not a single Harvard

13   administrator apologized for the harm their policies inflicted on Asian-American

14   applicants.

15   57. As documented in the <u>SFFA's legal complaint</u> against Harvard (page 57), college

16   counselors acknowledge discrimination against Asian Americans at elite

17   universities.

18   58. On May 25, 2016, Dr. Michele Hernandez, former Dartmouth admissions officer,

19   <u>revealed</u> on *Huffington Post* "how even the so-called 'holistic process' can

20   discriminate against Asian students" and how Ivy League college admission

21   officers often use racial stereotypes to discriminate against Asian-American

22   applicants.

59. Admission officers at elite universities have described Asian-American applicants using derogatory racial stereotypes, such as labeling them as "yet another textureless math grind." These dehumanizing stereotypes reflect not genuine individual assessment, but racial prejudices disguised as discretion.

60. Faculty at elite universities widely acknowledge that expressing race-neutral values—such as advocating for merit or equal treatment—in diversity statements is considered "career suicide."

61. Evidence also shows that elite universities were aware of discriminatory practices but often ignored or denied the issue until confronted with legal challenges. For instance, in 2006, Jian Li, an Asian-American applicant, filed a formal complaint against Princeton University for racial discrimination in admissions. Following this action, Princeton's admission rate for Asian-American students rose from 14.7% in 2007 to 25.4% in 2014. Similarly, after SFFA sued Harvard in 2015, the percentage of Asian-American admits increased from 17% in 2014 to 22% in 2016 after being flat for many years. In 2024, the percentage of Asian-American admits at Harvard reached 37%.

62. These patterns demonstrate a troubling reality: institutions were capable of increasing Asian-American enrollment without material changes in applicant qualifications, suggesting prior suppression of Asian admissions through discriminatory policies.

## B. Asian Americans Are Acutely Aware of the Discrimination

63. As documented in the SFFA's legal complaint against Harvard (page 60), Asian-American applicants and their families know that they are being discriminated against by elite universities.

64. Asian American students like Stanley and prospective applicants like the Minor Son have long internalized the unspoken rules of an admissions game that is rigged against them. They resort to downplaying their achievements and interests in math and science (or chess). They avoid mention of bilingual households, or they omit involvement in Asian cultural organizations. It is well documented that many Asian-American applicants attempt to appear "less Asian" on their college applications to escape the penalty for their racial identity.

65. These learned behaviors are passed down from older students, for example from Stanley to Minor Son. Guidance counselors and even college admissions consultants also communicate to Stanley, Minor Son, and other Asian American students the harsh reality that Asian identity is a liability. This racial double standard is common knowledge, a moral stain on our educational institutions, and a direct violation of the American compact that all Americans are entitled to their civil rights.

66. No student in America should be compelled, as do Stanley and the Minor Son, to obscure their heritage or downplay their authentic achievements out of fear that their racial identity will count against them.

## C. Extraordinary Qualifications of Stanley Zhong

67. It is against this backdrop that Stanley faced the admissions process. Stanley is not merely a qualified applicant—he is, by any objective measure, among the top college applicants in the country.

68. Stanley Zhong attended Henry M. Gunn High School, ranked #14 in California by U.S. News & World Report and the #1 best public high school in the San Francisco Bay Area according to Niche. Within this competitive setting, Stanley still stood head and shoulders above his peers. He distinguished himself as a National Merit Scholarship finalist. Although Stanley's high school does not publish individual student rankings based on grade point average, he is confirmed to be *at least* within the top 9% of his class, as he qualified for UC's "Eligibility in the Local Context" (ELC). ELC guarantees admission to a UC campus for California high school students who rank in the top 9% of their class, as determined by their GPA in UC-approved coursework completed in the 10th and 11th grades. In fact, UC Merced offered him admission even though he did not apply.

69. He achieved a perfect PSAT score without any preparation and went on to score 1590 out of 1600 on the SAT, after just a few nights of self-study and without any paid tutoring or test prep.

70. Stanley's high school grade point average was 3.97 (unweighted) and 4.42 (weighted).

71. Stanley also satisfied UC's A-G subject requirements.

72. Stanley's excellence extended well beyond the classroom. He took on leadership roles in a variety of academic and volunteer organizations. While still in high school, he co-founded and served as the 2nd president of OpenBrackets, a nonprofit run by high schoolers that delivered free coding lessons to more than 500 students in underserved communities across California, Washington, and Texas. It received positive feedback from Stackoverflow co-founder Mr. Jeff Atwood. For this work, Stanley was awarded the President's Volunteer Service Award at its highest level. He also co-founded and led his school's competitive programming club.

73. Mr. Josh Paley, Stanley's high school Computer Science teacher, has offered to testify as a character witness.

74. Stanley is a self-taught programmer whose extraordinary talent has earned him top honors in some of the world's most competitive coding contests—often outperforming industry professionals.

75. Stanley placed 2nd in Carnegie Mellon's picoCTF cybersecurity challenge and was invited to CMU with expenses paid, took 6th in Stanford's ProCo, and reached the elite Platinum Division of the USA Computing Olympiad. Twice, he placed 2nd globally (2nd and 1st in the U.S., respectively) in MIT's Battlecode high school division, qualifying for invitations to MIT with expenses paid. (Unfortunately, one of those trips didn't happen due to COVID.) He also ranked among the top 500 globally in both Google's Code Jam (427th) and Meta's Hacker Cup (329th) —competitions dominated by seasoned software professionals from around the world.

76. His skill was so advanced that in 2019, Google invited him for a full-time software engineer interview, unaware he was only 13 years old; the interview was canceled only after his age came to light because minors can't sign Google's employment agreement.

77. Stanley repeatedly demonstrated extraordinary initiative far beyond his years. After reading an NPR story in April 2020 about state unemployment systems buckling under COVID-related demand due to outdated COBOL infrastructure, Stanley independently taught himself COBOL, published sample code to GitHub, and volunteered his help to the "COBOL Cowboys" featured in the article—earning a personal phone call and words of encouragement from their CEO.

78. Frustrated by the lack of free e-signature tools during the pandemic, in 2021, Stanley launched RabbitSign, the world's only unlimited free e-signature service with SOC 2, ISO 27001 and HIPAA compliance included. Built by Stanley on Amazon Web Services, RabbitSign was so secure and well-architected that AWS called it "one of the most efficient and secure" applications they had reviewed and decided to feature it in a case study. Stanley's innovation drew national attention: RabbitSign was spotlighted on *Viewpoint with Dennis Quaid*—a program that has previously interviewed Fortune 500 CEOs and U.S. presidents—for its potential to help reduce healthcare costs through accessible, secure digital tools.

79. Stanley's college application essay was pretty much captured in the *Viewpoint* interview mentioned above. It discussed why he created RabbitSign, how he

1    overcame rejections to eventually find a partner to provide free HIPAA-compliant

2    e-signing to help lower America's healthcare cost, and how RabbitSign is the first

3    Activism Corporation created to counter corporate greed.

4    80. Just before his 18th birthday, Stanley underwent one of the most rigorous and

5    objective evaluations available in the modern labor market: Google's full-time

6    software engineer interview process. Five randomly assigned professionally

7    trained Google engineers assessed Stanley, devoting over ten hours to

8    evaluating his technical skills, communication abilities, and teamwork—precisely

9    the traits elite universities purport to assess through "holistic" admissions.

10   81. Importantly, the structure of Google's process eliminates any risk of favoritism:

11   interviewers are randomly assigned, shielded from outside influence, and

12   incentivized to avoid inflating evaluations, as doing so could lead to internal

13   compensation disparities.

14   82. Mr. Dan Bloomberg, a longtime Google employee who served on Google's hiring

15   committees for 18 years, has agreed to testify about Google's interview process.

16   83. Based solely on their independent assessments, the Google engineers

17   recommended Stanley for an L4 software engineer role, a position typically

18   reserved for candidates with a Ph.D. or equivalent industry experience. Google

19   extended the offer in September 2023, just after Stanley's 18th birthday.

20   84. Stanley's full-year job performance evaluation in January 2025 confirmed the

21   wisdom of Google's decision: Stanley met all expectations and demonstrated

22   strong potential for continued growth. That Google—an employer with far more

1    applicants than even the most competitive universities—recognized Stanley as

2    qualified for a postdoctoral-level role, while five UC campuses deemed him

3    unworthy of undergraduate admission, provides compelling circumstantial

4    evidence of the discriminatory standards UC applies to Asian American

5    applicants.

6 **D. Stanley Applied on Merit—UC Rejected on Race**

7    85. For enrollment in Fall 2023, Stanley applied to the undergraduate Computer

8    Science programs at five UC campuses, namely the University of California at

9    Davis, the University of California at Berkeley, the University of California at

10   Santa Barbara, the University of California at Los Angeles, and the University of

11   California at San Diego.

12   86. Like many Asian American candidates for admission, Stanley naively dared to

13   hope that, despite the well-known barriers facing applicants who look like him, his

14   individual merit might still prevail. That maybe, just maybe, UC would look past

15   his race.

16   87. Unfortunately, like too many Asian American students, he learned that it would

17   not. Despite extraordinary academic credentials, internationally recognized

18   accomplishments, his applications to all five UC campuses were rejected.

19   88. Stanley's story was cited in a congressional hearing in September 2023, and

20   reported in national news.

89. After Stanley's story first hit the news in October 2023, multiple independent college admissions experts and counselors (unconnected to UC) reviewed Stanley's application materials, including his essay. Tellingly, not one of these experts could identify a legitimate, performance-based reason why Stanley would have been rejected by a school of UC's caliber. Some of them have offered to testify as expert witnesses when this lawsuit proceeds to trial. By all objective indicators, Stanley appeared to be the kind of candidate any top university would eagerly admit. The absence of any apparent, merit-based explanation for this "bizarre" result raises a strong inference that Stanley's race played a role in UC's decision. There is no other explanation.

90. These rejections by five UC campuses defy common sense and contradict expert assessments of his application. As the Supreme Court noted in *Miller v. Johnson*, 515 U.S. 900, 901 (1995), "bizarreness" can serve as "persuasive circumstantial evidence that race for its own sake … was a legislature's dominant and controlling rationale." Similarly, the stark disparity between Stanley's qualifications and the UC campuses' admissions decisions raises serious concerns about the role of race in UC's admissions process. This striking incongruity strongly suggests that UC's admissions policies are being applied in a discriminatory fashion.

91. Stanley was denied the opportunity to compete for admission to UC on equal footing with other applicants on the basis of race or ethnicity due to UC's discriminatory admissions policies and practices.

1    92. Stanley is ready and able to apply to UC when it ceases its intentional

2        discrimination against Asian Americans.

3    93. As a result of the unlawful discrimination, Stanley Zhong has suffered significant

4        harm, including but not limited to the loss of educational opportunities,

5        reputational damage, and emotional distress. Plaintiffs seek all available legal

6        and equitable relief to remedy these injuries.

**7 E. Unconstitutionality of ED's Numerical Racial Targets**

8    94. The U.S. Department of Education (ED) administers Minority Serving Institutions

9        (MSI) grant programs with eligibility requirements tied to numerical racial targets.

10       Examples include: the Hispanic-Serving Institutions (HSI) Program, which

11       requires at least 25% Hispanic enrollment; the Alaska Native-Serving and Native

12       Hawaiian-Serving Institutions (ANNH) Program, which requires at least 20%

13       Alaska Native or at least 10% Native Hawaiian students; and the Asian American

14       and Native American Pacific Islander-Serving Institutions (AANAPISI) Program,

15       which requires at least 10% enrollment of Asian American or Native American

16       Pacific Islander students.

17   95. The HSI program is in Titles III and V of the Higher Education Act. *See 20 U.S.C.*

18       *§1067q(a)(2); §1101(c); §1101a.*

19   96. These numerical racial targets are inherently rigid and inflexible.

97. These numerical racial thresholds are arbitrary, incentivizing institutions to manipulate or strategically balance the racial composition of their student bodies to qualify for federal grant funding.

98. These numerical racial targets fail to preserve or advance national security interests.

99. These numerical racial targets do not remedy specific instances of federal government discrimination.

100.    These numerical racial targets do not serve a compelling government interest. Even if racial diversity in the college student body were recognized as a compelling government interest, these numerical racial targets may not reflect genuine diversity. Any institution meeting the numerical target qualifies, even if its student body remains racially homogeneous beyond that threshold. And governments cannot "remedy the effects of societal discrimination through explicitly race-based measures." *SFFA v. Harvard*, 600 U.S. at 226.

101.    These numerical racial targets are not narrowly tailored. If Minority-Serving Institutions (MSI) programs' primary purpose is to improve educational opportunities for historically underserved communities, that objective could be more effectively and legally achieved through race-neutral alternatives. For example, reallocating MSI program funding to existing need-based programs, such as the Pell Grant program, would directly support economically disadvantaged students regardless of their immutable traits such as race,

1    ensuring equal access to higher education without violating constitutional

2    principles.

3    102.    These numerical racial targets facially discriminate among institutions based

4    on the racial and ethnic balances of their student bodies. They are "a facially

5    discriminatory law or policy that expressly classifies individuals on the basis of

6    race". See *Chinese Am. Citizens All. of Greater N.Y. v. Adams*, 116 F.4th 161,

7    170 (2d Cir. 2024). As the Supreme Court affirmed in *Miller v. Johnson*, 515 U.S.

8    900, 911 (1995), "At the heart of the Constitution's guarantee of equal protection

9    lies the simple command that the Government must treat citizens as individuals,

10   not as simply components of a racial, religious, sexual or national class." The

11   Supreme Court reaffirmed in *SFFA v. Harvard*, 600 U.S. 181, 206 (2023),

12   "Eliminating racial discrimination means eliminating all of it."

13   103.    Under Title VI, a federal fund recipient's express or admitted use of a

14   classification based on race, color, or national origin establishes intent without

15   regard to the decision-makers' animus or ultimate objective. Such classifications

16   demonstrate a discriminatory purpose as a matter of law. *See Miller v. Johnson*,

17   515 U.S. 900, 904–05 (1995); *see also Wittmer v. Peters*, 904 F. Supp. 845,

18   849–50 (C.D. Ill. 1995), *aff'd*, 87 F.3d 916 (7th Cir. 1996). "Put another way, direct

19   evidence of intent is 'supplied by the policy itself.'" *Hassan v. City of New York*,

20   804 F.3d 277, 295 (3d Cir. 2015) (quoting *Massarsky v. Gen. Motors Corp.*, 706

21   F.2d 111, 128 (3d Cir.1983) (Sloviter, J., dissenting)).

22   104.    Where a plaintiff demonstrates that a challenged policy overtly and expressly

23   singles out a protected group for disparate treatment, "a plaintiff need not prove

1   the malice or discriminatory animus of a defendant …" *Bangerter v. Orem City*

2   *Corp.*, 46 F.3d 1491, 1501 (10th Cir. 1995); *see also Ferrill v. Parker Grp., Inc.*,

3   168 F.3d 468, 473 n.7 (11th Cir. 1999) ("[I]ll will, enmity, or hostility are not

4   prerequisites of intentional discrimination."). Rather, the focus is on the "explicit

5   terms of the discrimination," *Int'l Union, United Auto. Aerospace & Agric.*

6   *Implement Workers of Am. v. Johnson Controls, Inc.*, 499 U.S. 187, 199 (1991);

7   that is, how the federal fund recipient's actions specifically deprived or otherwise

8   adversely affected the individual or individuals of access to a federally funded

9   program or benefit. Even benign motivations for racial classifications are

10  presumptively invalid and trigger strict scrutiny in Equal Protection Clause and

11  Title VI cases. *Adarand*, 515 U.S. at 223–24 (1995); *Grutter*, 539 U.S. at 326.

12  105.   These numerical racial targets fail to meet the strict scrutiny standard required

13  for race-based government policies, as they are neither narrowly tailored nor

14  serve a compelling governmental interest. As a result, these targets violate the

15  Equal Protection principles of the Fifth Amendment and are unconstitutional. The

16  Supreme Court has held that the federal government is subject to the same

17  Equal Protection standards as state and local governments through a process

18  known as reverse incorporation. Under this doctrine, the Fifth Amendment's Due

19  Process Clause imposes the same restrictions on the federal government that

20  the Fourteenth Amendment's Equal Protection Clause imposes on states. See

21  *Adarand Constructors, Inc. v. Peña*, 515 U.S. 200 (1995).

22  106.   These numerical racial targets incentivize universities to suppress

23  Asian-American enrollment as seen in UC's case below.

1    107.    ED's unconstitutional grant programs (like HSI) create a direct financial

2         incentive for universities like UC to achieve numerical racial targets by engaging

3         in racial balancing that has harmed Stanley's and will imminently harm the Minor

4         Son's ability to compete on equal footing. This makes the threat to them—and

5         Nan's interest as Minor Son's parent and next friend—concrete and immediate,

6         not speculative.

