1

2

3

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA



AUG 2 1 2025

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
            DEPUTY CLERK

**Stanley Zhong; Nan Zhong,** individually and as next friend of his **Minor Son,**

Plaintiffs,

v.

**The Regents of the University of California; Maria Anguiano, Elaine E. Batchlor, Josiah Beharry, Carmen Chu, Michael Cohen, Gareth Elliott, Howard "Peter" Guber, Jose M. Hernandez, Nancy Lee, Richard Leib, Hadi Makarechian, Ana Matosantos, Robert Myers, Lark Park, Janet Reilly, Mark Robinson, Gregory Sarris, Jonathan "Jay" Sures,** each in their personal capacity and their official capacities as regents of the University of California; **The University of California; Michael V. Drake,** in their personal capacity and their official capacity as President of the University of California; **Katherine S. Newman,** in their personal capacity and their official capacity as Provost and Executive Vice President of Academic Affairs of the University of California; **Han Mi Yoon-Wu,** in their personal capacity and official capacity as Associate Vice Provost and Executive Director of Undergraduate Admissions of the University of California; **Erwin Chemerinsky,** in their personal capacity and official capacity as Dean of the Law School of the University of California at Berkeley; **The University of California at Davis; Gary S. May,** in their personal capacity and their official capacity as Chancellor of the University of California at Davis; **Robert Penman,** in their personal capacity and their official capacity as Executive Director of Undergraduate Admissions

Case No.

2:25-cv-00495-DAD-CSK


SECOND AMENDED

COMPLAINT


JURY TRIAL DEMANDED

of the University of California at Davis; **Dipak Ghosal**, in their personal capacity and their official capacity as Chair of the Department of Computer Science of the University of California at Davis; **Kevin R. Johnson**, in their official capacity as Dean of the Law School of the University of California at Davis; **The University of California at Berkeley; Rich Lyons,** in their personal capacity and their official capacity as Chancellor of the University of California at Berkeley; **Carol Christ,** in their personal capacity and their official capacity as former Chancellor of the University of California at Berkeley; **Olufemi Ogundele**, in their personal capacity and their official capacity as Director of Undergraduate Admissions of the University of California at Berkeley; **Claire J. Tomlin**, in their personal capacity and their official capacity as Chair of the Department of Computer Science of the University of California at Berkeley; **The University of California at Santa Barbara; Henry T. Yang,** in their personal capacity and their official capacity as Chancellor of the University of California at Santa Barbara; **Lisa Przekop**, in their personal capacity and in their official capacity as Executive Director of Admissions of the University of California at Santa Barbara; **Divyakant Agrawal**, in their official capacity as Chair of the Department of Computer Science of the University of California at Santa Barbara; **The University of California at Los Angeles; Gene Block,** in their personal capacity and their official capacity as Chancellor of the University of California at Los Angeles; **Gary Clark**, in their personal capacity and their official capacity as Director of Undergraduate Admissions of the University of California at Los Angeles; **Todd Millstein**, in their official capacity as Chair of the Department of Computer Science of the University of California at Los Angeles; **The University of California at San Diego; Pradeep K. Khosla,** in their personal capacity and their official capacity as Chancellor of

the University of California at San Diego; **Blia Yang**, in their personal capacity and their official capacity as Executive Director of Undergraduate Admissions of the University of California at San Diego; **Sorin Lerner**, in their personal capacity and their official capacity as Chair of the Department of Computer Science of the University of California at San Diego; **Other persons Does 1-20** acting in concert with those named above; **The U.S. Department of Education** and **Linda McMahon**, in her official capacity as the U.S. Secretary of Education,

          Defendants.

1    **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES**

2 **I. INTRODUCTION**

3    1. Plaintiffs Stanley Zhong ("Stanley") and Nan Zhong ("Nan"), individually and

4       acting on behalf of his Minor Son ("Minor Son"), pursuant to Federal Rule of Civil

5       Procedure 5.2(a), collectively referred to as "Plaintiffs," bring this civil rights

6       action against the University of California ("UC") and the named UC officials

7       (collectively, "Co-Defendant UC").

8    2. Plaintiffs allege that the University of California and its officials discriminated

9       against highly qualified Asian-American applicants, including Stanley, in the

10      admissions, and, by maintaining the same race-conscious policies, place the

11      Minor Son under an imminent threat of similar discrimination. That conduct

12      violates: (1) the Equal Protection Clause of the Fourteenth Amendment to the

1    U.S. Constitution; (2) Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et

2    seq.; (3) 42 U.S.C. § 1981, which guarantees equal contractual rights regardless

3    of race; and (4) Article I, Section 31 of the California Constitution, which prohibits

4    racial discrimination or preference in public education.

5    3. Plaintiffs also bring claims against the U.S. Department of Education ("ED") and

6    Secretary Linda McMahon (collectively, "Co-Defendant ED"), challenging the

7    constitutionality of the numerical racial targets embedded in federal grant

8    programs, including the Hispanic-Serving Institutions (HSI) program. These

9    targets not only violate the Fifth Amendment but also incentivize violations of the

10   Fourteenth Amendment, Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 1981,

11   and state anti-discrimination laws.

12   4. Plaintiffs further assert that Co-Defendant ED has violated the Administrative

13   Procedure Act (APA) by failing to properly investigate and address the racially

14   discriminatory admissions and hiring practices of UC and other institutions of

15   higher education.

16   5. This case is about the most basic of American promises: to give meaning to the

17   Declaration of Independence's promise that *all human beings are created equal*.

18   Especially over the past half-century, the nation has made a concerted effort to

19   transform this ideal from a lofty aspiration to enforceable guarantee. At the heart

20   is the simple but profound rule: that racial discrimination is more than unfair—it is

21   illegal and indeed, unconstitutional.

6. And yet, in one of the most competitive and consequential domains of American life, college admissions, our elite public universities like UC—and the government actors who fund and partner with them—proudly discriminate against Asian American applicants based on their race and have done so for decades. UC operates as though anti-discrimination law protects only *certain* minorities of their preference. Under this conception, Asian Americans are treated not as beneficiaries of civil rights, but as exceptions who are not entitled to civil rights.

7. UC does not openly call these policies what they are—racial discrimination. Instead, UC uses euphemistic language like "affirmative action" and "holistic review." Racial favoritism is rebranded as "progress," and UC reframes race preferences as somehow desirable. But discrimination by another name is still discrimination. Focusing on the benefit to some rather than the burden on others is a rhetorical sleight of hand. Giving a competitor a head start in a race is no different from forcing their rival to start behind the starting line. In a zero-sum admissions process, selecting winners based on race necessarily predetermines losers. UC's rhetoric obscures the harm, but does not erase it.

8. The results speak for themselves. For years, UC's college admissions systemically penalized hard-working Asian American students—not because they lack merit, but because they don't fit the racial preferences that UC wants to engineer. In the name of vague notions of restitution for past racial injustice, universities like UC have simply created new victims.

9. Stanley and the Minor Son of Nan Zhong do not ask for special treatment. They ask only for what the Constitution guarantees: an equal shot. A chance to be

1    evaluated on the strength of their character, their intellect, and their

2    achievements, without penalty for race. The Constitution demands nothing less.

3    10. Plaintiffs seek declaratory and injunctive relief to ensure that UC's admissions

4    policies comply with federal and state law and to allow Asian Americans

5    applicants like Stanley Zhong and the Minor Son an equal opportunity to

6    compete for admission on the basis of merit, free from discrimination. Plaintiffs

7    also seek nominal damages and other appropriate relief for the injuries suffered

8    to their civil rights.

9 **II. PARTIES**

10 **A. Plaintiffs**

11    11. Plaintiff Stanley Zhong is a second-generation Asian American student who at all

12    relevant times was a resident of the state of California. Stanley was denied

13    admission to UC despite extraordinary credentials. Stanley Zhong is a US citizen.

14    12. Like his older brother, Nan Zhong's Minor Son is an Asian American student and

15    a minor child with strong academic ambitions and performance to match. He

16    intends to apply to UC. Because he faces a credible and imminent harm of being

17    subjected to the same discriminatory admissions policies, the Minor Son has

18    standing to seek prospective relief as recognized by the Supreme Court in *Gratz*

19    *v. Bollinger,* 539 U.S. 244 (2003), and *Northeastern Fla. Chapter of the*

20    *Associated Gen. Contractors of America v. Jacksonville*, 508 U.S. 656 (1993). He

21    is a resident of the state of California.

13. Plaintiff Nan Zhong proceeds on behalf of and as next friend of his Minor Son pursuant to Fed. R. Civ. P. 17(c); he is a first-generation immigrant from China and a permanent resident of California. He is also the father of Stanley Zhong.

14. Plaintiff Nan Zhong also proceeds individually because he personally suffers concrete injury due to emotional distress, financial impact, and denial of equal opportunity for his children.

15. Nan suffered a direct financial injury in the form of non-refundable application fees paid to institutions that engaged in discriminatory practices, which the ED's policies incentivize and its inaction fails to prevent or remedy. Nan suffered additional financial loss as a result of UC's rejection of Stanley's applications. In anticipation of the significantly higher out-of-state tuition at alternative institutions, Nan was forced to liquidate stock holdings, thereby forfeiting substantial gains as their value later increased. These are concrete, personal financial losses—not merely generalized grievances. Directly attributable to the discriminatory policies and programs of UC and ED, these losses further support Nan's individual standing to bring this claim.

16. Nan also faces imminent harm in the form of non-refundable application fees and the potential obligation to pay out-of-state tuition for his Minor Son. This prospective injury—directly traceable to the discriminatory policies and programs of UC and ED—further establishes his individual standing to seek forward-looking relief, as recognized by the Supreme Court in *Gratz v. Bollinger* and *Northeastern Fla. Chapter*.

1    17. Stanley and Nan reached out to multiple legal resources and entities for

2        representation. However, these entities either declined to take the case or failed

3        to respond. Consequently, Stanley and Nan are compelled to represent

4        themselves as pro se litigants.

5    **A.1. Equitable Grounds for Allowing Nan to Proceed as Next Friend**

6    18. The 2024 decision of the Second Circuit Court of Appeals in *Chinese American*

7        *Citizens Alliance of Greater New York (CACAGNY) v. Adams*, 116 F.4th 161,

8        affirms that an "equal protection claim can be asserted by individuals alleging

9        they suffered harm from the discriminatory policy or law, as well as other

10       individuals (such as a parent or guardian) or organizations that also have

11       standing to sue."

12   19. Under Federal Rule of Civil Procedure 17(c)(2), "[t]he court must appoint a

13       guardian ad litem—or issue another appropriate order—to protect a minor or

14       incompetent person who is unrepresented in an action." A parent may serve as

15       "next friend" if two conditions are met: (1) the minor cannot appear on their own

16       behalf due to age or incapacity, and (2) the next friend is dedicated to the best

17       interests of the minor and has a significant relationship with them. *Whitmore v.*

18       *Arkansas*, 495 U.S. 149, 163–64 (1990). The Supreme Court has long

19       recognized that next-friend standing exists to ensure access to the courts where

20       the real party in interest cannot vindicate their own rights, particularly in cases

21       implicating fundamental constitutional protections. See *id*. at 164.

20. Nan acknowledges the Ninth Circuit's holding in *Johns v. County of San Diego*,
114 F.3d 874, 876 (9th Cir. 1997), that "constitutional claims are personal and
cannot be asserted vicariously," and that "[i]t goes without saying that it is not in
the interest of minors or incompetents that they be represented by non-attorneys.
Where they have claims that require adjudication, they are entitled to trained
legal assistance so their rights may be fully protected." *Johns* cited cases such
as *Osei-Afriyie v. Medical College*, 937 F.2d 876, 883 (3d Cir. 1991), which
stressed that "[t]he infant is always the ward of every court wherein his rights or
property are brought into jeopardy, and is entitled to the most jealous care that no
injustice be done to him." Importantly, *Johns* held that dismissal should be
without prejudice, so that the minor may refile upon reaching the age of majority,
reaffirming that "the goal is to protect the rights of infants."

21. The holding in *Johns* appears to rest on the assumption that minors will have
access to legal representation—either through retained counsel or pro bono
assistance—so that their rights will not be lost in the interim. This case presents
a materially different situation. Over the course of a year, Plaintiffs contacted
dozens of civil rights organizations, law firms, attorneys, and legal scholars
nationwide. Plaintiffs also sought to attract qualified counsel through extensive
public engagement: granting interviews to the *Los Angeles Times*, *Fox News*,
*New York Post*, *ABC7*, local and campus newspapers, and even having the case
cited in a congressional hearing. Plaintiffs further reached out to outlets such as
the *New York Times*, *Bloomberg*, *CNN*, *CBS*, *NBC*, *MSNBC*, *KQED*, and *KUOW*,

1    none of which chose to cover the story. Despite this unusually broad effort, and

2    despite demonstrable public interest, no attorney has agreed to take the case.

3    22. Indeed, Plaintiffs have successfully secured representation in parallel university

4    discrimination suits (against the University of Michigan and Cornell University)

5    when counsel was available. The same attorneys were implored to take this case

6    but declined due to limited capacity. This demonstrates that Plaintiffs are willing

7    to proceed with qualified counsel, and would immediately do so if available. The

8    failure to obtain representation here is not due to lack of diligence or financial

9    commitment, but to the practical unavailability of counsel despite extraordinary

10    efforts.

11    23. Nan's Minor Son, currently age 16, intends to apply for admission to the

12    University of California and other selective institutions. Based on the allegations

13    in the Second Amended Complaint, UC's admissions policies will deny him the

14    opportunity to compete on equal footing with other applicants due to unlawful

15    racial preferences, creating an imminent discriminatory barrier. By the time the

16    minor turns 18, the imminent harm will have ripened into actual injury, but waiting

17    until then would forfeit the ability to seek timely injunctive relief. Moreover, Nan

18    himself suffers direct and imminent financial harm, including the obligation to pay

19    higher out-of-state tuition should his Minor Son be unlawfully denied admission to

20    a California public university, as well as costs associated with application fees

21    and other expenditures tied to the admissions process. These harms further

22    support his stake in the litigation and alignment of interests with his Minor Son.

24. Under these exceptional circumstances, if the imminent harm facing Minor Son materializes into actual injury and no attorney is available to represent him, it would be a profound injustice to bar him from seeking legal redress solely due to the unavailability of counsel. Such a result would contradict the Ninth Circuit's stated objective in *Johns*—to protect the rights and interests of minors—not extinguish them. Equity counsels otherwise. As *Whitmore* makes clear, next-friend standing exists precisely to prevent the denial of judicial review where a party is unable to litigate on their own behalf. Rule 17(c)(2) authorizes the Court to issue "another appropriate order" beyond appointment of counsel, and here, the only practical order to safeguard the Minor Son's rights is to permit Nan to proceed as next friend.

## B. Defendants

25. Defendant the Regents of the University of California is a non-profit educational institution organized under the laws of the state of California.

26. Defendants Maria Anguiano, Elaine E. Batchlor, Josiah Beharry, Carmen Chu, Michael Cohen, Gareth Elliott, Howard "Peter" Guber, Jose M. Hernandez, Nancy Lee, Richard Leib, Hadi Makarechian, Ana Matosantos, Robert Myers, Lark Park, Janet Reilly, Mark Robinson, Gregory Sarris, and Jonathan "Jay" Sures are appointed regents of the University of California system. Collectively, they are the governing board of UC. Each appointed regent is sued in their personal and official capacities.

1   27. Defendant the University of California is a public educational institution and a

2      recipient of federal financial assistance, subject to Title VI of the Civil Rights Act

3      of 1964. The University's undergraduate admissions office, operating under the

4      direction of senior administrators and the Regents, is directly responsible for

5      implementing the discriminatory policies and practices challenged in this action.

6   28. Defendants the University of California at Davis (UC Davis), the University of

7      California at Berkeley (UC Berkeley), the University of California at Santa

8      Barbara (UC Santa Barbara), the University of California at Los Angeles (UCLA),

9      and the University of California at San Diego (UC San Diego) are five campuses

10     of the University of California. Each of them rejected Stanley's undergraduate

11     application for Fall 2023 enrollment.

12   29. Defendant Michael V. Drake is the President of the University of California during

13     the relevant admissions cycles and currently exercises authority over the

14     University's operations and enforcement of admissions policies. He is sued in his

15     personal and official capacity.

16   30. Defendant Katherine S. Newman is the Provost and Executive Vice President of

17     Academic Affairs of the University of California during the relevant admissions

18     cycles and currently exercises authority over the University's operations and

19     enforcement of admissions policies. She is sued in her personal and official

20     capacity.

21   31. Defendant Han Mi Yoon-Wu is the Associate Vice Provost and Executive Director

22     of Undergraduate Admissions for the University of California. In this capacity, she

1    oversees admissions policies and practices systemwide and has ultimate

2    authority over the implementation of UC's "holistic review" framework. Her office

3    approved and enforced admissions practices that systematically disadvantaged

4    Asian-American applicants such as Stanley Zhong. She repeatedly dismissed

5    Plaintiff's complaint offhandedly with an absurd logic. She is sued in her personal

6    and official capacities.

7    32. Defendant Erwin Chemerinsky is the Dean of UC Berkeley School of Law. Dean

8        Chemerinsky was named the most influential person in legal education in the

9        United States by National Jurist magazine. He was also the President of the

10       Association of American Law Schools. While serving in leadership and legal

11       advisory roles, Chemerinsky publicly defended the use of race-conscious

12       admissions policies and made statements encouraging circumvention of

13       Proposition 209, which Plaintiffs allege contributed to a culture and practice of

14       noncompliance within UC. As a prominent legal voice in the UC system with

15       administrative authority, his statements reflect UC's institutional commitment to

16       racial preferences in violation of federal and state law. He is sued in his personal

17       and official capacity.

18   33. Defendant Gary S. May is the Chancellor of UC Davis during the relevant

19       admissions cycles and currently exercises authority over the University's

20       operations and enforcement of admissions policies. He is sued in his personal

21       and official capacity.

22   34. Defendant Robert Penman is the Executive Director of Undergraduate

23       Admissions of UC Davis. In that role, he oversees undergraduate admissions

1   and related policies. He is a principal architect and enforcer of the admissions

2   system challenged in this lawsuit, including the purportedly "holistic" review

3   process which incorporates racial considerations in a manner inconsistent with

4   federal and state law. He is sued in his personal and official capacity.

5   35. Defendant Dipak Ghosal is the Chair of the Department of Computer Science of

6   UC Davis. In that role, he oversees the department's undergraduate admissions

7   and related policies. He is sued in his personal and official capacity.

8   36. Defendant Kevin R. Johnson is the Dean of UC Davis School of Law. In that role,

9   he has publicly supported the goal of increasing enrollment for certain racial

10  groups. As a prominent legal voice in the UC system with administrative

11  influence, his statements reflect UC's institutional commitment to racial

12  preferences in violation of federal and state law. He is sued in his official capacity.

13  37. Defendant Rich Lyons is the Chancellor of UC Berkeley and currently exercises

14  authority over the University's operations and enforcement of admissions

15  policies. He is sued in his personal and official capacity.

16  38. Defendant Carol Christ is the former Chancellor of UC Berkeley during the

17  relevant admissions cycles and exercised authority over the University's

18  operations and enforcement of admissions policies. She is sued in her personal

19  and official capacity.

20  39. Defendant Olufemi Ogundele is the Director of Undergraduate Admissions of UC

21  Berkeley. In that role, he oversees undergraduate admissions and related

22  policies. He is a principal architect and enforcer of the admissions system

1 challenged in this lawsuit, including the purportedly "holistic" review process

2 which incorporates racial considerations in a manner inconsistent with federal

3 and state law. He is sued in his personal and official capacity.

4 40. Defendant Claire J. Tomlin is the Chair of the Department of Computer Science

5 of UC Berkeley. In that role, she oversees the department's undergraduate

6 admissions and related policies. She is sued in her personal and official capacity.

7 41. Defendant Henry T. Yang is the Chancellor of UC Santa Barbara during the

8 relevant admissions cycles and currently exercises authority over the University's

9 operations and enforcement of admissions policies. He is sued in his personal

10 and official capacity.

11 42. Defendant Lisa Przekop is the Executive Director of Admissions of UC Santa

12 Barbara. In that role, she oversees undergraduate admissions and related

13 policies. She is a principal architect and enforcer of the admissions system

14 challenged in this lawsuit, including the purportedly "holistic" review process

15 which incorporates racial considerations in a manner inconsistent with federal

16 and state law. She is sued in her personal and official capacity.

17 43. Defendant Divyakant Agrawal is the Chair of the Department of Computer

18 Science of UC Santa Barbara. In that role, he oversees the department's

19 undergraduate admissions and related policies. Plaintiff Nan Zhong contacted Dr.

20 Agrawal following Stanley's rejection, and Agrawal expressed concerns about the

21 outcome. His involvement supports Plaintiffs' claim that even departmental

1  leadership recognized inconsistencies in the admissions process. He is sued in

2  his official capacity.

3  44. Defendant Gene Block is the Chancellor of UCLA during the relevant admissions

4  cycles and currently exercises authority over the University's operations and

5  enforcement of admissions policies. He is sued in his personal and official

6  capacity.

7  45. Defendant Gary Clark is the Director of Undergraduate Admissions of UCLA. In

8  that role, he oversees undergraduate admissions and related policies. He is a

9  principal architect and enforcer of the admissions system challenged in this

10  lawsuit, including the purportedly "holistic" review process which incorporates

11  racial considerations in a manner inconsistent with federal and state law. He is

12  sued in his personal and official capacity.

13  46. Defendant Todd Millstein is the Chair of the Department of Computer Science of

14  UCLA. In that role, he oversees the department's undergraduate admissions and

15  related policies. Plaintiff Nan Zhong contacted Dr. Millstein following Stanley's

16  rejection, and Millstein expressed concerns about the outcome. His involvement

17  supports Plaintiffs' claim that even departmental leadership recognized

18  inconsistencies in the admissions process. He is sued in his official capacity.

19  47. Defendant Pradeep K. Khosla is the Chancellor of UC San Diego during the

20  relevant admissions cycles and currently exercises authority over the University's

21  operations and enforcement of admissions policies. He is sued in his personal

22  and official capacity.

1   48. Defendant Blia Yang is the Executive Director of Undergraduate Admissions of

2       UC San Diego. In that role, she oversees undergraduate admissions and related

3       policies. She is a principal architect and enforcer of the admissions system

4       challenged in this lawsuit, including the purportedly "holistic" review process

5       which incorporates racial considerations in a manner inconsistent with federal

6       and state law. She is sued in her personal and official capacity.