7    **F. UC's Motive and Intent to Racial Balance its Student Body and its Enduring**

8    **Commitment to Racial Engineering**

9    108.    Given that the undergraduate admissions office functions as a centralized,

10        close-knit unit lacking the protections of tenure, it is not surprising that no

11        whistleblowers have emerged from within. This stands in contrast to the multiple

12        whistleblower reports Plaintiffs have obtained concerning the use of race in

13        faculty hiring and graduate admissions at UC. Nevertheless, UC's intent to

14        racially balance its undergraduate student body remains readily discernible.

15    109.    Dating back at least to *Bakke* in 1978, UC has a long and well-documented

16        history of promoting racial preferences, particularly in its admissions practices.

17        For decades, UC openly embraced race-conscious admissions policies—and

18        proudly defended them as central to its institutional mission.

19    110.    After the state audit in 1987, UC Berkeley Chancellor Ira Michael Heyman

20        publicly apologized in 1989 for admissions policies that led to a decline in

21        Asian-American undergraduate enrollment.

FIRST AMENDED COMPLAINT                                    Page 30 of 118

1    111.    In 2003, the UC Regents repealed their own internal measures forbidding the

2          use of race in admissions and hiring.

3    112.    Since then, UC has spent decades fighting to institute and preserve

4          discrimination on the basis of race. Recently, that commitment was on full display

5          in its support for Proposition 16 in 2020 and its objection to the Supreme Court's

6          ruling in *SFFA v. Harvard* In 2023. In both cases, UC vigorously defended racial

7          preference in admissions.

8    113.    In June 2020, the UC Board of Regents unanimously endorsed Assembly

9          Constitutional Amendment 5 (ACA 5) and the repeal of Proposition 209, which

10         had banned the consideration of race and gender in admissions decisions since

11         1996. In a released <u>statement</u>, the Board declared,

12              "UC has long been committed to creating and maintaining a student body

13              that reflects California's laudable cultural, racial, geographic, and

14              socioeconomic diversity."

15    UC then-President Janet Napolitano added,

16              "It makes little sense to exclude any consideration of race in admissions

17              when the aim of the University's holistic process is to fully understand and

18              evaluate each applicant through multiple dimensions."

19    In other words, UC asserts a contradiction: to treat applicants as individuals, UC

20    must first classify them by race. These are statements from decision-makers that

21    express a racial intent and discriminatory motive.

FIRST AMENDED COMPLAINT                                        Page 31 of 118

114.    In November 2020, after California voters rejected Proposition 16, UC issued a statement that it

> "is disappointed that Proposition 16, the state ballot measure and constitutional amendment that would have repealed Proposition 209, did not pass in this election ... UC remains steadfast in its commitment to attract and support a student body that reflects California's dynamism and diversity, despite this setback ... UC still does not reflect the diversity of California's population ... However, excluding race and gender from that consideration continues to be a tall barrier to women and students from underrepresented groups."

This official statement from the UC Office of the President leaves no doubt about UC's desire and intent to use race in its admissions and hiring.

115.    While UC never defines its ideal student body composition—a point Plaintiffs intend to explore during discovery—it is evident that UC was dissatisfied with the existing racial makeup of its student population and wants to balance it.

116.    Then in the lead-up to *SFFA v. Harvard*, 600 U.S. 181 (2023), UC once again fought tooth-and-nail to argue for its ability to discriminate based on race. In its amicus brief filed with the US Supreme Court, UC stated:

> "At many of UC's campuses, especially the flagship campuses, there remain stark differences between the demographics of UC's enrolled student population and the demographics of the applicant pool that UC seeks to serve—that is, California public high school graduates. To be clear, UC does

1    not maintain any 'specified' racial targets based on the demographics of high

2    school graduates or any other baseline. See *Fisher v. University of Texas at*

3    *Austin, 570 U.S. 297, 311 (2013) ('Fisher I')* (demographic targets constitute

4    impermissible racial balancing) (citation omitted). Instead, UC looks at

5    demographics to determine whether there are *substantial* demographic

6    disparities of the sort that this Court has recognized can undermine a

7    university's ability to provide the educational benefits of diversity."

8    While UC claims it does not use "specified" racial targets, the brief fails to explain

9    how it defines or measures "*substantial* demographic disparities"—a point

10   Plaintiffs intend to explore during discovery since "fixing demographic disparities"

11   strongly implies racial balancing. Nevertheless, UC's statement reveals its intent

12   to increase enrollment for certain racial groups, a motive that implicates strict

13   scrutiny under constitutional law.

14   117.    The brief also states

15       "Second, UC's student population at many of its campuses is now starkly

16       different, demographically speaking, from the population of California high

17       school graduates. That raises concerns that UC is not enrolling sufficient

18       students with diverse perspectives, and that it will not be perceived as open

19       to, and welcoming of, all students across the State—which in turn threatens

20       its legitimacy in the eyes of citizens of California."

21   It clearly demonstrates UC's intent to push toward racial proportionality that

22   mirrors the general population. Had the brief been filed before the election in

23   2020, UC could have been forgiven for misrepresenting what the "citizens of

1    California" demanded. However, when it filed the amicus brief in August 2022,

2    less than two years after California voters decisively rejected Proposition 16,

3    UC's statement can only be described as disingenuous and self-aggrandizing. It

4    was also misleading the Supreme Court.

5    118.    The brief further states that

6         "After Proposition 209 Prohibited Consideration of Race in Admissions,

7         Diversity Fell Dramatically Across UC's Campuses."

8    It reveals that whatever UC says about "diversity," what UC actually means is

9    "race." At UC, "diversity" became a euphemism for racial engineering and

10   disparate treatment— now used not to open the door to talent but to justify

11   denying opportunity to students who failed to meet the university's preferred

12   demographic profile.

13   119.    The brief touted UC's unwavering commitment to diversity (i.e. racial

14   engineering). It further vigorously argued for the revival of race-based admissions

15   policies by lamenting that

16        "Yet despite its extensive efforts, UC struggles to enroll a student body that is

17        sufficiently racially diverse to attain the educational benefits of diversity. The

18        shortfall is especially apparent at UC's most selective campuses, where

19        African American, Native American, and Latinx students are

20        underrepresented and widely report struggling with feelings of racial

21        isolation."

22   In plain terms, the University admitted that it cannot achieve its preferred racial

23   composition without relying on race-conscious decision-making. What is also

1  apparent is that Asian Americans are not among the groups preferred by UC.

2  Asian Americans of sufficient caliber were available but looked over in

3  admissions because "ethnic diversity" did not include Asians. They were

4  disproportionately excluded.

5  120.   UC thus admitted two critical points: (1) its demographic targets remain

6  non-negotiable, and (2) those targets are unattainable without using race. UC's

7  dogged legal efforts to justify race discrimination is part of its long history of

8  double standards for Asian Americans.

9  121.   When confronted with a choice—between advancing "diversity" (i.e.

10  race-based admission) goals or upholding equal treatment for high-achieving

11  groups like Asian Americans—UC sides with diversity, even if it means racially

12  discriminating. In practice, this results in academically superior Asian Americans

13  applicants being systematically disadvantaged to make room for less qualified

14  candidates from other racial groups.

15  122.   In July 2023, following the Supreme Court's ruling in *SFFA v. Harvard*, UC

16  President Michael V. Drake <u>stated</u> that "We are disappointed in the U.S.

17  Supreme Court's decision to bar the use of race in college admissions." It is a

18  statement from a decision-maker that expresses a racial intent and discriminatory

19  motive. One might have hoped that a great university would welcome the

20  restoration of merit based, equal treatment. Instead, UC's chief decision-maker

21  signaled regret that the University could not discriminate against applicants on

22  the basis of race. UC's leadership all but announced that it would search for

23  workarounds to preserve the racial preferences the Court condemned.

123.   Professor Shannon Speed holds multiple senior positions at UCLA, including the Paula Gunn Allen Chair in American Indian Studies, Director of the American Indian Studies Center, and Special Advisor to the Chancellor on Native American and Indigenous Affairs. In a published interview with the *Daily Bruin* on December 2, 2023, Professor Speed articulated a clear institutional objective of racial balancing within the university's student body, stating:

> "We're a minority-majority state, so I think it's important that all the UC campuses become minority-serving institutions … **We need to be at least educating certain communities at a proportionate rate to their presence in the state population.**" (Emphasis added.)

This public statement by a senior UCLA administrator—who serves in an advisory capacity to the Chancellor—expressly advocates for aligning the racial composition of the student body with the demographic makeup of the state, thereby endorsing proportional racial representation as an institutional goal.

124.   UC adopted the "UC 2030 Capacity Plan," with the goal of having its student bodies "better reflec[t] California's racial/ethnic … diversity." UC President Drake wanted "intentional" "growth" in terms of making "graduate students … better reflect and tap the talent of underrepresented populations who represent the majority of Californians." To support this goal of "mov[ing] the needle on the diversity of graduate students," the Regents "requested graduate professional programs" to "present race/ethnicity data on students and faculty, along with diversity plans within the program."

125.    Even isolated comments may constitute direct evidence of discrimination if they are "contemporaneous with the [adverse action] or causally related to the [adverse action] decision making process." *Kennedy v. Schoenberg, Fisher & Newman, Ltd.*, 140 F.3d 716, 723 (7th Cir. 1998) (citations omitted).

126.    The type of direct evidence of discriminatory intent does not require "a virtual admission of illegality." *Venters*, 123 F.3d at 973. For example, direct evidence need not take the form of an admission where the defendant states "I'm [taking this adverse action] because you're in a protected group." *Sheehan v. Donlen Corp.*, 173 F.3d 1039, 1044 (7th Cir. 1999); see *Venters*, 123 F.3d at 973. The court in *Venters* explained that "the evidence need not be this obvious to qualify as direct evidence." *Id.* And the Sheehan court explained why: because such a requirement "would cripple enforcement of the ... discrimination laws." *Sheehan*, 173 F.3d at 1044.

127.    In light of the evidence indicating racially discriminatory intent, Plaintiffs are entitled to discovery.

128.    By defending the use of racial criteria, openly expressing dissatisfaction with the racial composition of its student body, and framing race-conscious admissions as a permanent institutional value, UC has revealed its intent and implied its ongoing use of unconstitutional and discriminatory practices. This discriminates against Asian Americans like Stanley and Minor Son because, by virtue of merit, their "race" would be overrepresented according to UC's preferences.

## G. UC's Action for Racial Balancing its Student Body

129.    In addition to its evident motive and intent for racial balancing, UC possesses the means and opportunity to manipulate the racial composition of its student body under its current "holistic" admissions framework, which has a history of corruption and lacks transparency, independent third-party oversight and accountability. Indeed, UC's intent is matched by its actions.

130.    Despite claiming it does not maintain racial targets in its amicus brief for *SFFA*, UC actively pursues Hispanic-Serving Institutions (HSI) status at each of its campuses. HSI designation requires at least 25% Hispanic student enrollment. In or around 2019, UC Berkeley and UCLA established task forces led by their respective Chancellors—Carol Christ and Gene Block—to achieve this racial target. These task forces demonstrate that UC has adopted policies aimed at meeting specific numerical racial goals, contradicting its statements in the *SFFA v. Harvard* amicus brief. Such race-based decision-making triggers strict scrutiny and, under *SFFA v. Harvard*, cannot survive it. It also violates Article I, Section 31 of the California Constitution.

131.    A university policy that amounts to racial balancing is "patently unconstitutional." *Grutter v. Bollinger*, 539 U.S. 306, 329 (2003). Racial balancing seeks to ensure a specified percentage of a racial group within the student body merely due to race or ethnicity. *Id.* Courts have consistently rejected proportional representation as a constitutional justification for race-based admissions. See *Id.* at 343.

132. These actions also raise serious concerns that UC misrepresented material facts to the Supreme Court in its amicus brief for *SFFA v. Harvard.*

133. The deliberate use of numerical racial goals incentivizes actions that limit Asian-American enrollment despite their growing demographic presence.

134. UC's race-conscious practices have not escaped federal notice. On March 14, 2025, the U.S. Department of Education's Office for Civil Rights ("OCR") announced a sweeping Title VI enforcement initiative, opening formal investigations into 45 universities for "race-exclusionary practices" that violate the Civil Rights Act. UC appears on that list as a chief offender.

135. OCR's decision to single out UC is significant. Title VI investigations issue only where the agency has received credible evidence that an institution continues to deploy race as a decision-making factor after *SFFA.* Thus, a federal body has already found sufficient cause to suspect UC of maintaining unlawful racial preferences.

## H. Documented Instances of Race-based Discrimination in UC's Admissions and Hiring

136. In another case similar to Stanley's, in 2022, an Asian American student with the following qualifications was rejected by UC San Diego (but admitted by MIT).

   a. GPA: 4.4+

   b. SAT: 1590

c. ISEF (International Science and Engineering Fair) Grand Award

d. USACO Silver Award

e. AIME Qualifier

f. American Protege International

g. Music competition 1st place

h. MCWiT Impact Award

i. Founder of nonprofit (taught 1500+ students around the world)

In contrast, also in 2022, a Hispanic student with the following qualifications was admitted by UC San Diego.

j. GPA: 4.1

k. No SAT (PSAT was 780 out of 1520)

l. No activities

137. Pulitzer Prize–winning journalist Daniel Golden documented the widespread anti-Asian discrimination in college admissions in his book titled *The Price of Admission*. Golden exposed how elite universities like UC routinely pass over Asian American applicants with exceptional qualifications in favor of far less qualified candidates from preferred racial groups. For example, UCLA and UC Berkeley rejected Stanley Park, a Korean American student who faced serious

1  adversity (single immigrant parent with cancer and no college degree), while

2  accepting non-Asian students with SAT scores 520 points lower.

3  138. In 2002, a 159-page analysis of undergraduate admissions on the UC

4  Berkeley campus <u>revealed</u> that 381 applicants who had scored lower than 1000

5  on the SAT were admitted to Berkeley, while 641 students with scores of 1500 or

6  higher were rejected (1600 is a perfect score). Another 2,577 candidates scoring

7  between 1401 and 1500 were denied admission.

8  139. In response, Mr. John Moores, then-chairman of the UC Board of Regents,

9  accused UC's flagship campus of "blatantly" discriminating against Asian

10  Americans. "There are remarkably consistent, clear patterns of racial

11  discrimination" against Asian Americans in undergraduate admissions, Moores

12  said. In an article, Moores said UC Berkeley was admitting hundreds of African

13  American, American Indian and Latino students with SAT scores of 1000 or less

14  while rejecting Asian American high achievers with scores of 1400 or above.

15  140. Mr. Moores was concerned with the resolution adopted by the Regents stating

16  that UC was in compliance with Proposition 209. He wrote that there is no

17  evidence suggesting compliance with the proposition. …the UC admission study

18  group did not come to any conclusion about Proposition 209, and no evidence of

19  compliance with Proposition 209 has been presented to the Board …

20  Furthermore, all evidence to date, including comments by President Dynes

21  suggests there may be cause for concern."

141.    Mr. Moores further wrote, "When I tried to get to the bottom of the admission matters, I was met with stonewalling, obfuscation and personal attacks by the administration of UC … UC personnel have demonstrated a continuing bias in the manner in which they have attempted to explain away problematic admission issues … They seem to have an agenda with respect to outcomes, rather than attempting to be objective in studying and interpreting the data. I believe they try to find facts to fit their views of what they want to achieve."

142.    Even the chairman of the UC Board of Regents had trouble accessing UC's admissions data. This pattern of data obscurity continued in the decades after.

143.    Around 2018, UC refused to fulfill public records requests and litigated against a lawsuit that sought access to its admissions data for research purposes. This was despite having provided similar data in 2008. UC's actions are part of the persistent pattern of concealing admissions data from 3rd-party examinations. Given virtually all previous admissions data showed strong racial preferences in UC admissions in direct violation of Proposition 209, UC is certainly motivated to go to such extraordinary lengths to hide its admissions data.

144.    UC San Diego employs a point-based system for admissions to selective majors for continuing students, assigning one point for each of the following four criteria: a 3.0 GPA or higher in major screening courses, California residency, Pell Grant eligibility, and first-generation college status. Assuming all applicants are California residents, under this point-based system, a middle-class applicant with a 4.0 GPA can earn a maximum of only two points. In contrast, an applicant

FIRST AMENDED COMPLAINT

1    from a poor family may earn three points even with a 1.0 GPA. This policy

2    exemplifies UC's decision-making that weighs students' immutable

3    characteristics far more than academic criteria. When used excessively as

4    overriding criteria, these immutable characteristics can act as proxies for race,

5    resulting in disparate treatment of Asian-American applicants by "insulat(ing)

6    applicants who belong to certain racial or ethnic groups from the competition for

7    admission." *Grutter*, 539 U.S. at 334 (citation omitted).

8    145.    While distinct from undergraduate admissions, UC's faculty hiring practices

9    provide compelling circumstantial evidence of its institutional and systematic race

10   preference in decision-making. These policies reveal a university-wide culture

11   deeply steeped in race-consciousness—one that cannot plausibly separate its

12   hiring practices from its highly suspect admissions outcomes. UC's widespread

13   adoption of race-conscious policies in faculty hiring supports the inference of

14   similar practices in student admissions.