7   49. Defendant Sorin Lerner is the Chair of the Department of Computer Science of

8       UC San Diego. In that role, he oversees the department's undergraduate

9       admissions and related policies. He is sued in his personal and official capacity.

10  50. Defendants Doe 1 through 20 are individuals whose identities are currently

11      unknown but who acted in concert with the named Defendants in formulating or

12      implementing the discriminatory admissions policies described in this Complaint.

13      Plaintiffs will amend this Complaint to identify these individuals once their

14      identities are discovered through formal proceedings.

15  51. All Defendants associated with UC can be served at the Office of the General

16      Counsel, 1111 Franklin Street, 8th Floor, Oakland, California 94607.

17  52. Defendant the U.S. Department of Education is an executive agency of the

18      federal government responsible for the enforcement and administration of the

19      Higher Education Act and the HSI program. Defendant ED's OCR (Office of Civil

20      Rights) is responsible for enforcing federal anti-discrimination laws in colleges.

21  53. Defendant Linda McMahon is the Secretary of the U.S. Department of Education.

22      The Secretary is responsible for the administration and enforcement of the

1    Higher Education Act and the HSI program. *See, e.g.*, 20 U.S.C. §§1003(17),

2    1067q(b)(1)(A), 1101(c), 1102a(a). She is sued in her official capacity.

## 3 III. JURISDICTION AND VENUE

4    54. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, as the

5    claims arise under the Constitution and laws of the United States. The Court also

6    has jurisdiction under 28 U.S.C. § 1343(a)(3) because Plaintiffs seek to redress

7    the deprivation of civil rights under color of state law.

8    55. The Court has supplemental jurisdiction over Plaintiffs' state-law

9    claims—including the claim under the California Constitution, Art. I, §

10   31—pursuant to 28 U.S.C. § 1367, because those claims form part of the same

11   case or controversy as the federal claims. Plaintiffs further seek declaratory relief

12   under 28 U.S.C. §§ 2201–2202.

13   56. Venue is proper for Co-Defendant UC because a substantial part of the events or

14   omissions giving rise to the claim occurred, and will occur, in this judicial district

15   and division. *See* 28 U.S.C. § 1391(b)(2). Venue is additionally proper because

16   at least one of the defendants resides in this judicial district and division and all

17   the defendants associated with UC reside in California. *See* 28 U.S.C. §

18   1391(b)(1).

19   57. Venue is also proper for ED and Secretary Linda McMahon because they are

20   United States agencies and officers sued in their official capacities. So this action

21   can be brought in any judicial district in which a substantial part of the events or

22   omissions giving rise to the claim occurred. *See* 28 U.S.C. §1391(e)(1).

1    58. The U.S. Department of Education cannot invoke sovereign immunity because

2    the Administrative Procedure Act's waiver of sovereign immunity extends to

3    constitutional claims. *See Muniz-Muniz v. U.S. Border Patrol*, 741 F.3d 668, 673

4    (6th Cir. 2013).

## IV. FACTUAL ALLEGATIONS

### A. The Legacy of Anti–Asian Discrimination and Widespread Culture of Anti-Asian Discrimination at Elite Universities

8    59. The Zhongs belong to an oppressed minority given the history of the United

9    States. Asian Americans have long faced systemic exclusion and discrimination

10    in the United States. The Chinese Exclusion Act of 1882 barred Chinese

11    immigrants from entering the country or obtaining citizenship—a policy so

12    discriminatory that Congress formally apologized in 2012. Other Asian

13    communities have faced similar patterns of xenophobia, violence, and exclusion

14    throughout U.S. history. During World War II, over 120,000 Japanese Americans

15    were forcibly incarcerated based solely on their ancestry.

16    60. In recent decades, UC along with this nation's most elite educational institutions

17    has continued this sad history. These institutions of higher education, including

18    UC, subject Asian Americans to a quiet but no less insidious form of

19    discrimination. Cloaked in the language of "affirmative action" and "holistic

20    review," UC and other institutions of higher education hold Asian American

21    applicants to higher standards than applicants of other races, penalizing Asian

22    applicants specifically because they were born with the wrong skin color.

61. Across the country, defenders of race-conscious admissions have downplayed or outright denied the existence of anti–Asian American discrimination. These denials, however, are untenable. Within the world of college admissions, discrimination against Asian Americans has become the worst-kept secret: admissions officers, consultants, and students alike understand that being Asian is a major disadvantage because these institutions discriminate on the basis of race behind closed doors.

62. On September 22, 2016, *Inside Higher Education* released a survey of admission officers. It revealed that 42% of private college admissions officers and 39% of their public counterparts acknowledged that Asian American applicants are held to higher standards than students of other races.

63. Together with many elite universities, Harvard openly gave preferential treatment to some racial groups at the expense of Asian-American applicants until its practice was ruled illegal by the Supreme Court in *SFFA v. Harvard* in 2023. Notably, following the Supreme Court's ruling in *SFFA*, not a single Harvard administrator apologized for the harm their policies inflicted on Asian-American applicants.

64. As documented in the SFFA's legal complaint against Harvard (page 57), college counselors acknowledge discrimination against Asian Americans at elite universities.

65. On May 25, 2016, Dr. Michele Hernandez, former Dartmouth admissions officer, revealed on *Huffington Post* "how even the so-called 'holistic process' can

discriminate against Asian students" and how Ivy League college admission

officers often use racial stereotypes to discriminate against Asian-American

applicants.

66. Admission officers at elite universities have described Asian-American applicants

using derogatory racial stereotypes, such as labeling them as "yet another

textureless math grind." These dehumanizing stereotypes reflect not genuine

individual assessment, but racial prejudices disguised as discretion.

67. Faculty at elite universities widely acknowledge that expressing race-neutral

values—such as advocating for merit or equal treatment—in diversity statements

is considered "career suicide."

68. Evidence also shows that elite universities were aware of discriminatory practices

but often ignored or denied the issue until confronted with legal challenges. For

instance, in 2006, Jian Li, an Asian-American applicant, filed a formal complaint

against Princeton University for racial discrimination in admissions. Following this

action, Princeton's admission rate for Asian-American students rose from 14.7%

in 2007 to 25.4% in 2014. Similarly, after SFFA sued Harvard in 2015, the

percentage of Asian-American admits increased from 17% in 2014 to 22% in

2016 after being flat for many years. In 2024, the percentage of Asian-American

admits at Harvard reached 37%.

69. These patterns demonstrate a troubling reality: institutions were capable of

increasing Asian-American enrollment without material changes in applicant

1    qualifications, suggesting prior suppression of Asian admissions through

2    discriminatory policies.

### B. Asian Americans Are Acutely Aware of the Discrimination

4    70. As documented in the SFFA's legal complaint against Harvard (page 60),

5    Asian-American applicants and their families know that they are being

6    discriminated against by elite universities.

7    71. Reflecting the importance of the issue of possible admissions quotas among

8    Asian Americans, it was one of the key concerns raised by 17 prominent Asian

9    American supporters in their July 1989 meeting with President Bush.

10   72. Asian American students like Stanley and prospective applicants like the Minor

11   Son have long internalized the unspoken rules of an admissions game that is

12   rigged against them. They resort to downplaying their achievements and

13   interests in math and science (or chess). They avoid mention of bilingual

14   households, or they omit involvement in Asian cultural organizations. It is well

15   documented that many Asian-American applicants attempt to appear "less Asian"

16   on their college applications to escape the penalty for their racial identity.

17   73. These learned behaviors are passed down from older students, for example from

18   Stanley to Minor Son. Guidance counselors and even college admissions

19   consultants also communicate to Stanley, Minor Son, and other Asian American

20   students the harsh reality that Asian identity is a liability. This racial double

21   standard is common knowledge, a moral stain on our educational institutions,

1    and a direct violation of the American compact that all Americans are entitled to

2    their civil rights.

3    74. No student in America should be compelled, as do Stanley and the Minor Son, to

4    obscure their heritage or downplay their authentic achievements out of fear that

5    their racial identity will count against them.

## C. Extraordinary Qualifications of Stanley Zhong

7    75. It is against this backdrop that Stanley faced the admissions process. Stanley is

8    not merely a qualified applicant—he is, by any objective measure, among the top

9    college applicants in the country.

10   76. Stanley Zhong attended Henry M. Gunn High School, ranked #14 in California by

11   U.S. News & World Report and the #1 best public high school in the San

12   Francisco Bay Area according to Niche. Within this competitive setting, Stanley

13   still stood head and shoulders above his peers. He distinguished himself as a

14   National Merit Scholarship finalist. Although Stanley's high school does not

15   publish individual student rankings based on grade point average, he is

16   confirmed to be *at least* within the top 9% of his class, as he qualified for UC's

17   "Eligibility in the Local Context" (ELC). ELC guarantees admission to a UC

18   campus for California high school students who rank in the top 9% of their class,

19   as determined by their GPA in UC-approved coursework completed in the 10th

20   and 11th grades. In fact, UC Merced offered him admission even though he did

21   not apply.

1    77. He achieved a perfect PSAT score without any preparation and went on to score

2        1590 out of 1600 on the SAT, after just a few nights of self-study and without any

3        paid tutoring or test prep.

4    78. Stanley's high school grade point average was 3.97 (unweighted) and 4.42

5        (weighted).

6    79. Stanley also satisfied UC's A-G subject requirements.

7    80. Stanley's excellence extended well beyond the classroom. He took on leadership

8        roles in a variety of academic and volunteer organizations. While still in high

9        school, he co-founded and served as the 2nd president of OpenBrackets, a

10       nonprofit run by high schoolers that delivered free coding lessons to more than

11       500 students in underserved communities across California, Washington, and

12       Texas. It received positive feedback from Stackoverflow co-founder Mr. Jeff

13       Atwood. For this work, Stanley was awarded the President's Volunteer Service

14       Award at its highest level. He also co-founded and led his school's competitive

15       programming club.

16   81. Mr. Josh Paley, Stanley's high school Computer Science teacher, has offered to

17       testify as a character witness.

18   82. Stanley is a self-taught programmer whose extraordinary talent has earned him

19       top honors in some of the world's most competitive coding contests—often

20       outperforming industry professionals.

83. Stanley placed 2nd in Carnegie Mellon's picoCTF cybersecurity challenge and was invited to CMU with expenses paid, took 6th in Stanford's ProCo, and reached the elite Platinum Division of the USA Computing Olympiad. Twice, he placed 2nd globally (2nd and 1st in the U.S., respectively) in MIT's Battlecode high school division, qualifying for invitations to MIT with expenses paid. (Unfortunately, one of those trips didn't happen due to COVID.)

84. He also ranked among the top 500 globally in both Google's Code Jam (427th) and Meta's Hacker Cup (329th) —competitions dominated by seasoned software professionals from around the world.

85. His skill was so advanced that in 2019, Google invited him for a full-time software engineer interview, unaware he was only 13 years old; the interview was canceled only after his age came to light because minors can't sign Google's employment agreement.

86. Stanley repeatedly demonstrated extraordinary initiative far beyond his years. After reading an NPR story in April 2020 about state unemployment systems buckling under COVID-related demand due to outdated COBOL infrastructure, Stanley independently taught himself COBOL, published sample code to GitHub, and volunteered his help to the "COBOL Cowboys" featured in the article—earning a personal phone call and words of encouragement from their CEO.

87. Disappointed that no existing e-signature service provided any relief when the demand surged during COVID, in 2021, Stanley launched RabbitSign, the

1    world's only unlimited free e-signature service with SOC 2, ISO 27001 and

2    HIPAA compliance included. Built by Stanley on Amazon Web Services,

3    RabbitSign was so secure and well-architected that AWS called it "one of the

4    most efficient and secure" applications they had reviewed and decided to feature

5    it in a case study. Stanley's innovation drew national attention: RabbitSign was

6    spotlighted on *Viewpoint with Dennis Quaid*—a program that has previously

7    interviewed Fortune 500 CEOs and U.S. presidents—for its potential to help

8    reduce healthcare costs through accessible, secure digital tools.

9    88. Stanley's college application essay, substantially reflected in the *Viewpoint*

10   interview referenced above, recounted his motivation for creating RabbitSign, a

11   free HIPAA-compliant e-signing platform designed to help reduce America's

12   healthcare costs. He described how he overcame repeated rejections to

13   eventually partner with a mission-aligned organization and launch RabbitSign as

14   the first Activism Corporation—an innovative model aimed at tackling corporate

15   greed using free market forces. A nearly identical version of this essay helped

16   advance him from a National Merit Scholarship semifinalist to a finalist.

17   89. Just before his 18th birthday, Stanley underwent one of the most rigorous and

18   objective evaluations available in the modern labor market: Google's full-time

19   software engineer interview process. Five randomly assigned professionally

20   trained Google engineers assessed Stanley, devoting over ten hours to

21   evaluating his technical skills, communication abilities, and teamwork—precisely

22   the traits elite universities purport to assess through "holistic" admissions.

90. Importantly, the structure of Google's process eliminates any risk of favoritism: interviewers are randomly assigned, shielded from outside influence, and incentivized to avoid inflating evaluations, as doing so could lead to internal compensation disparities.

91. Mr. Dan Bloomberg, a longtime Google employee who served on Google's hiring committees for 18 years, has agreed to testify about Google's interview process.

92. Based solely on their independent assessments, the Google engineers recommended Stanley for an L4 software engineer role, a position typically reserved for candidates with a Ph.D. or equivalent industry experience. Google extended the offer in September 2023, just after Stanley's 18th birthday.

93. Stanley's full-year job performance evaluation in January 2025 confirmed the wisdom of Google's decision: Stanley met all expectations and demonstrated strong potential for continued growth. That Google—an employer with far more applicants than even the most competitive universities—recognized Stanley as qualified for a postdoctoral-level role, while five UC campuses deemed him unworthy of undergraduate admission, provides compelling circumstantial evidence of the discriminatory standards UC applies to Asian American applicants.

## D. Stanley Applied on Merit—UC Rejected on Race

94. For enrollment in Fall 2023, Stanley applied to the undergraduate Computer Science programs at five UC campuses, namely UC Davis, UC Berkeley, UC Santa Barbara, UCLA, and UC San Diego.

95. Like many Asian American candidates for admission, Stanley naively dared to hope that, despite the well-known barriers facing applicants who look like him, his individual merit might still prevail. That maybe, just maybe, UC would look past his race.

96. Unfortunately, like too many Asian American students, he learned that it would not. Despite extraordinary academic credentials, internationally recognized accomplishments, his applications to all five UC campuses were rejected.

97. Stanley's story was cited in a congressional hearing in September 2023, and reported in national news.

98. After Stanley's story first hit the news in October 2023, multiple independent college admissions experts and counselors (unconnected to UC) reviewed Stanley's application materials, including his essay. Tellingly, not one of these experts could identify a legitimate, performance-based reason why Stanley would have been rejected by a school of UC's caliber. Some of them have offered to testify as expert witnesses when this lawsuit proceeds to trial. By all objective indicators, Stanley appeared to be the kind of candidate any top university would eagerly admit. The absence of any apparent, merit-based explanation for this "bizarre" result raises a strong inference that Stanley's race played a role in UC's decision. There is no other explanation.

99. These rejections by five UC campuses defy common sense and contradict expert assessments of his application. As the Supreme Court noted in *Miller v. Johnson*, 515 U.S. 900, 901 (1995), "bizarreness" can serve as "persuasive circumstantial

1  evidence that race for its own sake ... was a legislature's dominant and

2  controlling rationale." Similarly, the stark disparity between Stanley's

3  qualifications and the UC campuses' admissions decisions raises serious

4  concerns about the role of race in UC's admissions process. This striking

5  incongruity strongly suggests that UC's admissions policies are being applied in

6  a racially discriminatory fashion.

7  100.  Stanley was denied the opportunity to compete for admission to UC on equal

8  footing with other applicants on the basis of race or ethnicity due to UC's

9  discriminatory admissions policies and practices.

10  101.  Stanley is ready and able to apply to UC when it ceases its intentional

11  discrimination against Asian Americans.

12  102.  As a result of the unlawful discrimination, Stanley Zhong has suffered

13  significant harm, including but not limited to the loss of educational opportunities,

14  reputational damage, and emotional distress. Plaintiffs seek all available legal

15  and equitable relief to remedy these injuries.

16  **E. Unconstitutionality of ED's Numerical Racial Targets**

17  103.  The U.S. Department of Education (ED) administers Minority Serving

18  Institutions (MSI) grant programs with eligibility requirements tied to numerical

19  racial targets. Examples include: the Hispanic-Serving Institutions (HSI) Program,

20  which requires at least 25% Hispanic enrollment; the Alaska Native-Serving and

21  Native Hawaiian-Serving Institutions (ANNH) Program, which requires at least

22  20% Alaska Native or at least 10% Native Hawaiian students; and the Asian

1    American and Native American Pacific Islander-Serving Institutions (AANAPISI)

2    Program, which requires at least 10% enrollment of Asian American or Native

3    American Pacific Islander students.

4    104.   The HSI program is in Titles III and V of the Higher Education Act. *See 20*

5    *U.S.C. §1067q(a)(2); §1101(c); §1101a.*

6    105.   These numerical racial targets are inherently rigid and inflexible.

7    106.   These numerical racial thresholds are arbitrary, incentivizing institutions to

8    manipulate or strategically balance the racial composition of their student bodies

9    to qualify for federal grant funding.

10    107.   These numerical racial targets fail to preserve or advance national security

11    interests.

12    108.   These numerical racial targets do not remedy specific instances of federal

13    government discrimination.

14    109.   These numerical racial targets do not serve a compelling government interest.

15    Even if racial diversity in the college student body were recognized as a

16    compelling government interest, these numerical racial targets may not reflect

17    genuine diversity. Any institution meeting the numerical target qualifies, even if its

18    student body remains racially homogeneous beyond that threshold. And

19    governments cannot "remedy the effects of societal discrimination through

20    explicitly race-based measures." *SFFA v. Harvard*, 600 U.S. at 226.

110.   These numerical racial targets are not narrowly tailored. If Minority-Serving Institutions (MSI) programs' primary purpose is to improve educational opportunities for historically underserved communities, that objective could be more effectively and legally achieved through race-neutral alternatives. For example, reallocating MSI program funding to existing need-based programs, such as the Pell Grant program, would directly support economically disadvantaged students regardless of their immutable traits such as race, ensuring equal access to higher education without violating constitutional principles.

111.   These numerical racial targets facially discriminate among institutions based on the racial and ethnic balances of their student bodies. They are "a facially discriminatory law or policy that expressly classifies individuals on the basis of race". See *Chinese Am. Citizens All. of Greater N.Y. v. Adams*, 116 F.4th 161, 170 (2d Cir. 2024). As the Supreme Court affirmed in *Miller v. Johnson*, 515 U.S. 900, 911 (1995), "At the heart of the Constitution's guarantee of equal protection lies the simple command that the Government must treat citizens as individuals, not as simply components of a racial, religious, sexual or national class." The Supreme Court reaffirmed in *SFFA v. Harvard*, 600 U.S. 181, 206 (2023), "Eliminating racial discrimination means eliminating all of it."

112.   Under Title VI, a federal fund recipient's express or admitted use of a classification based on race, color, or national origin establishes intent without regard to the decision-makers' animus or ultimate objective. Such classifications demonstrate a discriminatory purpose as a matter of law. *See Miller v. Johnson*,

1    515 U.S. 900, 904–05 (1995); *see also Wittmer v. Peters*, 904 F. Supp. 845,

2    849–50 (C.D. Ill. 1995), *aff'd*, 87 F.3d 916 (7th Cir. 1996). "Put another way, direct

3    evidence of intent is 'supplied by the policy itself.'" *Hassan v. City of New York*,

4    804 F.3d 277, 295 (3d Cir. 2015) (quoting *Massarsky v. Gen. Motors Corp.*, 706

5    F.2d 111, 128 (3d Cir.1983) (Sloviter, J., dissenting)).

6    113.    Where a plaintiff demonstrates that a challenged policy overtly and expressly

7    singles out a protected group for disparate treatment, "a plaintiff need not prove

8    the malice or discriminatory animus of a defendant ..." *Bangerter v. Orem City*

9    *Corp.*, 46 F.3d 1491, 1501 (10th Cir. 1995); *see also Ferrill v. Parker Grp., Inc.*,

10   168 F.3d 468, 473 n.7 (11th Cir. 1999) ("[I]ll will, enmity, or hostility are not

11   prerequisites of intentional discrimination."). Rather, the focus is on the "explicit

12   terms of the discrimination," *Int'l Union, United Auto. Aerospace & Agric.*

13   *Implement Workers of Am. v. Johnson Controls, Inc.*, 499 U.S. 187, 199 (1991);

14   that is, how the federal fund recipient's actions specifically deprived or otherwise

15   adversely affected the individual or individuals of access to a federally funded

16   program or benefit. Even benign motivations for racial classifications are

17   presumptively invalid and trigger strict scrutiny in Equal Protection Clause and

18   Title VI cases. *Adarand*, 515 U.S. at 223–24 (1995); *Grutter*, 539 U.S. at 326.

19   114.    These numerical racial targets fail to meet the strict scrutiny standard required

20   for race-based government policies, as they are neither narrowly tailored nor

21   serve a compelling governmental interest. As a result, these targets violate the

22   Equal Protection principles of the Fifth Amendment and are unconstitutional. The

23   Supreme Court has held that the federal government is subject to the same

1    Equal Protection standards as state and local governments through a process

2    known as reverse incorporation. Under this doctrine, the Fifth Amendment's Due

3    Process Clause imposes the same restrictions on the federal government that

4    the Fourteenth Amendment's Equal Protection Clause imposes on states. See

5    *Adarand Constructors, Inc. v. Peña*, 515 U.S. 200 (1995).

6    115.    ED's unconstitutional grant programs (like HSI) create a direct financial

7    incentive for universities like UC to achieve numerical racial targets by engaging

8    in racial balancing that has harmed Stanley's and will imminently harm the Minor

9    Son's ability to compete on equal footing. This makes the threat to them—and

10    Nan's interest as Minor Son's parent and next friend—concrete and immediate,

11    not speculative.

12 **F. UC's Motive and Intent to Racial Balance its Student Body and its Enduring**
13 **Commitment to Racial Engineering**

14    116.    Given that the undergraduate admissions office functions as a centralized,

15    close-knit unit lacking the protections of tenure, it is not surprising that no

16    whistleblowers have emerged from within. This stands in contrast to the multiple

17    whistleblower reports Plaintiffs have obtained concerning the use of race in

18    faculty hiring and graduate admissions at UC. Nevertheless, UC's intent to

19    racially balance its undergraduate student body remains readily discernible.