15   146.    Admissions and hiring are inherently interconnected and inseparable in the

16   context of racial discrimination within educational institutions. Faculty and

17   administrators play a pivotal role in shaping academic standards, mentoring

18   students, and influencing the culture and policies of a university, including

19   admissions criteria and practices. A racially biased hiring process can create and

20   perpetuate a discriminatory culture by fostering an environment where certain

21   racial perspectives are prioritized over objective, merit-based considerations.

22   Racially-motivated hiring policies often have a direct ripple effect on student

23   admissions. When university leadership consistently selects and empowers

1    individuals committed to race-based decision-making, it is hardly surprising that

2    those values also shape admissions policies and the student body. It is

3    implausible that a university can operate one process in a race-conscious

4    manner while keeping the other race-neutral, as both are fundamentally linked in

5    their goals and execution. Therefore, examining both admissions and hiring

6    practices is essential to providing a holistic assessment of whether a university's

7    policies violate constitutional and statutory protections against racial

8    discrimination.

9    147.    While the Supreme Court's *Grutter* decision in 2003 permitted a limited,

10    time-bound consideration of race in college admissions, no such exception has

11    ever been allowed for hiring. Consequently, if a college intentionally incorporates

12    race into its hiring decisions, it's more than plausible that they do the same for

13    student admissions. UC's faculty-hiring record therefore supplies powerful

14    circumstantial evidence that race remains a defining criterion in UC's

15    decision-making, including the exclusion of Stanley and imminent exclusion of

16    the Minor Son.

17    148.    In an extraordinary public admission, UC Berkeley Law School Dean Erwin

18    Chemerinsky said the quiet part out loud. In a public talk to a large audience

19    (presumably law school students), Mr. Chemerinsky admitted that his school

20    systematically considers race in its internal decision-making and **actively**

21    **conceals this practice**. When discussing the consideration of race in faculty

22    hiring, Mr. Chemerinsky described and preached the "unstated Affirmative Action"

23    practiced at UC as follows: "Don't say that [you are considering a candidate's

1    race]. You can think it. You can vote it … Don't ever articulate that is what you

2    are doing." He also said "If I'm ever deposed, I'm going to deny I said this to you."

3    These comments—caught on video—confirm that UC clings to racial

4    preferences, but has just evolved ever more elusive ways of doing so. Given how

5    unequivocally Dean Chemerinsky's statement reveals the deliberate intent by

6    senior UC administrators to actively conceal their use of race in decision-making,

7    the merit of Plaintiffs' allegations should be evaluated based on whether UC's

8    admissions process has a discriminatory effect on Asian-American applicants,

9    without any further need to establish the discriminatory intent. As Mr.

10   Chemerinsky admitted in the video, statistical analysis is key to identifying racial

11   discrimination in admissions. Plaintiffs intend to conduct such an analysis during

12   the discovery phase of this lawsuit. The expert witnesses for Students for Fair

13   Admissions have agreed to conduct statistical analysis on the admissions data

14   once obtained in the discovery of this lawsuit.

15   149.    In November 2022, *The New Yorker* staff writer Jay Caspian Kang quoted Mr.

16   Erwin Chemerinsky as follows:

17        "What colleges and universities will need to do after affirmative action is

18        eliminated is find ways to achieve diversity that can't be documented as

19        violating the Constitution," Mr. Chemerinsky stated. "So they can't have any

20        explicit use of race. They have to make sure that their admissions statistics

21        don't reveal any use of race. But they can use proxies for race."

22   Note that he said "can't be documented as violating the Constitution" instead of

23   "don't violate the Constitution". This statement is a clear acknowledgment that

1    senior UC officials intend to bypass constitutional and legal prohibitions on racial

2    discrimination by employing indirect methods—namely, "proxies for race"—to

3    achieve the same racial outcomes that explicit race-based policies once

4    facilitated.

5    150.   The use of racial proxies to achieve racial balancing is unconstitutional. In

6    *Parents Involved in Community Schools v. Seattle School District No. 1*, 551 U.S.

7    701, 743 (2007), the Supreme Court held that racial balancing is not a compelling

8    state interest and "[r]acial balancing is not transformed from 'patently

9    unconstitutional' to a compelling state interest simply by relabeling it 'racial

10   diversity.'" Similarly, in *SFFA v. Harvard*, 600 U.S. 181 (2023), the Supreme Court

11   reaffirmed that admissions policies designed to achieve racial diversity by using

12   proxies for race are equally unconstitutional. "[W]hat cannot be done directly

13   cannot be done indirectly."

14   151.   The statements made by Dean Chemerinsky are not incidental expressions of

15   UC's values in niche departments or by isolated academics. UC's admissions

16   decisions track the racial discrimination of its industry outside the campus; and

17   they also track the racial discrimination of its faculty hiring within the campus.

18   152.   The statements made by Dean Chemerinsky provide strong circumstantial

19   evidence that UC is knowingly and deliberately structuring its admissions policies

20   to evade legal prohibitions on racial discrimination.

21   153.   As a law professor, Mr. Chemerinsky must know what he was preaching is

22   illegal. By his own admission, he clearly knew it was illegal. Yet, he preached it

1    with a sense of pride and braggadocio. His statements unequivocally

2    demonstrate reckless or callous indifference to federally protected rights. It is

3    also worth emphasizing that Mr. Chemerinsky is the Dean, the top administrator,

4    of UC Berkeley Law School. Mr. Chemerinsky's statements happened to be in a

5    public talk, happened to be captured in video, and happened to be shared on the

6    web. What is visible to the public must be only the tip of the iceberg. It is

7    reasonable to infer the preaching and practice of "unstated Affirmative Action" is

8    widespread in UC's admissions and hiring process, which lacks transparency and

9    accountability.

10    154.    The I-am-proud-of-it attitude that Mr. Chemerinsky demonstrated in the video

11    when talking about his action of breaking the law and hiding it compounded the

12    emotional distress Stanley and Nan have endured.

13    155.    Mr. Steven Dubinett, the dean of UCLA medical school, directs a center that

14    houses a race-based fellowship. Its web page was deleted after media exposure,

15    indicating awareness of its illegality.

16    156.    A New York Times opinion piece by a former UC admissions reader shared

17    her detection of "unspoken directives", questioned whether "Proposition 209

18    serve(s) merely to push race underground" and described the admission reading

19    process as "an extreme version of the American non-conversation about race."

20    157.    In 2024, UCLA posted a position (Job #JPF08858) for a "Tenure-Track

21    Assistant Professor in Pacific Islander Experiences in Engineering." The position

22    description emphasized "strong ties to Pacific Islander experiences in the United

1    States" and "the success of Pacific Islander scholars." On their face, these

2    requirements have the clear and impermissible effect of limiting and classifying

3    applicants based on their race and national origin, thereby creating an unlawful

4    preference that restricts the candidate pool.

5    158.    The Standing Order of UC Regents 101.1(d) explicitly states: "No political test

6    shall ever be considered in the appointment and promotion of any faculty

7    member or employee." However, UC flagrantly violates this mandate by using

8    diversity statements as a decisive factor in faculty hiring. At certain UC

9    campuses, if a faculty applicant's diversity statement fails to satisfy the diversity

10   bureaucrats, their application is summarily excluded from consideration without

11   any review of their academic qualifications. In 2016, at least five UC campuses

12   — Berkeley, Davis, Irvine, Riverside and Santa Cruz — decided their hiring

13   committees could perform an initial screening of candidates based only on

14   diversity statements. For instance, at UC Davis, the vice provost explicitly

15   instructed search committees to disqualify candidates who did not "look

16   outstanding" on diversity, regardless of the quality of their academic research.

17   The championing of diversity at UC resulted in many campuses rejecting

18   disproportionate numbers of white and Asian and Asian American applicants.

19   159.    As documented in the National Association of Scholars (NAS) report titled

20   "Diversity Statement, Then Dossier," UC's cluster hiring reinforces the use of

21   diversity statements as litmus tests for employment, and eliminated faculty

22   candidates solely on the basis of diversity statements—demonstrating that hiring

23   decisions were overtly identity-driven rather than based on academic merit.

160.    In 2017, the UC Berkeley College of Engineering conducted a hiring initiative which made "advancing equity and inclusion" a "key criterion in selecting faculty candidates," and which relied heavily upon applicant diversity statements as a selection tool throughout the hiring process. The program, by its own standards, was a remarkable success. The applicant pool was 2 percent African American, but 22 percent of candidates who received offers were African American. The College of Engineering declared in its follow-up report that emphasizing diversity would become a permanent priority in hiring, noting that "we will continue to emphasize in our hiring practices that excellence in advancing equity and inclusion must be considered on par with excellence in research and teaching."

161.    During the 2018-19 academic year, UC Berkeley's hiring process for a life sciences position narrowed 894 applicants to 214, peremptorily disqualifying 76% of applicants based solely on diversity statements. According to UC's summary report, "The LSI [Life Sciences Initiative] Committee conducted a first review and evaluated candidates based solely on contributions to diversity, equity and inclusion. Only candidates that met a high standard in this area were advanced for further review, narrowing the pool down to 214 for serious consideration." Under such a faculty hiring system, even Nobel Prize winners would not be considered if they focused on academic research instead of diversity. This approach disproportionately affected applicants of different racial groups, increasing the percentage of African American and Hispanic dramatically, while reducing the percentage of Asian and White significantly. (See screenshot below.)

**Table A: Life Science Faculty (Cluster) Search Demographics:**

| GENDER | Applicant Pool | Longlist | Shortlist |
|---|---|---|---|
| Count | 894 | 214 | 22 |
| Female | 41.70% | 60.30% | 63.60% |
| Male | 56.50% | 39.30% | 36.40% |
| Unknown | 1.80% | 0.50% | 0.00% |
| **RACE/ETHNICITY** | **Applicant Pool** | **Longlist** | **Shortlist** |
| Count | 894 | 214 | 22 |
| African American | 2.80% | 6.10% | 9.10% |
| Hispanic | 13.20% | 22.90% | 59.10% |
| Native American | 0.40% | 1.40% | 0.00% |
| Asian | 25.70% | 18.70% | 18.20% |
| White | 53.70% | 48.10% | 13.60% |
| Unknown | 4.10% | 2.80% | 0.00% |

Hispanic candidates constituted 13.2% of applicants and 59.1% of finalists. Asian candidates constituted 25.7% of applicants and 18.2% of finalists. White candidates constituted 25.7% of applicants and 13.6% of finalists. Black candidates made up 2.8% of applicants and 9.1% of finalists.

162.    The LSI Committee used a standardized rubric for its diversity statement review: "Rubric for Assessing Contributions to Diversity, Equity, and Inclusion" (RACDEI). RACDEI clearly promotes an ideological agenda. It dictates that candidates should receive a low score if they state the intention to "treat everyone the same." RACDEI also rewards candidates for discussing "diversity, equity, inclusion, and belonging as core values that every faculty member should actively contribute to."

163.    In 2019, in a faculty hiring program funded by UC's Office of the President, UC Santa Cruz "puts diversity at the forefront of searches". "Roughly a third of the faculty recruitments in the coming year will put contributions to diversity, equity, and inclusion at the forefront ... In the recruitments that are part of the pilot program, search committees will first review and assess candidates'

1   statements on contributions to diversity, equity, and inclusion before determining

2   whether to evaluate the rest of the application materials." "It's critical that our

3   faculty better reflect the great diversity of our student body and arrive ready to

4   help make our campus even more inclusive," said Herbert Lee, vice provost for

5   Academic Affairs and the campus diversity officer for faculty. Given the

6   university's "long standing commitment to progress on social justice, global and

7   community health seemed like a natural area of growth for the campus, and one

8   where we should make every possible effort to recruit faculty who reflect the

9   diversity of the state and nation," Paul Koch, dean of physical and biological

10  sciences, said in a press release.

11  164.   Mr. Yoel Inbar, a noted psychology professor at the University of Toronto, was

12  rejected for a position at UCLA because his podcast expressed skepticism about

13  the use of diversity statements in hiring.

14  165.   A cottage industry has sprouted nationally and in California to guide

15  applicants in writing these statements.

16  166.   In sum, UC's practice of DEI cluster hiring infuses the watchwords of identity

17  politics into the faculty hiring process, uses diversity statements as an ideological

18  screen, provides camouflage for racial preferences, and transforms the university

19  mission from the pursuit of truth to political activism. As mentioned earlier, at UC,

20  diversity means race. UC's use of diversity statements in faculty hiring is a

21  subterfuge for racial discrimination. When applicants are required to submit a

22  diversity statement, university reviewers would likely be able to tell the applicants'

23  race, allowing it to be taken into account in violation of federal and state laws.

1    Perhaps recognizing its harm and illegality, in March 2025, UC finally disallowed

2    requiring diversity statements in recruitment.

3    167.    Given that UC is not conducting itself as a bona fide academic institution for

4    student admissions or faculty hiring, any traditional judicial deference afforded to

5    academic institutions should not apply in lawsuits concerning student admissions

6    or faculty hiring at UC.

7 **I. Statistical Evidence That UC Discriminates Against Asian-American Applicants**

8    168.    In addition to Stanley's case, there is a pattern of similar rejections

9    experienced by other Asian-American applicants with outstanding qualifications.

10    The statistical evidence further reveals the extent of anti-Asian discrimination in

11    UC's admissions.

12    169.    In or around 2021, numerous high schools with high concentrations of

13    Asian-American students experienced a precipitous decline in UC admission

14    rates.

15    170.    For example, in 2016, 119 students from Westview High School applied to UC

16    Berkeley, and 44% were admitted. By 2021, however, the admission rate for

17    Westview High School students had plummeted to just 6.7%. Notably, 40.2% of

18    the student body at Westview High School is Asian-American.

19    171.    As another example, between 2018 and 2023, UC San Diego's admission

20    rates for various high schools shifted dramatically, displaying a strong negative

21    correlation with the percentage of Asian-American students in their student

1  bodies. As reflected in the table below, several highly ranked high schools with

2  large Asian-American populations experienced a steep decline in the percentage

3  of students admitted to UC San Diego in 2023 compared to 2018. Conversely,

4  several lower-ranked high schools with relatively small Asian-American

5  populations saw increased admission rates over the same period.

|  | Asian Percentage | National Ranking by US News | 2018 Admission Rate | 2023 Admission Rate |
|---|---|---|---|---|
| Bonita Vista | 10% | 2190 | 37% | 61% |
| King-Chavez | 0% | 9135 | 31.8% | 57.1% |
| Canyon Crest Academy | 42% | 140 | 61.3% | 15.7% |
| Westview | 40.2% | 401 | 65.5% | 13.3% |
| Del Norte | 42.2% | 329 | 60.4% | 11% |
| California average | 10.1% | N/A | 30.2% | 25% |

6  *Table 1: Precipitous drop of acceptance rate at Asian-concentrated high schools*

7  Notably, the change in UC San Diego's admission rate for a given high school is

8  inversely correlated with both the school's academic ranking and the proportion

9  of Asian-American students enrolled—that is, the higher the school's ranking and

10  the greater its Asian-American representation, the lower its UC San Diego

11  admission rate. This pattern represents a marked departure from standard

12  procedural expectations and strongly suggests a pattern unexplainable on

13  grounds other than race. It constitutes compelling circumstantial evidence of

14  discriminatory intent under *Arlington Heights* framework.

172.    According to the 2020 U.S. Census, California's Asian population grew by 25% from 2010 to 2020 and likely continued rising thereafter, making it the fastest-growing ethnic group in the state. But the percentage of Asian students at UC has declined.

173.    Between 2002 and 2022, Asian American's percentage in UC enrollment dropped from 38% to 32%, despite explosive growth in the state's Asian population. The Chinese American enrollment at UC between 2018 and 2024 also declined overall. At UC Berkeley, one of the most selective campuses of the UC system, Asian admits trended significantly downward in recent years. The percentage of Asian applicants admitted by UC Berkeley went from 18.9% (3,188 out of 16,866) in 2014 to 15.8% (4,416 out of 27,875) in 2023.

174.    The gap between Asian population growth and declining percentage in UC enrollment strongly suggests systemic discrimination. As the Court explained in *Reno v. Bossier Parish School Board*, 520 U.S. 471, 487 (1997), the natural consequences of an action often provide probative evidence of intent. Here, the persistent adverse impact on Asian-American applicants indicates a racially motivated policy, despite UC's denials.

175.    In nearly every case examined by the Plaintiff, whenever the SAT data of the applicants is available, it consistently indicates that Asian-American applicants face significantly higher score thresholds for admission compared to other racial groups. For example, in 2023, if African-American enrollees at Cornell University and the University of Michigan were held to the same SAT score standards as Asian-American enrollees, these two institutions would have admitted at least

1    7.1% and 9.6%, respectively, of all African-American SAT-takers nationwide who

2    scored within the top 1400–1600 range—an outcome that is statistically

3    improbable given the competitive nature of college admissions and the

4    geographic distribution of high-achieving students.