20    117.    Dating back at least to *Bakke* in 1978, UC has a long and well-documented

21    history of promoting racial preferences, particularly in its admissions practices.

1    For decades, UC openly embraced race-conscious admissions policies—and

2    proudly defended them as central to its institutional mission.

3    118.    During the late 1980's through the early 1990's, the U.S. Department of

4    Education's Office of Civil Rights claimed that Berkeley's affirmative action

5    program was discriminatory and harmful to Asian American students in particular.

6    119.    On September 9, 1989, the *New York Times* reported that "The University of

7    California at Berkeley earlier this year announced plans to substantially alter its

8    admissions policies to correct what it called possible unintentional discrimination

9    against Asian students."

10    120.    After the state audit in 1987, UC Berkeley Chancellor Ira Michael Heyman

11    publicly apologized in 1989 for admissions policies that led to a decline in

12    Asian-American undergraduate enrollment.

13    121.    In 2003, the UC Regents repealed their own internal measures forbidding the

14    use of race in admissions and hiring.

15    122.    Since then, UC has spent decades fighting to institute and preserve

16    discrimination on the basis of race. Recently, that commitment was on full display

17    in its support for Proposition 16 in 2020 and its objection to the Supreme Court's

18    ruling in *SFFA v. Harvard* In 2023. In both cases, UC vigorously defended racial

19    preference in admissions.

20    123.    In June 2020, the UC Board of Regents unanimously endorsed Assembly

21    Constitutional Amendment 5 (ACA 5) and the repeal of Proposition 209, which

had banned the consideration of race and gender in admissions decisions since

1996. In a released statement, the Board declared,

> "UC has long been committed to creating and maintaining a student body
> that reflects California's laudable cultural, racial, geographic, and
> socioeconomic diversity."

UC then-President Janet Napolitano added,

> "It makes little sense to exclude any consideration of race in admissions
> when the aim of the University's holistic process is to fully understand and
> evaluate each applicant through multiple dimensions."

In other words, UC asserts a contradiction: to treat applicants as individuals, UC

must first classify them by race. These are statements from decision-makers that

express a racial intent and discriminatory motive.

124.    In July 2020, UC then-President Janet Napolitano publicly described herself

as a strong supporter of Proposition 16.

125.    In November 2020, after California voters rejected Proposition 16, UC issued

a statement that it

> "is disappointed that Proposition 16, the state ballot measure and
> constitutional amendment that would have repealed Proposition 209, did not
> pass in this election ... UC remains steadfast in its commitment to attract and
> support a student body that reflects California's dynamism and diversity,
> despite this setback ... UC still does not reflect the diversity of California's

1    population … However, excluding race and gender from that consideration

2    continues to be a tall barrier to women and students from underrepresented

3    groups."

4    This official statement from the UC Office of the President leaves no doubt about

5    UC's desire and intent to use race in its admissions and hiring.

6    126.    While UC never defines its ideal student body composition—a point Plaintiffs

7    intend to explore during discovery—it is evident that UC was dissatisfied with the

8    existing racial makeup of its student population and wants to balance it.

9    127.    Then in the lead-up to *SFFA v. Harvard*, UC once again fought tooth-and-nail

10    to argue for its ability to discriminate based on race. In its amicus brief filed with

11    the US Supreme Court, UC stated:

12    "At many of UC's campuses, especially the flagship campuses, there remain

13    stark differences between the demographics of UC's enrolled student

14    population and the demographics of the applicant pool that UC seeks to

15    serve—that is, California public high school graduates. To be clear, UC does

16    not maintain any 'specified' racial targets based on the demographics of high

17    school graduates or any other baseline. See *Fisher v. University of Texas at*

18    *Austin, 570 U.S. 297, 311 (2013) ('Fisher I')* (demographic targets constitute

19    impermissible racial balancing) (citation omitted). Instead, UC looks at

20    demographics to determine whether there are *substantial* demographic

21    disparities of the sort that this Court has recognized can undermine a

22    university's ability to provide the educational benefits of diversity."

1  While UC claims it does not use "specified" racial targets, the brief fails to explain

2  how it defines or measures "*substantial* demographic disparities"—a point

3  Plaintiffs intend to explore during discovery since "fixing demographic disparities"

4  strongly implies racial balancing. Nevertheless, UC's statement reveals its intent

5  to increase enrollment for certain racial groups, a motive that implicates strict

6  scrutiny under constitutional law.

7  128.    The brief also states

8      "Second, UC's student population at many of its campuses is now starkly

9      different, demographically speaking, from the population of California high

10     school graduates. That raises concerns that UC is not enrolling sufficient

11     students with diverse perspectives, and that it will not be perceived as open

12     to, and welcoming of, all students across the State—which in turn threatens

13     its legitimacy in the eyes of citizens of California."

14  It clearly demonstrates UC's intent to push toward racial proportionality that

15  mirrors the general population. Had the brief been filed before the election in

16  2020, UC could have been forgiven for misrepresenting what the "citizens of

17  California" demanded. However, when it filed the amicus brief in August 2022,

18  less than two years after California voters decisively rejected Proposition 16,

19  UC's statement can only be described as disingenuous and self-aggrandizing. It

20  was also misleading the Supreme Court.

21  129.    The brief further states that

22      "After Proposition 209 Prohibited Consideration of Race in Admissions,

23      Diversity Fell Dramatically Across UC's Campuses."

It reveals that whatever UC says about "diversity," what UC actually means is "race." At UC, "diversity" became a euphemism for racial engineering and disparate treatment— now used not to open the door to talent but to justify denying opportunity to students who failed to meet the university's preferred demographic profile.

130.    The brief touted UC's unwavering commitment to diversity (i.e. racial engineering). It further vigorously argued for the revival of race-based admissions policies by lamenting that

> "Yet despite its extensive efforts, UC struggles to enroll a student body that is sufficiently racially diverse to attain the educational benefits of diversity. The shortfall is especially apparent at UC's most selective campuses, where African American, Native American, and Latinx students are underrepresented and widely report struggling with feelings of racial isolation."

In plain terms, the University admitted that it cannot achieve its preferred racial composition without relying on race-conscious decision-making. What is also apparent is that Asian Americans are not among the groups preferred by UC. Asian Americans of sufficient caliber were available but looked over in admissions because "ethnic diversity" did not include Asians. They were disproportionately excluded.

131.    UC thus admitted two critical points: (1) its demographic targets remain non-negotiable, and (2) those targets are unattainable without using race. UC's

1    dogged legal efforts to justify race discrimination is part of its long history of

2    double standards for Asian Americans.

3    132.    When confronted with a choice—between advancing "diversity" (i.e.

4    race-based admission) goals or upholding equal treatment for high-achieving

5    groups like Asian Americans—UC sides with diversity, even if it means racially

6    discriminating. In practice, this results in academically superior Asian Americans

7    applicants being systematically disadvantaged to make room for less qualified

8    candidates from other racial groups.

9    133.    In July 2023, following the Supreme Court's ruling in *SFFA v. Harvard*, UC

10    President Michael V. Drake stated that "We are disappointed in the U.S.

11    Supreme Court's decision to bar the use of race in college admissions." It is a

12    statement from a decision-maker that expresses a racial intent and discriminatory

13    motive. One might have hoped that a great university would welcome the

14    restoration of merit based, equal treatment. Instead, UC's chief decision-maker

15    signaled regret that the University could not discriminate against applicants on

16    the basis of race. UC's leadership all but announced that it would search for

17    workarounds to preserve the racial preferences the Court condemned.

18    134.    Professor Shannon Speed holds multiple senior positions at UCLA, including

19    the Paula Gunn Allen Chair in American Indian Studies, Director of the American

20    Indian Studies Center, and Special Advisor to the Chancellor on Native American

21    and Indigenous Affairs. In a published interview with the *Daily Bruin* on

22    December 2, 2023, Professor Speed articulated a clear institutional objective of

23    racial balancing within the university's student body, stating:

1       "We're a minority-majority state, so I think it's important that all the UC

2       campuses become minority-serving institutions … **We need to be at least**

3       **educating certain communities at a proportionate rate to their presence**

4       **in the state population.**" (Emphasis added.)

5       This public statement by a senior UCLA administrator—who serves in an

6       advisory capacity to the Chancellor—expressly advocates for aligning the racial

7       composition of the student body with the demographic makeup of the state,

8       thereby endorsing proportional racial representation as an institutional goal.

9      135.    UC adopted the "UC 2030 Capacity Plan," with the goal of having its student

10     bodies "better reflec[t] California's racial/ethnic … diversity." UC President Drake

11     wanted "intentional" "growth" in terms of making "graduate students … better

12     reflect and tap the talent of underrepresented populations who represent the

13     majority of Californians." To support this goal of "mov[ing] the needle on the

14     diversity of graduate students," the Regents "requested graduate professional

15     programs" to "present race/ethnicity data on students and faculty, along with

16     diversity plans within the program."

17    136.    Even isolated comments may constitute direct evidence of discrimination if

18     they are "contemporaneous with the [adverse action] or causally related to the

19     [adverse action] decision making process." *Kennedy v. Schoenberg, Fisher &*

20     *Newman, Ltd.*, 140 F.3d 716, 723 (7th Cir. 1998) (citations omitted).

21    137.    The type of direct evidence of discriminatory intent does not require "a virtual

22     admission of illegality." *Venters*, 123 F.3d at 973. For example, direct evidence

1    need not take the form of an admission where the defendant states "I'm [taking

2    this adverse action] because you're in a protected group." *Sheehan v. Donlen*

3    *Corp.*, 173 F.3d 1039, 1044 (7th Cir. 1999); see *Venters*, 123 F.3d at 973. The

4    court in *Venters* explained that "the evidence need not be this obvious to qualify

5    as direct evidence." *Id.* And the Sheehan court explained why: because such a

6    requirement "would cripple enforcement of the ... discrimination laws." *Sheehan*,

7    173 F.3d at 1044.

8    138.   By defending the use of racial criteria, openly expressing dissatisfaction with

9    the racial composition of its student body, and framing race-conscious

10    admissions as a permanent institutional value, UC has revealed its intent and

11    implied its ongoing use of unconstitutional and discriminatory practices. This

12    discriminates against Asian Americans like Stanley and Minor Son because, by

13    virtue of merit, their "race" would be overrepresented according to UC's

14    preferences.

15    139.   UC's discriminatory admissions practices are enabled by a state political

16    environment that statutorily encourages racial balancing. California Education

17    Code § 66010.2(c), for example, defines "educational equity" as achieving a

18    "diverse and **representative** student body," language that effectively endorses

19    the unconstitutional goal of racial proportionality. Tellingly, the statute calls for

20    only a "reasonable chance" for students to develop their potential—a deliberate

21    retreat from the constitutional guarantee of an "equal chance."

22    140.   If racial balancing is the standard, then by racial proportionality's logic, every

23    divergence in racial distribution—between elementary and middle schools,

1   between regions, between departments within a university—must be corrected

2   until racial composition is uniform everywhere. That is not only absurd in

3   principle, it is unconstitutional in law.

4   141.   The fundamental flaw in this thinking lies in equating disparity with

5   discrimination, and statistical underrepresentation with injustice. If that standard

6   were applied consistently, one might demand that 7.2% of NFL players be Asian

7   Americans, since Asian Americans make up 7.2% of the U.S. population. Yet no

8   one sues the NFL for racial discrimination, because it is understood that

9   representation in professional sports reflects differences in talent and

10  interest—not discrimination.

11  142.   Conversely, while Asian Americans are statistically overrepresented on

12  college campuses, this is a reflection of academic excellence, not privilege or

13  favoritism. Rejecting more qualified Asian American applicants to admit others

14  with lower qualifications—solely to balance racial statistics—is not only unfair, it

15  is unconstitutional. As the Supreme Court has repeatedly affirmed, the

16  Constitution protects individuals, not groups. In college admissions, it is the

17  individual applicant's merit and achievement, not skin color, that must be the

18  basis for judgment.

19  **F.1. Statements by UC Officials Demonstrating Intent**

20  143.   Senior UC officials have openly discussed strategies to maintain racial

21  outcomes in admissions despite legal prohibitions, including plausible deniability

22  and avoiding records that could reveal discriminatory intent.

144.    In an extraordinary public admission, UC Berkeley Law School Dean Erwin Chemerinsky said the quiet part out loud. In a public talk to a large audience (a constitutional law class in the spring 2023 semester), Mr. Chemerinsky admitted that his school systematically considers race in its internal decision-making and **actively conceals this practice**. When discussing the consideration of race in faculty hiring, Mr. Chemerinsky described and preached the "unstated Affirmative Action" practiced at UC as follows: "Don't say that [you are considering a candidate's race]. You can think it. You can vote it ... Don't ever articulate that is what you are doing." He also said "If I'm ever deposed, I'm going to deny I said this to you." These comments—caught on video—confirm that UC clings to racial preferences, but has just evolved ever more elusive ways of doing so. Such statements, made in a professional setting to a legal audience, reflect calculated policy positions rather than offhand or casual commentary. As Mr. Chemerinsky admitted in the video, statistical analysis is key to identifying racial discrimination in admissions. Plaintiffs intend to conduct such an analysis during the discovery phase of this lawsuit. The expert witnesses for Students for Fair Admissions have agreed to conduct statistical analysis on the admissions data once obtained in the discovery of this lawsuit.

145.    In November 2022, *The New Yorker* quoted Mr. Erwin Chemerinsky:

> "What colleges and universities will need to do after affirmative action is eliminated is find ways to achieve diversity that can't be documented as violating the Constitution," Mr. Chemerinsky stated. "So they can't have any

1   explicit use of race. They have to make sure that their admissions statistics

2   don't reveal any use of race. But they can use proxies for race."

3  Note that he said "can't be documented as violating the Constitution" instead of

4  "don't violate the Constitution". This statement is a clear acknowledgment that

5  senior UC officials intend to bypass constitutional and legal prohibitions on racial

6  discrimination by employing indirect methods—namely, "proxies for race"—to

7  achieve the same racial outcomes that explicit race-based policies once

8  facilitated.

9  146. The use of racial proxies to achieve racial balancing is unconstitutional. In

10  *Parents Involved in Community Schools v. Seattle School District No. 1*, 551 U.S.

11  701, 743 (2007), the Supreme Court held that racial balancing is not a compelling

12  state interest and "[r]acial balancing is not transformed from 'patently

13  unconstitutional' to a compelling state interest simply by relabeling it 'racial

14  diversity.'" Similarly, in *SFFA v. Harvard*, 600 U.S. 181 (2023), the Supreme Court

15  reaffirmed that admissions policies designed to achieve racial diversity by using

16  proxies for race are equally unconstitutional. "[W]hat cannot be done directly

17  cannot be done indirectly."

18  147. The statements made by Dean Chemerinsky are not incidental expressions of

19  UC's values in niche departments or by isolated academics. UC's admissions

20  decisions track the racial discrimination of its industry outside the campus; and

21  they also track the racial discrimination of its faculty hiring within the campus.

1    148.    The statements made by Dean Chemerinsky provide strong circumstantial

2          evidence that UC is knowingly and deliberately structuring its admissions policies

3          to evade legal prohibitions on racial discrimination.

4    149.    As a law professor, Mr. Chemerinsky must know what he was preaching is

5          illegal. By his own admission, he clearly knew it was illegal. Yet, he preached it

6          with a sense of pride and braggadocio. His statements unequivocally

7          demonstrate reckless or callous indifference to federally protected rights. It is

8          also worth emphasizing that Mr. Chemerinsky is the Dean, the top administrator,

9          of UC Berkeley Law School. Mr. Chemerinsky's statements happened to be in a

10         public talk, happened to be captured in video, and happened to be shared on the

11         web. What is visible to the public must be only the tip of the iceberg. It is

12         reasonable to infer the preaching and practice of "unstated Affirmative Action" is

13         widespread in UC's admissions and hiring process, which lacks transparency and

14         accountability.

15    150.    The I-am-proud-of-it attitude that Mr. Chemerinsky demonstrated in the video

16         when talking about his action of breaking the law and hiding it compounded the

17         emotional distress Stanley and Nan have endured.

18    151.    The remarks by Mr. Chemerinsky, caught on video, were not an inadvertent

19         slip of tongue. At the American Association of Law Schools ("AALS") conference

20         addressing how universities might adapt admissions practices in the wake of

21         SFFA, Mr. Chemerinsky moderated a panel discussion featuring Timothy Lynch,

22         General Counsel of the University of Michigan, and Kevin R. Johnson, Dean of

23         UC Davis School of Law. When attendees expressed concern about the legality

1    of certain proposed strategies in light of the Court's ruling, Mr. Lynch emphasized

2    the importance of maintaining plausible deniability, cautioning: "You should be

3    aware right now of the record you're creating ... What are your faculty saying in

4    emails? What are they saying in public?" Notably, the University of Michigan has

5    been prohibited from using racial preferences under state law since 2006.

6    In another exchange about how plaintiffs often seek to uncover evidence of

7    discriminatory intent, the panelists made the following revealing statements:

8    Lynch: "The key question in terms of creating the record is what can you say

9    right now is the race-neutral explanation for doing it, and how do you avoid

10   having your faculty colleagues muddy the record."

11   Chemerinsky: "Great point."

12   Johnson: "I think Tim offered a lot of sound advice. ... In fact—and I won't

13   name the president of the University of California's name who said this—

14   she said that if we weren't getting sued for our efforts at outreach, we

15   weren't doing enough in terms of our admissions procedures and process."

16   Mr. Johnson further stated: "We're a public university with a very diverse

17   population, with a K–12 population [that's] over 50 percent Latinx. We… should

18   strive to produce lawyers that reflect that rich diversity and have experience and

19   are willing to represent that diversity." This is not merely a description of UC's

20   demographics. It is a declaration of a **racial enrollment goal**—an express intent

21   to align law school admissions outcomes with the racial composition of the K–12

22   pipeline. Johnson's remarks reveal that UC's admissions leadership is explicitly

1    motivated by the desire to engineer student bodies that "reflect" particular racial

2    proportions, rather than applying race-neutral criteria.

3    Mr. Chemerinsky himself cautioned: "I think it's very important not to talk about it

4    in terms of it being an attempt to circumvent the [Supreme Court] decision."

5    Significantly, he did not say, "It's very important not to circumvent the Supreme

6    Court's decision." His warning was about **how to speak about it**, not whether to

7    engage in circumvention—revealing an intent to disguise impermissible conduct

8    rather than to avoid it.

9    Mr. Lynch advised: "...it does raise questions about how you comply with [Court

10   ruling]... whether you change the title... whether you change criteria... that says

11   it is not your membership in the group but... your commitment to expanding

12   opportunities for people in that group that then has it pass muster." This

13   recommendation describes the use of facially race-neutral criteria as a proxy for

14   racial preferences.

15   152.    These statements are not stray remarks but probative evidence under

16   *Arlington Heights*. The Supreme Court recognized that contemporaneous

17   statements by decisionmakers, especially when coupled with efforts to obscure

18   true motives, are highly relevant to proving discriminatory intent. Here, the

19   panelists' candid discussion about plausible deniability, "avoiding a record," and

20   framing policies to withstand litigation reflects a deliberate attempt to conceal

21   unlawful racial considerations behind race-neutral pretexts. Chemerinsky's

22   caution "not to talk about it in terms of circumventing the [Supreme Court]

23   decision" only underscores the awareness that these strategies are designed to

1    achieve racially motivated outcomes through indirect means. Taken together,

2    these admissions align squarely with *Arlington Heights* intent factors, providing

3    compelling evidence that race remains a motivating factor in UC's admissions

4    policies despite the formal legal prohibition.

5 **G. UC's Action for Racial Balancing its Student Body**

6    153.    In addition to its evident motive and intent for racial balancing, UC possesses

7    the means and opportunity to manipulate the racial composition of its student

8    body under its current "holistic" admissions framework, which has a history of

9    corruption and lacks transparency, independent third-party oversight and

10    accountability. Indeed, UC's intent is matched by its actions.

11    154.    Despite claiming it does not maintain racial targets in its amicus brief for

12    *SFFA*, UC actively pursues Hispanic-Serving Institutions (HSI) status at each of

13    its campuses. HSI designation requires at least 25% Hispanic student

14    enrollment. In or around 2019, UC Berkeley and UCLA established task forces

15    led by their respective Chancellors—Carol Christ and Gene Block—to achieve

16    this racial target. These task forces demonstrate that UC has adopted policies

17    aimed at meeting specific numerical racial goals, contradicting its statements in

18    the *SFFA v. Harvard* amicus brief. Such race-based decision-making triggers

19    strict scrutiny and, under *SFFA v. Harvard*, cannot survive it. It also violates

20    Article I, Section 31 of the California Constitution.

21    155.    A university policy that amounts to racial balancing is "patently

22    unconstitutional." *Grutter v. Bollinger*, 539 U.S. 306, 329 (2003). Racial balancing

1      seeks to ensure a specified percentage of a racial group within the student body

2      merely due to race or ethnicity. *Id.* Courts have consistently rejected proportional

3      representation as a constitutional justification for race-based admissions. See *Id.*

4      at 343.

5      156.    These actions also raise serious concerns that UC misrepresented material

6      facts to the Supreme Court in its amicus brief for *SFFA v. Harvard*.

7      157.    In a December 2020 report from the *Chancellor's Task Force on Becoming a*

8      *Hispanic Serving Institution*, UC Berkeley **Chancellor Carol Christ** charged the

9      task force with creating a roadmap for the university to achieve one of its "boldest

10     goals": ensuring that "at least 25 percent of enrolled undergraduate students...

11     self-identify as Chicanx/Latinx" by 2027. The report quantifies the university's

12     progress towards this goal, noting that at 17.9% Latinx enrollment, it is "7.1%

13     away from meeting the enrollment requirement".

14     158.    This pursuit of a numerical racial target is part of a broader, unconstitutional

15     effort to engage in racial balancing. The report repeatedly states that UC

16     Berkeley "must reflect the public it serves" and that achieving HSI status is an

17     "essential step for UC Berkeley to become more representative of California". It

18     explicitly contrasts the state's 52% Latinx high school graduate population with

19     Berkeley's 16% Latinx undergraduate population, framing the initiative as a way

20     to achieve "representation aligned with the demographics of the population it

21     serves". Such a goal of racial proportionality is patently unconstitutional.