5    176.    More importantly, applying the same analysis, Cornell would have admitted

6    4.1% of top-scoring Hispanic applicants, 1.9% of top-scoring White applicants,

7    and only 1.0% of top-scoring Asian-American applicants. Only two plausible

8    explanations exist. The first is that top-scoring Black applicants are somehow

9    seven times more likely than their Asian-American counterparts to matriculate at

10    Cornell over peer institutions—a statistical improbability, particularly given that

11    other elite universities also enroll substantial numbers of high-achieving Black

12    students. A similar pattern appears at the University of Michigan, where

13    top-scoring Black applicants are allegedly six times more likely than their

14    Asian-American counterparts to enroll—a claim that strains credibility. But no one

15    can seriously believe that Cornell and the University of Michigan have somehow

16    cornered the market on talented Black freshmen. The far more

17    straightforward—and credible—explanation is that both Cornell and the

18    University of Michigan have manipulated their admissions standards by race:

19    selectively raising or lowering the bar based on racial identity. In doing so, they

20    have disproportionately admitted lower-scoring applicants of preferred racial

21    groups while systematically denying admission to higher-scoring Asian-American

22    applicants, all in service of engineering a predetermined racial composition.

177.    While SAT scores are not the sole measure of merit, the significant statistical

irregularities raise serious concerns as to whether the admissions policies of

Cornell University and the University of Michigan comply with constitutional and

legal prohibitions against racial preferences. Unless these institutions can

demonstrate that Asian-American applicants were substantially less qualified

based on other relevant criteria considered in the admissions process—which

they have failed to do—the disparities strongly suggest impermissible racial

discrimination.

178.    It is against this backdrop that UC discontinued the collection of SAT scores in

2021, adopting a "test-blind" admissions policy that remains in effect today.

During the years in which UC did collect such data, it almost certainly became

aware that Asian-American applicants faced a substantially higher admissions

threshold—mirroring patterns observed at institutions such as Cornell and the

University of Michigan. This likely created a strong institutional incentive to cease

collecting or publishing SAT data, in order to obscure the evident disparities and

avoid scrutiny.

179.    Despite UC's efforts to obscure disparities by eliminating SAT score reporting,

the racially engineered outcomes remain apparent. For Fall 2024 enrollment, the

table below compares, across five racial groups, the percentage of the group in

the top two SAT ranges (1400-1600 and 1200-1390) and the percentage of the

group admitted by the five UC campuses that rejected Stanley's application.

|  | Asian | White | Hispanic | Black | American Indian |
|---|---|---|---|---|---|
| SAT Takers scoring 1400-1600 | 25% | 6% | 2% | 1% | 1% |
| SAT Takers scoring 1200-1390 | 31% | 23% | 9% | 6% | 5% |
| UC Davis | 38% | 36% | 37% | 27% | 39% |
| UC Berkeley | 16% | 15% | 13% | 12% | 19% |
| UC Santa Barbara | 36% | 31% | 31% | 23% | 24% |
| UCLA | 11% | 10% | 7% | 11% | 17% |
| UC San Diego | 27% | 23% | 28% | 18% | 25% |

1    *Table 2: Racial groups' percentage in top SAT ranges and percentage admitted*

2    Note that 25% Asians, 2% Hispanic and 1% of Black are in the top 1400-1600

3    range. Yet UCLA's acceptance rates for Asian and Black applicants are both

4    11%, and the acceptance rates at UC Davis and UC San Diego for Asian and

5    Hispanic applicants are also roughly equivalent. It doesn't take an advanced

6    degree in mathematics to recognize the profound racial disparities reflected in

7    the table above. Small wonder, then, that UC avoids collecting or publishing SAT

8    statistics for admitted students by race—an omission that marks a stark

9    departure from standard procedural transparency. Given the substantial

10    disparities in SAT performance and the nearly identical acceptance rates

11    referenced above, the only plausible explanation is the use of racial preferences

12    on a broad scale—unless UC can substantiate that Asian-American applicants

13    are significantly less qualified on other admissions criteria, which it has thus far

14    failed to do.

180.    UC also withholds data on the number of National Merit Scholarship finalists among its admitted students. Disclosure of such information would provide another critical benchmark for evaluating the reasonableness of its decision to reject Stanley—a National Merit Scholarship finalist—and would shed light on whether similarly qualified applicants are being admitted on a consistent and equitable basis.

181.    In a 2014 study commissioned by UCLA, only later obtained through a public records request in 2018, sociology professor Robert Mare documented a consistent pattern of anti-Asian discrimination in admissions at UCLA. His report said,

> "'North Asian' (Chinese, Japanese, Korean, Indian/Pakistani American) applicants receive somewhat less favorable holistic read scores than applicants in other ethnic identity groups who are otherwise similar in measured academic qualifications, personal characteristics, and measured challenges and hardships."

It further concluded that

> "among otherwise equivalent applicants, whites, African Americans and Latinos are overrepresented among those admitted, and Asian-American applicants are underrepresented."

Additionally, the report noted that

1    "the disadvantages of Asian applicants occur, with varying magnitudes,

2    throughout the admissions process."

3    Mare even provided numerical estimates quantifying the number of admission

4    offers—broken down by race—that resulted directly from the consideration of

5    race. According to his analysis, more than two thousand offers were affected

6    over a five-year period.

7    182.    The table below presents the undergraduate admissions rates for Black

8    applicants compared to the overall applicant pool at each UC campus in both

9    2010 and 2023.

|  | 2010 Admissions Rates | | 2023 Admissions Rates | |
|---|---|---|---|---|
|  | Black | Overall | Black | Overall |
| UCLA | 14% | 23% | 10% | 9% |
| UC Berkeley | 13% | 21% | 10% | 12% |
| UC Irvine | 24% | 45% | 21% | 26% |
| UC Santa Barbara | 28% | 45% | 25% | 28% |
| UC San Diego | 19% | 38% | 18% | 25% |
| UC Santa Cruz | 41% | 64% | 52% | 63% |
| UC Davis | 31% | 48% | 30% | 42% |
| UC Riverside | 56% | 76% | 57% | 70% |
| UC Merced | 76% | 89% | 80% | 88% |

10    *Table 3: Black and overall admissions rates at UC in 2010 and 2023*

11    Over this period, it is apparent that all UC campuses have shifted toward a

12    practice of aligning admissions rates across racial and ethnic groups, irrespective

13    of academic qualifications. This trend of convergence is especially pronounced at

1    the more selective campuses, such as UCLA and UC Berkeley. Notably,

2    Professor Robert Mare's reports had already documented significant admissions

3    preferences for Black applicants at UCLA in 2010.

4    183.    Since there is no evidence that the average academic preparation of Black

5    applicants improved substantially between 2010 and 2023, the only plausible

6    explanation for the shift in admissions rates is that UC systematically adjusted

7    admissions standards—raising them for some racial groups and lowering them

8    for others.

9    184.    Admissions to UC's graduate programs—such as its law and medical

10    schools—like their undergraduate counterparts, also reflect significant racial

11    preferences.

12    185.    In December 2012, Danny Yagan, an Associate Professor of Economics at

13    UC Berkeley, pushed a paper titled "LAW SCHOOL ADMISSIONS UNDER THE

14    UC AFFIRMATIVE ACTION BAN". Using a seventeen-year sample of law school

15    applications, it concluded the following.

16    The pre-ban black admission rate was 61%. Controlling for selective attrition

17    from applicant pools, I find that the ban reduced the black admission rate to

18    31%---half of the pre-ban rate but still four times higher than the 8% rate that

19    would prevail under observed white admission standards. Observed black

20    admission advantages at intermediate credential levels were as large as 99

21    percentage points before the ban and 63 percentage points after the ban.

186.  In 2020, UCLA medical school adopted the "Anti-Racism Roadmap" and instituted policies that use race in its admissions. For example, it insists that its student body "should reflect the population of State of California". It also monitors the racial numbers in its admissions process.

187.  Dr. Jennifer Lucero has publicly emphasized the importance of racially diversifying medical school admissions. Following her appointment to lead UCLA's medical school admissions in June 2020, the number of Asian matriculants declined from 84 in 2019 to 55 in 2022—a 35% decrease. Such precipitous changes in admission outcomes strongly suggest the implementation of deliberate, race-conscious directives. In 2023, Asian applicants comprised 40.79% of the total applicant pool but accounted for only 29.71% of matriculants. In contrast, Black applicants represented just 7.86% of applicants yet constituted 14.29% of matriculants. From 2020 to 2023, White and Asian applicants consistently made up approximately 73% of the total applicant pool. Nonetheless, the combined percentage of White and Asian matriculants declined markedly over that period—from 65.7% in 2020 to 57.1% in 2021, 57.8% in 2022, and just 53.7% in 2023.

188.  According to whistleblowers with direct knowledge, the admissions committee at UCLA's medical school routinely and openly discusses applicants' race—or racial proxies—and uses race as a factor in admissions decisions. Dr. Jennifer Lucero and the committee are reported to admit Black applicants with below-average GPA and MCAT scores, including significantly below-average scores, while holding White and Asian applicants to much higher standards, often

FIRST AMENDED COMPLAINT

1    requiring near-perfect academic credentials for serious consideration.

2    Whistleblowers have confirmed that race is explicitly discussed and factored into

3    admissions decisions. In one instance, when the committee was reviewing a

4    Black applicant with significantly below-average academic metrics, Dr. Lucero

5    allegedly remarked: "Did you not know African-American women are dying at a

6    higher rate than everyone else? We need people like this in the medical school."

7    189.    Additionally, on April 8, 2025, according to an individual familiar with the

8    matter, the medical school circulated a memo outlining "guiding principles for

9    student representation on the admissions committee," which includes both faculty

10    and upper-year medical students. These guidelines reportedly instruct the

11    committee to consider race when selecting student members to serve as

12    admissions officers.

13    190.    Following public outcry over the Varsity Blues scandal, California state

14    lawmakers commissioned an audit of the University of California's admissions

15    practices. The California State Auditor's 2020 report found that UC "has allowed

16    for improper influence in admissions decisions, and it has not treated applicants

17    fairly or consistently." Specifically, the audit revealed that UC Berkeley and UCLA

18    "admitted thousands of applicants whose records demonstrated that they were

19    less qualified than other applicants who were denied admission."

20    191.    The audit also identified significant bias within the admissions process.

21    Despite UC's guidelines excluding personal details such as race, gender, and

22    birthplace from the 14 official admission factors, several campuses allowed

23    application readers to access such details. For example, UC Berkeley, UCLA,

1    and UC San Diego permitted readers to view students' names and native

2    languages. Additionally, UC Berkeley and UC San Diego exposed applicants'

3    gender, while UC Berkeley and UCLA displayed applicants' birthplaces. The audit

4    <u>warned</u> that this practice could lead readers to infer race or ethnicity, introducing

5    bias into decisions.

6    192.    In *Students for Fair Admissions v. University of Texas Austin, No. 24-50631*

7    *(5th Cir. 2025)*, the Fifth Circuit Court of Appeals noted that admissions officers'

8    access to racial data could still potentially allow for racial discrimination, thus

9    maintaining a live controversy.

10   193.    Finally, it is worth noting that studies comparing the academic qualifications of

11   admitted students by race fail to fully capture the extent of racial discrimination

12   faced by Asian-American applicants. By rejecting highly qualified Asian-American

13   applicants like Stanley, UC artificially narrows the academic qualification gap

14   between admitted students of different racial groups. As a matter of mathematical

15   fact, the more highly qualified Asian-American applicants the university rejects,

16   the smaller the observed qualification gap among admitted students becomes. To

17   accurately assess the extent of racial discrimination, it is necessary to compare

18   not only the admitted Asian-American students but also the rejected

19   Asian-American applicants against admitted students from other racial groups.

20   However, limitations in the publicly available UC admissions data currently

21   prevent such an analysis. The plaintiffs intend to pursue this essential data

22   comparison during the discovery phase of this lawsuit.

## J. Whistleblower Reports

194.    Senior UC administrators not only preach and practice "unstated Affirmative Action", they also actively persecute those who advocate for academic excellence over identity politics. From 2022 to 2024, Professor Perry Link, Chancellorial Chair for Teaching Across Disciplines at UC Riverside and a leading authority on modern and contemporary Chinese literature and culture, faced disciplinary action after expressing concerns during a faculty search committee meeting about prioritizing a Black candidate's race over qualifications. His comments, which he stated were intended to caution against elevating race as the "overriding criterion," were reported to university officials without his knowledge. Professor Link was subsequently removed from the search committee and subjected to a prolonged disciplinary process, including hearings resembling a trial, where termination was suggested as a penalty. Although a faculty committee unanimously found him innocent of the charges, Chancellor Kim Wilcox issued a formal letter of censure, overriding the committee's recommendation. Professor Perry Link was accused of making racist comments during the hiring process but was not informed of the specific remarks deemed problematic until nearly a year later. UC Riverside eventually acquitted him of all charges but allegedly threatened to penalize him if he spoke publicly about the ordeal. Despite UC's threats, Professor Link, a distinguished scholar at age 80, courageously made the incident public. If UC has attempted to silence a prominent tenured professor, it is reasonable to infer the tremendous pressure any professor, non-tenured administrator or staff would face if they were to speak

1    up. Therefore it is reasonable to infer that numerous similar cases exist at UC in

2    which victims chose to remain silent, fearing retaliation that could jeopardize their

3    careers and livelihoods. This incident highlights senior UC administrators'

4    preoccupation with immutable characteristics such as race, in clear violation of

5    the Fourteenth Amendment, Title VII of the Civil Rights Act, 42 U.S.C. 1981 and

6    the California Constitution. It also demonstrates the great lengths to which they

7    go to silence any dissidents or whistleblowers, creating a reasonable fear of

8    retaliation for students, administrators or faculties who might otherwise provide

9    more direct evidence. This documented pattern of intimidation and suppression

10    creates a chilling effect, making direct testimony from internal sources

11    exceptionally difficult to obtain outside of discovery. Therefore, Plaintiffs' reliance

12    on compelling circumstantial evidence, coupled with their right to discovery, is not

13    only justified but essential to uncover the full extent of UC's unlawful

14    race-conscious practices.

15    195.    Professor Perry Link has provided a sworn affidavit attesting to his direct

16    knowledge of racial considerations in the university's faculty hiring practices, and

17    the retaliation he experienced. He is prepared to testify when this lawsuit

18    proceeds to trial.

19    196.    Professor C. L. has agreed to provide a sworn affidavit attesting to his direct

20    knowledge of racial considerations in the university's faculty hiring practices and

21    in graduate students admissions. He is prepared to testify when this lawsuit

22    proceeds to trial.

197.   Professor G. B. has provided an affidavit attesting to their direct knowledge of racial considerations in the university's faculty hiring practices and in graduate students admissions. G.B. is prepared to testify when this lawsuit proceeds to trial. To protect against potential retaliation, their testimony will be provided under a Protective Order with an "Attorneys' Eyes Only" (AEO) designation, pursuant to Federal Rule of Civil Procedure 26(c).

198.   Plaintiffs also plan to subpoena testimonies from Professor Tim Groseclose. (Professor Robert Mare passed away, unfortunately.)

199.   Plaintiffs also plan to subpoena testimonies from the whistleblowers at UCLA medical school.

## K. UC's Holistic Review is a Euphemism for Discrimination

200.   In the wake of *SFFA*, the percentage of Asian American students at top universities surged, validating what had long been suspected: elite schools would admit more qualified Asian students once merit was considered instead of race — universities had simply chosen not to. It was only under the glare of legal scrutiny that these institutions retreated from race-based practices they could no longer justify or conceal.

201.   Not so at UC, where even after *SFFA* made clear that racial balancing violates both the Equal Protection Clause and Title VI, UC responded not by obeying the law, but with defiance.

202.    As currently adopted by UC, the preferred end run around anti-discrimination law is called "holistic review." In public, "holistic" sounds like individualized evaluation; inside the admissions office it operates as a euphemism for race-balancing. The so-called "holistic" review appears less a rigorous evaluation than a cover for subjective decision-making.

203.    UC uses "holistic review" as a backdoor to consider prohibited characteristics such as race. UC is hardly alone in treating "holistic review" as a workaround. This is an industry-wide practice. While UC is not the only school to adopt "holistic" review to achieve race-based outcomes, it stands out as one of the worst offenders.

204.    UC insists on implementing both "holistic reviews" and a "test-blind" admissions policy. However, this position is inherently contradictory and makes consistency even more elusive. A review cannot be truly holistic if it deliberately excludes objective measures like standardized tests, especially for STEM applicants where such metrics are crucial for assessing academic preparedness. According to the UC Regents' Bylaws, the Academic Senate holds the authority to "set the conditions of admissions." In 2020, the UC Academic Senate overwhelmingly voted 51-0, with one abstention, to retain standardized tests such as the SAT. Despite this overwhelming endorsement amid growing applicant pools and widespread grade inflation, the UC Board of Regents, composed primarily of political appointees, overruled the recommendation, raising significant concerns about their underlying motivations. Although UC claimed in 2020 that it would develop a "new test," no such test was ever created, resulting

1    in the complete elimination of standardized testing from the admissions process.