159.    To achieve this 25% racial target, the Task Force—which included Olufemi Ogundele, Assistant Vice Chancellor of the Office of Undergraduate Admissions—was charged with reviewing and recommending changes to "admissions and recruitment strategies". The resulting plan calls for specific actions to alter the applicant pool and admissions outcomes. These actions demonstrate a clear intent to manipulate the admissions process to engineer a specific racial composition, in direct violation of the Equal Protection Clause and the California Constitution.

160.    Admissions are a zero-sum process, where a benefit given to one applicant necessarily comes at the expense of another. By creating a policy with the express goal of increasing the representation of one racial group to meet a numerical target, Co-Defendant UC intentionally put applicants from other racial groups, particularly Asian Americans, at a disadvantage. The rejection of Stanley Zhong—an applicant with qualifications that UC officials have been unwilling or unable to claim were matched by all admitted non-Asian students—was the direct and foreseeable consequence of this unconstitutional racial balancing scheme.

161.    Furthermore, the university official who oversaw Stanley's rejection was directly involved in creating this discriminatory plan. As Assistant Vice Chancellor for the Office of Undergraduate Admissions, Olufemi Ogundele was not only responsible for the admissions cycle in which Stanley was rejected but was also an active member of the Chancellor's HSI Task Force. His participation demonstrates that the unconstitutional goal of achieving a 25% racial quota was

1    not an abstract policy but an operational objective of the very office that denied

2    Stanley Zhong admission. Therefore, the decision to reject Stanley was made

3    within an admissions framework deliberately engineered to prioritize a

4    candidate's race over individual merit to meet a predetermined demographic

5    outcome.

6    162.    Linked from the report from the *Chancellor's Task Force on Becoming a*

7    *Hispanic Serving Institution*, UC Berkeley's own reports make explicit that the

8    HSI initiative is directly tied to admissions quotas. The *Chicanx Latinx Task Force*

9    *Report (2016–2017)* openly recommended "increase admission and enrollment

10   of Chicanx/Latinx undergraduate students with the goal of becoming a

11   Hispanic-Serving Institution," confirming that admissions policy was to be

12   manipulated to satisfy HSI benchmarks. A 2015 report similarly called for

13   Berkeley to "take immediate action" so that its student body "more closely reflects

14   the demographics of the state," explicitly defining "underrepresented" as groups

15   "disproportionately represented compared to their proportion among residents of

16   the state." A February 2020 memo to the HSI Task Force, which referenced

17   "admissions" repeatedly, demonstrates that admissions were a central focus of

18   the HSI program. Taken together, these documents show that UC has pursued

19   racial proportionality in admissions and the "Hispanic-Serving Institution"

20   designation—a direct violation of constitutional prohibitions against racial targets.

21   163.    On December 7, 2020, UCLA's top leadership, including Defendant

22   **Chancellor Gene D. Block**, announced a campus-wide directive to become a

23   Hispanic-Serving Institution (HSI) by 2025. They justified this goal as a response

1    to "changing demographics in California," an explicit admission of their intent to

2    engage in impermissible racial balancing by aligning the student body with state

3    demographics. This top-down push for numerical racial targets is a system-wide

4    policy championed by Defendant Chancellors across the University of California:

5    • After UC Davis achieved HSI eligibility in October 2024, Defendant **Chancellor**

6    **Gary S. May** celebrated the effort as a "milestone" nearly a decade in the

7    making.

8    • Defendant **Chancellor Henry T. Yang** "oversaw the designation of the [UC Santa

9    Barbara] campus as an HSI in 2015".

10    • Defendant **Chancellor Pradeep K. Khosla** challenged the UC San Diego

11    community to pursue the "goal of becoming an HSI" so the campus could "better

12    reflect and serve the diverse population of California".

13    This collective leadership from Chancellors Christ, Block, May, Yang, and Khosla

14    demonstrates a clear and persistent commitment to achieving specified

15    numerical racial targets, intentionally and purposefully favoring a particular racial

16    group at the expense of others. Their actions and public statements constitute a

17    reckless or callous indifference to the federally protected rights of applicants to

18    be judged on their individual merit, not their race.

19    164.   UC's race-conscious practices have not escaped federal notice. On March 14,

20    2025, the U.S. Department of Education's Office for Civil Rights ("OCR")

21    announced a sweeping Title VI enforcement initiative, opening formal

22    investigations into 45 universities for "race-exclusionary practices" that violate the

23    Civil Rights Act. UC appears on that list as a chief offender.

165.    OCR's decision to single out UC is significant. Title VI investigations issue only where the agency has received credible evidence that an institution continues to deploy race as a decision-making factor after *SFFA*. Thus, a federal body has already found sufficient cause to suspect UC of maintaining unlawful racial preferences.

## H. Documented Instances of Racial Intent and Discrimination in UC's Admissions and Hiring

### H.1. Evidence of Racial Discrimination in UC's Admissions

166.    In another case similar to Stanley's, in 2022, an Asian American student with the following qualifications was rejected by UC San Diego (but admitted by MIT).

a.  GPA: 4.4+

b.  SAT: 1590

c.  ISEF (International Science and Engineering Fair) Grand Award

d.  USACO Silver Award

e.  AIME Qualifier

f.  American Protege International

g.  Music competition 1st place

h.  MCWiT Impact Award

i.  Founder of nonprofit (taught 1500+ students around the world)

1    In contrast, also in 2022, a Hispanic student with the following qualifications was

2    admitted by UC San Diego.

3        j.   GPA: 4.1

4        k.   No SAT (PSAT was 780 out of 1520)

5        l.   No activities

6    167.   Pulitzer Prize–winning journalist Daniel Golden documented the widespread

7    anti-Asian discrimination in college admissions in his book titled *The Price of*

8    *Admission*. Golden exposed how elite universities like UC routinely pass over

9    Asian American applicants with exceptional qualifications in favor of far less

10   qualified candidates from preferred racial groups. For example, UCLA and UC

11   Berkeley rejected Stanley Park, a Korean American student who faced serious

12   adversity (single immigrant parent with cancer and no college degree), while

13   accepting non-Asian students with SAT scores 520 points lower.

14   168.   In 2002, a 159-page analysis of undergraduate admissions on the UC

15   Berkeley campus revealed that 381 applicants who had scored lower than 1000

16   on the SAT were admitted to Berkeley, while 641 students with scores of 1500 or

17   higher were rejected (1600 is a perfect score). Another 2,577 candidates scoring

18   between 1401 and 1500 were denied admission.

19   169.   In response, Mr. John Moores, then-chairman of the UC Board of Regents,

20   accused UC's flagship campus of "blatantly" discriminating against Asian

21   Americans. "There are remarkably consistent, clear patterns of racial

discrimination" against Asian Americans in undergraduate admissions, Moores said. In an article, Moores said UC Berkeley was admitting hundreds of African American, American Indian and Latino students with SAT scores of 1000 or less while rejecting Asian American high achievers with scores of 1400 or above.

170.    Mr. Moores was concerned with the resolution adopted by the Regents stating that UC was in compliance with Proposition 209. He wrote that "there is no evidence suggesting compliance with the proposition. …the UC admission study group did not come to any conclusion about Proposition 209, and no evidence of compliance with Proposition 209 has been presented to the Board … Furthermore, all evidence to date, including comments by President Dynes suggests there may be cause for concern."

171.    Mr. Moores further wrote, "When I tried to get to the bottom of the admission matters, I was met with stonewalling, obfuscation and personal attacks by the administration of UC … UC personnel have demonstrated a continuing bias in the manner in which they have attempted to explain away problematic admission issues … They seem to have an agenda with respect to outcomes, rather than attempting to be objective in studying and interpreting the data. I believe they try to find facts to fit their views of what they want to achieve."

172.    Even the chairman of the UC Board of Regents had trouble accessing UC's admissions data. This pattern of data obscurity continued in the decades after.

173.    Around 2018, UC refused to fulfill public records requests and defended against a lawsuit that sought access to its admissions data for research

1    purposes. This was despite having provided similar data in 2008. UC's actions

2    are part of the persistent pattern of concealing admissions data from 3rd-party

3    examinations. Given virtually all previous admissions data showed strong racial

4    preferences in UC admissions in direct violation of Proposition 209, UC is

5    certainly motivated to go to such extraordinary lengths to hide its admissions

6    data.

7    174.    UC San Diego employs a point-based system for admissions to selective

8    majors for continuing students, assigning one point for each of the following four

9    criteria: a 3.0 GPA or higher in major screening courses, California residency,

10   Pell Grant eligibility, and first-generation college status. Assuming all applicants

11   are California residents, under this point-based system, a middle-class applicant

12   with a 4.0 GPA can earn a maximum of only two points. In contrast, an applicant

13   from a poor family may earn three points even with a 1.0 GPA. This policy

14   exemplifies UC's decision-making that weighs students' immutable

15   characteristics far more than academic criteria. When used excessively as

16   overriding criteria, these immutable characteristics can act as proxies for race,

17   resulting in disparate treatment of Asian-American applicants by "insulat(ing)

18   applicants who belong to certain racial or ethnic groups from the competition for

19   admission." *Grutter*, 539 U.S. at 334 (citation omitted).

20   175.    Mr. Steven Dubinett, the dean of UCLA medical school, directs a center that

21   houses a race-based fellowship. Its web page was deleted after media exposure,

22   indicating awareness of its illegality.

176.    A New York Times opinion piece by a former UC admissions reader shared her detection of "unspoken directives", questioned whether "Proposition 209 serve(s) merely to push race underground" and described the admission reading process as "an extreme version of the American non-conversation about race."

177.    In 2020, UCLA medical school adopted the "Anti-Racism Roadmap" and instituted policies that use race in its admissions. For example, it insists that its student body "should reflect the population of State of California". It also monitors the racial numbers in its admissions process.

178.    Dr. Jennifer Lucero has publicly emphasized the importance of racially diversifying medical school admissions. Following her appointment to lead UCLA's medical school admissions in June 2020, the number of Asian matriculants declined from 84 in 2019 to 55 in 2022—a 35% decrease. Such precipitous changes in admission outcomes strongly suggest the implementation of deliberate, race-conscious directives. In 2023, Asian applicants comprised 40.79% of the total applicant pool but accounted for only 29.71% of matriculants. In contrast, Black applicants represented just 7.86% of applicants yet constituted 14.29% of matriculants. From 2020 to 2023, White and Asian applicants consistently made up approximately 73% of the total applicant pool. Nonetheless, the combined percentage of White and Asian matriculants declined markedly over that period—from 65.7% in 2020 to 57.1% in 2021, 57.8% in 2022, and just 53.7% in 2023.

179.    According to whistleblowers with direct knowledge, the admissions committee at UCLA's medical school routinely and openly discusses applicants' race—or

1  racial proxies—and uses race as a factor in admissions decisions. Dr. Jennifer

2  Lucero and the committee are reported to admit Black applicants with

3  below-average GPA and MCAT scores, including significantly below-average

4  scores, while holding White and Asian applicants to much higher standards, often

5  requiring near-perfect academic credentials for serious consideration.

6  Whistleblowers have confirmed that race is explicitly discussed and factored into

7  admissions decisions. In one instance, when the committee was reviewing a

8  Black applicant with significantly below-average academic metrics, Dr. Lucero

9  allegedly remarked: "Did you not know African-American women are dying at a

10  higher rate than everyone else? We need people like this in the medical school."

11  180.   Additionally, on April 8, 2025, according to an individual familiar with the

12  matter, the medical school circulated a memo outlining "guiding principles for

13  student representation on the admissions committee," which includes both faculty

14  and upper-year medical students. These guidelines reportedly instruct the

15  committee to consider race when selecting student members to serve as

16  admissions officers.

## H.2. Evidence of Racial Discrimination in UC's Hiring

18  181.   While distinct from undergraduate admissions, UC's faculty hiring practices

19  provide compelling circumstantial evidence of its institutional and systemic race

20  preference in decision-making. These policies reveal a university-wide culture

21  deeply steeped in race-consciousness—one that cannot plausibly separate its

22  hiring practices from its highly suspect admissions outcomes. UC's widespread

1  adoption of race-conscious policies in faculty hiring supports the inference of

2  similar practices in student admissions.

3  182.  Admissions and hiring are inherently interconnected and inseparable in the

4  context of racial discrimination within educational institutions. Faculty and

5  administrators play a pivotal role in shaping academic standards, mentoring

6  students, and influencing the culture and policies of a university, including

7  admissions criteria and practices. A racially biased hiring process can create and

8  perpetuate a discriminatory culture by fostering an environment where certain

9  racial perspectives are prioritized over objective, merit-based considerations.

10  Racially-motivated hiring policies often have a direct ripple effect on student

11  admissions. When university leadership consistently selects and empowers

12  individuals committed to race-based decision-making, it is hardly surprising that

13  those values also shape admissions policies and the student body. It is

14  implausible that a university can operate one process in a race-conscious

15  manner while keeping the other race-neutral, as both are fundamentally linked in

16  their goals and execution. Therefore, examining both admissions and hiring

17  practices is essential to providing a holistic assessment of whether a university's

18  policies violate constitutional and statutory protections against racial

19  discrimination.

20  183.  In 2024, UCLA posted a position (Job #JPF08858) for a "Tenure-Track

21  Assistant Professor in Pacific Islander Experiences in Engineering." The position

22  description emphasized "strong ties to Pacific Islander experiences in the United

23  States" and "the success of Pacific Islander scholars." On their face, these

1    requirements have the clear and impermissible effect of limiting and classifying

2    applicants based on their race and national origin, thereby creating an unlawful

3    preference that restricts the candidate pool.

4    184.    The Standing Order of UC Regents 101.1(d) explicitly states: "No political test

5    shall ever be considered in the appointment and promotion of any faculty

6    member or employee." However, UC flagrantly violates this mandate by using

7    diversity statements as a decisive factor in faculty hiring. At certain UC

8    campuses, if a faculty applicant's diversity statement fails to satisfy the diversity

9    bureaucrats, their application is summarily excluded from consideration without

10   any review of their academic qualifications. In 2016, at least five UC campuses

11   — Berkeley, Davis, Irvine, Riverside and Santa Cruz — decided their hiring

12   committees could perform an initial screening of candidates based only on

13   diversity statements. For instance, at UC Davis, the vice provost explicitly

14   instructed search committees to disqualify candidates who did not "look

15   outstanding" on diversity, regardless of the quality of their academic research.

16   The championing of diversity at UC resulted in many campuses rejecting

17   disproportionate numbers of white and Asian and Asian American applicants.

18   185.    As documented in the National Association of Scholars (NAS) report titled

19   "Diversity Statement, Then Dossier," UC's cluster hiring reinforces the use of

20   diversity statements as litmus tests for employment, and eliminated faculty

21   candidates solely on the basis of diversity statements—demonstrating that hiring

22   decisions were overtly identity-driven rather than based on academic merit.

186.    In 2017, the UC Berkeley College of Engineering conducted a hiring initiative which made "advancing equity and inclusion" a "key criterion in selecting faculty candidates," and which relied heavily upon applicant diversity statements as a selection tool throughout the hiring process. The program, by its own standards, was a remarkable success. The applicant pool was 2 percent African American, but 22 percent of candidates who received offers were African American. The College of Engineering declared in its follow-up report that emphasizing diversity would become a permanent priority in hiring, noting that "we will continue to emphasize in our hiring practices that excellence in advancing equity and inclusion must be considered on par with excellence in research and teaching."

187.    During the 2018-19 academic year, UC Berkeley's hiring process for a life sciences position narrowed 894 applicants to 214, peremptorily disqualifying 76% of applicants based solely on diversity statements. According to UC's summary report, "The LSI [Life Sciences Initiative] Committee conducted a first review and evaluated candidates based solely on contributions to diversity, equity and inclusion. Only candidates that met a high standard in this area were advanced for further review, narrowing the pool down to 214 for serious consideration." Under such a faculty hiring system, even Nobel Prize winners would not be considered if they focused on academic research instead of diversity. This approach disproportionately affected applicants of different racial groups, increasing the percentage of African American and Hispanic dramatically, while reducing the percentage of Asian and White significantly. (See screenshot below.)

Table A: Life Science Faculty (Cluster) Search Demographics:

| GENDER | Applicant Pool | Longlist | Shortlist |
|---|---|---|---|
| Count | 894 | 214 | 22 |
| Female | 41.70% | 60.30% | 63.60% |
| Male | 56.50% | 39.30% | 36.40% |
| Unknown | 1.80% | 0.50% | 0.00% |
| RACE/ETHNICITY | Applicant Pool | Longlist | Shortlist |
| Count | 894 | 214 | 22 |
| African American | 2.80% | 6.10% | 9.10% |
| Hispanic | 13.20% | 22.90% | 59.10% |
| Native American | 0.40% | 1.40% | 0.00% |
| Asian | 25.70% | 18.70% | 18.20% |
| White | 53.70% | 48.10% | 13.60% |
| Unknown | 4.10% | 2.80% | 0.00% |

Hispanic candidates constituted 13.2% of applicants and 59.1% of finalists. Asian candidates constituted 25.7% of applicants and 18.2% of finalists. White candidates constituted 53.7% of applicants and 13.6% of finalists. Black candidates made up 2.8% of applicants and 9.1% of finalists.

188.    The LSI Committee used a standardized rubric for its diversity statement review: "Rubric for Assessing Contributions to Diversity, Equity, and Inclusion" (RACDEI). RACDEI clearly promotes an ideological agenda. It dictates that candidates should receive a low score if they state the intention to "treat everyone the same." RACDEI also rewards candidates for discussing "diversity, equity, inclusion, and belonging as core values that every faculty member should actively contribute to."

189.    In 2019, in a faculty hiring program funded by UC's Office of the President, UC Santa Cruz "puts diversity at the forefront of searches". "Roughly a third of the faculty recruitments in the coming year will put contributions to diversity, equity, and inclusion at the forefront ... In the recruitments that are part of the pilot program, search committees will first review and assess candidates'

1    statements on contributions to diversity, equity, and inclusion before determining

2    whether to evaluate the rest of the application materials." "It's critical that our

3    faculty better reflect the great diversity of our student body and arrive ready to

4    help make our campus even more inclusive," said Herbert Lee, vice provost for

5    Academic Affairs and the campus diversity officer for faculty. Given the

6    university's "long standing commitment to progress on social justice, global and

7    community health seemed like a natural area of growth for the campus, and one

8    where we should make every possible effort to recruit faculty who reflect the

9    diversity of the state and nation," Paul Koch, dean of physical and biological

10   sciences, said in a press release.

11   190.    Mr. Yoel Inbar, a noted psychology professor at the University of Toronto, was

12   rejected for a position at UCLA because his podcast expressed skepticism about

13   the use of diversity statements in hiring.

14   191.    A cottage industry has sprouted nationally and in California to guide

15   applicants in writing these statements.

16   192.    In sum, UC's practice of DEI cluster hiring infuses the watchwords of identity

17   politics into the faculty hiring process, uses diversity statements as an ideological

18   screen, provides camouflage for racial preferences, and transforms the university

19   mission from the pursuit of truth to political activism. As mentioned earlier, at UC,

20   diversity means race. UC's use of diversity statements in faculty hiring is a

21   subterfuge for racial discrimination. When applicants are required to submit a

22   diversity statement, university reviewers would likely be able to tell the applicants'

23   race, allowing it to be taken into account in violation of federal and state laws.

1    Perhaps recognizing its harm and illegality, in March 2025, UC finally disallowed

2    requiring diversity statements in recruitment.

3    193.    Given that UC is not conducting itself as a bona fide academic institution for

4    student admissions or faculty hiring, any traditional judicial deference afforded to

5    academic institutions should not apply in lawsuits concerning student admissions

6    or faculty hiring at UC.

7    194.    While the Supreme Court's *Grutter* decision in 2003 permitted a limited,

8    time-bound consideration of race in college admissions, no such exception has

9    ever been allowed for hiring. Consequently, if a college intentionally incorporates

10    race into its hiring decisions, it's more than plausible that they do the same for

11    student admissions. UC's faculty-hiring record therefore supplies powerful

12    circumstantial evidence that race remains a defining criterion in UC's

13    decision-making, including the exclusion of Stanley and imminent exclusion of

14    the Minor Son.

15 **I. Statistical Evidence That UC Discriminates Against Asian-American Applicants**

16    195.    In addition to Stanley's case, there is a pattern of similar rejections

17    experienced by other Asian-American applicants with outstanding qualifications.

18    The statistical evidence further reveals the extent of anti-Asian discrimination in

19    UC's admissions.

1    **I.1. Drop in Asian Admissions**

2    196.    In or around 2021, numerous high schools with high concentrations of

3    Asian-American students experienced a precipitous decline in UC admission

4    rates.

5    197.    For example, in 2016, 119 students from Westview High School applied to UC

6    Berkeley, and 44% were admitted. By 2021, however, the admission rate for

7    Westview High School students had plummeted to just 6.7%. Notably, 40.2% of

8    the student body at Westview High School is Asian-American.

9    198.    As another example, between 2018 and 2023, UC San Diego's admission

10    rates for various high schools shifted dramatically, displaying a strong negative

11    correlation with the percentage of Asian-American students in their student

12    bodies. As reflected in the table below, several highly ranked high schools with

13    large Asian-American populations experienced a steep decline in the percentage

14    of students admitted to UC San Diego in 2023 compared to 2018. Conversely,

15    several lower-ranked high schools with relatively small Asian-American

16    populations saw increased admission rates over the same period.

1

| High School | Asian Percentage | National Ranking by US News | 2018 Admission Rate | 2023 Admission Rate |
|---|---|---|---|---|
| Bonita Vista | 10% | 2190 | 37% | 61% |
| King-Chavez | 0% | 9135 | 31.8% | 57.1% |
| Canyon Crest Academy | 42% | 140 | 61.3% | 15.7% |
| Westview | 40.2% | 401 | 65.5% | 13.3% |
| Del Norte | 42.2% | 329 | 60.4% | 11% |
| California average | 10.1% | N/A | 30.2% | 25% |

2    *Table 1: Precipitous drop of acceptance rate at Asian-concentrated high schools*

3    Notably, the change in UC San Diego's admission rate for a given high school is

4    inversely correlated with both the school's academic ranking and the proportion

5    of Asian-American students enrolled—that is, the higher the school's ranking and

6    the greater its Asian-American representation, the lower its UC San Diego

7    admission rate. This pattern represents a marked departure from standard

8    procedural expectations and strongly suggests a pattern unexplainable on

9    grounds other than race. It constitutes compelling circumstantial evidence of

10   discriminatory intent under *Arlington Heights* framework.