2    This decision appears to be a calculated move to compromise intellectual

3    honesty and academic integrity, potentially facilitating the concealment of

4    discriminatory practices against Asian-American applicants. Notably, leading

5    institutions like MIT, Dartmouth, Yale, Brown, Harvard, Caltech, Cornell, and the

6    University of Texas at Austin have reinstated standardized testing, further

7    highlighting the questionable nature of UC's continued "test-blind" policy

8    post-COVID. The UC is increasingly isolated in its stance as an "SAT Denier",

9    where they avoid releasing objective data by refusing to collect it in the first

10    place. These circumstances necessitate legal scrutiny of UC's policy, its

11    underlying motivations, its disparate treatment of Asian-American applicants, and

12    whether UC continues to merit the traditional judicial deference granted to bona

13    fide academic institutions.

14    205.    Even the euphemism "holistic" suggests a thorough and individualized

15    evaluation process. However, based on UCLA's job posting, UCLA pays its

16    application readers just $2.57 per application. As a reference, the minimum wage

17    for hotel workers in Los Angeles is $22.50 per hour. Since UCLA requires its

18    application readers to hold at least a bachelor's degree, their effective wage

19    should meet or exceed this minimum. If we assume UCLA is not breaking the

20    minimum wage law, a reader would need to review at least 8.75 applications per

21    hour—less than seven minutes per application. UC's application readers must

22    evaluate each applicant's transcript, extracurricular activities, essays,

23    recommendation letters, and other application documents. A typical college

1    application has about 3000 words. Even if we assume a reader doesn't have to

2    look up anything mentioned in the application, pause to reflect, or compare

3    across applications, a reader needs to read over 437 words per minute, far

4    above the average college graduate reading speed of 235 words per minute.

5    This breakneck pace is entirely incompatible with any genuine notion of "holistic"

6    review. Compounding the challenge, readers are expected to maintain

7    consistency across 146,276 undergraduate applications (UCLA's 2024 applicant

8    pool). This is, in effect, a near-impossible task. By contrast, Google invests over

9    10 hours per interviewee, highlighting just how superficial UCLA's rapid

10   evaluations must be.

11   206.   Maintaining any meaningful level of consistency across such a vast pool,

12          under severe time constraints, necessarily forces readers to rely heavily on easily

13          digestible, quantifiable metrics such as SAT scores and GPA.

14   207.   Making matters worse, UC then removed the one merit-based yardstick that

15          might have anchored these snap verdicts. Starting with the COVID-era 2021

16          cycle, UC dropped the SAT/ACT requirement for undergraduate admissions, and

17          UC has kept that test-blind policy. In short, UC refuses to apply color-blind

18          admissions policy but opts for test-blind policy instead.

19   208.   By discarding the most objective datapoint, UC ensures that admissions

20          decisions lean harder than ever on discretionary, purportedly "holistic" factors.

21          Indeed, the implementation of a 'test-blind' policy, especially given the

22          disproportionate academic achievements of Asian American students on

23          standardized tests, serves as an impermissible proxy for race.

209.    Yet when it comes to subjective criteria like "fit" or "contribution to campus culture," UC's reliance on quantifiable proxies becomes more troubling. On information and belief, UC uses race—or more accurately, self-reported racial identity—or racial proxies as a crude stand-in, a convenient shortcut, that "objectively" indicates cultural value, personality, and individual perspective. These dehumanizing stereotypes reflect not genuine, individual assessment, however, but racial profiling disguised as discretion.

210.    Universities, including UC, continue to engineer racial outcomes under the cover of subjective judgment and plausible deniability. But this change in terminology remains merely cosmetic; the discriminatory intent also remains.

211.    The one, true individual distinction that matters, individual merit, is discounted so that Asian Americans may be excluded. UC bypasses the need for any genuine individualized understanding but calls it "holistic." In this way, "individualism" can only be recognized through the lens of racial group identity. This turns equal protection on its head and reveals the extent to which UC has (unfortunately) come to view race as a defining feature of personhood.

212.    The result is a process that is neither "holistic" nor individualized. It is a rushed, inconsistent system that relies on superficial and impermissible self-reported racial categorization to evaluate subjective traits.

213.    At some point after Proposition 209, UC rebranded its race-conscious policies "holistic"—a transparent attempt to evade judicial scrutiny.

214.    After the adoption of "holistic review" around 2007, UC became markedly more opaque regarding race-related matters. UC deliberately discontinued public-facing websites that had allowed researchers to examine correlations between student credentials, race, and admissions decisions, as well as to analyze aggregated changes in GPA, STEM attrition, and graduation rates by race. In 2018, UC refused to provide Professor Richard Sander with anonymized, individual-level data on student admissions and outcomes—data it had readily furnished for admissions through 2006. This sustained effort to withhold critical admissions data represents a significant departure from established transparency norms and strongly suggests a pattern of conduct that cannot be explained on grounds other than race, thereby offering compelling circumstantial evidence of discriminatory intent under the *Arlington Heights* framework.

215.    Following the implementation of a holistic review system in 2007, UCLA prohibited faculty members on its Admissions Committee from accessing its admissions data. In response, Professor Tim Groseclose, a member of the Admissions Committee, invoked whistleblower protection and resigned from UCLA in protest. In his book *Cheating: An Insider's Report on the Use of Race in Admissions at UCLA* (2014), Professor Groseclose described how then-UCLA Chancellor Norm Abrams explicitly cited raising African American enrollment as the motivation behind adopting holistic admissions. In reality, UC was searching for subterfuge for reactivating racial preferences in admissions. The number of blacks admitted as freshmen to UCLA roughly doubled after its adoption of "holistic review". Ironically, between 2006, the last year of the pre-holistic system,

1    and 2007, the first year of the holistic system, admissions rates dropped for some

2    socio-economically disadvantaged ethnic groups. For example, the Latino rate

3    dropped from 18.3% to 16.8%, and the Vietnamese rate dropped from 28.6% to

4    21.4%. Furthermore, Professor Groseclose's statistical analysis showed that, for

5    a group of applicants receiving the same scores from their initial readers, UCLA

6    admitted 55% poor African Americans, 38% rich African Americans, 23% poor

7    North Asians and 18% rich North Asians. Note that *rich* African Americans were

8    admitted much more frequently than *poor* North Asians. If affirmative action were

9    truly about leveling the playing field, this outcome is indefensible. UC never

10   disputed the accuracy of Professor Groseclose's account.

11   216.   Soon after 2007, top UC administrators began to encourage other UC

12          campuses to adopt the same "holistic" approach that UCLA had implemented. In

13          2011, the Regents mandated that all UC campuses utilize either "holistic" or

14          "comprehensive" review in undergraduate admissions.

15   217.   Discriminating against disadvantaged Asian students in favor of affluent Black

16          (or Hispanic) applicants does not advance equality of opportunity; it betrays it. If

17          the goal were truly to level the playing field and expand opportunity for the

18          disadvantaged, socioeconomic status might be a logical and equitable focus that

19          would avoid running afoul of the law's prohibition on racial discrimination (as is

20          actually practiced in other states like Texas).

21   218.   Instead, UC explicitly rejects that approach precisely because it would not

22          produce its desired racial engineering preferences. The implication is

23          unmistakable: UC's priority is not to uplift the underserved, but to engineer a

1    specific racial composition, even if that means favoring affluent non-Asian

2    minority applicants over low-income Asian students. In doing so, UC betrays the

3    professed moral foundation of affirmative action and reveals its true

4    purpose—not equality of opportunity, but as a backdoor for invidious racial

5    discrimination. UC and other elite institutions' policies reveal that the goal was

6    never fairness— it is about achieving predetermined racial preferences, no

7    matter whose rights are trampled.

8    219.    When Stanley applied for Fall 2023, the test-blind policy was in force, so his

9    file reached the committee stripped of the one objective measure that might have

10    anchored an honest comparison. Admissions readers—working at a

11    seven-minute pace—were left to fill that vacuum with subjective cues and

12    race-linked proxies, the very tools UC had crafted to preserve its preferred

13    race-based demographic engineering. In short, Stanley was judged by a process

14    "holistic" in name only: rushed, inconsistent, and driven by racial identity rather

15    than by his extraordinary merit.

16 L. A Prima Facie Case under the *McDonnell Douglas* Framework

17    220.    In addition to the analysis under the *Arlington Heights* framework, the

18    circumstances surrounding Stanley Zhong's rejection also support a claim of

19    racial discrimination under the *McDonnell Douglas* burden-shifting framework.

20    221.    To establish a prima facie case of racial discrimination in admissions under

21    this framework, Plaintiff Stanley Zhong must demonstrate that:

22    (1) he is a member of a protected class;

1    (2) he was eligible for admission to the University;

2    (3) he was denied admission or otherwise treated adversely; and

3    (4) similarly situated individuals outside the protected class received more

4    favorable treatment.

5    Stanley Zhong satisfies each of these elements. *See McDonnell Douglas Corp. v.*

6    *Green,* 411 U.S. 792 (1973). In *Ames v. Ohio Dep't of Youth Services*, 605 U.S.

7    ___ (2025), the Supreme Court also unanimously reiterated its "instruction to

8    avoid inflexible applications of the prima facie standard. *Teamsters v. United*

9    *States*, 431 U. S. 324, 358. Pp. 4–7."

10   222.   First, Stanley is a member of a protected class—Asian Americans.

11   223.   Second, Stanley applied for admission to the Computer Science programs at

12   several University of California campuses for the Fall 2023 admissions cycle. He

13   was not merely qualified, but possessed exceptionally rare, objectively verifiable

14   qualifications. His achievements place him in the highest echelon of applicants

15   worldwide. These achievements include, but are not limited to:

16   ● Dominance in High School Coding Competitions:

17       ○ Securing top ranks in multiple prestigious coding contests for his age

18          group, including placing #2 globally (#1 in the United States) in MIT's

19          Battlecode contest.

20   ● Elite Performance in Professional Coding Competitions:

21       ○ Achieving the rank of 427 worldwide in the Google Code Jam semifinals, a

22          competition primarily for professional software engineers worldwide.

1        ○   Achieving the rank of 329 worldwide in the Meta (Facebook) Hacker Cup

2            semifinals, another competition primarily for professionals worldwide.

3    ●   Innovation and Industry Recognition:

4        ○   Developing RabbitSign, a novel and unlimited free e-signing service that

5            gained significant traction. This service was lauded by Amazon Web

6            Services (AWS) in a technical review as "one of the most efficient and

7            secure accounts" they had ever reviewed.

8    ●   Ultimate Professional Validation:

9        ○   Being hired by Google at age 18 for a software engineering position (Level

10           4) that ordinarily requires Ph.D.-level expertise or equivalent industry

11           experience.

12   Collectively, these accomplishments demonstrate that Plaintiff Stanley Zhong's

13   qualifications far exceeded the academic and technical standards required for

14   undergraduate admission to even the most selective university programs.

15   224.   Third, despite his extraordinary qualifications, Stanley was rejected by the

16   undergraduate Computer Science programs at all five UC campuses to which he

17   applied: UC Davis, UC Berkeley, UC Santa Barbara, UCLA, and UC San Diego.

18   225.   Fourth, the circumstances surrounding these rejections give rise to a strong

19   inference of racial discrimination. Preliminary investigation, including review of

20   publicly available information such as LinkedIn profiles, has identified non-Asian

21   students admitted to these Computer Science programs whose documented

22   academic performance, technical skills, and extracurricular achievements appear

23   substantially less distinguished than Stanley's exceptional, internationally

1    recognized accomplishments. For the Fall 2023 enrollment, these Computer

2    Science programs admitted 989 at UC Davis, 375 students at UC Berkeley, 1,006

3    at UC Santa Barbara, 368 at UCLA, and 1,621 at UC San Diego. It is practically

4    impossible that all the admitted students across these campuses possessed

5    qualifications equal to or exceeding Stanley's.

6    226.    On May 24, 2024, Plaintiff Nan Zhong emailed the UC's Directors of

7    Admissions and Computer Science department chairs, stating:

8        "Alternatively, if any of the CS chairs cc'd is willing to put their academic

9        reputation on the line, and vouch that all admitted non-Asian students are

10       reasonably equally or more qualified than the rejection cases we compiled,

11       that would move the conversation forward in a meaningful way too. Feel free

12       to use Stanley's case as an example rejection case."

13   No response was ever received. This silence speaks volumes and suggests that

14   the University's position may be untenable when confronted with comparative

15   applicant data.

16   227.    The rejection of a candidate with Stanley's exceptional credentials by five UC

17   campuses gives rise to a plausible inference that race, rather than merit, was a

18   determinative factor in the admissions decisions. This disparity warrants

19   discovery into the University's admissions records and decision-making

20   processes to assess the role of race under the then-prevailing legal framework

21   and to ensure compliance with current constitutional standards.

## M. Corruption in UC's Admissions and Untrustworthy Top Management

228.    UC's admissions process has been repeatedly compromised by scandals involving favoritism and fraud. In 2007, *The Daily Bruin*, UCLA's student newspaper, uncovered significant ethical violations within the orthodontics residency program. The investigation revealed that the program granted preferential admissions to major donors and their relatives, directly contravening UC policies. Internal emails and interviews exposed a systemic practice of advancing donor-affiliated applicants despite lower qualifications, undermining fairness and merit-based admissions.

229.    In 2020, UCLA men's soccer coach Jorge Salcedo was sentenced to eight months in prison for his role in the Varsity Blues scandal. Mr. Salcedo facilitated the fraudulent admission of students by falsely designating them as recruited athletes with fabricated soccer credentials. Mr. Salcedo's actions could not have been possible without substantial cooperation from the UC Admissions office.

230.    In response to the Varsity Blues scandal, UC conducted an internal review of its admissions practices, concluding that only two cases involved potential improper admissions. However, this self-assessment was sharply refuted by the findings of the California State Auditor's report in 2020, which identified 64 cases of inappropriate admissions. These cases involved preferential treatment due to applicants' family donations and personal connections to campus staff. The report also warned that the true number of compromised admissions could exceed **400 students**—a far more pervasive issue than UC acknowledged.

231.    The audit highlighted systemic favoritism at UC Berkeley, stating that "UC
Berkeley Frequently Gave Preferential Treatment to Relatives and Friends of
Faculty, Staff, and Donors". This behavior exemplifies a disregard for fairness in
admissions decisions. In one egregious case, a UC Regent violated university
policies by advocating for a waitlisted applicant through a personal letter to the
UC Berkeley Chancellor; the applicant was subsequently admitted. Despite this
clear breach of policy, neither the Regent nor the Chancellor faced any
consequences.

232.    Compounding these concerns, the California State Auditor's report <u>criticized</u>
UC's Office of the President for failing to provide adequate oversight, which
allowed significant procedural weaknesses to persist across campuses. The
report explicitly stated, "The University Has Not Made Sufficient Changes
Following the National College Admissions Scandal". This pattern of inadequate
accountability and ineffective self-regulation raises serious doubts about UC's
commitment to integrity and fairness in admissions, warranting further scrutiny
and legal action to enforce compliance with constitutional and statutory
obligations.

233.    Following the release of the California State Auditor's report, UC President
Michael V. Drake claimed that UC's internal audit recommendations aligned with
those of the state auditor. However, the state auditor, who noted significant
differences between the two assessments, publicly refuted this assertion. The
state auditor <u>warned</u> that the entire UC admissions process requires an

1  **overhaul**, citing inconsistent standards and practices that allowed applicants to

2  be evaluated on inappropriate reasons.

3  234.  Further reinforcing these concerns, California State Auditor Grant Parks

4  stated in a July 2024 letter to a state lawmaker that UC's actions had failed to

5  adequately address the weaknesses identified in its 2020 recommendations.

6  Parks remarked, "We have found [UC's] responses to not address weaknesses

7  we have seen in their implementation of [the 2020] recommendation".

8  235.  This ongoing failure to implement meaningful reforms calls into question UC's

9  commitment to transparency, accountability, and equal treatment of all applicants.

10  The discrepancies between UC's internal audits and the findings of independent

11  oversight bodies demonstrate UC's systemic unwillingness to acknowledge and

12  correct entrenched problems within its admissions framework, jointly and

13  severally across its campuses.

14  236.  These cases illustrate a persistent pattern of unethical admissions practices

15  that prioritize personal connections and financial influence over academic merit.

16  The breadth and frequency of such incidents point to systemic flaws within UC's

17  admissions framework, necessitating comprehensive third-party oversight.