11   199.    According to the 2020 U.S. Census, California's Asian population grew by

12   25% from 2010 to 2020 and likely continued rising thereafter, making it the

13   fastest-growing ethnic group in the state. But the percentage of Asian students at

14   UC has declined.

200.    Between 2002 and 2022, Asian Americans' percentage in UC enrollment dropped from 38% to 32%, despite explosive growth in the state's Asian population. The Chinese American enrollment at UC between 2018 and 2024 also declined overall. At UC Berkeley, one of the most selective campuses of the UC system, Asian admits trended significantly downward in recent years. The percentage of Asian applicants admitted by UC Berkeley went from 18.9% (3,188 out of 16,866) in 2014 to 15.8% (4,416 out of 27,875) in 2023.

201.    The gap between Asian population growth and declining percentage in UC enrollment strongly suggests systemic discrimination. As the Court explained in *Reno v. Bossier Parish School Board*, 520 U.S. 471, 487 (1997), the natural consequences of an action often provide probative evidence of intent. Here, the persistent adverse impact on Asian-American applicants indicates a racially motivated policy, despite UC's denials.

**I.2. SAT Disparities**

202.    In nearly every case examined by the Plaintiff, whenever the SAT data of the admits is available, it consistently indicates that Asian-American applicants face significantly higher score thresholds for admission compared to other racial groups. For example, in 2023, if African-American enrollees at Cornell University and the University of Michigan were held to the same SAT score standards as Asian-American enrollees, these two institutions would have admitted at least 7.1% and 9.6%, respectively, of all African-American SAT-takers nationwide who scored within the top 1400–1600 range—an outcome that is statistically

1    improbable given the competitive nature of college admissions and the

2    geographic distribution of high-achieving students.

3    203.    More importantly, applying the same analysis, Cornell would have admitted

4    4.1% of top-scoring Hispanic applicants, 1.9% of top-scoring White applicants,

5    and only 1.0% of top-scoring Asian-American applicants. Only two plausible

6    explanations exist. The first is that top-scoring Black applicants are somehow

7    seven times more likely than their Asian-American counterparts to matriculate at

8    Cornell over peer institutions—a statistical improbability, particularly given that

9    other elite universities also enroll substantial numbers of high-achieving Black

10   students. A similar pattern appears at the University of Michigan, where

11   top-scoring Black applicants are allegedly six times more likely than their

12   Asian-American counterparts to enroll—a claim that strains credibility. But no one

13   can seriously believe that Cornell and the University of Michigan have somehow

14   cornered the market on talented Black freshmen. The far more

15   straightforward—and credible—explanation is that both Cornell and the

16   University of Michigan have manipulated their admissions standards by race:

17   selectively raising or lowering the bar based on racial identity. In doing so, they

18   have disproportionately admitted lower-scoring applicants of preferred racial

19   groups while systematically denying admission to higher-scoring Asian-American

20   applicants, all in service of engineering a predetermined racial composition.

21   204.    While SAT scores are not the sole measure of academic merit, the

22   pronounced statistical disparities in admissions outcomes raise grave concerns

23   under the *Arlington Heights* framework regarding whether Cornell University and

1 the University of Michigan have impermissibly relied on race in their admissions

2 decisions. Unless these institutions can demonstrate—using other legitimate and

3 relevant admissions criteria—that Asian-American applicants were substantially

4 less qualified, which they have not done, the disparities strongly indicate

5 intentional racial discrimination. Under *Arlington Heights*, stark statistical

6 anomalies can be powerful evidence of discriminatory intent, particularly when

7 coupled with the absence of a race-neutral explanation.

8 205. A Brookings Institution study found that Asian-American high school students

9 devote two to three times more hours to academic work than students from other

10 racial groups. (See Exhibit 1.) Yet this substantial effort advantage is entirely

11 disregarded by those who dismiss the SAT as a meaningful metric. The study

12 further found that the gap in academic work hours between low-income and

13 non-low-income students is far smaller than the racial gaps. Consistent with this

14 survey, income differences don't explain the race gaps in SAT data, according to

15 the Journal of Blacks in Higher Education. In fact on the SAT Math, for example,

16 Asian students from the bottom income quintile outperform Black students from

17 the top income quintile. (See Exhibit 2.)

18 206. Some SAT critics claim that racial disparities in SAT scores prove the test

19 itself is racially biased or contain "cultural biases" that give advantage to Asian

20 Americans. But this argument collapses under scrutiny. First, many

21 Asian-American students, including Stanley, are raised by immigrant parents who

22 do not speak English as their first language and who never took the SAT

23 themselves. For example, Nan has never taken the SAT and still has no idea

1    what types of questions appear on it. In fact, Exhibit 2 does show Asians don't

2    excel on the SAT Verbal nearly as much as they do on the SAT Math. Second,

3    numerous studies confirm that Asian-American students, on average, devote

4    significantly more time to academic work than their peers. These facts undercut

5    the narrative of inherent SAT bias and instead point to differences in preparation

6    and effort—factors that have been systematically ignored by the institutions in

7    question.

8    207.    Studies by Opportunity Insight at Harvard University show that (1) Students

9    with higher SAT/ACT scores are more likely to have higher college GPAs than

10    their peers with lower scores; (2) High school GPA does a poor job of predicting

11    academic success in college; and (3) Students from different socioeconomic

12    backgrounds who have comparable SAT/ACT scores receive similar grades in

13    college.

14    208.    It is against this backdrop that UC discontinued the collection of SAT scores in

15    2021, adopting a "test-blind" admissions policy that remains in effect today.

16    During the years in which UC did collect such data, it almost certainly became

17    aware that Asian-American applicants faced a substantially higher admissions

18    threshold—mirroring patterns observed at institutions such as Cornell and the

19    University of Michigan. This likely created a strong institutional incentive to cease

20    collecting or publishing SAT data, in order to obscure the evident disparities and

21    avoid scrutiny.

22    209.    Despite UC's efforts to obscure disparities by eliminating SAT score reporting,

23    the racially engineered outcomes remain apparent. For Fall 2024 enrollment, the

1    table below compares, across five racial groups, the percentage of the group in

2    the top two SAT ranges (1400-1600 and 1200-1390) and the percentage of the

3    group admitted by the five UC campuses that rejected Stanley's application.

|  | Asian | White | Hispanic | Black | American Indian |
|---|---|---|---|---|---|
| SAT Takers scoring 1400-1600 | 25% | 6% | 2% | 1% | 1% |
| SAT Takers scoring 1200-1390 | 31% | 23% | 9% | 6% | 5% |
| UC Davis | 38% | 36% | 37% | 27% | 39% |
| UC Berkeley | 16% | 15% | 13% | 12% | 19% |
| UC Santa Barbara | 36% | 31% | 31% | 23% | 24% |
| UCLA | 11% | 10% | 7% | 11% | 17% |
| UC San Diego | 27% | 23% | 28% | 18% | 25% |

4    *Table 2: Racial groups' percentage in top SAT ranges and percentage admitted*

5    *by UC*

6    Note that 25% Asians, 2% Hispanic and 1% of Black are in the top 1400-1600

7    range. Yet UCLA's acceptance rates for Asian and Black applicants are both

8    11%, and the acceptance rates at UC Davis and UC San Diego for Asian and

9    Hispanic applicants are also roughly equivalent. It doesn't take an advanced

10    degree in mathematics to recognize the profound racial disparities reflected in

11    the table above. Small wonder, then, that UC avoids collecting or publishing SAT

12    statistics for admitted students by race—an omission that marks a stark

13    departure from standard procedural transparency. Given the substantial

14    disparities in SAT performance and the nearly identical acceptance rates

1   referenced above, the only plausible explanation is the use of racial preferences

2   on a broad scale—unless UC can substantiate that Asian-American applicants

3   are significantly less qualified on other admissions criteria, which it has thus far

4   failed to do.

5   210.   UC also withholds data on the number of National Merit Scholarship finalists

6       among its admitted students. Disclosure of such information would provide

7       another critical benchmark for evaluating the reasonableness of its decision to

8       reject Stanley—a National Merit Scholarship finalist—and would shed light on

9       whether similarly qualified applicants are being admitted on a consistent and

10      equitable basis.

11  **I.3. Studies of Admissions Data**

12  211.   In a 2014 study commissioned by UCLA, only later obtained through a public

13      records request in 2018, sociology professor Robert Mare documented a

14      consistent pattern of anti-Asian discrimination in admissions at UCLA. His report

15      said,

16          "'North Asian' (Chinese, Japanese, Korean, Indian/Pakistani American)

17          applicants receive somewhat less favorable holistic read scores than

18          applicants in other ethnic identity groups who are otherwise similar in

19          measured academic qualifications, personal characteristics, and measured

20          challenges and hardships."

21  It further concluded that

1       "among otherwise equivalent applicants, whites, African Americans and

2       Latinos are overrepresented among those admitted, and Asian-American

3       applicants are underrepresented."

4   Additionally, the report noted that

5       "the disadvantages of Asian applicants occur, with varying magnitudes,

6       throughout the admissions process."

7   Mare even provided numerical estimates quantifying the number of admission

8   offers—broken down by race—that resulted directly from the consideration of

9   race. According to his analysis, more than two thousand offers were affected

10  over a five-year period.

11  212.    The table below presents the undergraduate admissions rates for Black

12      applicants compared to the overall applicant pool in both 2010 and 2023.

|                  | 2010 Admissions Rates | | 2023 Admissions Rates | |
| --- | --- | --- | --- | --- |
|                  | Black | Overall | Black | Overall |
| UCLA             | 14%   | 23%     | 10%   | 9%      |
| UC Berkeley      | 13%   | 21%     | 10%   | 12%     |
| UC Irvine        | 24%   | 45%     | 21%   | 26%     |
| UC Santa Barbara | 28%   | 45%     | 25%   | 28%     |
| UC San Diego     | 19%   | 38%     | 18%   | 25%     |
| UC Santa Cruz    | 41%   | 64%     | 52%   | 63%     |
| UC Davis         | 31%   | 48%     | 30%   | 42%     |
| UC Riverside     | 56%   | 76%     | 57%   | 70%     |
| UC Merced        | 76%   | 89%     | 80%   | 88%     |

13      *Table 3: Black and overall admissions rates at UC in 2010 and 2023*

1    Over this period, it is apparent that all UC campuses have shifted toward a

2    practice of aligning admissions rates across racial and ethnic groups, irrespective

3    of academic qualifications. This trend of convergence is especially pronounced at

4    the more selective campuses, such as UCLA and UC Berkeley.

5    213.    Notably, Professor Robert Mare's reports had already documented significant

6    admissions preferences for Black applicants at UCLA in 2010. Since there is no

7    evidence that the average academic preparation of Black applicants improved

8    substantially between 2010 and 2023, the only plausible explanation for the shift

9    in admissions rates is that UC systematically adjusted admissions

10    standards—raising them for some racial groups and lowering them for others.

11    214.    Admissions to UC's graduate programs—such as its law and medical

12    schools—like their undergraduate counterparts, also reflect significant racial

13    preferences.

14    215.    In December 2012, Danny Yagan, an Associate Professor of Economics at

15    UC Berkeley, pushed a paper titled "LAW SCHOOL ADMISSIONS UNDER THE

16    UC AFFIRMATIVE ACTION BAN". Using a seventeen-year sample of law school

17    applications, it concluded the following.

18        The pre-ban black admission rate was 61%. Controlling for selective attrition

19        from applicant pools, I find that the ban reduced the black admission rate to

20        31%---half of the pre-ban rate but still four times higher than the 8% rate that

21        would prevail under observed white admission standards. Observed black

1      admission advantages at intermediate credential levels were as large as 99

2      percentage points before the ban and 63 percentage points after the ban.

3   216.   Following public outcry over the Varsity Blues scandal, California state

4      lawmakers commissioned an audit of the University of California's admissions

5      practices. The California State Auditor's 2020 report found that UC "has allowed

6      for improper influence in admissions decisions, and it has not treated applicants

7      fairly or consistently." Specifically, the audit revealed that UC Berkeley and UCLA

8      "admitted thousands of applicants whose records demonstrated that they were

9      less qualified than other applicants who were denied admission."

10   217.   The audit also identified significant bias within the admissions process.

11      Despite UC's guidelines excluding personal details such as race, gender, and

12      birthplace from the 14 official admission factors, several campuses allowed

13      application readers to access such details. For example, UC Berkeley, UCLA,

14      and UC San Diego permitted readers to view students' names and native

15      languages. Additionally, UC Berkeley and UC San Diego exposed applicants'

16      gender, while UC Berkeley and UCLA displayed applicants' birthplaces. The audit

17      warned that this practice could lead readers to infer race or ethnicity, introducing

18      bias into decisions.

19   218.   In *Students for Fair Admissions v. University of Texas Austin, No. 24-50631*

20      *(5th Cir. 2025)*, the Fifth Circuit Court of Appeals noted that admissions officers'

21      access to racial data could still potentially allow for racial discrimination, thus

22      maintaining a live controversy.

1   219.   Finally, it is worth noting that studies comparing the academic qualifications of

2       admitted students by race fail to fully capture the extent of racial discrimination

3       faced by Asian-American applicants. By rejecting highly qualified Asian-American

4       applicants like Stanley, UC artificially narrows the academic qualification gap

5       between admitted students of different racial groups. As a matter of mathematical

6       fact, the more highly qualified Asian-American applicants the university rejects,

7       the smaller the observed qualification gap among admitted students becomes. To

8       accurately assess the extent of racial discrimination, it is necessary to compare

9       not only the admitted Asian-American students but also the rejected

10      Asian-American applicants against admitted students from other racial groups.

11      However, limitations in the publicly available UC admissions data currently

12      prevent such an analysis. The plaintiffs intend to pursue this essential data

13      comparison during the discovery phase of this lawsuit.

## J. Whistleblower Reports

15  220.   Senior UC administrators not only preach and practice "unstated Affirmative

16      Action", they also actively persecute those who advocate for academic

17      excellence over identity politics. From 2022 to 2024, Professor Perry Link,

18      Chancellorial Chair for Teaching Across Disciplines at UC Riverside and a

19      leading authority on modern and contemporary Chinese literature and culture,

20      faced disciplinary action after expressing concerns during a faculty search

21      committee meeting about prioritizing a Black candidate's race over qualifications.

22      His comments, which he stated were intended to caution against elevating race

23      as the "overriding criterion," were reported to university officials without his

1    knowledge. Professor Link was subsequently removed from the search

2    committee and subjected to a prolonged disciplinary process, including hearings

3    resembling a trial, where termination was suggested as a penalty. Although a

4    faculty committee unanimously found him innocent of the charges, Chancellor

5    Kim Wilcox issued a formal letter of censure, overriding the committee's

6    recommendation. Professor Perry Link was accused of making racist comments

7    during the hiring process but was not informed of the specific remarks deemed

8    problematic until nearly a year later. UC Riverside eventually acquitted him of all

9    charges but allegedly threatened to penalize him if he spoke publicly about the

10    ordeal. Despite UC's threats, Professor Link, a distinguished scholar at age 80,

11    courageously made the incident public. If UC has attempted to silence a

12    prominent tenured professor, it is reasonable to infer the tremendous pressure

13    any professor, non-tenured administrator or staff would face if they were to speak

14    up. Therefore it is reasonable to infer that numerous similar cases exist at UC in

15    which victims chose to remain silent, fearing retaliation that could jeopardize their

16    careers and livelihoods. This incident highlights senior UC administrators'

17    preoccupation with immutable characteristics such as race, in clear violation of

18    the Fourteenth Amendment, Title VII of the Civil Rights Act, 42 U.S.C. 1981 and

19    the California Constitution. It also demonstrates the great lengths to which they

20    go to silence any dissidents or whistleblowers, creating a reasonable fear of

21    retaliation for students, administrators or faculties who might otherwise provide

22    more direct evidence. This documented pattern of intimidation and suppression

23    creates a chilling effect, making direct testimony from internal sources

24    exceptionally difficult to obtain outside of discovery. Therefore, Plaintiffs' reliance

1    on compelling circumstantial evidence, coupled with their right to discovery, is not

2    only justified but essential to uncover the full extent of UC's unlawful

3    race-conscious practices.

4    221.    Professor Perry Link has provided a sworn affidavit attesting to his direct

5    knowledge of racial considerations in the university's faculty hiring practices, and

6    the retaliation he experienced. He is prepared to testify when this lawsuit

7    proceeds to trial.

8    222.    Professor C. L. has agreed to provide a sworn affidavit attesting to his direct

9    knowledge of racial considerations in the university's faculty hiring practices and

10    graduate students admissions. He is prepared to testify when this lawsuit

11    proceeds to trial.

12    223.    Professor G. B. has provided an affidavit attesting to their direct knowledge of

13    racial considerations in the university's faculty hiring practices and graduate

14    students admissions. G.B. is prepared to testify when this lawsuit proceeds to

15    trial. To protect against potential retaliation, their testimony will be provided under

16    a Protective Order with an "Attorneys' Eyes Only" (AEO) designation, pursuant to

17    Federal Rule of Civil Procedure 26(c).

18    224.    Plaintiffs also plan to subpoena testimonies from Professor Tim Groseclose

19    (see below).

20    225.    Professor Robert Mare passed away, unfortunately.

1   226.   Plaintiffs also plan to subpoena testimonies from the whistleblowers at UCLA

2       medical school.

### K. UC's Holistic Review is a Euphemism for Discrimination

4   227.   In the wake of *SFFA*, the percentage of Asian American students at top

5       universities surged, validating what had long been suspected: elite schools would

6       admit more qualified Asian students once merit was considered instead of race

7       — universities had simply chosen not to. It was only under the glare of legal

8       scrutiny that these institutions retreated from race-based practices they could no

9       longer justify or conceal.

10  228.   Not so at UC, where even after *SFFA* made clear that racial balancing

11      violates both the Equal Protection Clause and Title VI, UC responded not by

12      obeying the law, but with defiance.

13  229.   As currently adopted by UC, the preferred end run around anti-discrimination

14      law is called "holistic review." In public, "holistic" sounds like individualized

15      evaluation; inside the admissions office it operates as a euphemism for

16      race-balancing. The so-called "holistic" review appears less a rigorous evaluation

17      than a cover for subjective decision-making.

18  230.   UC uses "holistic review" as a backdoor to consider prohibited characteristics

19      such as race. UC is hardly alone in treating "holistic review" as a workaround.

20      This is an industry-wide practice. While UC is not the only school to adopt

21      "holistic" review to achieve race-based outcomes, it stands out as one of the

22      worst offenders.

231.    UC insists on implementing both "holistic reviews" and a "test-blind"
admissions policy. However, this position is inherently contradictory and makes
consistency even more elusive. A review cannot be truly holistic if it deliberately
excludes objective measures like standardized tests, especially for STEM
applicants where such metrics are crucial for assessing academic preparedness.
According to the UC Regents' Bylaws, the Academic Senate holds the authority
to "set the conditions of admissions." In 2020, the UC Academic Senate
overwhelmingly voted 51-0, with one abstention, to retain standardized tests
such as the SAT. Despite this overwhelming endorsement amid growing applicant
pools and widespread grade inflation, the UC Board of Regents, composed
primarily of political appointees, overruled the recommendation, raising
significant concerns about their underlying motivations. Although UC claimed in
2020 that it would develop a "new test," no such test was ever created, resulting
in the complete elimination of standardized testing from the admissions process.
This decision appears to be a calculated move to compromise intellectual
honesty and academic integrity, potentially facilitating the concealment of
discriminatory practices against Asian-American applicants. Notably, leading
institutions like MIT, Dartmouth, Yale, Brown, Harvard, Caltech, Cornell, and the
University of Texas at Austin have reinstated standardized testing, further
highlighting the questionable nature of UC's continued "test-blind" policy
post-COVID. The UC is increasingly isolated in its stance as an "SAT Denier",
where they avoid releasing objective data by refusing to collect it in the first
place. These circumstances necessitate legal scrutiny of UC's policy, its
underlying motivations, its disparate treatment of Asian-American applicants, and

1    whether UC continues to merit the traditional judicial deference granted to bona

2    fide academic institutions.

3    232.    Even the euphemism "holistic" suggests a thorough and individualized

4    evaluation process. However, based on UCLA's job posting, UCLA pays its

5    application readers just $2.57 per application. As a reference, the minimum wage

6    for hotel workers in Los Angeles is $22.50 per hour. Since UCLA requires its

7    application readers to hold at least a bachelor's degree, their effective wage

8    should meet or exceed this minimum. If we assume UCLA is not breaking the

9    minimum wage law, a reader would need to review at least 8.75 applications per

10    hour—less than seven minutes per application. UC's application readers must

11    evaluate each applicant's transcript, extracurricular activities, essays,

12    recommendation letters, and other application documents. A typical college

13    application has about 3000 words. Even if we assume a reader doesn't have to

14    look up anything mentioned in the application, pause to reflect, or compare

15    across applications, a reader needs to read over 437 words per minute, far

16    above the average college graduate reading speed of 235 words per minute.

17    This breakneck pace is entirely incompatible with any genuine notion of "holistic"

18    review. Compounding the challenge, readers are expected to maintain

19    consistency across 146,276 undergraduate applications (UCLA's 2024 applicant

20    pool). This is, in effect, a near-impossible task. By contrast, Google invests over

21    10 hours per interviewee, highlighting just how superficial UCLA's rapid

22    evaluations must be.

233.    Top UC administrator acknowledged the fact above. In an online panel discussion in July 2023 shortly after the Supreme Court's ruling in *SFFA v. Harvard*, Mr. Erwin Chemerinsky said, "You mentioned … looking at essays. We can do that in a law school where we get 8,000 applications. But Berkeley for its freshman class got 150,000 applications. Reading essays and giving them substantial weight becomes much more difficult in that context."

234.    Maintaining any meaningful level of consistency across such a vast pool, under severe time constraints, necessarily forces readers to rely heavily on easily digestible, quantifiable metrics such as SAT scores and GPA.

235.    Making matters worse, UC then removed the one merit-based yardstick that might have anchored these snap verdicts. Starting with the COVID-era 2021 cycle, UC dropped the SAT/ACT requirement for undergraduate admissions, and UC has kept that test-blind policy. In short, UC refuses to apply color-blind admissions policy but opts for test-blind policy instead.

236.    By discarding the most objective datapoint, UC ensures that admissions decisions lean harder than ever on discretionary, purportedly "holistic" factors. Indeed, the implementation of a 'test-blind' policy, especially given the disproportionate academic achievements of Asian American students on standardized tests, serves as an impermissible proxy for race.