18  237.  Although UC may invoke autonomy as a shield against external scrutiny, its

19  repeated lapses in admissions integrity demonstrate that its autonomy cannot

20  supersede the need for transparency, fairness, and compliance with

21  anti-discrimination laws. Without robust external review mechanisms, the integrity

22  of UC's admissions system remains fundamentally compromised.

## N. UC Officials' Callous Indifference to Plaintiffs' Federally Protected Rights

238.   UC officials have consistently ignored or dismissed complaints regarding absurd admissions outcomes and allegations of racial discrimination, highlighting reckless or callous indifference to Plaintiffs' federally protected rights across the board.

239.   More than a year passed between Nan Zhong's initial complaint to the UC Board of Regents about Stanley's admission results and the filing of this lawsuit in February 2025, during which the Board took no meaningful action. Nan initially contacted the UC Board of Regents in November 2023, and spoke **four** times directly to the Board during the public comment period of the UC Board of Regents meetings. Nan specifically requested their action after the Admissions Office was apparently dismissive. Yet, the UC Board of Regents took no action. The entire UC Board of Regents demonstrated reckless or callous indifference to Plaintiffs' federally protected rights.

240.   Ms. Han Mi Yoon-Wu, UC's Associate Vice Provost and Executive Director of Undergraduate Admissions, repeatedly dismissed the complaints offhandedly, asserting that Nan's allegations of racial discrimination were unfounded because California law prohibits such practices. By that logic, any criminal could claim innocence simply because the law prohibits the very act they are accused of committing. When Nan questioned whether the mere existence of a law guaranteed compliance, Yoon-Wu failed to answer.

241.   Doesn't Ms. Han Mi Yoon-Wu understand the absurdity of her statement? For someone with the level of her position, the answer must be yes. Her dismissive and irrational response can only be interpreted as an act of arrogant disregard for Asian applicants and their families, conveying an implicit message: *I can do and say whatever I want; there is nothing you can do about it. Get lost.*

242.   Yoon-Wu's action demonstrated reckless or callous indifference to Plaintiffs' federally protected rights. It reveals an intentional disregard for legitimate grievances and a profound indifference to the university's constitutional duty to ensure an admissions process free from racial discrimination.

243.   Michael V. Drake, the President of the University of California, and Katherine S. Newman, the Provost and Executive Vice President of Academic Affairs of the University of California, were both cc'd in the email exchanges between Nan and Han Mi Yoon-Wu. As a Regent, Mr. Drake was also present at the UC Board of Regents meetings when Nan made his comment to the Board multiple times over several months. Neither ever took any action. They demonstrated reckless or callous indifference to Plaintiffs' federally protected rights.

244.   All admissions directors and supervisors named as defendants exhibited reckless and callous indifference to Plaintiffs' federally protected rights by systematically prioritizing racial considerations over academic qualifications. This is evidenced by the starkly discriminatory admissions outcomes produced under their supervision. Despite unambiguous legal prohibitions against racial preferences, these officials repeatedly rejected exceptionally qualified applicants, including Stanley Zhong, whose academic and professional accomplishments far

1    exceeded typical admissions standards. They persisted in this unlawful conduct

2    notwithstanding public outcry, numerous complaints, and the well-established

3    legal framework prohibiting such practices in public education. Their actions were

4    not merely negligent—they reflected a deliberate and conscious disregard for

5    Plaintiffs' rights under federal and state law. This sustained pattern of knowing

6    indifference underscores the intentional nature of the harm inflicted upon

7    Plaintiffs and similarly situated individuals.

8    245.    Nan also contacted the Chairs of the Computer Science Departments at all

9    five UC campuses on multiple occasions, requesting their assessment of

10    Stanley's application. Only Professors Divyakant Agrawal and Todd Millstein

11    responded, expressing concern. The others failed to reply

12    altogether—demonstrating, at best, reckless disregard, and at worst, callous

13    indifference to Plaintiffs' federally protected rights.

14    246.    This cavalier attitude has only deepened the emotional distress suffered by

15    Stanley and Nan, compounding the harm inflicted by the University's

16    discriminatory practices.

17    247.    The denial of Stanley's applications to five UC campuses—combined with

18    UC's complete failure to even acknowledge the issue for over a year—cannot be

19    dismissed as mere random error. Rather, these actions reveal a pattern of

20    systemic bias and reckless or callous indifference to Plaintiffs' federally protected

21    rights, suggesting malice toward Stanley and, by extension, other similarly

22    situated Asian-American applicants. While it is true that Google's job offer came

23    after UC's rejections—meaning UC could not have foreseen that Google would

FIRST AMENDED COMPLAINT

1    recognize Stanley's skills had already reached the Ph.D. level—the fundamental

2    issue remains: the technical achievements included in Stanley's UC applications

3    were substantially the same as those sent to Google. While Google found

4    Stanley's achievements sufficient to consider him for a Ph.D.-level position, UC,

5    in contrast, deemed him unqualified for undergraduate admission. This stark

6    contrast underscores a systemic barrier that profoundly affects Asian-American

7    applicants' experiences in college admissions. Even when their qualifications

8    reach the Ph.D. level, they may still be denied undergraduate admission. This

9    fosters a pervasive sense of helplessness—the belief that the system is rigged to

10   reject you regardless of your merits—that contributes significantly to the mental

11   health challenges within the Asian-American youth community.

12   248.    Disturbingly, after becoming aware of Google's assessment of Stanley's skills,

13   Co-Defendant UC had a year to respond but refused to engage in any

14   meaningful discussion about his applications, which only compounded the

15   emotional distress Stanley and Nan have endured.

16   249.    Co-Defendant UC, aware of the legal prohibitions against racial discrimination

17   in university admissions under the Fourteenth Amendment, Title VI, 42 U.S.C. §

18   1981, and the California Constitution, have every incentive to conceal the true

19   nature of their race-conscious decision-making processes. Plaintiffs allege that

20   Defendants acted with deliberate indifference to Plaintiffs' rights, but

21   acknowledge that the precise mechanisms of discrimination—such as how racial

22   balancing was operationalized, who authorized it, and whether specific metrics or

23   targets were used—are likely concealed in non-public communications and

1    internal documents. Co-Defendant UC are too smart to leave a direct paper trail

2    visible to the public. Courts have long recognized that discriminatory intent is

3    rarely documented overtly, and that plaintiffs must be permitted to use discovery

4    to obtain circumstantial and contextual evidence. See *Village of Arlington Heights*

5    *v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 266–68 (1977)

6    (permitting intent to be inferred from indirect evidence).

7    250.    Discovery is essential to uncover these non-public policies, communications,

8    and data. Plaintiffs have alleged sufficient facts to render their claims plausible.

9    The factual development of this case—particularly with respect to the roles of

10    individual defendants, internal deliberations, and race-conscious criteria used in

11    "holistic" review—must proceed through discovery, as the key evidence lies

12    within the exclusive control of Co-Defendant UC.

13 **O. Lack of Response by Government Officials**

14    251.    Stanley's mother filed a civil rights complaint with the Office for Civil Rights

15    (OCR) in the U.S. Department of Education. The complaint included all the

16    sixteen colleges that rejected Stanley. However, the OCR dismissed the case

17    after misinterpreting her email, relying on reasoning that directly contradicted her

18    intended meaning. When she pointed out the misunderstanding, the OCR

19    refused to reopen the case, stating it had been closed. The official dismissal

20    letter cited reasoning that the OCR knew was factually incorrect. Despite her

21    repeated requests to correct the letter and remove the inaccurate rationale, the

22    OCR declined to make any changes, even after she escalated the matter. ED's

1    failure to enforce civil rights laws has let the direct harm to Stanley and other

2    Asian-American applicants persist.

3    252.   Nan also raised his concerns with California Assemblymember Marc Berman,

4    mentioning that hundreds of his constituents were deeply concerned about UC's

5    admissions practices. Despite several email exchanges, Mr. Berman did not

6    respond substantively.

7    253.   Nan and other concerned Asian parents brought the issue to at least another

8    five California Assembly members and Senators. None of them took any action.

9    254.   In November 2023, Nan organized a petition that gathered over 4,000

10    endorsements for letters expressing concerns about UC admissions. These

11    letters were sent to Governor Gavin Newsom and Lt. Governor Eleni Kounalakis,

12    both of whom serve as ex officio Regents of the University of California. Neither

13    has replied.

14    255.   Plaintiffs have made every reasonable effort to engage in dialogue and

15    pursue resolution before filing this lawsuit.

16 **P. Asian Americans Face Hostility**

17    256.   Public hostility toward Asian-American students asserting their legal rights is

18    well-documented, particularly on college campuses.

19    257.   Asian Americans who challenge this discrimination do so at great personal

20    risk. On campus, advocating for equal treatment under the law has been

21    perversely rebranded as an attack on civil rights—an Orwellian inversion that

22    suggests those rights belong only to the "right kind" of minority.

1    258.    At UC, as at many elite colleges, Asian Americans endure a dual-indignity

2    —first, they are subjected to systemic discrimination in the admissions process.

3    Then, should they be lucky enough to reach campus and object to that injustice,

4    they are vilified as opponents of "equity" or "allies" of the oppressors or branded

5    "racist." This national climate manifests itself at UC and throughout the body of

6    academic institutions. UC condemns discrimination against some groups, but

7    celebrates discrimination against Asian Americans and other groups.

8    259.    For example, during the *SFFA v. Harvard* trial, widespread protests erupted

9    against SFFA's challenge to race-conscious admissions, which hurt

10    Asian-American applicants. Even after the Supreme Court ruled against Harvard,

11    then-president Claudine Gay responded with open defiance, stating, "We will

12    comply with the court's decision. But it doesn't change our values." While the first

13    half of her statement reflects legal necessity, the latter half unmistakably signals

14    defiance.

15    260.    Academics such as Professor Janelle Wong and Professor Viet Thanh

16    Nguyen publicly asserted that no Asian American had suffered discrimination in

17    the college admissions process, misleading the public with statements like, "Not

18    a single Asian-American student has testified that they faced discrimination in the

19    high-profile Harvard case." Such assertions are demonstrably inaccurate and

20    serve to suppress legitimate grievances. On November 4, 2024, Nan challenged

21    both Professor Janelle Wong and Professor Viet Thanh Nguyen to a public

22    debate. Neither has replied as of July 27, 2025.

FIRST AMENDED COMPLAINT

261.     A particularly striking example occurred at a panel discussion following a screening of the MSNBC documentary *Admissions Granted* in San Francisco on May 9, 2024. The reaction of the audience, a few hundred people strong, vividly illustrated this hostility. When the moderator introduced a Harvard student advocating for race-conscious admissions, the room erupted in thunderous applause and cheers. In contrast, the Asian-American student whose case launched the *SFFA* lawsuit received only sparse clapping—approximately a quarter of which likely came from Nan alone.

262.     This pervasive social hostility—manifesting in microaggressions and overt hostility—discourages Asian-American students from challenging discriminatory policies, effectively silencing those who have been harmed. It is therefore reasonable to infer that numerous Asian-American applicants, either already harmed by UC's admissions practices or anticipating future discrimination, remain silent due to legitimate concerns about retaliation or social pressure.

263.     This hostile climate has a direct, suppressive effect on potential plaintiffs. Many Asian-American applicants rejected by UC initially expressed interest in joining this lawsuit. However, after spending just a few months on college campuses as freshmen, the vast majority of them withdrew.

**Q. Minor Son as a Prospective Applicant Can Only Conclude That He Is Not Welcome at UC**

264.     Minor Son is currently a rising junior in high school and anticipates applying to UC during the 2026-2027 application cycle for fall 2027 enrollment.

FIRST AMENDED COMPLAINT

265.   Like his brother, Minor Son is talented. Minor Son already demonstrates the
academic excellence, intellectual curiosity, and extracurricular achievement that
define top college applicants. Although he has not yet taken the PSAT due to his
grade level, he expects to do well, just as his older brother Stanley did, based on
his advanced coursework and consistent academic performance. Minor Son's
current GPA stands at a perfect 4.0 (unweighted), even higher than Stanley's at
the same stage, placing him among the very top of his class.

266.   Outside the classroom, Minor Son exhibits a well-rounded and disciplined
character. He has been a member of his high school's varsity cross-country team
since his freshman year, he is a national-level Rubik's Cube competitor capable
of solving the cube in 6.25 seconds during official events, and he has taught
himself to juggle five balls. Minor Son has performed on stage at the second
largest annual juggling festival in North America.

267.   However, based on Stanley's experience, Minor Son has learned of a
consistent pattern in which UC discriminates against Asian American applicants
because of their race.

268.   Minor Son is also discouraged and humiliated by repeated and public
knowledge of UC's discrimination against Asian Americans in its admissions.

269.   Minor Son has also learned through friendship networks within his community
and through publicly available reports that Asian American students who speak
up for equal treatment under the law on UC campuses and throughout academia

1    are branded "racists" and ostracized on campus —reinforcing that UC's bias

2    extends beyond admissions into campus culture.

3    270.    Minor Son is aware of admissions statistics indicating that—even among the

4    most qualified—Asian Americans face significantly lower admission rates without

5    the 'correct' race for UC's race-based admissions process.

6    271.    Under Article III of the Constitution, as construed by precedents such as

7    *Gratz v. Bollinger* and *Northeastern Fla. Chapter*, an imminent discriminatory

8    barrier (like a university's admissions policy) constitutes a sufficient

9    "injury-in-fact" for standing.

10    272.    Both because of hard data indicating that the collective experience of Asian

11    Americans at UC is dismal in the admissions pool and also because of his direct

12    experience of his brother's hardship and rejection, Minor Son faces certain harm

13    if he applies to UC. In short, Minor Son has come to view application to UC as an

14    Asian American student, no matter how talented, as a fool's errand. Through its

15    actions, UC has concretely deterred Minor Son from applying for admission in the

16    future.

17    273.    In sum, while Minor Son is positioned to be a highly competitive applicant to

18    any elite university, he confronts a tangible and immediate risk and harm of

19    race-based discrimination at UC.

## R. Summary of UC's Illegal Use of Race

274.    In sum, the compelling statistical and anecdotal evidence unequivocally demonstrates that the University of California has, and continues to, impermissibly use race as a factor in its operations. This pattern of unconstitutional conduct is evident across multiple critical functions:

    a.  Undergraduate Admissions (Historic and Current):

        i.  As early as 2002, internal analyses and the public accusations of then-UC Board of Regents Chairman John Moores unequivocally flagged racial discrimination in undergraduate admissions, despite official denials.

        ii.  While UC has since actively concealed its current undergraduate admissions data, the circumstantial evidence is overwhelming. Plaintiffs have documented

            1.  absurd individual rejections of exceptionally qualified Asian American applicants;

            2.  racial disparities identified by Professor Tim Groseclose and Professor Robert Mare;

            3.  profound disparities between standardized test scores and acceptance rates across racial groups;

4. substantial gap between Asian population growth and its declining percentage in students admitted by UC; and

5. precipitous drops in admission rates at Asian-concentrated high schools.

iii. These all powerfully indicate the continued, plausible use of race in UC's undergraduate admissions, discriminating against Asian Americans.

b. Graduate School Admissions (Recent):

i. Law School Admissions

Recent academic studies, such as the 2012 paper on law school admissions post-Proposition 209, illustrate a persistent, significant advantage for certain racial groups even after a ban on racial preference, strongly suggesting the continued, albeit covert, consideration of race.

ii. Medical School Admissions

The precipitous decline in Asian matriculants at UCLA Medical School following the implementation of "Anti-Racism Roadmap" policies, coupled with documented discussions of racial balancing by admissions officials and the admitted practice of favoring specific racial groups with significantly lower qualifications, provides undeniable evidence of race-based decision-making.

1              iii. Whistleblower reports documented racial preference in graduate

2                   admissions.

3        c.  Faculty Hiring:

4              i.  Whistleblower reports, UC's pervasive use of diversity statements

5                   as ideological litmus tests, and cluster hiring initiatives explicitly

6                   designed to increase "minority" faculty representation, all confirm a

7                   deeply embedded institutional culture of race-consciousness that

8                   permeates hiring decisions. The admission by Dean Chemerinsky

9                   of "unstated Affirmative Action" in faculty hiring and the use of

10                 "proxies for race" in student admissions, explicitly advising

11                 concealment, serves as a direct, unvarnished admission of intent to

12                 evade constitutional prohibitions.

13            ii. Whistleblower reports documented not only racial preference in

14                 faculty hiring but also senior UC administrators' retaliation against

15                 faculties opposing this illegal practice.

16    275.   Additionally, senior UC administrators have made repeated public statements

17    expressing a desire and intent to consider race in admissions.

18    276.   Co-Defendant UC's persistent obfuscation of its admissions data strongly

19    suggests a deliberate attempt to hide ongoing discriminatory practices.

FIRST AMENDED COMPLAINT

**S. Legal Basis**

277.    In *SFFA v. Harvard*, 600 U.S. 181 (2023), the Supreme Court definitively held that race-based admissions policies violate the Equal Protection Clause.