237.    Yet when it comes to subjective criteria like "fit" or "contribution to campus culture," UC's reliance on quantifiable proxies becomes more troubling. On information and belief, UC uses race—or more accurately, self-reported racial

1    identity—or racial proxies as a crude stand-in, a convenient shortcut, that

2    "objectively" indicates cultural value, personality, and individual perspective.

3    These dehumanizing stereotypes reflect not genuine, individual assessment,

4    however, but racial profiling disguised as discretion.

5    238.    Universities, including UC, continue to engineer racial outcomes under the

6    cover of subjective judgment and plausible deniability. But this change in

7    terminology remains merely cosmetic; the discriminatory intent also remains.

8    239.    The one, true individual distinction that matters, individual merit, is

9    discounted so that Asian Americans may be excluded. UC bypasses the need for

10    any genuine individualized understanding but calls it "holistic." In this way,

11    "individualism" can only be recognized through the lens of racial group identity.

12    This turns equal protection on its head and reveals the extent to which UC has

13    (unfortunately) come to view race as a defining feature of personhood.

14    240.    The result is a process that is neither "holistic" nor individualized. It is a

15    rushed, inconsistent system that relies on superficial and impermissible

16    self-reported racial categorization to evaluate subjective traits.

17    241.    At some point after Proposition 209, UC rebranded its race-conscious policies

18    "holistic"—a transparent attempt to evade judicial scrutiny. After the adoption of

19    "holistic review" around 2007, UC became markedly more opaque regarding

20    race-related matters. UC deliberately discontinued public-facing websites that

21    had allowed researchers to examine correlations between student credentials,

22    race, and admissions decisions, as well as to analyze aggregated changes in

1   GPA, STEM attrition, and graduation rates by race. In 2018, UC refused to

2   provide Professor Richard Sander with anonymized, individual-level data on

3   student admissions and outcomes—data it had readily furnished for admissions

4   through 2006. This sustained effort to withhold critical admissions data

5   represents a significant departure from established transparency norms and

6   strongly suggests a pattern of conduct that cannot be explained on grounds other

7   than race, thereby offering compelling circumstantial evidence of discriminatory

8   intent under the *Arlington Heights* framework.

9   242.   Following the implementation of a holistic review system in 2007, UCLA

10  prohibited faculty members on its Admissions Committee from accessing its

11  admissions data. In response, Professor Tim Groseclose, a member of the

12  Admissions Committee, invoked whistleblower protection and resigned from

13  UCLA in protest. In his book *Cheating: An Insider's Report on the Use of Race in*

14  *Admissions at UCLA* (2014), Professor Groseclose described how then-UCLA

15  Chancellor Norm Abrams explicitly cited raising African American enrollment as

16  the motivation behind adopting holistic admissions. In reality, UC was searching

17  for subterfuge for reactivating racial preferences in admissions. The number of

18  blacks admitted as freshmen to UCLA roughly doubled after its adoption of

19  "holistic review". Ironically, between 2006, the last year of the pre-holistic system,

20  and 2007, the first year of the holistic system, admissions rates dropped for some

21  socio-economically disadvantaged ethnic groups. For example, the Latino rate

22  dropped from 18.3% to 16.8%, and the Vietnamese rate dropped from 28.6% to

23  21.4%. Furthermore, Professor Groseclose's statistical analysis showed that, for

a group of applicants receiving the same scores from their initial readers, UCLA admitted 55% poor African Americans, 38% rich African Americans, 23% poor North Asians and 18% rich North Asians. Note that *rich* African Americans were admitted much more frequently than *poor* North Asians. If affirmative action were truly about leveling the playing field, this outcome is indefensible. UC never disputed the accuracy of Professor Groseclose's account.

243.    Soon after 2007, top UC administrators began to encourage other UC campuses to adopt the same "holistic" approach that UCLA had implemented. In 2011, the Regents mandated that all UC campuses utilize either "holistic" or "comprehensive" review in undergraduate admissions.

244.    Discriminating against disadvantaged Asian students in favor of affluent Black (or Hispanic) applicants does not advance equality of opportunity — it betrays it. If the true objective were to level the playing field and expand opportunity for the disadvantaged, socioeconomic status would be a logical and equitable focus, one that would avoid violating the law's prohibition on racial discrimination (as is actually practiced in other states like Texas).

245.    Instead, UC explicitly rejects that approach precisely because it would not produce its desired racial engineering preferences. As Mr. Erwin Chemerinsky publicly acknowledged: "In her dissent, Justice Sotomayor said there could be benefits given on the grounds of socioeconomic status. The problem the University of California discovered was just giving a benefit based on socioeconomic status doesn't yield racial diversity." UC has remained fixated on race regardless of socioeconomic status.

246.    The implication is unmistakable: UC's priority is not to uplift the underserved, but to engineer a specific racial composition, even if that means favoring affluent non-Asian minority applicants over low-income Asian students. In doing so, UC betrays the professed moral foundation of affirmative action and reveals its true purpose—not equality of opportunity, but as a backdoor for invidious racial discrimination. UC and other elite institutions' policies reveal that the goal was never fairness— it is about achieving predetermined racial preferences, no matter whose rights are trampled.

247.    When Stanley applied for Fall 2023, the test-blind policy was in force, so his file reached the committee stripped of the one objective measure that might have anchored an honest comparison. Admissions readers—working at a seven-minute pace—were left to fill that vacuum with subjective cues and race-linked proxies, the very tools UC had crafted to preserve its preferred race-based demographic engineering. In short, Stanley was judged by a process "holistic" in name only: rushed, inconsistent, and driven by racial identity rather than by his extraordinary merit.

## L. A Prima Facie Case under the *McDonnell Douglas* Framework

248.    In addition to the analysis under the *Arlington Heights* framework, the circumstances surrounding Stanley Zhong's rejection also support a claim of racial discrimination under the *McDonnell Douglas* burden-shifting framework.

249.    To establish a prima facie case of racial discrimination in admissions under this framework, Plaintiff Stanley Zhong must demonstrate that:

1    (1) he is a member of a protected class;

2    (2) he was eligible for admission to the University;

3    (3) he was denied admission or otherwise treated adversely; and

4    (4) similarly situated individuals outside the protected class received more

5    favorable treatment.

6    Stanley Zhong satisfies each of these elements. *See McDonnell Douglas Corp. v.*

7    *Green,* 411 U.S. 792 (1973). In *Ames v. Ohio Dep't of Youth Services*, 605 U.S.

8    ___ (2025), the Supreme Court also unanimously reiterated its "instruction to

9    avoid inflexible applications of the prima facie standard. *Teamsters v. United*

10    *States*, 431 U. S. 324, 358. Pp. 4–7."

11    250.    First, Stanley is a member of a protected class—Asian Americans.

12    251.    Second, Stanley applied for admission to the Computer Science programs at

13    several University of California campuses for the Fall 2023 admissions cycle. He

14    was not merely qualified, but possessed exceptionally rare, objectively verifiable

15    qualifications. His achievements place him in the highest echelon of applicants

16    worldwide. These achievements include, but are not limited to:

17    • Dominance in High School Coding Competitions:

18    ○ Securing top ranks in multiple prestigious coding contests for his age

19    group, including placing #2 globally (#1 in the United States) in MIT's

20    Battlecode contest.

21    • Elite Performance in Professional Coding Competitions:

22    ○ Achieving the rank of 427 globally in the Google Code Jam semifinals, a

23    competition primarily for professional software engineers worldwide.

1          ○  Achieving the rank of 329 globally in the Meta (Facebook) Hacker Cup

2            semifinals, another competition primarily for professionals worldwide.

3      ● Innovation and Industry Recognition:

4          ○  Developing RabbitSign, a novel and unlimited free e-signing service that

5            gained significant traction. This service was lauded by Amazon Web

6            Services (AWS) in a technical review as "one of the most efficient and

7            secure accounts" they had ever reviewed.

8      ● Ultimate Professional Validation:

9          ○  Being hired by Google at age 18 for a software engineering position (Level

10           4) that ordinarily requires Ph.D.-level expertise or equivalent industry

11           experience.

12    Collectively, these accomplishments demonstrate that Plaintiff Stanley Zhong's

13    qualifications far exceeded the academic and technical standards required for

14    undergraduate admission to even the most selective university programs.

15    252.   Third, despite his extraordinary qualifications, Stanley was rejected by the

16    undergraduate Computer Science programs at all five UC campuses to which he

17    applied: UC Davis, UC Berkeley, UC Santa Barbara, UCLA, and UC San Diego.

18    253.   Fourth, the circumstances surrounding these rejections give rise to a strong

19    inference of racial discrimination. Preliminary investigation, including review of

20    publicly available information such as LinkedIn profiles, has identified non-Asian

21    students admitted to these Computer Science programs whose documented

22    academic performance, technical skills, and extracurricular achievements appear

23    substantially less distinguished than Stanley's exceptional, internationally

1    recognized accomplishments. For the Fall 2023 enrollment, these Computer

2    Science programs admitted 989 students at UC Davis, 375 at UC Berkeley, 1,006

3    at UC Santa Barbara, 368 at UCLA, and 1,621 at UC San Diego. It is practically

4    impossible that all the admitted students across these campuses possessed

5    qualifications equal to or exceeding Stanley's.

6    254.    On May 24, 2024, Plaintiff Nan Zhong emailed the UC's Directors of

7    Admissions and Computer Science department chairs, stating:

8        "Alternatively, if any of the CS chairs cc'd is willing to put their academic

9        reputation on the line, and vouch that all admitted non-Asian students are

10       reasonably equally or more qualified than the rejection cases we compiled,

11       that would move the conversation forward in a meaningful way too. Feel free

12       to use Stanley's case as an example rejection case."

13    No response was ever received. This silence speaks volumes and suggests that

14    the University's position may be untenable when confronted with comparative

15    applicant data.

16    255.    The rejection of a candidate with Stanley's exceptional credentials by five UC

17    campuses gives rise to a plausible inference that race, rather than merit, was a

18    determinative factor in the admissions decisions. This disparity warrants

19    discovery into the University's admissions records and decision-making

20    processes to assess the role of race under the then-prevailing legal framework

21    and to ensure compliance with current constitutional standards.

## 1 M. Corruption in UC's Admissions and Untrustworthy Top Management

2    256.   UC's admissions process has been repeatedly compromised by scandals

3    involving favoritism and fraud. In 2007, *The Daily Bruin*, UCLA's student

4    newspaper, uncovered significant ethical violations within the orthodontics

5    residency program. The investigation revealed that the program granted

6    preferential admissions to major donors and their relatives, directly contravening

7    UC policies. Internal emails and interviews exposed a systemic practice of

8    advancing donor-affiliated applicants despite lower qualifications, undermining

9    fairness and merit-based admissions.

10   257.   In 2020, UCLA men's soccer coach Jorge Salcedo was sentenced to eight

11   months in prison for his role in the Varsity Blues scandal. Mr. Salcedo facilitated

12   the fraudulent admission of students by falsely designating them as recruited

13   athletes with fabricated soccer credentials. Mr. Salcedo's actions could not have

14   been possible without substantial cooperation from the UC Admissions office.

15   258.   In response to the Varsity Blues scandal, UC conducted an internal review of

16   its admissions practices, concluding that only two cases involved potential

17   improper admissions. However, this self-assessment was sharply refuted by the

18   findings of the California State Auditor's report in 2020, which identified 64 cases

19   of inappropriate admissions. These cases involved preferential treatment due to

20   applicants' family donations and personal connections to campus staff. The

21   report also warned that the true number of compromised admissions could

22   exceed **400 students**—a far more pervasive issue than UC acknowledged.

1   259.   The audit highlighted systemic favoritism at UC Berkeley, stating that "UC

2          Berkeley Frequently Gave Preferential Treatment to Relatives and Friends of

3          Faculty, Staff, and Donors". This behavior exemplifies a disregard for fairness in

4          admissions decisions. In one egregious case, a UC Regent violated university

5          policies by advocating for a waitlisted applicant through a personal letter to the

6          UC Berkeley Chancellor; the applicant was subsequently admitted. Despite this

7          clear breach of policy, neither the Regent nor the Chancellor faced any

8          consequences.

9   260.   Compounding these concerns, the California State Auditor's report criticized

10         UC's Office of the President for failing to provide adequate oversight, which

11         allowed significant procedural weaknesses to persist across campuses. The

12         report explicitly stated, "The University Has Not Made Sufficient Changes

13         Following the National College Admissions Scandal". This pattern of inadequate

14         accountability and ineffective self-regulation raises serious doubts about UC's

15         commitment to integrity and fairness in admissions, warranting further scrutiny

16         and legal action to enforce compliance with constitutional and statutory

17         obligations.

18  261.   Following the release of the California State Auditor's report, UC President

19         Michael V. Drake claimed that UC's internal audit recommendations aligned with

20         those of the state auditor. However, the state auditor, who noted significant

21         differences between the two assessments, publicly refuted this assertion. The

22         state auditor warned that the entire UC admissions process requires an

1    **overhaul**, citing inconsistent standards and practices that allowed applicants to
2    be evaluated on inappropriate reasons.

3    262.    Further reinforcing these concerns, California State Auditor Grant Parks
4    stated in a July 2024 letter to a state lawmaker that UC's actions had failed to
5    adequately address the weaknesses identified in its 2020 recommendations.
6    Parks remarked, "We have found [UC's] responses to not address weaknesses
7    we have seen in their implementation of [the 2020] recommendation".

8    263.    This ongoing failure to implement meaningful reforms calls into question UC's
9    commitment to transparency, accountability, and equal treatment of all applicants.
10   The discrepancies between UC's internal audits and the findings of independent
11   oversight bodies demonstrate UC's systemic unwillingness to acknowledge and
12   correct entrenched problems within its admissions framework, jointly and
13   severally across its campuses.

14   264.    These cases illustrate a persistent pattern of unethical admissions practices
15   that prioritize personal connections and financial influence over academic merit.
16   The breadth and frequency of such incidents point to systemic flaws within UC's
17   admissions framework, necessitating comprehensive third-party oversight.

18   265.    Although UC may invoke autonomy as a shield against external scrutiny, its
19   repeated lapses in admissions integrity demonstrate that its autonomy cannot
20   supersede the need for transparency, fairness, and compliance with
21   anti-discrimination laws. Without robust external review mechanisms, the integrity
22   of UC's admissions system remains fundamentally compromised.

## N. UC Officials' Callous Indifference to Plaintiffs' Federally Protected Rights

266.   UC officials have consistently ignored or dismissed complaints regarding absurd admissions outcomes and allegations of racial discrimination, highlighting reckless or callous indifference to Plaintiffs' federally protected rights across the board.

267.   More than a year passed between Nan Zhong's initial complaint to the UC Board of Regents about Stanley's admission results and the filing of this lawsuit in February 2025, during which the Board took no meaningful action. Nan initially contacted the UC Board of Regents in November 2023, and spoke **four** times directly to the Board during the public comment period of the UC Board of Regents meetings. Nan specifically requested their action after the Admissions Office was apparently dismissive. Yet, the UC Board of Regents took no action. The entire UC Board of Regents demonstrated reckless or callous indifference to Plaintiffs' federally protected rights.

268.   Ms. Han Mi Yoon-Wu, UC's Associate Vice Provost and Executive Director of Undergraduate Admissions, repeatedly dismissed the complaints offhandedly, asserting that Nan's allegations of racial discrimination were unfounded because California law prohibits such practices. By that logic, any criminal could claim innocence simply because the law prohibits the very act they are accused of committing. When Nan questioned whether the mere existence of a law guaranteed compliance, Yoon-Wu failed to answer.

269. Doesn't Ms. Han Mi Yoon-Wu understand the absurdity of her statement? For someone with the level of her position, the answer must be yes. Her dismissive and irrational response can only be interpreted as an act of arrogant disregard for Asian applicants and their families, conveying an implicit message: *I can do and say whatever I want; there is nothing you can do about it. Get lost.*

270. Yoon-Wu's action demonstrated reckless or callous indifference to Plaintiffs' federally protected rights. It reveals an intentional disregard for legitimate grievances and a profound indifference to the university's constitutional duty to ensure an admissions process free from racial discrimination.

271. Michael V. Drake, the President of the University of California, and Katherine S. Newman, the Provost and Executive Vice President of Academic Affairs of the University of California, were both cc'd in the email exchanges between Nan and Han Mi Yoon-Wu. As a Regent, Mr. Drake was also present at the UC Board of Regents meetings when Nan made his comment to the Board multiple times over several months. Neither ever took any action. They demonstrated reckless or callous indifference to Plaintiffs' federally protected rights.

272. Nan also emailed Rich Lyons, Chancellor of UC Berkeley, on March 23, 2025 regarding Stanley's case. He never replied, demonstrating reckless disregard and callous indifference to Plaintiffs' federally protected rights.

273. All admissions directors and supervisors named as defendants exhibited reckless and callous indifference to Plaintiffs' federally protected rights by systematically prioritizing racial considerations over academic qualifications. This

1    is evidenced by the starkly discriminatory admissions outcomes produced under

2    their supervision. Despite unambiguous legal prohibitions against racial

3    preferences, these officials repeatedly rejected exceptionally qualified applicants,

4    including Stanley Zhong, whose academic and professional accomplishments far

5    exceeded typical admissions standards. They persisted in this unlawful conduct

6    notwithstanding public outcry, numerous complaints, and the well-established

7    legal framework prohibiting such practices in public education. Their actions were

8    not merely negligent—they reflected a deliberate and conscious disregard for

9    Plaintiffs' rights under federal and state law. This sustained pattern of knowing

10    indifference underscores the intentional nature of the harm inflicted upon

11    Plaintiffs and similarly situated individuals.

12    274.    Nan also contacted the Chairs of the Computer Science Departments at all

13    five UC campuses on multiple occasions, requesting their assessment of

14    Stanley's application. Only Professors Divyakant Agrawal and Todd Millstein

15    responded, expressing concern. The others failed to reply

16    altogether—demonstrating, at best, reckless disregard, and at worst, callous

17    indifference to Plaintiffs' federally protected rights.

18    275.    This cavalier attitude has only deepened the emotional distress suffered by

19    Stanley and Nan, compounding the harm inflicted by the University's

20    discriminatory practices.

21    276.    The denial of Stanley's applications to five UC campuses—combined with

22    UC's complete failure to even acknowledge the issue for over a year—cannot be

23    dismissed as mere random error. Rather, these actions reveal a pattern of

1    systemic bias and reckless or callous indifference to Plaintiffs' federally protected

2    rights, suggesting malice toward Stanley and, by extension, other similarly

3    situated Asian-American applicants. While it is true that Google's job offer came

4    after UC's rejections—meaning UC could not have foreseen that Google would

5    recognize Stanley's skills had already reached the Ph.D. level—the fundamental

6    issue remains: the technical achievements included in Stanley's UC applications

7    were substantially the same as those sent to Google. While Google found

8    Stanley's achievements sufficient to consider him for a Ph.D.-level position, UC,

9    in contrast, deemed him unqualified for undergraduate admission. This stark

10   contrast underscores a systemic barrier that profoundly affects Asian-American

11   applicants' experiences in college admissions. Even when their qualifications

12   reach the Ph.D. level, they may still be denied undergraduate admission. This

13   fosters a pervasive sense of helplessness—the belief that the system is rigged to

14   reject you regardless of your merits—that contributes significantly to the mental

15   health challenges within the Asian-American youth community.

16   277.    Disturbingly, after becoming aware of Google's assessment of Stanley's skills,

17   Co-Defendant UC had a year to respond but refused to engage in any

18   meaningful discussion about his applications, which only compounded the

19   emotional distress Stanley and Nan have endured.

20   278.    Co-Defendant UC, aware of the legal prohibitions against racial discrimination

21   in university admissions under the Fourteenth Amendment, Title VI, 42 U.S.C. §

22   1981, and the California Constitution, have every incentive to conceal the true

23   nature of their race-conscious decision-making processes. Plaintiffs allege that

1    Defendants acted with deliberate indifference to Plaintiffs' rights, but

2    acknowledge that the precise mechanisms of discrimination—such as how racial

3    balancing was operationalized, who authorized it, and whether specific metrics or

4    targets were used—are likely concealed in non-public communications and

5    internal documents. Co-Defendant UC are too smart to leave a direct paper trail

6    visible to the public. Courts have long recognized that discriminatory intent is

7    rarely documented overtly, and that plaintiffs must be permitted to use discovery

8    to obtain circumstantial and contextual evidence. See *Village of Arlington Heights*

9    *v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 266–68 (1977)

10    (permitting intent to be inferred from indirect evidence).

11    279.    Discovery is essential to uncover these non-public policies, communications,

12    and data. Plaintiffs have alleged sufficient facts to render their claims plausible.

13    The factual development of this case—particularly with respect to the roles of

14    individual defendants, internal deliberations, and race-conscious criteria used in

15    "holistic" review—must proceed through discovery, as the key evidence lies

16    within the exclusive control of Co-Defendant UC.

17 **O. Lack of Response by Government Officials**

18    280.    Stanley's mother filed a civil rights complaint with the Office for Civil Rights

19    (OCR) in the U.S. Department of Education. The complaint included all the

20    sixteen colleges that rejected Stanley. However, the OCR dismissed the case

21    after misinterpreting her email, relying on reasoning that directly contradicted her

22    intended meaning. When she pointed out the misunderstanding, the OCR

23    refused to reopen the case, stating it had been closed. The official dismissal

1    letter cited reasoning that the OCR knew was factually incorrect. Despite her

2    repeated requests to correct the letter and remove the inaccurate rationale, the

3    OCR declined to make any changes, even after she escalated the matter. ED's

4    failure to enforce civil rights laws has let the direct harm to Stanley and other

5    Asian-American applicants persist.

6    281.    Nan also raised his concerns with California Assemblymember Marc Berman,

7    mentioning that hundreds of his constituents were deeply concerned about UC's

8    admissions practices. Despite several email exchanges, Mr. Berman did not

9    respond substantively.

10   282.    Nan and other concerned Asian parents brought the issue to at least another

11   five California Assembly members and Senators. None of them took any action.

12   283.    In November 2023, Nan organized a petition that gathered over 4,000

13   endorsements for letters expressing concerns about UC admissions. These

14   letters were sent to Governor Gavin Newsom and Lt. Governor Eleni Kounalakis,

15   both of whom serve as ex officio Regents of the University of California. Neither

16   has replied.

17   284.    Plaintiffs have made every reasonable effort to engage in dialogue and

18   pursue resolution before filing this lawsuit.

19   **P. Minor Son as a Prospective Applicant Can Only Conclude That He Is Not**
20   **Welcome at UC**

21   285.    Minor Son is currently a junior in high school and anticipates applying to UC

22   during the 2026-2027 application cycle for fall 2027 enrollment.