278.    UC's racially discriminatory admission policies and practices violate the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

279.    UC's racially discriminatory admissions policies and practices also violate Title VI of the Civil Rights Act of 1964, which prohibits racial discrimination in programs receiving federal financial assistance.

280.    UC's racially discriminatory admissions policies and practices also violate 42 U.S.C. 1981, which prohibits racial discrimination in contracting.

281.    UC's racially discriminatory admissions policies and practices also violate Article I, Section 31 of the California Constitution, which unequivocally states: "The State shall not discriminate against, or grant preferential treatment to, any individual or group on the basis of race, sex, color, ethnicity, or national origin in the operation of public employment, public education, or public contracting." This provision explicitly prohibits both discrimination and preferential treatment on the basis of race.

282.    UC's actions represent a blatant and ongoing disregard for established federal and state constitutional law, necessitating judicial intervention to restore meritocracy and equal protection for all applicants, regardless of race.

283.    In addition to direct evidence of discrimination, racial "prejudice or stereotype"
may be proven through circumstantial evidence. *See Village of Arlington Heights
v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 266 (1977).

284.    When a plaintiff relies on the *Arlington Heights* method to establish intent, "the
plaintiff need provide very little such evidence ... to raise a genuine issue of fact
...; any indication of discriminatory motive ... may suffice to raise a question that
can only be resolved by a fact-finder." *Pac. Shores Props.*, 730 F.3d at 1159
(citations omitted).

285.    While disparate impact is not the only factor in an *Arlington Heights* case,
"showing disproportionate impact, even if not overwhelming impact, suffices to
establish one of the circumstances evidencing discriminatory intent." *N. Carolina
State Conference of NAACP v. McCrory*, 831 F.3d 204 (4th Cir. 2016).

286.    Using the *Arlington Heights* method of proving intent, the court analyzes
whether discriminatory purpose motivated a recipient's actions by examining
factors such as statistics demonstrating a "clear pattern unexplainable on
grounds other than race." *Village of Arlington Heights v. Metropolitan Housing
Development Corp.*, 429 U.S. 266 (1977).

287.    In *International Brotherhood of Teamsters v. United States*, 431 U.S. 324
(1977), a case brought under the "pattern or practice" provision of Title VII, the
Court stated that "statistics showing racial or ethnic imbalance are probative ...
because such imbalance is often a telltale sign of purposeful discrimination." *Id.*
at 339 n.20. Accordingly, statistical evidence of a sufficiently "gross disparity"

1    between the affected population and the general population may establish an

2    inference of intentional discrimination. *Hazelwood Sch. Dist. v. United States*, 433

3    U.S. 299, 307–08 (1977) ("Where gross statistical disparities can be shown, they

4    alone may in a proper case constitute *prima facie* proof of a pattern or practice of

5    discrimination.").

6    288.    In *Comm. Concerning Community Improvement v. City of Modesto*, 583 F.3d

7    690 (9th Cir. 2009), the Ninth Circuit Court of Appeals stated that "proof of

8    disproportionate impact on an identifiable group, such as evidence of 'gross

9    statistical disparities,' can satisfy the intent requirement where it tends to show

10    that some invidious or discriminatory purpose underlies the policy." The racial

11    disparities documented by Professor Tim Groseclose and Professor Robert

12    Mare, profound disparities between standardized test scores and acceptance

13    rates across racial groups, and precipitous drops in admission rates at

14    Asian-concentrated high schools, and the gap between Asian population growth

15    and its declining percentage in students admitted by UC, all strongly suggests

16    "gross statistical disparities."

17    289.    As the Supreme Court explained in *Columbus Board of Education v. Penick*,

18    443 U.S. 449, 464–65 (1979), "[a]ctions having foreseeable and anticipated

19    disparate impact are relevant evidence to prove the ultimate fact, forbidden

20    purpose. . . . [T]he foreseeable effects standard [may be] utilized as one of the

21    several kinds of proofs from which an inference of segregative intent may be

22    properly drawn. . . . Adherence to a particular policy or practice, with full

23    knowledge of the predictable effects of such adherence . . . is one factor among

1    many others which may be considered by a court in determining whether an

2    inference of segregative intent should be drawn." In light of the well-documented

3    racial disparities in SAT scores, the foreseeable impact of eliminating the SAT by

4    UC as an admissions criterion further supports an inference of racial intent.

5    290.    *FBI v. Fikre*, 601 U.S. 234 (2024) held that the presumption of good faith for

6    government actors is no longer good law. Specifically, *Fikre* held that the

7    requirement of proving that voluntary cessation is permanent "holds for

8    governmental defendants no less than for private ones," *id.* at 241.

9    291.    The Equal Protection Clause of the Fourteenth Amendment prohibits states

10    from denying any person "the equal protection of the laws." The Clause's "central

11    purpose is to prevent the States from purposefully discriminating between

12    individuals on the basis of race." See *Shaw v. Reno*, 509 U.S. 630, 642 (1993).

13    Thus, a state law or policy that discriminates on the basis of race is subject to

14    strict scrutiny, regardless of its intended beneficiaries. See *Adarand Constructors,*

15    *Inc. v. Peña*, 515 U.S. 200, 227 (1995).

16    292.    As the Supreme Court noted in *SFFA v. Harvard*, "College admissions are

17    zero-sum. A benefit provided to some applicants but not to others necessarily

18    advantages the former group at the expense of the latter." The distinction

19    between preferential treatment and adverse impact is illusory—both actions are

20    inherently racially motivated and inseparable, representing merely different ways

21    of describing the same net discriminatory conduct. In a zero-sum situation, when

22    assessing whether a policy constitutes racial discrimination, courts should focus

23    on the presence of racial intent, regardless of whether that intent manifests as

1    preferential treatment or adverse impact. As the Supreme Court affirmed in *SFFA*

2    *v. Harvard*, "[W]hat cannot be done directly cannot be done indirectly. The

3    Constitution deals with substance, not shadows," and the prohibition against

4    racial discrimination is "levelled at the thing, not the name." *Cummings v.*

5    *Missouri*, 71 U.S. (4 Wall.) 277, 325, 18 L.Ed. 356 (1867).

6    293.    The argument that Asian Americans are over-represented in UC's student

7    body relative to the general population does not negate claims of discrimination.

8    Equal protection requires that individuals be treated as individuals, not as

9    members of a racial class. See *Miller v. Johnson*, 515 U.S. 900, 911 (1995). Even

10   if aggregate Asian enrollment remains relatively high, systemic bias may

11   suppress their numbers below what they would be in a race-neutral system.

12   "[I]nvidious discrimination does not become less so because the discrimination

13   accomplished is of a lesser magnitude." See *Personnel Administrator of*

14   *Massachusetts v. Feeney*, 442 U.S. 256, 277 (1979). The "law's focus on

15   individuals rather than groups [is] anything but academic." *Bostock* v. *Clayton*

16   *County*, 590 U.S. 644, 659 (2020). Chief Justice John Roberts unequivocally

17   articulated in *SFFA v. Harvard* that "the student must be treated based on his or

18   her experiences as an individual—not on the basis of race."

19   294.    Further supporting this action, in *Ames v. Ohio Dep't of Youth Services*, 605

20   U.S. ___ (2025), the Supreme Court unanimously held that Title VII protects

21   "individuals," not groups, and protects "minority and majority" alike. It reaffirmed

22   two key principles: first, that "the standard for proving disparate treatment under

23   Title VII does not vary based on whether the plaintiff is a member of a majority

1    group"—a principle that logically extends to Title VI, particularly for groups that

2    may be overrepresented in a college's student body relative to the general

3    population; and second, the Court reiterated its longstanding guidance against

4    rigid or inflexible applications of the prima facie standard.

5    295.    Further supporting this action, in *Chinese American Citizens Alliance of*

6    *Greater New York (CACAGNY) v. Adams*, 116 F.4th 161 (2d Cir. 2024), the

7    Second Circuit Court of Appeals unanimously affirmed that an equal protection

8    claim may proceed if "any individual has been negatively affected or harmed by a

9    discriminatory law or policy based on race, even if there is no disparate impact

10    on members of that racial class in the aggregate."

11    296.    The Second Circuit Court of Appeals further held that a facially neutral policy

12    driven by racial motives violates equal protection, even if aggregate enrollment

13    improves. The ruling states "if discriminatory intent is proven, a negative effect or

14    harm from that discriminatory policy on individual Asian-American students

15    applying to the SHSs [Specialized High Schools] would be sufficient to trigger

16    strict scrutiny review". The court further held that a policy or a program "is not

17    immunized from strict scrutiny because it underperforms in an unconstitutional

18    mission with respect to a targeted racial group in the aggregate." Therefore,

19    policies aiming to reach HSI designation at UC—whether or not the 25% target

20    has been met—are subject to strict scrutiny and won't survive it.

21    297.    Moreover, *CACAGNY* rejected the defense that admitting students to any

22    school within a system negates discrimination claims. The Second Circuit Court

23    stated that denying a student access to their preferred institution due to race is

1  actionable. Similarly, admitting Asian-American students to less selective UC

2  campuses does not absolve more selective campuses from discrimination

3  claims.

4  298.  In *CACAGNY*, the Second Circuit Court stated that "Applying Supreme Court

5  precedent, we have generally recognized three types of discriminatory laws: (1) a

6  facially discriminatory law or policy that expressly classifies individuals on the

7  basis of race; (2) a facially neutral law that is enforced in a discriminatory fashion;

8  and (3) a facially neutral law that was adopted with discriminatory intent and

9  resulted in a discriminatory effect. *See Chabad Lubavitch of Litchfield Cnty., Inc.*

10  *v. Litchfield Hist. Dist. Comm'n,* 768 F.3d 183, 199 (2d Cir. 2014)."

11  299.  For UC, all three types of discriminatory policies and practices identified by

12  the Second Circuit Court are evident:

13      a. **Facially discriminatory policies**: Ample evidence shows that UC

14          employs explicitly race-based discriminatory policies–including numerical

15          racial targets–that are directly tied to student admissions.

16      b. **Discriminatory enforcement**: UC's regular and frequent absurd and

17          incongruous admission outcomes strongly indicate that UC exercises its

18          admissions policies in a discriminatory fashion.

19      c. **Discriminatory intent and effect**: UC's official statements and its senior

20          administrator have repeatedly expressed a desire and intent to use race in

21          admissions. There is substantial evidence of adverse effects on

22          Asian-American applicants, both individually and collectively. Additionally,

23          UC's faculty hiring practices and graduate admissions are demonstrably

1    racially motivated, resulting in disparate treatment of various racial groups.

2    Moreover, a senior UC administrator openly advocated for circumventing

3    legal scrutiny by ensuring racial intent was carried out without being

4    explicitly documented—effectively endorsing discrimination through covert

5    means.

6    These actions constitute violations of the Equal Protection Clause of the

7    Fourteenth Amendment, Title VI of the Civil Rights Act of 1964, 42 U.S.C 1981,

8    and Article I, Section 31 of the California Constitution.

## 9 V. CLAIMS FOR RELIEF

## 10 COUNT I - Violation of the Equal Protection Clause, U.S. Const. Amend. XIV

## 11 (Against the Individual Defendants at UC in their Official and Personal Capacities)

12    300.    Plaintiffs reallege and incorporate by reference the allegations set forth

13    above. Taken together, the facts presented form a consistent, disturbing pattern

14    of intentional racial discrimination—one that culminated in the rejection of Stanley

15    Zhong and the discouragement of his brother Minor Son, not because they lack

16    merit, but because they do not fit the racial profile Co-Defendant UC wants to

17    engineer.

18    301.    Plaintiffs bring this claim under 42 U.S.C. § 1983 to vindicate rights secured

19    by the Equal Protection Clause of the Fourteenth Amendment.

1    302.    The equal protection clause of the Fourteenth Amendment prohibits state

2        actors from denying individuals equal protection of the laws, including through

3        the use of race as a motivating factor in government decision-making.

4    303.    The discriminatory intent of Co-Defendant UC can be inferred from a

5        constellation of evidentiary factors, including: (1) the demonstrable statistical

6        evidence of disparate impact on Asian Americans in admissions; (2) their

7        historical track record of discrimination against Asian Americans in admissions;

8        (3) the sequence of events demonstrating their resolute opposition to legal

9        mandates to evaluate admissions candidates without regard to racial preference;

10       and (4) their deviations from regular procedures or substantive norms of racial

11       equality and evaluation of academic candidates on the basis of merit regardless

12       of race.

13   304.    As a public institution, Co-Defendant UC's admissions policies and practices

14       violate the Equal Protection Clause of the Fourteenth Amendment by

15       intentionally discriminating against Asian-American applicants, including Stanley,

16       on the basis of race.

17   305.    Excluding Defendant Divyakant Agrawal and Defendant Todd Millstein,

18       Co-Defendant UC's acts and omissions were motivated by malicious and

19       oppressive motives, or in deliberate or reckless disregard of the plaintiffs'

20       constitutional rights, namely to discriminate on the basis of race, and involved

21       reckless or callous indifference to Stanley's and Minor Son's constitutionally

22       protected rights. Their conduct was undertaken in the face of the known,

23       perceived risk that their actions violated federal or state law.

306.    As a result of the illegal discrimination by Co-Defendant UC, Plaintiffs have suffered direct and indirect damages in an amount to be determined at trial.

307.    Plaintiffs have been and will continue to be injured or face imminent harm by Co-Defendant UC's ongoing discriminatory admissions policies, which deny them an equal opportunity to compete for admission based on race or ethnicity.

308.    Plaintiffs are entitled to a declaratory judgment and a permanent injunction because there is no plain, adequate, or speedy remedy at law to prevent Co-Defendant UC from continuing to use admissions policies and practices that discriminate on the basis of race or ethnicity in violation of the Fourteenth Amendment and because the harm Plaintiffs will otherwise continue to suffer is irreparable. Co-Defendant UC, excluding Defendant Divyakant Agrawal and Defendant Todd Millstein, acted with callous indifference to Plaintiffs' rights under the Equal Protection Clause. Accordingly, Plaintiffs seek punitive damages to deter such unconstitutional conduct.

309.    Plaintiffs seek this relief under 42 U.S.C. § 1983 and any other law that might supply a cause of action for the requested relief, including the Declaratory Judgment Act (28 U.S.C. § 2201) and the implied cause of action recognized in *Ex parte Young*, 209 U.S. 123 (1908).

310.    Plaintiffs seek this relief only against the individual defendants at UC, and not against the institutional defendants.

1 **COUNT II - Violation of Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d)**

2 **(against the University of California)**

3  311.  Plaintiffs reallege and incorporate by reference the allegations set forth

4      above.

5  312.  Plaintiffs bring this claim under Title VI of the Civil Rights Act of 1964, which

6      prohibits any program or activity receiving federal financial assistance from

7      subjecting individuals to discrimination on the basis of race.

8  313.  UC receives substantial federal funding and is therefore subject to the

9      requirements of Title VI.

10  314.  Although Title VI does not, by its terms, incorporate constitutional standards,

11      the Supreme Court has made clear that a Title VI claim for racial discrimination in

12      admissions is coextensive with a claim under the Equal Protection Clause.

13  315.  For the reasons set forth earlier in this complaint, Plaintiffs allege that UC

14      intentionally discriminated against Asian-American applicants, including Stanley

15      and Minor Son, on the basis of race, in direct violation of Title VI.

16  316.  As a result of the illegal discrimination by Co-Defendant UC, Plaintiffs have

17      suffered direct and indirect damages in an amount to be determined at trial.

18  317.  Plaintiffs have been and will continue to be injured or face imminent harm by

19      Co-Defendant UC's ongoing discriminatory admissions policies, which deny them

20      an equal opportunity to compete for admission based on race or ethnicity.

1    318.   Plaintiffs are entitled to a declaratory judgment and a permanent injunction

2           because there is no plain, adequate, or speedy remedy at law to prevent

3           Co-Defendant UC from continuing to use admissions policies and practices that

4           discriminate on the basis of race or ethnicity in violation of Title VI of the Civil

5           Rights Act of 1964 and because the harm Plaintiffs will otherwise continue to

6           suffer is irreparable.

7    319.   Plaintiffs seek this relief under Title VI, 42 U.S.C. § 1983, and any other law

8           that might supply a cause of action for the requested relief, including the

9           Declaratory Judgment Act (28 U.S.C. § 2201) and the implied cause of action

10          recognized in *Ex parte Young*, 209 U.S. 123 (1908).

11   320.   Plaintiffs seek this relief only against the institutional defendants UC and not

12          the individual defendants.

13 **COUNT III - Violation of 42 U.S.C. § 1981**

14 **(Against the Individual Defendants at UC in their Official and Personal Capacities)**

15   321.   Plaintiffs reallege and incorporate by reference the allegations set forth

16          above.

17   322.   42 U.S.C. § 1981(a) guarantees individuals the same right to make and

18          enforce contracts without regard to race. This includes the right to enter into

19          contracts for educational services at public universities. UC is a public institution

20          bound by this statutory obligation.