286.  Like his brother, Minor Son is talented. Minor Son already demonstrates the academic excellence, intellectual curiosity, and extracurricular achievement that define top college applicants. Minor Son's current GPA stands at a perfect 4.0 (unweighted), even higher than Stanley's at the same stage, placing him among the very top of his class.

287.  He is actively preparing for the college admissions process. Although he has not yet taken the PSAT due to his grade level, he has registered to take the SAT and is researching prospective universities and majors. His advanced coursework and consistent academic performance position him for a strong showing on standardized tests.

288.  Outside the classroom, Minor Son exhibits a well-rounded and disciplined character. He has been a member of his high school's varsity cross-country team since his freshman year, he is a national-level Rubik's Cube competitor capable of solving the cube in 6.25 seconds during official events, and he has taught himself to juggle five balls. He has performed on stage at the second largest annual juggling festival in North America.

289.  However, based on Stanley's experience, Minor Son has learned of a consistent pattern in which UC discriminates against Asian American applicants because of their race.

290.  Minor Son is also discouraged and humiliated by repeated and public knowledge of UC's discrimination against Asian Americans in its admissions.

1   291.   Minor Son has also learned through friendship networks within his community

2   and through publicly available reports that Asian American students who speak

3   up for equal treatment under the law on UC campuses and throughout academia

4   are branded "racists" and ostracized on campus —reinforcing that UC's bias

5   extends beyond admissions into campus culture.

6   292.   Minor Son is aware of admissions statistics indicating that—even among the

7   most qualified—Asian Americans face significantly lower admission rates without

8   the 'correct' race for UC's race-based admissions process.

9   293.   Under Article III of the Constitution, as construed by precedents such as

10   *Gratz v. Bollinger* and *Northeastern Fla. Chapter*, an imminent discriminatory

11   barrier (like a university's admissions policy) constitutes a sufficient

12   "injury-in-fact" for standing.

13   294.   Both because of hard data indicating that the collective experience of Asian

14   Americans at UC is dismal in the admissions pool and also because of his direct

15   experience of his brother's hardship and rejection, Minor Son faces certain harm

16   if he applies to UC. In short, Minor Son has come to view application to UC as an

17   Asian American student, no matter how talented, as a fool's errand. Through its

18   actions, UC has concretely deterred Minor Son from applying for admission in the

19   future.

20   295.   In sum, while Minor Son is positioned to be a highly competitive applicant to

21   any elite university, he confronts a tangible and immediate risk and harm of

22   race-based discrimination at UC.

## Q. Asian Americans Face Hostility

296.    Public hostility toward Asian-American students asserting their legal rights is well-documented, particularly on college campuses.

297.    Asian Americans who challenge this discrimination do so at great personal risk. On campus, advocating for equal treatment under the law has been perversely rebranded as an attack on civil rights—an Orwellian inversion that suggests those rights belong only to the "right kind" of minority.

298.    At UC, as at many elite colleges, Asian Americans endure a dual-indignity —first, they are subjected to systemic discrimination in the admissions process. Then, should they be lucky enough to reach campus and object to that injustice, they are vilified as opponents of "equity" or "allies" of the oppressors or branded "racist."  This national climate manifests itself at UC and throughout the body of academic institutions. UC condemns discrimination against some groups, but celebrates discrimination against Asian Americans and other groups.

299.    For example, during the *SFFA v. Harvard* trial, widespread protests erupted against SFFA's challenge to race-conscious admissions, which hurt Asian-American applicants. Even after the Supreme Court ruled against Harvard, then-president Claudine Gay responded with open defiance, stating, "We will comply with the court's decision. But it doesn't change our values." While the first half of her statement reflects legal necessity, the latter half unmistakably signals defiance.

300.  Academics such as Professor Janelle Wong and Professor Viet Thanh Nguyen publicly asserted that no Asian American had suffered discrimination in the college admissions process, misleading the public with statements like, "Not a single Asian-American student has testified that they faced discrimination in the high-profile Harvard case." Such assertions are demonstrably inaccurate and serve to suppress legitimate grievances. On November 4, 2024, Nan challenged both Professor Janelle Wong and Professor Viet Thanh Nguyen to a public debate. Neither has replied.

301.  A particularly striking example occurred at a panel discussion following a screening of the MSNBC documentary *Admissions Granted* in San Francisco on May 9, 2024. The reaction of the audience, a few hundred people strong, vividly illustrated this hostility. When the moderator introduced a Harvard student advocating for race-conscious admissions, the room erupted in thunderous applause and cheers. In contrast, the Asian-American student whose case launched the *SFFA* lawsuit received only sparse clapping—approximately a quarter of which likely came from Nan alone.

302.  This pervasive social hostility—manifesting in microaggressions and overt hostility—discourages Asian-American students from challenging discriminatory policies, effectively silencing those who have been harmed. It is therefore reasonable to infer that numerous Asian-American applicants, either already harmed by UC's admissions practices or anticipating future discrimination, remain silent due to legitimate concerns about retaliation or social pressure.

303.   This hostile climate has a direct, suppressive effect on potential plaintiffs. Many Asian-American applicants rejected by UC initially expressed interest in joining this lawsuit. However, after spending just a few months on college campuses as freshmen, the vast majority of them withdrew.

## R. Summary of UC's Illegal Use of Race

304.   In sum, the compelling statistical and anecdotal evidence unequivocally demonstrates that the University of California has, and continues to, impermissibly use race as a factor in its operations. This pattern of unconstitutional conduct is evident across multiple critical functions:

   a.   Undergraduate Admissions:

      i.   As early as 2002, internal analyses and the public accusations of then-UC Board of Regents Chairman John Moores flagged racial discrimination in undergraduate admissions, despite official denials.

      ii.   While UC has since actively concealed its current undergraduate admissions data, the circumstantial evidence is overwhelming. Plaintiffs have documented

         1.   absurd individual rejections of exceptionally qualified Asian American applicants;

         2.   UC's pursuit of numerical racial targets, led by the Chancellors;

3.  racial disparities identified by Professor Tim Groseclose and Professor Robert Mare;

4.  profound disparities between standardized test scores and acceptance rates across racial groups;

5.  substantial gap between Asian population growth and its declining percentage in students admitted by UC; and

6.  precipitous drops in admission rates at some Asian-concentrated high schools.

iii.  These all powerfully indicate the continued, plausible use of race in UC's undergraduate admissions, discriminating against Asian Americans.

b.  Graduate School Admissions:

i.  Law School Admissions

Recent academic studies, such as the 2012 paper on law school admissions post-Proposition 209, illustrate a persistent, significant advantage for certain racial groups even after a ban on racial preference, strongly suggesting the continued, albeit covert, consideration of race.

ii.  Medical School Admissions

The precipitous decline in Asian matriculants at UCLA Medical School following the implementation of "Anti-Racism Roadmap"

1    policies, coupled with documented discussions of racial balancing

2    by admissions officials and the admitted practice of favoring specific

3    racial groups with significantly lower qualifications, provides

4    undeniable evidence of race-based decision-making.

5        iii. Whistleblower reports documented racial preference in graduate

6    admissions.

7    c.  Faculty Hiring:

8        i. Whistleblower reports, UC's pervasive use of diversity statements

9    as ideological litmus tests, and cluster hiring initiatives explicitly

10   designed to increase "minority" faculty representation, all confirm a

11   deeply embedded institutional culture of race-consciousness that

12   permeates hiring decisions. The admission by Dean Chemerinsky

13   of "unstated Affirmative Action" in faculty hiring and the use of

14   "proxies for race" in student admissions, explicitly advising

15   concealment, serves as a direct, unvarnished admission of intent to

16   evade constitutional prohibitions.

17       ii. Whistleblower reports documented not only racial preference in

18   faculty hiring but also senior UC administrators' retaliation against

19   faculties opposing this illegal practice.

20   305.  Additionally, senior UC administrators have made repeated public statements

21   expressing an intent to conceal the use of race in admissions and hiring.

1    306.    Co-Defendant UC's persistent obfuscation of its admissions data strongly

2        suggests a deliberate attempt to hide ongoing discriminatory practices.

3 **S. Legal Basis**

4    307.    In *SFFA v. Harvard*, 600 U.S. 181 (2023), the Supreme Court definitively held

5        that race-based admissions policies violate the Equal Protection Clause.

6    308.    UC's racially discriminatory admission policies and practices violate the Equal

7        Protection Clause of the Fourteenth Amendment to the United States

8        Constitution.

9    309.    UC's racially discriminatory admissions policies and practices also violate

10        Title VI of the Civil Rights Act of 1964, which prohibits racial discrimination in

11        programs receiving federal financial assistance.

12    310.    UC's racially discriminatory admissions policies and practices also violate 42

13        U.S.C. 1981, which prohibits racial discrimination in contracting.

14    311.    UC's racially discriminatory admissions policies and practices also violate

15        Article I, Section 31 of the California Constitution, which unequivocally states:

16        "The State shall not discriminate against, or grant preferential treatment to, any

17        individual or group on the basis of race, sex, color, ethnicity, or national origin in

18        the operation of public employment, public education, or public contracting."

19    312.    UC's actions represent a blatant and ongoing disregard for established

20        federal and state constitutional law, necessitating judicial intervention to restore

21        equal protection for all applicants, regardless of race.

313. In addition to direct evidence of discrimination, racial "prejudice or stereotype" may be proven through circumstantial evidence. *See Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 266 (1977).

314. When a plaintiff relies on the *Arlington Heights* method to establish intent, "the plaintiff need provide very little such evidence ... to raise a genuine issue of fact ...; any indication of discriminatory motive ... may suffice to raise a question that can only be resolved by a fact-finder." *Pac. Shores Props.*, 730 F.3d at 1159 (citations omitted).

315. While disparate impact is not the only factor in an *Arlington Heights* case, "showing disproportionate impact, even if not overwhelming impact, suffices to establish one of the circumstances evidencing discriminatory intent." *N. Carolina State Conference of NAACP v. McCrory*, 831 F.3d 204 (4th Cir. 2016).

316. Using the *Arlington Heights* method of proving intent, the court analyzes whether discriminatory purpose motivated a recipient's actions by examining factors such as statistics demonstrating a "clear pattern unexplainable on grounds other than race." *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 266 (1977).

317. In *International Brotherhood of Teamsters v. United States*, 431 U.S. 324 (1977), a case brought under the "pattern or practice" provision of Title VII, the Court stated that "statistics showing racial or ethnic imbalance are probative ... because such imbalance is often a telltale sign of purposeful discrimination." *Id.* at 339 n.20. Accordingly, statistical evidence of a sufficiently "gross disparity"

1    between the affected population and the general population may establish an

2    inference of intentional discrimination. *Hazelwood Sch. Dist. v. United States*, 433

3    U.S. 299, 307–08 (1977) ("Where gross statistical disparities can be shown, they

4    alone may in a proper case constitute *prima facie* proof of a pattern or practice of

5    discrimination.").

6    318.    In *Comm. Concerning Community Improvement v. City of Modesto*, 583 F.3d

7        690 (9th Cir. 2009), the Ninth Circuit Court of Appeals stated that "proof of

8        disproportionate impact on an identifiable group, such as evidence of 'gross

9        statistical disparities,' can satisfy the intent requirement where it tends to show

10       that some invidious or discriminatory purpose underlies the policy." The racial

11       disparities documented by Professor Tim Groseclose and Professor Robert

12       Mare, profound disparities between standardized test scores and acceptance

13       rates across racial groups, and precipitous drops in admission rates at

14       Asian-concentrated high schools, and the gap between Asian population growth

15       and its declining percentage in students admitted by UC, all strongly suggest

16       "gross statistical disparities."

17   319.    As the Supreme Court explained in *Columbus Board of Education v. Penick*,

18       443 U.S. 449, 464–65 (1979), "[a]ctions having foreseeable and anticipated

19       disparate impact are relevant evidence to prove the ultimate fact, forbidden

20       purpose. . . . [T]he foreseeable effects standard [may be] utilized as one of the

21       several kinds of proofs from which an inference of segregative intent may be

22       properly drawn. . . . Adherence to a particular policy or practice, with full

23       knowledge of the predictable effects of such adherence . . . is one factor among

1    many others which may be considered by a court in determining whether an

2    inference of segregative intent should be drawn." In light of the well-documented

3    racial disparities in SAT scores, the foreseeable impact of eliminating the SAT by

4    UC as an admissions criterion further supports an inference of racial intent.

5    320.    *FBI v. Fikre*, 601 U.S. 234 (2024) held that the presumption of good faith for

6    government actors is no longer good law. Specifically, *Fikre* held that the

7    requirement of proving that voluntary cessation is permanent "holds for

8    governmental defendants no less than for private ones," *id.* at 241.

9    321.    The Equal Protection Clause of the Fourteenth Amendment prohibits states

10   from denying any person "the equal protection of the laws." The Clause's "central

11   purpose is to prevent the States from purposefully discriminating between

12   individuals on the basis of race." See *Shaw v. Reno*, 509 U.S. 630, 642 (1993).

13   Thus, a state law or policy that discriminates on the basis of race is subject to

14   strict scrutiny, regardless of its intended beneficiaries. See *Adarand Constructors,*

15   *Inc. v. Peña*, 515 U.S. 200, 227 (1995).

16   322.    As the Supreme Court noted in *SFFA v. Harvard*, "College admissions are

17   zero-sum. A benefit provided to some applicants but not to others necessarily

18   advantages the former group at the expense of the latter." The distinction

19   between preferential treatment and adverse impact is illusory—both actions are

20   inherently racially motivated and inseparable, representing merely different ways

21   of describing the same net discriminatory conduct. In a zero-sum situation, when

22   assessing whether a policy constitutes racial discrimination, courts should focus

23   on the presence of racial intent, regardless of whether that intent manifests as

1    preferential treatment or adverse impact. As the Supreme Court affirmed in *SFFA*

2    *v. Harvard*, "[W]hat cannot be done directly cannot be done indirectly. The

3    Constitution deals with substance, not shadows," and the prohibition against

4    racial discrimination is "levelled at the thing, not the name." *Cummings v.*

5    *Missouri*, 71 U.S. (4 Wall.) 277, 325, 18 L.Ed. 356 (1867).

6    323.   The argument that Asian Americans are over-represented in UC's student

7    body relative to the general population does not negate claims of discrimination.

8    Equal protection requires that individuals be treated as individuals, not as

9    members of a racial class. See *Miller v. Johnson*, 515 U.S. 900, 911 (1995). Even

10    if aggregate Asian enrollment remains relatively high, systemic bias may

11    suppress their numbers below what they would be in a race-neutral system.

12    "[I]nvidious discrimination does not become less so because the discrimination

13    accomplished is of a lesser magnitude." See *Personnel Administrator of*

14    *Massachusetts v. Feeney*, 442 U.S. 256, 277 (1979). The "law's focus on

15    individuals rather than groups [is] anything but academic." *Bostock* v. *Clayton*

16    *County*, 590 U.S. 644, 659 (2020). Chief Justice John Roberts unequivocally

17    articulated in *SFFA v. Harvard* that "the student must be treated based on his or

18    her experiences as an individual—not on the basis of race."

19    324.   Further supporting this action, in *Ames v. Ohio Dep't of Youth Services*, 605

20    U.S. ___ (2025), the Supreme Court unanimously held that Title VII protects

21    "individuals," not groups, and protects "minority and majority" alike. It reaffirmed

22    two key principles: first, that "the standard for proving disparate treatment under

23    Title VII does not vary based on whether the plaintiff is a member of a majority

1    group"—a principle that logically extends to Title VI, particularly for groups that

2    may be overrepresented in a college's student body relative to the general

3    population; and second, the Court reiterated its longstanding guidance against

4    rigid or inflexible applications of the prima facie standard.

5    325.   Further supporting this action, in *Chinese American Citizens Alliance of*

6    *Greater New York (CACAGNY) v. Adams*, 116 F.4th 161 (2d Cir. 2024), the

7    Second Circuit Court of Appeals unanimously affirmed that an equal protection

8    claim may proceed if "any individual has been negatively affected or harmed by a

9    discriminatory law or policy based on race, even if there is no disparate impact

10   on members of that racial class in the aggregate."

11   326.   The Second Circuit Court of Appeals further held that a facially neutral policy

12   driven by racial motives violates equal protection, even if aggregate enrollment

13   improves. The ruling states "if discriminatory intent is proven, a negative effect or

14   harm from that discriminatory policy on individual Asian-American students

15   applying to the SHSs [Specialized High Schools] would be sufficient to trigger

16   strict scrutiny review". The court further held that a policy or a program "is not

17   immunized from strict scrutiny because it underperforms in an unconstitutional

18   mission with respect to a targeted racial group in the aggregate." Therefore,

19   policies aiming to reach HSI designation at UC—whether or not the 25% target

20   has been met—are subject to strict scrutiny and won't survive it.

21   327.   Moreover, *CACAGNY* rejected the defense that admitting students to any

22   school within a system negates discrimination claims. The Second Circuit Court

23   stated that denying a student access to their preferred institution due to race is

1    actionable. Similarly, admitting Asian-American students to less selective UC

2    campuses does not absolve more selective campuses from discrimination

3    claims.

4    328.    In *CACAGNY*, the Second Circuit Court stated that "Applying Supreme Court

5    precedent, we have generally recognized three types of discriminatory laws: (1) a

6    facially discriminatory law or policy that expressly classifies individuals on the

7    basis of race; (2) a facially neutral law that is enforced in a discriminatory fashion;

8    and (3) a facially neutral law that was adopted with discriminatory intent and

9    resulted in a discriminatory effect. *See Chabad Lubavitch of Litchfield Cnty., Inc.*

10   *v. Litchfield Hist. Dist. Comm'n,*768 F.3d 183, 199 (2d Cir. 2014)."

11   329.    For UC, all three types of discriminatory policies and practices identified by

12   the Second Circuit Court are evident:

13        a. **Facially discriminatory policies**: Ample evidence shows that UC

14           employs explicitly race-based discriminatory policies–including numerical

15           racial targets–that are directly tied to student admissions.

16        b. **Discriminatory enforcement**: UC's regular and frequent absurd and

17           incongruous admission outcomes strongly indicate that UC exercises its

18           admissions policies in a discriminatory fashion.

19        c. **Discriminatory intent and effect**: UC's official statements and its senior

20           administrator have repeatedly expressed a desire and intent to use race in

21           admissions. There is substantial evidence of adverse effects on

22           Asian-American applicants, both individually and collectively. Additionally,

23           UC's faculty hiring practices and graduate admissions are demonstrably

1    racially motivated, resulting in disparate treatment of various racial groups.

2    Moreover, a senior UC administrator openly advocated for circumventing

3    legal scrutiny by ensuring racial intent was carried out without being

4    explicitly documented—effectively endorsing discrimination through covert

5    means.

6    These actions constitute violations of the Equal Protection Clause of the

7    Fourteenth Amendment, Title VI of the Civil Rights Act of 1964, 42 U.S.C 1981,

8    and Article I, Section 31 of the California Constitution.

## 9 V. CLAIMS FOR RELIEF

## 10 COUNT I - Violation of the Equal Protection Clause, U.S. Const. Amend. XIV

## 11 (Against the Individual Defendants at UC in their Official and Personal Capacities)

12    330.    Plaintiffs reallege and incorporate by reference the allegations set forth

13    above.

14    331.    Taken together, the facts presented form a consistent, disturbing pattern of

15    intentional racial discrimination—one that culminated in the rejection of Stanley

16    Zhong and the discouragement of his brother Minor Son, not because they lack

17    merit, but because they do not fit the racial profile Co-Defendant UC wants to

18    engineer.

19    332.    Plaintiffs bring this claim under 42 U.S.C. § 1983 to vindicate rights secured

20    by the Equal Protection Clause of the Fourteenth Amendment.

333.    The equal protection clause of the Fourteenth Amendment prohibits state actors from denying individuals equal protection of the laws, including through the use of race as a motivating factor in government decision-making.

334.    The discriminatory intent of Co-Defendant UC can be inferred from a constellation of evidentiary factors, including: (1) the demonstrable statistical evidence of disparate impact on Asian Americans in admissions; (2) their historical track record of discrimination against Asian Americans in admissions; (3) the sequence of events demonstrating their resolute opposition to legal mandates to evaluate admissions candidates without regard to racial preference; and (4) their deviations from regular procedures or substantive norms of racial equality and evaluation of academic candidates on the basis of merit regardless of race.

335.    As a public institution, Co-Defendant UC's admissions policies and practices violate the Equal Protection Clause of the Fourteenth Amendment by intentionally discriminating against Asian-American applicants, including Stanley, on the basis of race.

336.    Excluding Defendant Divyakant Agrawal and Defendant Todd Millstein, Co-Defendant UC's acts and omissions were motivated by malicious and oppressive motives, or in deliberate or reckless disregard of the plaintiffs' constitutional rights, namely to discriminate on the basis of race, and involved reckless or callous indifference to Stanley's and Minor Son's constitutionally protected rights. Their conduct was undertaken in the face of the known, perceived risk that their actions violated federal or state law.

337. As a result of the illegal discrimination by Co-Defendant UC, Plaintiffs have suffered direct and indirect damages in an amount to be determined at trial.

338. Plaintiffs have been and will continue to be injured or face imminent harm by Co-Defendant UC's ongoing discriminatory admissions policies, which deny them an equal opportunity to compete for admission based on race or ethnicity.

339. Plaintiffs are entitled to a declaratory judgment and a permanent injunction because there is no plain, adequate, or speedy remedy at law to prevent Co-Defendant UC from continuing to use admissions policies and practices that discriminate on the basis of race or ethnicity in violation of the Fourteenth Amendment and because the harm Plaintiffs will otherwise continue to suffer is irreparable. Co-Defendant UC, excluding Defendant Divyakant Agrawal and Defendant Todd Millstein, acted with callous indifference to Plaintiffs' rights under the Equal Protection Clause. Accordingly, Plaintiffs seek punitive damages to deter such unconstitutional conduct.

340. Plaintiffs seek this relief under 42 U.S.C. § 1983 and any other law that might supply a cause of action for the requested relief, including the Declaratory Judgment Act (28 U.S.C. § 2201) and the implied cause of action recognized in *Ex parte Young*, 209 U.S. 123 (1908).

341. Plaintiffs seek this relief only against the individual defendants at UC, and not against the institutional defendants.

1 **COUNT II - Violation of Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d)**
2 **(against the University of California)**

3   342.   Plaintiffs reallege and incorporate by reference the allegations set forth
4       above.