323.    42 U.S.C. § 1981(a) protects whites (and Asians) on the same terms that it protects "underrepresented" racial minorities. *See McDonald v. Santa Fe Trail Transportation Co.*, 427 U.S. 273, 295 (1976) ("[T]he Act was meant, by its broad terms, to proscribe discrimination in the making or enforcement of contracts against, or in favor of, any race.").

324.    Stanley and Minor Son are members of a protected class, namely Asian Americans by race and national origin.

325.    Stanley and Minor Son are objectively qualified for admissions to UC.

326.    Stanley was objectively evaluated by Google as possessing Ph.D.-level qualifications.

327.    Minor Son, though still in high school, has already demonstrated academic excellence, intellectual maturity, and exceptional extracurricular involvement that place him on track to be a top-tier college applicant. He maintains a perfect 4.0 GPA, outpacing Stanley at the same stage, and exhibits advanced cognitive abilities—including multiple six-second Rubik's Cube solves in official competition, five ball juggling on stage at national festival, varsity athletic performance, and deep engagement with intellectual pursuits.

328.    Stanley was rejected from UC despite the fact that his credentials placed him in the top echelon of applicants, not only by UC's standards but by the highest standards of academic institutions nationwide.

329.   Many similarly situated, non-Asian applicants were accepted despite having inferior credentials whereas Stanley was rejected.

330.   Co-Defendant UC's race-based admission standards have discouraged and preemptively prevented Minor Son from contracting with UC.

331.   Co-Defendant UC's decision to deny Stanley admission was not made in a vacuum. As detailed in the preceding sections of this complaint, Co-Defendant UC has repeatedly affirmed its commitment to racially balancing its student body, has publicly stated that "It makes little sense to exclude any consideration of race in admissions," and has continued to rely on "holistic review" as a smokescreen for race-based admissions even after the Supreme Court's ruling in *SFFA v. Harvard*.

332.   The stark statistical disparities in admission rates by race, Co-Defendant UC's long and well-documented history of defending race-based preferences, and its continued resistance to race-neutral alternatives provide overwhelming circumstantial evidence that Stanley's race was the but-for cause of his rejection. Had he not been Asian American, his application would have received materially different treatment. That is precisely what § 1981 forbids.

333.   Accordingly, Co-Defendant UC violated 42 U.S.C. § 1981 by discriminating against Asian Americans, and Plaintiffs seek all appropriate legal and equitable remedies.

334. As a result of Co-Defendant UC's discriminatory policies and practices, Plaintiffs have suffered harm, including the loss of educational opportunities, emotional distress, financial loss, and reputational damage.

335. Plaintiffs have been and will continue to be injured or face imminent harm by Co-Defendant UC's ongoing discriminatory admissions policies, which deny them an equal opportunity to compete for admission based on race or ethnicity.

336. Plaintiffs are entitled to a declaratory judgment and a permanent injunction because there is no plain, adequate, or speedy remedy at law to prevent Co-Defendant UC from continuing to use admissions policies and practices that discriminate on the basis of race or ethnicity in violation of 42 U.S.C. § 1981 and because the harm Plaintiffs will otherwise continue to suffer is irreparable. Co-Defendant UC, excluding Defendant Divyakant Agrawal and Defendant Todd Millstein, acted with callous indifference to Plaintiffs' federally protected rights. Accordingly, Plaintiffs seek punitive damages to deter such illegal conduct.

337. Plaintiffs seek this relief under 42 U.S.C. § 1983, as well as the implied right of action that the Supreme Court has recognized to enforce 42 U.S.C. § 1981(a), and any other law that might supply a cause of action for the requested relief, including the Declaratory Judgment Act (28 U.S.C. § 2201) and the implied cause of action recognized in *Ex parte Young*, 209 U.S. 123 (1908). *See Johnson v. Railway Express Agency, Inc.*, 421 U.S. 454, 459–60 (1975) and *Runyon v. McCrary*, 427 U.S. 160 (1976).

338.    Plaintiffs seek this relief only against the individual defendants at UC, and not against the institutional defendants.

339.    The text of 42 U.S.C. § 1981(a) makes no exceptions for "compelling state interests," "student-body diversity," or race-based affirmative-action programs. It prohibits all forms of racial discrimination in contracting—regardless of whether that racial discrimination is independently prohibited by the Equal Protection Clause.

**COUNT IV - Violation of California Constitution (Article I, Section 31)**

**(Against UC And All Individual Defendants at UC in Their Official and Personal Capacities)**

340.    Plaintiffs reallege and incorporate by reference the allegations set forth above.

341.    Article I, Section 31 of the California Constitution prohibits racial discrimination in public education. UC's discriminatory admissions policies and practices violate this provision by denying Asian-American applicants, including Stanley, equal access to public educational opportunities.

342.    Co-Defendant UC here has acted under the color of state law.

343.    Co-Defendant UC's continued use of race as a factor in undergraduate admissions, however obscured by euphemism or cloaked in "holistic" rhetoric, is a direct violation of the California Constitution.

344.   Co-Defendant UC's own public statements and internal materials confirm that race continues to play a determinative role in its operations. Co-Defendant UC has openly resisted race-neutral alternatives and has declared that "It makes little sense to exclude any consideration of race in admissions."

345.   Co-Defendant UC has also conceded, in court filings and public commentary, that race-neutral alternatives have not produced the racial outcomes it desires—thereby confirming that race remains a central feature of its admissions design.

346.   Stanley and Minor Son are denied equal consideration for admission to UC because of their race.

347.   That is precisely the kind of discriminatory and preferential treatment that Article I, Section 31 forbids. Co-Defendant UC's conduct constitutes a plain and ongoing violation of Article I, Section 31 of the California Constitution. Plaintiffs seek all appropriate legal and equitable remedies.

348.   As a result of Co-Defendant UC's discriminatory policies and practices, Plaintiffs have suffered harm, including the loss of educational opportunities, emotional distress, financial loss, and reputational damage.

349.   Plaintiffs have been and will continue to be injured or face imminent harm by Co-Defendant UC's ongoing discriminatory admissions policies, which deny them an equal opportunity to compete for admission based on race or ethnicity.

1    350.   Plaintiffs are entitled to a declaratory judgment and a permanent injunction

2        because there is no plain, adequate, or speedy remedy at law to prevent

3        Co-Defendant UC from continuing to use admissions policies and practices that

4        discriminate on the basis of race or ethnicity in violation of Article I, Section 31 of

5        the California Constitution and because the harm Plaintiffs will otherwise

6        continue to suffer is irreparable.

7 **COUNT V - Violation of the Due Process Clause of the Fifth Amendment**

8 **(Against ED And Secretary Linda McMahon in Her Official Capacity)**

9    351.   Plaintiffs reallege and incorporate by reference the allegations set forth

10        above.

11    352.   Co-Defendant ED's use of numerical racial targets, including but not limited to

12        the 25% Hispanic enrollment requirement for Hispanic-Serving Institutions (HSI)

13        status under 20 U.S.C. § 1101a, constitutes racial discrimination in violation of

14        the Due Process Clause of the Fifth Amendment, which encompasses equal

15        protection principles.

16    353.   The Fifth Amendment prohibits the federal government from treating

17        individuals differently based on race unless the policy is narrowly tailored to

18        serve a compelling governmental interest. Co-Defendant ED's racial targets fail

19        this standard, functioning as rigid racial quotas that unlawfully disadvantage

20        students of non-preferred racial groups, including Asian-American applicants.

21        The HSI program facially discriminates based on ethnicity. The program also

1    unconstitutionally requires and encourages universities to discriminate against

2    students based on ethnicity.

3    354.    The constitutional bans on ethnic discrimination "operat[e] as a specific

4    constitutional limitation upon the exercise by Congress of the taxing and

5    spending power." *Flast v. Cohen*, 392 U.S. 83, 104 (1968); *see, e.g., South*

6    *Dakota v. Dole*, 483 U.S. at 210-11 ("a grant of federal funds conditioned on

7    invidiously discriminatory state action … would be an illegitimate exercise of the

8    Congress' broad spending power").

9    355.    As a direct result of ED's unlawful policies and programs, Plaintiffs have been

10    and will continue to be injured and face imminent harm, including the denial of

11    equal access to federally funded educational programs, loss of educational

12    opportunities, financial loss, reputational damage, and emotional distress

13    resulting from the perception that the federal government endorses racial

14    discrimination in higher education.

15    356.    Plaintiffs seek only non-monetary relief against Co-Defendant ED.

16 **COUNT VI - Violation of the Administrative Procedure Act (APA)**

17 **(Against ED And Secretary Linda McMahon in Her Official Capacity)**

18    357.    Plaintiffs reallege and incorporate by reference the allegations set forth

19    above.

20    358.    ED's failure to investigate and enforce federal anti-discrimination laws,

21    including Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d), constitutes

1    arbitrary and capricious agency action in violation of the Administrative

2    Procedure Act (APA), 5 U.S.C. § 706.

3    359.    ED's OCR dismissed the complaint filed by Plaintiffs after misinterpreting an

4    email, refused to reopen the case even after the error was pointed out, issued an

5    official dismissal letter citing a rationale it knew to be false, and refused to correct

6    it after repeated requests and escalation. In doing so, the OCR has abdicated its

7    statutory duties under Title VI. The OCR's actions were arbitrary, capricious, and

8    an abuse of discretion in violation of the APA. They are indicative of a systemic

9    failure. What Plaintiffs challenge is not just a single decision not to enforce, but

10   rather the *irrational process* and the *manner* in which the OCR dismissed the

11   complaint.

12   360.    The APA's bar for actions "committed to agency discretion" does not apply

13   when statutory mandates provide a clear standard for assessing ED's actions.

14   For Title VI regulations, 34 C.F.R. § 100.7(c) states:

15   The responsible Department official or his designee will make a prompt

16   investigation whenever a compliance review, report, complaint, or any other

17   information indicates a possible failure to comply with this part.

18   Note that it does not say the official "may" or "can" investigate. It says the official

19   "will" make a prompt investigation. This language is mandatory, not discretionary.

20   While the ED had discretion in writing its regulations, once those regulations

21   were finalized, it is legally bound to follow them. The duty to investigate is

1    triggered whenever information (like Plaintiffs' complaint filed with OCR)

2    "indicates a possible failure to comply."

3    361.    While the statute grants broad authority, ED used that authority to impose a

4    specific, non-discretionary duty upon itself through its own regulations. Therefore,

5    ED's OCR's failure to conduct a proper and prompt investigation into Plaintiffs'

6    complaint—especially after Plaintiffs pointed out its clear misinterpretation of the

7    facts—was not a lawful exercise of discretion but a failure to follow its own

8    binding rules, making its action arbitrary, capricious, and an abuse of discretion

9    under the Administrative Procedure Act.

10    362.    In *Adams v. Richardson*, 480 F.2d 1159 (D.C. Cir. 1973), the D.C. Circuit held

11    that Title VI was judicially enforceable. It further held that federal agencies cannot

12    ignore substantial allegations of discrimination under Title VI, affirmatively

13    requiring agencies to investigate and act on complaints of unlawful

14    discrimination.

15    363.    The supposed alternative remedy of suing individual universities is wholly

16    inadequate to address the systemic harm caused by the Department of

17    Education's abdication of its statutory duties. Plaintiffs' civil rights complaint to the

18    Office for Civil Rights (OCR) named all sixteen colleges that rejected Stanley, yet

19    the agency summarily refused to investigate any of them. It is financially and

20    logistically prohibitive for Plaintiffs to bring separate legal actions against every

21    one of these institutions across the country. Consequently, a victory against UC

22    or any small subset of these colleges would provide no remedy for the

23    discriminatory practices that may be occurring at the remaining institutions. The

1    ED is the only entity with the mandate to address such widespread, systemic

2    failures. By refusing to act, the ED's abdication of its investigative duties not only

3    injured Stanley but also creates an imminent and irreparable harm by leaving

4    Nan's Minor Son vulnerable to the same unaddressed discrimination as he

5    prepares to apply to colleges.

6    364.   Furthermore, correcting the wrong by UC does not remedy ED's statutory and

7          constitutional failure to investigate and enforce anti-discrimination laws, which is

8          itself harmful and reviewable. A legal victory against UC will not:

9      •   Strike down the ED's unconstitutional numerical racial targets in its grant

10         programs.

11     •   Force the ED's Office for Civil Rights to reform its broken and arbitrary

12         complaint-handling process.

13   365.   Therefore, there is no alternative remedy for the specific injuries caused by

14         ED's actions and inaction.

15   366.   In sum, ED's refusal to investigate Plaintiffs' administrative complaint violates

16         clear statutory obligations under Title VI of the Civil Rights Act, which expressly

17         requires investigation of discrimination claims. Thus, ED's inaction is not

18         "committed to agency discretion" and is subject to judicial review under the APA.

19         Further, no adequate alternative remedy exists for ED's unlawful abdication of its

20         investigative responsibilities, making judicial review both proper and necessary.

21   367.   As a direct result of ED's unlawful actions and omissions, Plaintiffs have been

22         and will continue to be injured and face imminent harm, including the denial of

1  equal access to federally funded educational programs, loss of educational

2  opportunities, financial loss, reputational damage, and emotional distress caused

3  by ED's failure to uphold anti-discrimination protections in higher education.

4  368.  Plaintiffs seek only non-monetary relief against Co-Defendant ED.

## 5 VI. PRAYER FOR RELIEF

6 WHEREFORE, Plaintiffs seek the following relief pursuant to 42 U.S.C. §§ 1983, 1988,

7 Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 1981, the Fourteenth Amendment,

8 the California Constitution, the Fifth Amendment and the Administrative Procedure Act.

9 Plaintiffs respectfully request that this Court:

10  369.  Declaratory and Injunctive Relief Regarding Federal Racial Targets

11  a. Declare that the statutory racial enrollment targets used to determine

12  eligibility for designations such as Hispanic-Serving Institutions status

13  under 20 U.S.C. § 1101a violate the Equal Protection component of the

14  Fifth Amendment.

15  b. Permanently enjoin the Department of Education and its Secretary from

16  conditioning federal funding on numerical racial classifications not

17  narrowly tailored to serve a compelling government interest.

18  370.  Administrative Procedure Act Relief Regarding OCR's Inaction

19  a. Declare that OCR's failure to act on complaints alleging systemic racial

20  discrimination by federal fund recipients constitutes agency action

21  unlawfully withheld or unreasonably delayed under 5 U.S.C. § 706(1).

b. Remand to OCR with instructions to review and resolve the referenced complaints in a manner consistent with federal anti-discrimination law and constitutional requirements.

371. Declaratory and Injunctive Relief Regarding Co-Defendant UC

    a. Declare that Co-Defendant UC's student admissions and faculty hiring policies and practices violate:

        i. The Fourteenth Amendment to the U.S. Constitution,

        ii. Title VI of the Civil Rights Act of 1964,

        iii. 42 U.S.C. § 1981, and

        iv. Article I, Section 31 of the California Constitution (Proposition 209).

    b. Issue a permanent injunction prohibiting Co-Defendant UC from using race, ethnicity, or proxies thereof in admissions decisions or recruitment practices.

    c. Issue a permanent injunction requiring Co-Defendant UC to conduct all admissions in a manner that does not permit those engaged in the decisional process to be aware of or learn the race or ethnicity of any applicant for admission.

    d. Issue an injunction prohibiting Co-Defendant UC from retaining or reinstating personnel found personally liable without remedial controls in place.

372. Oversight & Mandatory Training at UC

    a. Upon a finding of ongoing noncompliance, appoint a court monitor to oversee all decisions relating to Co-Defendant UC's student admissions to ensure that these decisions are free from racial discrimination of any sort;

b. Require annual Proposition 209 training for all UC personnel involved in admissions or hiring.

c. Require all trained personnel to explicitly acknowledge that violating Prop 209 or failing to report violations may result in disciplinary action, including termination.

373. Award Monetary Damages & Attorney's Fees

a. Award to Plaintiffs nominal damages in the amount of $1.

b. Award to Plaintiffs compensatory damages in an amount equal to the application fee.

c. Award to Plaintiffs punitive damages from liable individual defendants in their personal capacity in an amount to be determined at trial.

d. Award reasonable attorneys' fees and costs incurred in this action under 42 U.S.C. § 1988. While Plaintiffs currently appear pro se, they expressly reserve the right to recover any documented legal expenditures should they retain counsel or incur other recoverable costs.

e. Grant such other and further relief as this Court deems just and proper.

## VII. JURY DEMAND

Pursuant to the Seventh Amendment to the United States Constitution and Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs hereby demand a trial by jury on all issues so triable.

---

I declare under penalty of perjury that the allegations in the complaint are true.

Respectfully submitted,

/s/ Stanley Zhong

Stanley Zhong (Pro Se)

211 Hope St #390755

Mountain View, CA 94039

/s/ Nan Zhong

Nan Zhong (Pro Se)

211 Hope St #390755

Mountain View, CA 94039

nanzhong1@gmail.com

**Dated:** July 27, 2025