5   343.   Plaintiffs bring this claim under Title VI of the Civil Rights Act of 1964, which
6       prohibits any program or activity receiving federal financial assistance from
7       subjecting individuals to discrimination on the basis of race.

8   344.   UC receives substantial federal funding and is therefore subject to the
9       requirements of Title VI.

10   345.   Although Title VI does not, by its terms, incorporate constitutional standards,
11       the Supreme Court has made clear that a Title VI claim for racial discrimination in
12       admissions is coextensive with a claim under the Equal Protection Clause.

13   346.   For the reasons set forth earlier in this complaint, Plaintiffs allege that UC
14       intentionally discriminated against Asian-American applicants, including Stanley
15       and Minor Son, on the basis of race, in direct violation of Title VI.

16   347.   As a result of the illegal discrimination by Co-Defendant UC, Plaintiffs have
17       suffered direct and indirect damages in an amount to be determined at trial.

18   348.   Plaintiffs have been and will continue to be injured or face imminent harm by
19       Co-Defendant UC's ongoing discriminatory admissions policies, which deny them
20       an equal opportunity to compete for admission based on race or ethnicity.

349.    Plaintiffs are entitled to a declaratory judgment and a permanent injunction because there is no plain, adequate, or speedy remedy at law to prevent Co-Defendant UC from continuing to use admissions policies and practices that discriminate on the basis of race or ethnicity in violation of Title VI of the Civil Rights Act of 1964 and because the harm Plaintiffs will otherwise continue to suffer is irreparable.

350.    Plaintiffs seek this relief under Title VI, 42 U.S.C. § 1983, and any other law that might supply a cause of action for the requested relief, including the Declaratory Judgment Act (28 U.S.C. § 2201) and the implied cause of action recognized in *Ex parte Young*, 209 U.S. 123 (1908).

351.    Plaintiffs seek this relief only against the institutional defendants UC and not the individual defendants.

## COUNT III - Violation of 42 U.S.C. § 1981

## (Against the Individual Defendants at UC in their Official and Personal Capacities)

352.    Plaintiffs reallege and incorporate by reference the allegations set forth above.

353.    42 U.S.C. § 1981(a) guarantees individuals the same right to make and enforce contracts without regard to race. This includes the right to enter into contracts for educational services at public universities. UC is a public institution bound by this statutory obligation.

354.   42 U.S.C. § 1981(a) protects whites (and Asians) on the same terms that it protects "underrepresented" racial minorities. *See McDonald v. Santa Fe Trail Transportation Co.*, 427 U.S. 273, 295 (1976) ("[T]he Act was meant, by its broad terms, to proscribe discrimination in the making or enforcement of contracts against, or in favor of, any race.").

355.   Stanley and Minor Son are members of a protected class, namely Asian Americans by race and national origin.

356.   Stanley and Minor Son are objectively qualified for admissions to UC.

357.   Stanley was objectively evaluated by Google as possessing Ph.D.-level qualifications.

358.   Minor Son, though still in high school, has already demonstrated academic excellence, intellectual maturity, and exceptional extracurricular involvement that place him on track to be a top-tier college applicant. He maintains a perfect 4.0 GPA, outpacing Stanley at the same stage, and exhibits advanced cognitive abilities—including multiple six-second Rubik's Cube solves in official competition, five ball juggling on stage at national festival, varsity athletic performance, and deep engagement with intellectual pursuits.

359.   Stanley was rejected from UC despite the fact that his credentials placed him in the top echelon of applicants, not only by UC's standards but by the highest standards of academic institutions nationwide.

360.    Many similarly situated, non-Asian applicants were accepted despite having inferior credentials whereas Stanley was rejected.

361.    Co-Defendant UC's race-based admission standards have discouraged and preemptively prevented Minor Son from contracting with UC.

362.    Co-Defendant UC's decision to deny Stanley admission was not made in a vacuum. As detailed in the preceding sections of this complaint, Co-Defendant UC has repeatedly affirmed its commitment to racially balancing its student body, has publicly stated that "It makes little sense to exclude any consideration of race in admissions," and has continued to rely on "holistic review" as a smokescreen for race-based admissions even after the Supreme Court's ruling in *SFFA v. Harvard*.

363.    The stark statistical disparities in admission rates by race, Co-Defendant UC's long and well-documented history of defending race-based preferences, and its continued resistance to race-neutral alternatives provide overwhelming circumstantial evidence that Stanley's race was the but-for cause of his rejection. Had he not been Asian American, his application would have received materially different treatment. That is precisely what § 1981 forbids.

364.    Accordingly, Co-Defendant UC violated 42 U.S.C. § 1981 by discriminating against Asian Americans, and Plaintiffs seek all appropriate legal and equitable remedies.

365. As a result of Co-Defendant UC's discriminatory policies and practices, Plaintiffs have suffered harm, including the loss of educational opportunities, emotional distress, financial loss, and reputational damage.

366. Plaintiffs have been and will continue to be injured or face imminent harm by Co-Defendant UC's ongoing discriminatory admissions policies, which deny them an equal opportunity to compete for admission based on race or ethnicity.

367. Plaintiffs are entitled to a declaratory judgment and a permanent injunction because there is no plain, adequate, or speedy remedy at law to prevent Co-Defendant UC from continuing to use admissions policies and practices that discriminate on the basis of race or ethnicity in violation of 42 U.S.C. § 1981 and because the harm Plaintiffs will otherwise continue to suffer is irreparable. Co-Defendant UC, excluding Defendant Divyakant Agrawal and Defendant Todd Millstein, acted with callous indifference to Plaintiffs' federally protected rights. Accordingly, Plaintiffs seek punitive damages to deter such illegal conduct.

368. Plaintiffs seek this relief under 42 U.S.C. § 1983, as well as the implied right of action that the Supreme Court has recognized to enforce 42 U.S.C. § 1981(a), and any other law that might supply a cause of action for the requested relief, including the Declaratory Judgment Act (28 U.S.C. § 2201) and the implied cause of action recognized in *Ex parte Young*, 209 U.S. 123 (1908). *See Johnson v. Railway Express Agency, Inc.*, 421 U.S. 454, 459–60 (1975) and *Runyon v. McCrary*, 427 U.S. 160 (1976).

369. Plaintiffs seek this relief only against the individual defendants at UC, and not against the institutional defendants.

370. The text of 42 U.S.C. § 1981(a) makes no exceptions for "compelling state interests," "student-body diversity," or race-based affirmative-action programs. It prohibits all forms of racial discrimination in contracting—regardless of whether that racial discrimination is independently prohibited by the Equal Protection Clause.

## COUNT IV - Violation of California Constitution (Article I, Section 31)

## (Against UC And All Individual Defendants at UC in Their Official and Personal Capacities)

371. Plaintiffs reallege and incorporate by reference the allegations set forth above.

372. Article I, Section 31 of the California Constitution prohibits racial discrimination in public education. UC's discriminatory admissions policies and practices violate this provision by denying Asian-American applicants, including Stanley, equal access to public educational opportunities.

373. Co-Defendant UC here has acted under the color of state law.

374. Co-Defendant UC's continued use of race as a factor in undergraduate admissions, however obscured by euphemism or cloaked in "holistic" rhetoric, is a direct violation of the California Constitution.

375.    Co-Defendant UC's own public statements and internal materials confirm that race continues to play a determinative role in its operations. Co-Defendant UC has openly resisted race-neutral alternatives and has declared that "It makes little sense to exclude any consideration of race in admissions."

376.    Co-Defendant UC has also conceded, in court filings and public commentary, that race-neutral alternatives have not produced the racial outcomes it desires—thereby confirming that race remains a central feature of its admissions design.

377.    Stanley and Minor Son are denied equal consideration for admission to UC because of their race.

378.    That is precisely the kind of discriminatory and preferential treatment that Article I, Section 31 forbids. Co-Defendant UC's conduct constitutes a plain and ongoing violation of Article I, Section 31 of the California Constitution. Plaintiffs seek all appropriate legal and equitable remedies.

379.    As a result of Co-Defendant UC's discriminatory policies and practices, Plaintiffs have suffered harm, including the loss of educational opportunities, emotional distress, financial loss, and reputational damage.

380.    Plaintiffs have been and will continue to be injured or face imminent harm by Co-Defendant UC's ongoing discriminatory admissions policies, which deny them an equal opportunity to compete for admission based on race or ethnicity.

1    381.    Plaintiffs are entitled to a declaratory judgment and a permanent injunction

2    because there is no plain, adequate, or speedy remedy at law to prevent

3    Co-Defendant UC from continuing to use admissions policies and practices that

4    discriminate on the basis of race or ethnicity in violation of Article I, Section 31 of

5    the California Constitution and because the harm Plaintiffs will otherwise

6    continue to suffer is irreparable.

7  **COUNT V - Violation of the Due Process Clause of the Fifth Amendment**

8  **(Against ED And Secretary Linda McMahon in Her Official Capacity)**

9    382.    Plaintiffs reallege and incorporate by reference the allegations set forth

10    above.

11    383.    Co-Defendant ED's use of numerical racial targets, including but not limited to

12    the 25% Hispanic enrollment requirement for Hispanic-Serving Institutions (HSI)

13    status under 20 U.S.C. § 1101a, constitutes racial discrimination in violation of

14    the Due Process Clause of the Fifth Amendment, which encompasses equal

15    protection principles.

16    384.    The Fifth Amendment prohibits the federal government from treating

17    individuals differently based on race unless the policy is narrowly tailored to

18    serve a compelling governmental interest. Co-Defendant ED's racial targets fail

19    this standard, functioning as rigid racial quotas that unlawfully disadvantage

20    students of non-preferred racial groups, including Asian-American applicants.

21    The HSI program facially discriminates based on ethnicity. The program also

1    unconstitutionally requires and encourages universities to discriminate against

2    students based on ethnicity.

3    385.    The constitutional bans on ethnic discrimination "operat[e] as a specific

4    constitutional limitation upon the exercise by Congress of the taxing and

5    spending power." *Flast v. Cohen*, 392 U.S. 83, 104 (1968); *see, e.g., South*

6    *Dakota v. Dole*, 483 U.S. at 210-11 ("a grant of federal funds conditioned on

7    invidiously discriminatory state action … would be an illegitimate exercise of the

8    Congress' broad spending power").

9    386.    The Supreme Court in *SFFA* reaffirmed that the Equal Protection Clause does

10   not tolerate classifications that treat individuals differently on the basis of race.

11   The HSI program does exactly that by tying eligibility to whether a school enrolls

12   a critical mass of students from one racial category.

13   387.    As a direct result of ED's unlawful policies and programs, Plaintiffs have been

14   and will continue to be injured and face imminent harm, including the denial of

15   equal access to federally funded educational programs, loss of educational

16   opportunities, financial loss, reputational damage, and emotional distress

17   resulting from the perception that the federal government endorses racial

18   discrimination in higher education.

19   388.    Plaintiffs seek only non-monetary relief against Co-Defendant ED.

**COUNT VI - Agency Action in Excess of Statutory Authority (Ultra Vires)**

**(Against ED And Secretary Linda McMahon in Her Official Capacity)**

389.  Plaintiffs reallege and incorporate by reference the allegations set forth above.

390.  Congress created the "Hispanic-Serving Institutions" ("HSI") program under Titles III and V of the Higher Education Act, defining HSIs as higher education institutions with at least 25% full-time equivalent undergraduate Hispanic enrollment.

391.  While Congress authorized ED to administer grant programs for HSIs, it did not authorize ED to require, induce, or pressure universities to adopt racially preferential admissions policies in order to qualify for or retain HSI status.

392.  ED has exceeded the scope of congressional authorization by interpreting and implementing the HSI program in ways that condition substantial federal funding on the maintenance or expansion of particular racial enrollment percentages. ED's administration of the program pressures universities—including the University of California—to treat race as a determinative factor in admissions in order to secure eligibility for HSI grants.

393.  This implementation is ultra vires because Congress never authorized ED to compel or incentivize institutions to engage in racial discrimination in admissions. The statute is a funding mechanism, not a license to disregard constitutional limits.

1    394.    Moreover, even if Congress had purported to authorize ED to incentivize

2    racial preferences in admissions, such authorization would itself be

3    unconstitutional. As the Supreme Court held in *Adarand Constructors, Inc. v.*

4    *Peña*, 515 U.S. 200 (1995), all racial classifications imposed by the federal

5    government are subject to strict scrutiny. The Court's decision in *SFFA v.*

6    *Harvard*, 600 U.S. 181 (2023), further clarified that racial balancing and

7    race-based admissions preferences are unconstitutional.

8    395.    ED's implementation of the HSI program, by requiring or pressuring

9    institutions to pursue numeric racial enrollment goals, is indistinguishable from

10    the racial balancing condemned in *SFFA*. It transforms a funding statute into a

11    tool for unconstitutional discrimination, coercing universities to adopt racially

12    preferential admissions policies that disadvantage Asian-American applicants.

13    396.    The Constitution forbids such an outcome. Federal agencies may not

14    implement congressional statutes in ways that compel unconstitutional conduct.

15    See *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 125 (2000) (an

16    agency may not exercise its authority in a manner inconsistent with the governing

17    statute or the Constitution).

18 **COUNT VII - Violation of the Administrative Procedure Act (APA)**

19 **(Against ED And Secretary Linda McMahon in Her Official Capacity)**

20    397.    Plaintiffs reallege and incorporate by reference the allegations set forth

21    above.

398.    ED's failure to investigate and enforce federal anti-discrimination laws, including Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d), constitutes arbitrary and capricious agency action in violation of the Administrative Procedure Act (APA), 5 U.S.C. § 706.

399.    ED's OCR dismissed the complaint filed by Plaintiffs after misinterpreting an email, refused to reopen the case even after the error was pointed out, issued an official dismissal letter citing a rationale it knew to be false, and refused to correct it after repeated requests and escalation. In doing so, the OCR has abdicated its statutory duties under Title VI. The OCR's actions were arbitrary, capricious, and an abuse of discretion in violation of the APA. They are indicative of a systemic failure. What Plaintiffs challenge is not just a single decision not to enforce, but rather the *irrational process* and the *manner* in which the OCR dismissed the complaint.

400.    The APA's bar for actions "committed to agency discretion" does not apply when statutory mandates provide a clear standard for assessing ED's actions. For Title VI regulations, 34 C.F.R. § 100.7(c) states:

> The responsible Department official or his designee will make a prompt investigation whenever a compliance review, report, complaint, or any other information indicates a possible failure to comply with this part.

Note that it does not say the official "may" or "can" investigate. It says the official "will" make a prompt investigation. This language is mandatory, not discretionary. While the ED had discretion in writing its regulations, once those regulations

1  were finalized, it is legally bound to follow them. The duty to investigate is

2  triggered whenever information (like Plaintiffs' complaint filed with OCR)

3  "indicates a possible failure to comply."

4  401.  While the statute grants broad authority, ED used that authority to impose a

5  specific, non-discretionary duty upon itself through its own regulations. Therefore,

6  ED's OCR's failure to conduct a proper and prompt investigation into Plaintiffs'

7  complaint—especially after Plaintiffs pointed out its clear misinterpretation of the

8  facts—was not a lawful exercise of discretion but a failure to follow its own

9  binding rules, making its action arbitrary, capricious, and an abuse of discretion

10  under the Administrative Procedure Act.

11  402.  In *Adams v. Richardson*, 480 F.2d 1159 (D.C. Cir. 1973), the D.C. Circuit held

12  that Title VI was judicially enforceable. It further held that federal agencies cannot

13  ignore substantial allegations of discrimination under Title VI, affirmatively

14  requiring agencies to investigate and act on complaints of unlawful

15  discrimination.

16  403.  The supposed alternative remedy of suing individual universities is wholly

17  inadequate to address the systemic harm caused by the Department of

18  Education's abdication of its statutory duties. Plaintiffs' civil rights complaint to the

19  Office for Civil Rights (OCR) named all sixteen colleges that rejected Stanley, yet

20  the agency summarily refused to investigate any of them. It is financially and

21  logistically prohibitive for Plaintiffs to bring separate legal actions against every

22  one of these institutions across the country. Consequently, a victory against UC

23  or any small subset of these colleges would provide no remedy for the

1    discriminatory practices that may be occurring at the remaining institutions. The

2    ED is the only entity with the mandate to address such widespread, systemic

3    failures. By refusing to act, the ED's abdication of its investigative duties not only

4    injured Stanley but also creates an imminent and irreparable harm by leaving

5    Nan's Minor Son vulnerable to the same unaddressed discrimination as he

6    prepares to apply to colleges.

7    404.    Furthermore, correcting the wrong by UC does not remedy ED's statutory and

8    constitutional failure to investigate and enforce anti-discrimination laws, which is

9    itself harmful and reviewable. A legal victory against UC will not:

10        • Strike down the ED's unconstitutional numerical racial targets in its grant

11            programs.

12        • Force the ED's Office for Civil Rights to reform its broken and arbitrary

13            complaint-handling process.

14    405.    Therefore, there is no alternative remedy for the specific injuries caused by

15    ED's actions and inaction.

16    406.    In sum, ED's refusal to investigate Plaintiffs' administrative complaint violates

17    clear statutory obligations under Title VI of the Civil Rights Act, which expressly

18    requires investigation of discrimination claims. Thus, ED's inaction is not

19    "committed to agency discretion" and is subject to judicial review under the APA.

20    Further, no adequate alternative remedy exists for ED's unlawful abdication of its

21    investigative responsibilities, making judicial review both proper and necessary.

1   407.   As a direct result of ED's unlawful actions and omissions, Plaintiffs have been

2   and will continue to be injured and face imminent harm, including the denial of

3   equal access to federally funded educational programs, loss of educational

4   opportunities, financial loss, reputational damage, and emotional distress caused

5   by ED's failure to uphold anti-discrimination protections in higher education.

6   408.   Plaintiffs seek only non-monetary relief against Co-Defendant ED.

## 7 VI. PRAYER FOR RELIEF

8 WHEREFORE, Plaintiffs seek the following relief pursuant to 42 U.S.C. §§ 1983, 1988,

9 Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 1981, the Fourteenth Amendment,

10 the California Constitution, the Fifth Amendment and the Administrative Procedure Act.

11 Plaintiffs respectfully request that this Court:

12   409.   Declaratory and Injunctive Relief Regarding Federal Racial Targets

13           a. Declare that the statutory racial enrollment targets used to determine

14               eligibility for designations such as Hispanic-Serving Institutions status

15               under 20 U.S.C. § 1101a violate the Equal Protection component of the

16               Fifth Amendment.

17           b. Declare that ED's implementation of the HSI program is ultra vires to the

18               extent it conditions funding on racial enrollment percentages or otherwise

19               pressures universities to adopt racially preferential admissions policies.

20           c. Permanently enjoin the Department of Education and its Secretary from

21               conditioning federal funding on numerical racial classifications not

22               narrowly tailored to serve a compelling government interest.

410.  Administrative Procedure Act Relief Regarding ED OCR's Inaction

    a.  Declare that OCR's failure to act on complaints alleging systemic racial discrimination by federal fund recipients constitutes agency action unlawfully withheld or unreasonably delayed under 5 U.S.C. § 706(1).

    b.  Remand to OCR with instructions to review and resolve the referenced complaints in a manner consistent with federal anti-discrimination law and constitutional requirements.

411.  Declaratory and Injunctive Relief Regarding Co-Defendant UC

    a.  Declare that Co-Defendant UC's student admissions and faculty hiring policies and practices violate:

        i.  The Fourteenth Amendment to the U.S. Constitution,

        ii.  Title VI of the Civil Rights Act of 1964,

        iii.  42 U.S.C. § 1981, and

        iv.  Article I, Section 31 of the California Constitution (Proposition 209).

    b.  Issue a permanent injunction prohibiting Co-Defendant UC from using race, ethnicity, or proxies thereof in admissions decisions or hiring practices.

    c.  Issue a permanent injunction requiring Co-Defendant UC to conduct all admissions in a manner that does not permit those engaged in the decisional process to be aware of or learn the race or ethnicity of any applicant for admission.

    d.  Issue an injunction prohibiting Co-Defendant UC from retaining or reinstating personnel found personally liable without remedial controls in place.

1   412.   Oversight & Mandatory Training at UC

2          a. Upon a finding of ongoing noncompliance, appoint a court monitor to

3             oversee all decisions relating to Co-Defendant UC's student admissions to

4             ensure that these decisions are free from racial discrimination of any sort;

5          b. Require annual Proposition 209 training for all UC personnel involved in

6             admissions or hiring.

7          c. Require all trained personnel to explicitly acknowledge that violating Prop

8             209 or failing to report violations may result in disciplinary action, including

9             termination.

10  413.   Award Monetary Damages & Attorney's Fees

11         a. Award to Plaintiffs nominal damages in the amount of $1.

12         b. Award to Plaintiffs compensatory damages in an amount equal to the

13            application fee.

14         c. Award to Plaintiffs punitive damages from liable individual defendants in

15            their personal capacity in an amount to be determined at trial.

16         d. Award reasonable attorneys' fees and costs incurred in this action under

17            42 U.S.C. § 1988. While Plaintiffs currently appear pro se, they expressly

18            reserve the right to recover any documented legal expenditures should

19            they retain counsel or incur other recoverable costs.

20         e. Grant such other and further relief as this Court deems just and proper.

21

1 **VII. JURY DEMAND**

2 Pursuant to the Seventh Amendment to the United States Constitution and Rule 38 of

3 the Federal Rules of Civil Procedure, Plaintiffs hereby demand a trial by jury on all

4 issues so triable.

5 _____

6 I declare under penalty of perjury that the foregoing is true and correct to the best of

7 my knowledge, information, and belief.

8 Respectfully submitted,

9 /s/ Stanley Zhong

10 Stanley Zhong (Pro Se)

11 211 Hope St #390755

12 Mountain View, CA 94039

13

14 /s/ Nan Zhong

15 Nan Zhong (Pro Se)

16 211 Hope St #390755

17 Mountain View, CA 94039

18 nanzhong1@gmail.com

19 **Dated:** August 17, 2025

1

# EXHIBIT 1

2      T<small>IME HIGH SCHOOL STUDENTS SPEND ON HOMEWORK BY RACE AND PARENT'S INCOME</small>



Figure 1: Time high school students spend on homework by race and parent's income

Source: Authors' calculations based on the American Time USe Survey, 2003-2013.

3

# EXHIBIT 2

1

2      SAT SCORES (MATH AND VERBAL) BY RACE & INCOME



3
4
5 We can't make an updated chart because ETS hides the newer data.