EXHIBIT A

1  HKM Employment Attorneys LLP
   Shemia Fagan SBA No. 362846
2  540 Howard Street
   San Francisco, CA 94105
3  (503) 334-0695
4  sfagan@hkm.com

5  NACHTLAW, P.C.
   David A. Nacht (PHV)
6  Fabiola A. Galguera (PHV)
7  501 Avis Dr, Ste. 3
   Ann Arbor, MI 48108
8  (734) 663-7550
   dnacht@nachtlaw.com
9
   *Attorneys for Plaintiffs*
10

11              **UNITED STATES DISTRICT COURT**

12              **EASTERN DISTRICT OF CALIFORNIA**

13

14
   STANLEY ZHONG and NAN ZHONG,          Case No.  2:25-cv-00495-DAD-CSK
15 on behalf of his MINOR SON,

16              Plaintiffs,

17 v.                                    **SECOND AMENDED COMPLAINT**

18 THE REGENTS OF THE UNIVERSITY          **JURY TRIAL DEMANDED**
   OF CALIFORNIA, former University of
19 California Regents RICHARD BLUM,
   HOWARD GUBER, JOHN PEREZ, and
20 RICHARD SHERMAN, *in their personal
   capacities*, University of California Regents
21 MARIA    ANGUIANO,    ELAINE    E.
   BATCHLOR, CARMEN CHU, MICHAEL
22 COHEN, GARETH ELLIOTT, HOWARD
   GUBER,    JOSE    M.    HERNANDEZ,
23 NANCY    LEE,    RICHARD    LEIB,
   HADI MAKARECHIAN,        ANA
24 MATOSANTOS, LARK PARK, JANET
   REILLY,    MARK    ROBINSON,    and
25 JONATHAN SURES, *in their personal and
   official capacities*, former University of
26 California    President    MICHAEL    V.
   DRAKE,    *in    his    personal    capacity*,
27

28

                                    1

University of California President JAMES B. MILLIKEN, *in his official capacity*, University of California Provost and Executive Vice President of Academic Affairs KATHERINE S. NEWMAN, *in her personal and official capacities*, Associate Vice Provost and Executive Director of Systemwide Undergraduate Admissions HAN MI YOON-WU, *in her personal and official capacities*, University of California at Davis Chancellor GARY S. MAY, *in his personal and official capacities*, University of California at Davis Executive Director of Undergraduate Admissions ROBERT PENMAN, *in his personal and official capacities*, Chair of the University of California at Davis Department of Computer Science DIPAK GHOSAL, *in his personal and official capacities*, former University of California at Berkeley Chancellor CAROL CHRIST, *in her personal capacity*, University of California at Berkeley Chancellor RICH LYONS, *in his official capacity*, University of California at Berkeley Dean of Enrollment Management and Undergraduate Admissions OLUFEMI OGUNDELE, *in his personal and official capacities*, Chair of the University of California at Berkeley Department of Computer Science CLAIRE J. TOMLIN, *in her personal and official capacities*, University of California at Santa Barbara Chancellor HENRY T. YANG, *in his personal and official capacities*, former University of California at Santa Barbara Executive Director of Admissions LISA PRZEKOP, *in her personal capacity*, University of California at Santa Barbara Executive Director of Admissions REFUGIA ACOSTA, *in her official capacity*, Chair of the University of California at Santa Barbara Department of Computer Science DIVYAKANT AGRAWAL, *in his official capacity*, University of California at Los Angeles Chancellor GENE BLOCK*, in his personal and official capacities*, University of California at Los Angeles Director of

Undergraduate Admissions GARY CLARK, *in his personal and official capacities*, Chair of the University of California at Los Angeles Computer Science Department TODD MILLSTEIN, *in his official capacity*, University of California at San Diego Chancellor PRADEEP K. KHOSLA, *in his official and personal capacities*, University of California at San Diego Executive Director of Undergraduate Admissions BLIA YANG, *in her personal and official capacities*, Chair of the University of California at San Diego Department of Computer Science SORIN LERNER, *in his personal and official capacities*, the UNITED STATES DEPARTMENT OF EDUCATION, and United States Secretary of Education LINDA McMAHON, *in her official capacity*,

Defendants.

NOW COME Plaintiffs Stanley Zhong ("Stanley") and Nan Zhong ("Nan"), acting on behalf of his Minor Son, by and through their attorneys, NACHTLAW, P.C., and hereby allege as follows:

**INTRODUCTION**

1.      Plaintiffs allege that the University of California discriminated against Stanley based on race, and it discriminates generally against Asian Americans, causing his brother, the Minor Son, to fear that any application will subject him to rejection and humiliation because of his race.

2.      This case is about the most basic of American promises: to give meaning to the Declaration of Independence's assertion that all human beings are created equal. Especially over the past half-century, the nation has made a concerted effort to transform this ideal from a lofty aspiration to enforceable guarantee. At the heart is the simple but profound rule: that racial discrimination is more than unfair—it is illegal and, indeed, unconstitutional.

3

3.     And yet, in one of the most competitive and consequential domains of American life, college admissions, our elite public universities like the University of California ("UC" or the "University")—and the government actors who fund and partner with them—proudly discriminate against Asian American applicants based on their race and have done so for decades. UC operates as though anti-discrimination law protects only their preferred minorities. Under this conception, Asian Americans are treated not as beneficiaries of civil rights, but as exceptions to them.

4.     UC does not openly call these policies what they are—racial discrimination. Instead, UC uses euphemistic language like "affirmative action." Under this logic, racial favoritism is rebranded as "progress," and UC reframes race preferences as positive. But discrimination by another name is still discrimination. Focusing on the benefit to some rather than the burden on others is a rhetorical sleight of hand, as in a zero-sum admissions process, selecting winners based on race necessarily predetermines losers. UC's rhetoric obscures this harm; it does not erase it.

5.     The results speak for themselves. For years, UC's college admissions process has systemically penalized hard-working Asian American students—not because they lack merit, but because UC has decided there are already enough of them on campus. In the name of vague notions of restitution for past racial injustice, universities like UC have simply created new victims.

6.     The use of "holistic review" as a smokescreen for intentional discrimination is exactly what the United States Supreme Court struck down in *Students for Fair Admissions v. Harvard*, 600 U.S. 181 (2023) ("*SFFA*").

7.     Stanley and the Minor Son of Nan Zhong do not ask for special treatment. They ask only for what the Constitution guarantees: an equal shot; a chance to be evaluated on the strength of their character, their intellect, and their achievements, without penalty for race. The Constitution demands nothing less.

8.     Plaintiffs seek declaratory relief holding that UC's admissions process is unlawful, as well as injunctive relief preventing any use of race in UC admissions, in order to allow Asian American applicants like Stanley Zhong and the Minor Son an equal opportunity to compete for admission based on merit, free from discrimination, as is required by federal law.

9.      Plaintiffs also seek damages and other appropriate relief for the injuries suffered to their civil rights.

10.     Plaintiffs bring this action against Defendants for violation of: (1) the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution, pursuant to 42 U.S.C. § 1983; (2) 42 U.S.C. § 1981, which guarantees equal contractual rights regardless of race, pursuant to 42 U.S.C. § 1983; (3) Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq*., and (4) the Administrative Procedure Act, 5 U.S.C. § 551 *et seq*.

## PARTIES, JURISDICTION, AND VENUE

11.     Plaintiff Stanley Zhong is a second-generation Asian American student who at all relevant times was a resident of the state of California. Stanley was denied admission to UC despite his extraordinary academic credentials.

12.     Plaintiff Nan Zhong proceeds on behalf of and as next friend of his Minor Son pursuant to Fed. R. Civ. P. 17(c); he is a first-generation immigrant from China and a permanent resident of California. He is also the father of Stanley Zhong. Like his older brother, Nan Zhong's Minor Son is an Asian American student and a minor child with strong academic ambitions and performance to match. He intends to apply to UC and because he faces a credible and imminent risk of harm from the same discriminatory admissions policies, the Minor Son has standing to seek prospective relief.

13.     Defendant the Regents of the University of California is the governing body of UC, a network of publicly funded and state-operated universities located in the State of California. UC receives state and federal funding for the provision of higher education.

14.     Defendants Richard Blum, Howard Guber, John Perez, and Richard Sherman are former Regents of the University of California, and they are sued in their personal capacities.

15.     Defendants Maria Anguiano, Elaine E. Batchlor, Carmen Chu, Michael Cohen, Gareth Elliott, Howard Guber, Jose M. Hernandez, Nancy Lee, Richard Leib, Hadi Makarechian, Ana Matosantos, Lark Park, Janet Reilly, Mark Robinson, and Jonathan Sures are current Regents of the University of California, and they are sued in their personal and official capacities.

16.     Defendant Michael V. Drake is the former President of the University of California, and he is sued in his personal capacity.

17.     Defendant James B. Milliken is the President of the University of California, and he is sued in his official capacity.

18.     Defendant Katherine S. Newman is the University of California Provost and Executive Vice President of Academic Affairs, and she is sued in her personal and official capacities.

19.     Defendant Han Mi Yoon-Wu is the University of California Associate Vice Provost and Executive Director of Undergraduate Admissions, and she is sued in her personal and official capacities.

20.     Defendant Gary S. May is the Chancellor of the University of California at Davis, and he is sued in his personal and official capacities.

21.     Defendant Robert Penman is the University of California at Davis Executive Director of Undergraduate Admissions, and he is sued in his personal and official capacities.

22.     Defendant Dipak Ghosal is the Chair of the University of California at Davis Department of Computer Science, and he is sued in his personal and official capacities.

23.     Defendant Carol Christ is the former Chancellor of the University of California at Berkeley, and she is sued in her personal capacity.

24.     Defendant Rich Lyons is the Chancellor of the University of California at Berkeley, and he is sued in his official capacity.

25.     Defendant Olufemi Ogundele is the University of California at Berkeley Dean of Enrollment Management and Undergraduate Admissions, and he is sued in his personal and official capacities.

26.     Defendant Claire J. Tomlin is the Chair of the University of California at Berkeley Department of Computer Science, and she is sued in her personal and official capacities.

27.     Defendant Henry T. Yang is the Chancellor of the University of California at Santa Barbara, and he is sued in his personal and official capacities.

6

28.     Defendant Lisa Przekop is the former University of California at Santa Barbara Executive Director of Admissions, and she is sued in her personal capacity.

29.     Defendant Refugia Acosta is the University of California at Santa Barbara Executive Director of Admissions, and she is sued in her official capacity.

30.     Defendant Divyakant Agrawal is the Chair of the University of California at Santa Barbara Department of Computer Science, and he is sued in his official capacity.

31.     Defendant Gene Block is the Chancellor of the University of California at Los Angeles, and he is sued in his personal and official capacities.

32.     Defendant Gary Clark is the University of California at Los Angeles Director of Undergraduate Admissions, and he is sued in his personal and official capacities.

33.     Defendant Todd Millstein is the Chair of the University of California at Los Angeles Computer Science Department, and he is sued in his official capacity.

34.     Defendant Pradeep K. Khosla is the Chancellor of the University of California at San Diego, and he is sued in his personal and official capacities.

35.     Defendant Blia Yang is the University of California at San Diego Executive Director of Undergraduate Admissions, and she is sued in her personal and official capacities.

36.     Defendant Sorin Lerner is the Chair of the University of California at San Diego Department of Computer Science, and he is sued in his personal and official capacities.

37.     Defendant the United States Department of Education ("Dept. of Ed.") is an agency of the federal government responsible for the enforcement and administration of the Higher Education Act ("HEA") and the Hispanic-Service Institutions ("HSI") program. The Dept. of Ed.'s Office of Civil Rights ("OCR") is responsible for enforcing federal anti-discrimination laws in education.

38.     Defendant Linda McMahon is the Secretary of the Dept. of Ed. The Secretary is responsible for the administration and enforcement of the HEA and HSI program (*see e.g.*, 20 U.S.C. §§1003(17), 1067q(b)(1)(A), 1101(c), 1102a(a)) and is sued in her official capacity.

7

39.     The events underlying this Complaint occurred within the Eastern District of California.

40.     This Court has federal subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343.

### FACTUAL ALLEGATIONS

### The Legacy of Anti-Asian Discrimination

41.     The Zhongs belong to an oppressed minority because Asian Americans have long faced systemic exclusion and discrimination in the United States. The Chinese Exclusion Act of 1882 barred Chinese immigrants from entering the country—a policy so discriminatory that Congress formally apologized in 2012. Similarly, the California Alien Land Law barred these "aliens ineligible for citizenship" from owning agricultural land or possessing long-term leases over it. Other Asian communities have faced similar patterns of xenophobia, violence, and exclusion throughout U.S. history. During World War II, over 120,000 Japanese Americans were forcibly incarcerated based solely on their ancestry.

42.     In recent decades, this sad history has continued among the nation's most elite educational institutions. These institutions of higher education, including UC, subject Asian Americans to a quiet but no less insidious form of discrimination—cloaked in the language of "affirmative action" and "holistic review."

43.     UC, like other institutions of higher education, holds Asian American applicants to higher standards than applicants of other races, penalizing Asian applicants specifically because they were born with the wrong skin color.

44.     Although across the country, defenders of race-conscious admissions have downplayed or outright denied the existence of anti–Asian American discrimination, such discrimination has become the worst-kept secret of the college admissions process.  Admissions officers, consultants, and students alike understand that being Asian is a major disadvantage because these institutions discriminate based on race behind closed doors.

45.     In this, Defendants simply follow an industry-wide pattern.

8

46.     Pulitzer Prize–winning journalist Daniel Golden documented this ubiquitous nationwide trend in his book titled *The Price of Admission*, exposing how elite universities like UC routinely pass over Asian American applicants with exceptional qualifications in favor of far less qualified candidates from preferred racial groups.

47.     A 2016 national survey revealed that 42% of private college admissions officers and 39% of their public counterparts acknowledged that Asian American applicants are held to higher standards than students of other races.

48.     Studies suggest that privileged, wealthy African American applicants are admitted at significantly higher rates than low-income, underprivileged Asian American applicants with identical academic credentials. If affirmative action were truly about leveling the playing field, this outcome is indefensible.

49.     Discriminating against disadvantaged Asian students in favor of affluent Black or Hispanic applicants does not advance equality of opportunity; it betrays it.

50.     UC and other elite institutions' policies reveal that the goal was never fairness—it is about achieving predetermined racial preferences, no matter whose rights are trampled.

51.     Asian American students like Stanley and prospective applicants like the Minor Son have long internalized the unspoken rules of this deeply unjust admissions process. They resort to downplaying their achievements and interests in math and science. They avoid mention of bilingual households and omit involvement in Asian cultural organizations when listing extracurricular activities. They seek to appear "less Asian" to escape the penalty for their racial identity.

52.     These learned behaviors are passed down from older students, for example from Stanley to Minor Son. Guidance counselors and even college admissions consultants also communicate to Stanley, Minor Son, and other Asian American students the harsh reality that Asian identity is treated as a liability. This racial double standard is common knowledge, a moral stain on our educational institutions, and a direct violation of the American compact that all Americans are entitled to their civil rights.

53.     Plaintiffs and similarly situated Asian American students have felt compelled to

9

obscure their heritage or downplay their authentic achievements out of fear that their racial identity will count against them.

54.    Asian Americans who challenge this discrimination do so at great personal risk. On campus, advocating for equal treatment under the law has been perversely rebranded as an attack on civil rights—an Orwellian inversion that suggests those rights belong only to the "right kind" of minority.

55.    Under this system at UC and throughout the body of American academic institutions, Asian Americans endure a dual-indignity: first, they are subjected to systemic discrimination in the admissions process; then, should they be lucky enough to reach campus and object to that injustice, they are vilified as opponents of "equity" or "allies" of the oppressors, or branded "racist."

### UC's Enduring Commitment to Racial Engineering

56.    Given that the undergraduate admissions office functions as a centralized, close-knit unit lacking the protections of tenure, it is not surprising that no whistleblowers have emerged from within. This stands in contrast to the multiple whistleblower reports Plaintiffs have obtained concerning the use of race in faculty hiring and graduate admissions at UC. Nevertheless, UC's intent to racially balance its undergraduate student body remains readily discernible.

57.    Dating back at least to the 1970s, UC has a long and well-documented history of promoting racial preferences, particularly in its admissions practices. For decades, UC openly embraced race-conscious admissions policies-and proudly defended them as central to its institutional mission.

58.    After the state audit in 1987, UC Berkeley Chancellor Ira Michael Heyman publicly apologized in 1989 for admissions policies that led to a decline in Asian-American undergraduate enrollment.

59.    In 2003, the UC Regents repealed their own internal measures forbidding the use of race in admissions and hiring.

60.    Since then, UC has spent decades fighting to institute and preserve discrimination

on the basis of race. Recently, that commitment was on full display in its support for Proposition 16 in 2020 and its objection to the Supreme Court's ruling in *SFFA v. Harvard*. In both cases, UC vigorously defended racial preference in admissions.

61.     On June 15, 2020, the Office of the President of the University of California submitted a formal memorandum to the Board of Regents recommending that the Regents endorse Assembly Constitutional Amendment 5 ("ACA 5") and repeal Proposition 209, which prohibited the University from discriminating against or granting preferential treatment on the basis of race, sex, color, ethnicity, or national origin.

62.     The memorandum stated that "attempting to address racial inequality without actually considering race has proven to be challenging," and that "highly competitive public universities cannot maintain historic levels of diversity … using only race-neutral methods."

63.     The memorandum further compared the percentage of "underrepresented groups" enrolled at UC to statewide demographic percentages and stated that UC enrollment "falls short of reflecting the diversity of California's population."

64.     On the same date, the Regents convened a special meeting to consider endorsement of ACA 5 and repeal of Proposition 209. During that meeting, then-President Napolitano stated that repeal would allow UC "to consider race and gender as two among the many factors in its admissions decisions."

65.     Regents and faculty discussed demographic imbalance between UC enrollment and the racial composition of the State and referenced "proportional diversity" and the inability to achieve diversity goals under race-neutral constraints.

66.     The Regents formally voted to endorse ACA 5, with Defendants Anguiano, Butler, Elliott, Leib, Makarechian, Park, Pérez, Reilly, and Sherman voting "aye," and separately voted to endorse repeal of Proposition 209, with Defendants Anguiano, Butler, Elliott, Leib, Makarechian, Park, Pérez, Reilly, Sherman, and Sures voting "aye."

67.     These official memoranda, deliberations, and formal votes constitute contemporaneous statements by final policymakers regarding the University's admissions

objectives.

68.     The University's expressed position that race-neutral methods were insufficient to achieve desired demographic outcomes, and its formal endorsement of restoring authority to consider race in admissions decisions, demonstrate that race was viewed as a necessary admissions factor.

69.     In a released statement, the Board declared, "UC has long been committed to creating and maintaining a student body that reflects California's laudable cultural, racial, geographic, and socioeconomic diversity." Then-President Napolitano added: "It makes little sense to exclude any consideration of race in admissions when the aim of the University's holistic process is to fully understand and evaluate each applicant through multiple dimensions."

70.     In other words, UC asserts a contradiction: to treat applicants as individuals, UC must first classify them by race. These are statements from decision-makers that express a racial intent and discriminatory motive.

71.     In July 2020, then-President of UC Janet Napolitano publicly described herself as a strong supporter of Proposition 16.

72.     In November 2020, after California voters rejected Proposition 16, UC issued a statement that it "is disappointed that Proposition 16, the state ballot measure and constitutional amendment that would have repealed Proposition 209, did not pass in this election ... UC remains steadfast in its commitment to attract and support a student body that reflects California's dynamism and diversity, despite this setback ... UC still does not reflect the diversity of California's population ... However, excluding race and gender from that consideration continues to be a tall barrier to women and students from underrepresented groups." This official statement from the UC Office of the President leaves no doubt about UC's desire and intent to use race in its admissions and hiring.

73.     Then, in the lead-up to *SFFA v. Harvard*, 600 U.S. 181 (2023), UC once again fought tooth-and-nail to argue for its ability to discriminate based on race. In its amicus brief filed with the US Supreme Court, UC stated: "At many of UC's campuses, especially the flagship

campuses, there remain stark differences between the demographics of UC's enrolled student population and the demographics of the applicant pool that UC seeks to serve-that is, California public high school graduates. To be clear, UC does not maintain any 'specified' racial targets based on the demographics of high school graduates or any other baseline. *See Fisher v. University of Texas at Austin*, 570 U.S. 297, 311 (2013). Instead, UC looks at demographics to determine whether there are substantial demographic disparities of the sort that this Court has recognized can undermine a university's ability to provide the educational benefits of diversity."

74.    The brief also states "Second, UC's student population at many of its campuses is now starkly different, demographically speaking, from the population of California high school graduates. That raises concerns that UC is not enrolling sufficient students with diverse perspectives, and that it will not be perceived as open to, and welcoming of, all students across the State-which in turn threatens its legitimacy in the eyes of citizens of California." This clearly demonstrates UC's intent to push toward racial proportionality that mirrors the general population.

75.    UC filed the amicus brief in August 2022, less than two years after California voters decisively rejected Proposition 16.

76.    The brief further states that "After Proposition 209 Prohibited Consideration of Race in Admissions, Diversity Fell Dramatically Across UC's Campuses." It reveals that whatever UC says about "diversity," what UC actually means is "race."

77.    It further vigorously argued for the revival of race-based admissions policies by lamenting that "despite its extensive efforts, UC struggles to enroll a student body that is sufficiently racially diverse to attain the educational benefits of diversity. The shortfall is especially apparent at UC's most selective campuses, where African American, Native American, and Latinx students are underrepresented and widely report struggling with feelings of racial isolation."

78.    UC thus admitted two critical points: (1) its demographic targets remain non-negotiable, and (2) those targets are unattainable without using race. UC's dogged legal efforts to justify race discrimination is part of its long history of double standards for Asian Americans.

79.    When confronted with a choice-between advancing "diversity" (i.e. race-based

admission) goals or upholding equal treatment for high-achieving groups like Asian Americans-UC sides with diversity, even if it means racially discriminating. In practice, this results in academically superior Asian Americans applicants being systematically disadvantaged to make room for less qualified candidates from other racial groups.

80.     In July 2023, following the Supreme Court's ruling in *SFFA v. Harvard*, UC President Michael V. Drake stated: "We are disappointed in the U.S. Supreme Court's decision to bar the use of race in college admissions." It is a statement from a decision-maker that expresses a racial intent and discriminatory motive.

81.     UC adopted the "UC 2030 Capacity Plan," with the goal of having its student bodies "better reflec[t] California's racial/ethnic ... diversity." UC President Drake wanted "intentional growth" in terms of making "graduate students ... better reflect and tap the talent of underrepresented populations who represent the majority of Californians." To support this goal of "mov[ing] the needle on the diversity of graduate students," the Regents "requested graduate professional programs" to "present race/ethnicity data on students and faculty, along with diversity plans within the program."

82.      By defending the use of racial criteria, openly expressing dissatisfaction with the racial composition of its student body, and framing race-conscious admissions as a permanent institutional value, UC has revealed its intent and implied its ongoing use of unconstitutional and discriminatory practices. This discriminates against Asian Americans like Stanley and Minor Son because, by virtue of merit, their "race" would be overrepresented according to UC's preferences.

83.     In addition to its evident motive and intent for racial balancing, UC possesses the means and opportunity to manipulate the racial composition of its student body under its current "holistic" admissions framework, which has a history of corruption and lacks transparency, independent third-party oversight and accountability. Indeed, UC's intent is matched by its actions.

84.     Despite claiming it does not maintain racial targets in its amicus brief for *SFFA*, UC actively pursues HSI (Hispanic Serving Institution) status at each of its campuses. HSI designation requires at least 25% Hispanic student enrollment. In or around 2019, UC Berkeley and UCLA

established task forces led by their respective Chancellors-Carol Christ and Gene Block-to achieve this racial target. These task forces demonstrate that UC has adopted policies aimed at meeting specific numerical racial goals, contradicting its statements in the *SFFA v. Harvard* amicus brief. Such race-based decision-making triggers strict scrutiny and, under *SFFA v. Harvard*, cannot survive it.

85.     In a December 2020 report from the *Chancellor's Task Force on Becoming a Hispanic Serving Institution*, UC Berkeley Chancellor Carol Christ charged the task force with creating a roadmap for the university to achieve one of its "boldest goals": ensuring that "at least 25 percent of enrolled undergraduate students… self-identify as Chicanx/Latinx" by 2027. The report quantifies the university's progress towards this goal, noting that at 17.9% Latinx enrollment, it is "7.1% away from meeting the enrollment requirement".

86.     The report repeatedly states that UC Berkeley "must reflect the public it serves" and that achieving HSI status is an "essential step for UC Berkeley to become more representative of California". It explicitly contrasts the state's 52% Latinx high school graduate population with Berkeley's 16% Latinx undergraduate population, framing the initiative as a way to achieve "representation aligned with the demographics of the population it serves".

87.     To achieve this 25% racial target, the Task Force—which included Olufemi Ogundele, Assistant Vice Chancellor of the Office of Undergraduate Admissions—was charged with reviewing and recommending changes to "admissions and recruitment strategies". The resulting plan calls for specific actions to alter the applicant pool and admissions outcomes. These actions demonstrate a clear intent to manipulate the admissions process to engineer a specific racial composition, in direct violation of the Equal Protection Clause and the California Constitution.

88.     Furthermore, the university official who oversaw Stanley's rejection was directly involved in creating this discriminatory plan. As Assistant Vice Chancellor for the Office of Undergraduate Admissions, Olufemi Ogundele was not only responsible for the admissions cycle in which Stanley was rejected but was also an active member of the Chancellor's HSI Task Force. His participation demonstrates that the unconstitutional goal of achieving a 25% racial quota was

15

not an abstract policy but an operational objective of the very office that denied Stanley Zhong admission. Therefore, the decision to reject Stanley was made within an admissions framework deliberately engineered to prioritize a candidate's race over individual merit to meet a predetermined demographic outcome.

89.    Linked from the report from the *Chancellor's Task Force on Becoming a Hispanic Serving Institution*, UC Berkeley's own reports make explicit that the HSI initiative is directly tied to admissions quotas. The *Chicanx Latinx Task Force Report* (2016–2017) openly recommended "increase admission and enrollment of Chicanx/Latinx undergraduate students with the goal of becoming a Hispanic-Serving Institution," confirming that admissions policy was to be manipulated to satisfy HSI benchmarks. A 2015 report similarly called for Berkeley to "take immediate action" so that its student body "more closely reflects the demographics of the state," explicitly defining "underrepresented" as groups "disproportionately represented compared to their proportion among residents of the state." A February 2020 memo to the HSI Task Force, which referenced "admissions" repeatedly, demonstrates that admissions were a central focus of the HSI program. Taken together, these documents show that UC has pursued racial proportionality in admissions and the "Hispanic-Serving Institution" designation—a direct violation of constitutional prohibitions against racial targets.

90.    On December 7, 2020, UCLA's top leadership, including Defendant Chancellor Gene D. Block, announced a campus-wide directive to become a Hispanic-Serving Institution (HSI) by 2025. They justified this goal as a response to "changing demographics in California," an explicit admission of their intent to engage in impermissible racial balancing by aligning the student body with state demographics. This top-down push for numerical racial targets is a system-wide policy championed by Defendant Chancellors across the University of California:

•    After UC Davis achieved HSI eligibility in October 2024, Defendant Chancellor Gary S. May celebrated the effort as a "milestone" nearly a decade in the making.

•    Defendant Chancellor Henry T. Yang "oversaw the designation of the [UC Santa Barbara] campus as an HSI in 2015".

● Defendant Chancellor Pradeep K. Khosla challenged the UC San Diego community to pursue the "goal of becoming an HSI" so the campus could "better reflect and serve the diverse population of California".

91. This collective leadership from Chancellors Christ, Block, May, Yang, and Khosla demonstrates a clear and persistent commitment to achieving specified numerical racial targets, intentionally and purposefully favoring a particular racial group at the expense of others. Their actions and public statements constitute a reckless or callous indifference to the federally protected rights of applicants to be judged on their individual merit, not their race.

92. A university policy that amounts to racial balancing is "patently unconstitutional." *Grutter v. Bollinger*, 539 U.S. 306, 329 (2003). Racial balancing seeks to ensure a specified percentage of a racial group within the student body merely due to race or ethnicity. *Id*. Courts have consistently rejected proportional representation as a constitutional justification for race-based admissions. *See id*. at 343.

93. In an extraordinary public admission during a Spring 2023 constitutional law class, UC Berkeley Law Dean Erwin Chemerinsky described how universities practice "unstated Affirmative Action," advising that schools not "say" race. "You can think it. You can vote it… Don't ever articulate that is what you are doing." He also said, "If I'm ever deposed, I'm going to deny I said this to you." These comments—caught on video—confirm that UC and other elite universities cling to racial preferences but have evolved ever more elusive ways of doing so.

94. In November of 2022, The New Yorker quoted Chemerinsky: "What colleges and universities will need to do after affirmative action is eliminated is find ways to achieve diversity that can't be documented as violating the Constitution… So they can't have any explicit use of race. They have to make sure that their admissions statistics don't reveal any use of race. But they can use proxies for race."

95. At the American Association of Law Schools ("AALS") conference, Chemerinsky moderated a panel addressing how universities might adapt admissions practices in the wake of *SFFA*, featuring Timothy Lynch, General Counsel of the University of Michigan. When discussing

how plaintiffs often seek to uncover evidence of discriminatory intent, the panelists had the following revealing exchange:

> **Lynch:** "The key question in terms of creating the record is what can you say right now is the race-neutral explanation for doing it, and how do you avoid having your faculty colleagues muddy the record."
>
> **Chemerinsky:** "Great point."
>
> **Chemerinsky further cautioned:** "I think it's very important not to talk about it in terms of it being an attempt to circumvent the [Supreme Court] decision."

96.    UC's race-conscious practices have not escaped federal notice. On March 14, 2025, the Dept. of Ed. OCR announced a sweeping Title VI enforcement initiative, opening formal investigations into 45 universities for "race-exclusionary practices" that violate the Civil Rights Act. UC appears on that list as a chief offender.

97.    OCR's decision to single out UC is significant. Title VI investigations issue only where the agency has received credible evidence that an institution continues to deploy race as a decision-making factor after *SFFA*. Thus, a federal body has already found sufficient cause to suspect UC of maintaining unlawful racial preferences.

**SFFA Reshaped the Law of Affirmative Action**

98.    In *SFFA*, the Supreme Court held unequivocally that race-based admissions policies violate the Equal Protection Clause.

99.    Two years later, in *Ames v. Ohio Department of Youth Services*, 605 U.S. ___ (2025), the Court reaffirmed that constitutional protections against racial discrimination apply equally to all racial groups—including those not labeled "underrepresented."

100.    In *SFFA*, the Supreme Court relied on statistical analysis to find that Harvard and the University of North Carolina ("UNC") had engaged in impermissible intentional discrimination prohibited by the Equal Protection Clause and Title VI.

101.    The *SFFA* plaintiffs submitted expert evidence involving mathematical modeling to predict whether admissions would go up if race were not a factor for Asian American applicants;

Plaintiffs in this matter have identified experts who will perform the same kind of analysis to demonstrate – with the benefit of discovery – that UC is engaged in the same "holistic review" process the Supreme Court invalidated in *SFFA*.

102.     The only difference between the defendant universities in *SFFA* and UC is that Harvard and UNC admitted their process was race-conscious, while UC is trying to obscure the role of race in its own "holistic review."

**UC's "Holistic Review" Intentionally Masks Ongoing Discrimination**

103.     In the wake of *SFFA*, the percentage of Asian American students at top universities surged, validating what had long been suspected: elite schools would admit more qualified Asian students once merit was considered instead of race — they had simply chosen not to. It was only under legal scrutiny that these institutions retreated from race-based practices they could no longer justify or conceal.

104.     Particularly instructive are statistical analyses that were run using the data that became publicly available through the *SFFA* case, since – Plaintiffs posit not-so-coincidentally – the details of actual admissions processes are tightly safeguarded by universities.

105.     Using the data collected, it became evident to statisticians that at Harvard, "the number of Asian Americans admitted would increase from 2,013 to 2,812, an increase of over 37%" for the classes of 2014-2019, had race not played a role in admissions. The same analysis yields a 20% increase in Asian Americans admitted to UNC.[1]

106.     The same cannot be said for UC, which responded with defiance even after *SFFA* made clear that racial balancing violates both the Equal Protection Clause and Title VI.

107.     As noted, UC's currently preferred end-run around anti-discrimination law is called the "holistic review." Though couched as a commitment to individualized consideration, the term "holistic" as used in UC's admissions is a euphemism for unconstitutional race-balancing.

---

[1] *See* Peter Arcidacono, Josh Kinsler, & Tyler Ranson, What the Students for Fair Admissions Cases Reveal About Racial Preferences, 1(4) J. Pol. Econ. Micro. 615 (2023).

19

108.    On information and belief, UC uses race—or more accurately, self-reported racial identity—as a crude analog for a candidate's value on the University's diversity balance-sheet. Rather than consider a candidate's individual merit, UC's "holistic review" process allows UC's analysis to be quite literally skin-deep.

109.    Universities, including UC, continue to engineer racial outcomes under the cover of subjective judgment and plausible deniability. This change in terminology—from "race-based" and "affirmative action" to "holistic" and "individualized"—is merely cosmetic; the discriminatory intent—and effect— remain.

110.    For example, as documented by Professor Tim Groseclose in a detailed study of UCLA admissions, the switch to "holistic review" was adopted explicitly to increase enrollment of so-called "underrepresented minorities," at the expense of more qualified Asian American applicants. He found that, even among applicants with identical reader scores, acceptance rates varied dramatically by race. Rich African Americans were admitted much more frequently than poor North Asians.

111.    On May 25, 2016, a former Dartmouth admissions officer revealed how "holistic review" allowed committees to mask racial bias behind vague, subjective criteria—often resorting to stereotypes to dismiss Asian American candidates as "yet another textureless math grind." These dehumanizing stereotypes reflect not genuine individual assessment, but racial generalizations disguised as discretion.

112.    Tellingly, "holistic review" is a legal term of art long used by universities openly engaged in race conscious admissions, a vestige of pre-*SFFA* Supreme Court jurisprudence which permitted the use of race in college admissions *only* in the context of a "holistic review."

113.    UC continues to use "holistic review" in its admissions process in the same way, in conformity with practices documented throughout higher education.

114.    UC is constitutionally prohibited from using racial preferences in student admissions. Nevertheless, the institution has demonstrated a clear desire to circumvent this ban. After the state of Michigan banned use of race in admissions in 2006, the University of Michigan

hosted a 2-day workshop featuring UC administrators, who shared their strategies for "navigating" – i.e. working around bans like Michigan's and California's Proposition 209, enacted in 1996.

115.    UC insists on implementing both "holistic reviews" and a "test-blind" admissions policy. However, this position is inherently contradictory and makes consistency even more elusive. A review cannot be truly holistic if it deliberately excludes objective measures like standardized tests, especially for STEM applicants where such metrics are crucial for assessing academic preparedness.

116.    According to the UC Regents' Bylaws, the Academic Senate holds the authority to "set the conditions of admissions." In 2020, the Academic Senate overwhelmingly voted 51-0, with one abstention, to retain standardized tests such as the SAT.

117.    Despite this overwhelming endorsement amid growing applicant pools and widespread grade inflation, the UC Board of Regents, composed primarily of political appointees, overruled the recommendation, with Defendants Anguiano, Blum, Butler, Cohen, Elliott, Leib, Makarechian, Park, Perez, Reilly, Sherman, and Sures voting "aye."

118.    Although UC claimed in 2020 that it would develop a "new test," no such test was ever created, resulting in the complete elimination of standardized testing from the admissions process. This decision appears to be a calculated move to compromise intellectual honesty and academic integrity, potentially facilitating the concealment of discriminatory practices against Asian American applicants.

119.    Notably, leading institutions like MIT, Dartmouth, Yale, Brown, Harvard, Caltech, Cornell, and the University of Texas at Austin have reinstated standardized testing, further highlighting the questionable nature of UC's continued "test-blind" policy post-COVID.

120.    While the euphemism "holistic" suggests a thorough and individualized evaluation process, based on UCLA's public job postings, UCLA pays its application readers just $2.57 per application. As a reference, the minimum wage for hotel workers in Los Angeles is $22.50 per hour. Since UCLA requires its application readers to hold at least a bachelor's degree, their effective wage should meet or exceed this minimum. If we assume UCLA is not breaking the minimum wage

law, a reader would need to review at least 8.75 applications per hour—less than seven minutes per application.

121.    UC's application readers must evaluate each applicant's transcript, extracurricular activities, essays, recommendation letters, and other application documents; a typical college application contains about 3000 words. Even if we assume a reader doesn't have to look up anything mentioned in the application, pause to reflect, or compare across applications, a reader needs to read over 437 words per minute, far above the average college graduate reading speed of 235 words per minute, in order to earn the minimum wage.

122.    This breakneck pace is entirely incompatible with any genuine notion of "holistic" review. Compounding the challenge, readers are expected to maintain consistency across 146,276 undergraduate applications (UCLA's 2024 applicant pool). This is, in effect, a near-impossible task. By contrast, Google invests over 10 hours per interviewee, highlighting the superficiality of UCLA's rapid evaluations.

123.    The result is a process that is neither "holistic" nor "individualized." It is a rushed, inconsistent system that relies on superficial and impermissible self-reported racial categorization to evaluate subjective traits.

124.    If the goal were truly to level the playing field and expand opportunity for the disadvantaged, socioeconomic status might be a logical and equitable focus that would avoid running afoul of the law's prohibition on racial discrimination—a method already in use in other states.

125.    Instead, UC explicitly rejects this approach precisely because it would not produce its desired demographic results. As Mr. Erwin Chemerinsky, Dean of the UC Berkeley School of Law, has publicly acknowledged: "In her dissent, Justice Sotomayor said there could be benefits given on the grounds of socioeconomic status. The problem the University of California discovered was just giving a benefit based on socioeconomic status doesn't yield racial diversity." UC has remained fixated on race regardless of socioeconomic status.

22

126.    The implication is unmistakable: UC's priority is not to uplift the underserved, but to engineer a specific racial composition, even if that means favoring affluent non-Asian minority applicants over low-income Asian students.

127.    In doing so, UC betrays the professed moral foundation of affirmative action and reveals its true purpose—not equality of opportunity, but as a backdoor for invidious racial discrimination.

**Evidence of Discriminatory Intent in UC Admissions**

128.    Pulitzer Prize–winning journalist Daniel Golden documented the widespread anti-Asian discrimination in college admissions in his book titled *The Price of Admission*. Golden exposed how elite universities (including UC) routinely pass over Asian American applicants with exceptional qualifications in favor of far less qualified candidates from preferred racial groups. For example, UCLA and UC Berkeley rejected Stanley Park, a Korean American student who faced serious adversity (single immigrant parent with cancer and no college degree), while accepting non-Asian students with SAT scores 520 points lower than his.

129.    In 2002, a 159-page analysis of undergraduate admissions on the UC Berkeley campus revealed that 381 applicants who had scored lower than 1000 on the SAT were admitted to Berkeley, while 641 students with scores of 1500 or higher were rejected (1600 is a perfect score). Another 2,577 candidates scoring between 1401 and 1500 were denied admission.

130.    In response, Mr. John Moores, then-chairman of the UC Board of Regents, accused UC's flagship campus of "blatantly" discriminating against Asian Americans. "There are remarkably consistent, clear patterns of racial discrimination" against Asian Americans in undergraduate admissions, Moores said.

131.    Moores said UC Berkeley was admitting hundreds of African American, American Indian and Latino students with SAT scores of 1000 or less while rejecting Asian American high achievers with scores of 1400 or above.

132.    Mr. Moores was concerned with the resolution adopted by the Regents stating that UC was complying with Proposition 209. He wrote that "there is no evidence suggesting

compliance with the proposition… the UC admission study group did not come to any conclusion about Proposition 209, and no evidence of compliance with Proposition 209 has been presented to the Board… Furthermore, all evidence to date, including comments by President Dynes suggests there may be cause for concern."

133.    Mr. Moores further wrote, "When I tried to get to the bottom of the admission matters, I was met with stonewalling, obfuscation and personal attacks by the administration of UC… UC personnel have demonstrated a continuing bias in the manner in which they have attempted to explain away problematic admission issues… They seem to have an agenda with respect to outcomes, rather than attempting to be objective in studying and interpreting the data. I believe they try to find facts to fit their views of what they want to achieve." Even the chairman of the UC Board of Regents had trouble accessing UC's admissions data.

134.    This pattern of data obscurity continued in the decades that followed.

135.    Around 2018, UC refused to fulfill public records requests and defended against a lawsuit that sought access to its admissions data for research purposes, despite having provided similar data in 2008. UC's actions are part of the persistent pattern of concealing admissions data from third-party examinations. Given virtually all previous admissions data showed strong racial preferences in UC admissions in direct violation of Proposition 209, UC is certainly motivated to go to such extraordinary lengths to hide its admissions data.

136.    A New York Times opinion piece by a former UC admissions reader shared her detection of "unspoken directives," questioned whether "Proposition 209 serve(s) merely to push race underground," and described the admission reading process as "an extreme version of the American non-conversation about race."

137.    In 2007, the Board of Regents adopted Policy 4400, a statement of UC's diversity goals that applies systemwide and was last amended in November 2024. Policy 4400 states that "diversity should be integral to the University's achievement of excellence," defines diversity to include race and ethnicity, directs UC to "achieve diversity, inclusion, and accessibility among its student bodies and among its faculty, staff, and other academic appointees," and emphasizes UC's

"historic obligation" to serve groups "historically excluded from higher education," tying institutional mission to racial and demographic representation and positioning diversity not as an aspirational value alone but as an outcome objective, requiring UC to take steps to reach specified levels of diversity.

138.    On June 25, 2020, the UC Board of Regents declared their support for ending race-blind admissions, "unanimously back[ing] an effort to overturn" Prop. 209 and arguing that race-neutral admissions have harmed UC's ability to enroll a student body reflecting California's full diversity. The Regents stated that UC's then-current policies were insufficient to keep up with California's changing demographics.

139.    The August 2025 Quick Reference Guide to UC Admissions presents an official overview of UC admission policy that aims to enroll "a student body whose demographics reflect the racial, geographic and socioeconomic diversity of our state."

140.    The 2023-24 UC Graduate, Undergraduate and Equity Affairs Annual Report is a systemwide annual report describing policies and programs designed to "advance equity and inclusion."

141.    The 2017 UC Davis Diversity and Inclusion Strategic Vision plan embeds race-conscious admissions pipelines and accountability by race across departments, identifying changes in enrollment, retention, and graduation rates of underrepresented minorities as a central measure of its potential success.

142.    The 2018 UC San Diego Strategic Plan for Inclusive Excellence is a Chancellor-endorsed plan requiring UC San Diego to "reflect California demographics" in faculty, staff, and students, establishing an HSI Working Group, and tying incentives to racial composition metrics, exhibiting a formal policy of racial balancing.

143.    The 2019 UCLA Proposition 209 Primer is an official UCLA guidance document explaining how campus units should interpret and comply with California Proposition 209, stating UCLA doesn't "have to be 'blind'" to race and invoking the HSI federal-program carveout to justify race-conscious policies.

144.    The 2020 UC San Diego Black Academic Excellence Initiative aimed to increase Black student enrollment.

145.    The 2020-21 UC Berkeley Division of Equity & Inclusion Impact Report announces UC Berkeley's goal of achieving HSI status by 2027 and celebrates race-exclusive African American Initiative scholarships, demonstrating evidence of systemwide racial balancing.

146.    The 2023 UC Santa Barbara Computer Science DEI Strategic Action Plan is a departmental DEI plan that includes a graphic showing "target groups and activities" linked to demographics and requires "Holistic Recruitment Training" and demographic-based evaluation metrics.

147.    The 2023-28 UCLA/Getty DEIA Strategic Plan is a five-year program-level plan requiring diverse compositions for admissions committees and citing elimination of GRE and internship requirements (i.e. removal of objective admissions criteria) as DEIA reforms.

148.    The 2025 UC San Diego Math Preparation Workgroup Report admits that underrepresented minority admits are disproportionately placed into remedial math, with some at a grade 4–6 level. Between 2020 and 2025, after eliminating the SAT requirement, the number of UCSD students whose math skills fall below middle-school level increased nearly thirtyfold—from under 1 percent to roughly one in eight. UCSD has been forced to redesign remedial math to cover elementary-school material and create an entirely new course to reteach high-school algebra and geometry. Among students placed into Math 2, UCSD's most remedial course, one in four had earned a perfect 4.0 in high-school math.

149.    The 2025 UC Santa Barbara Psychological & Brain Sciences Strategic Action Plan is a departmental DEI plan setting explicit numerical targets for student composition and outcomes, including requiring underrepresented minority representation in pre-majors and majors to "match (or exceed)" campus levels by Fall 2024, mandating underrepresented minority retention and graduation parity with other students, directing removal of curricular "barriers" in prerequisite courses to increase entry of underrepresented minorities.

26

150.    The UC Davis website currently admits that "holistic review" was designed to increase enrollment of underrepresented minorities, crediting it with a fivefold increase in Black and Latino medical students.

151.    In 2020, UCLA medical school adopted the "Anti-Racism Roadmap" and instituted policies that use race in its admissions. For example, it insists that its student body "should reflect the population of State of California". It also monitors the racial numbers in its admissions process.

152.    Dr. Jennifer Lucero has publicly emphasized the importance of racially diversifying medical school admissions. Following her appointment to lead UCLA's medical school admissions in June 2020, the number of Asian matriculants declined from 84 in 2019 to 55 in 2022—a 35% decrease. Such precipitous changes in admission outcomes strongly suggest the implementation of deliberate, race-conscious directives. In 2023, Asian applicants comprised 40.79% of the total applicant pool but accounted for only 29.71% of matriculants. In contrast, Black applicants represented just 7.86% of applicants yet constituted 14.29% of matriculants. From 2020 to 2023, White and Asian applicants consistently made up approximately 73% of the total applicant pool. Nonetheless, the combined percentage of White and Asian matriculants declined markedly over that period—from 65.7% in 2020 to 57.1% in 2021, 57.8% in 2022, and just 53.7% in 2023.

153.    According to whistleblowers with direct knowledge, the admissions committee at UCLA's medical school routinely and openly discusses applicants' race—or racial proxies—and uses race as a factor in admissions decisions. Dr. Jennifer Lucero and the committee are reported to admit Black applicants with below-average GPA and MCAT scores, including significantly below-average scores, while holding White and Asian applicants to much higher standards, often requiring near-perfect academic credentials for serious consideration. Whistleblowers have confirmed that race is explicitly discussed and factored into admissions decisions. In one instance, when the committee was reviewing a Black applicant with significantly below-average academic metrics, Dr. Lucero allegedly remarked: "Did you not know African-American women are dying at a higher rate than everyone else? We need people like this in the medical school."

154.    Additionally, on April 8, 2025, according to an individual familiar with the matter, the medical school circulated a memo outlining "guiding principles for student representation on the admissions committee," which includes both faculty and upper-year medical students. These guidelines reportedly instruct the committee to consider race when selecting student members to serve as admissions officers.

155.    The available statistical evidence of outcomes further supports Plaintiffs' allegation of discriminatory intent in UC admissions, showing a pattern of similar rejections experienced by other Asian American applicants with outstanding qualifications.

156.    In or around 2021, numerous high schools with high concentrations of Asian American students experienced a precipitous decline in UC admission rates. For example, in 2016, 119 students from Westview High School applied to UC Berkeley, and 44% were admitted. By 2021, however, the admission rate for Westview High School students had plummeted to just 6.7%. Notably, 40.2% of the student body at Westview High School is Asian American.

157.    As another example, between 2018 and 2023, UC San Diego's admission rates for various high schools shifted dramatically, displaying a strong negative correlation with the percentage of Asian American students in their student bodies. As reflected in the table below, several highly ranked high schools with large Asian American populations experienced a steep decline in the percentage of students admitted to UC San Diego in 2023 compared to 2018. Conversely, several lower-ranked high schools with relatively small Asian American populations saw increased admission rates over the same period.

| High School | Asian Percentage | National Ranking by US News | 2018 Admission Rate | 2023 Admission Rate |
|---|---|---|---|---|
| Bonita Vista | 10% | 2190 | 37% | 61% |
| King-Chavez | 0% | 9135 | 31.8% | 57.1% |
| Canyon Crest Academy | 42% | 140 | 61.3% | 15.7% |
| Westview | 40.2% | 401 | 65.5% | 13.3% |
| Del Norte | 42.2% | 329 | 60.4% | 11% |
| California average | 10.1% | N/A | 30.2% | 25% |

*Table 1: Precipitous drop of acceptance rate at Asian-concentrated high schools*

158.    Notably, the change in UC San Diego's admission rate for a given high school is inversely correlated with both the school's academic ranking and the proportion of Asian American students enrolled—that is, the higher the school's ranking and the greater its Asian American representation, the lower its UC San Diego admission rate.

159.    This pattern constitutes compelling circumstantial evidence of discriminatory intent in UC's admissions process.

160.    According to the 2020 U.S. Census, California's Asian population grew by 25% from 2010 to 2020 and likely continued rising thereafter, making it the fastest-growing ethnic group in the state, while the percentage of Asian students at UC has declined.

161.    Between 2002 and 2022, Asian Americans' percentage in UC enrollment dropped from 38% to 32%, despite explosive growth in the state's Asian population. The Chinese American enrollment at UC between 2018 and 2024 also declined overall. At UC Berkeley, one of the most selective campuses of the UC system, Asian admits have trended significantly downward in recent years. The percentage of Asian applicants admitted by UC Berkeley went from 18.9% (3,188 out of 16,866) in 2014 to 15.8% (4,416 out of 27,875) in 2023.

162.   The gap between Asian population growth and declining percentage of Asians in UC enrollment strongly suggests systemic discrimination. As the Supreme Court explained in *Reno v. Bossier Parish School Board*, 520 U.S. 471, 487 (1997), the natural consequences of an action often provide probative evidence of intent. Here, the persistent adverse impact on Asian American applicants is evidence of a racially motivated policy.

163.   All publicly available SAT score data indicates Asian American applicants face significantly higher score thresholds for admission compared to other racial groups.

164.   While SAT scores are not the sole measure of academic merit, studies by Opportunity Insight at Harvard University show that (1) students with higher standardized test scores are more likely to have higher college GPAs than their peers with lower scores; (2) high school GPA does a poor job of predicting academic success in college; and (3) students from different socioeconomic backgrounds who have comparable standardized test scores receive similar grades in college.

165.   UC discontinued the collection of SAT scores in 2021, adopting a "test-blind" admissions policy that remains in effect today. During the years in which UC did collect such data, it became aware that Asian American applicants faced a substantially higher admissions threshold, creating a strong institutional incentive to cease collecting or publishing SAT data in order to obscure the evident disparities and avoid scrutiny.

166.   Despite UC's efforts to obscure disparities by eliminating SAT score reporting, the racially engineered outcomes remain apparent. For Fall 2024 enrollment, the table below compares, across five racial groups, the percentage of the group in the top two SAT ranges (1400-1600 and 1200-1390) and the percentage of the group admitted by the five UC campuses that rejected Stanley's application.

|  | Asian | White | Hispanic | Black | American Indian |
|---|---|---|---|---|---|
| SAT Takers scoring 1400-1600 | 25% | 6% | 2% | 1% | 1% |
| SAT Takers scoring 1200-1390 | 31% | 23% | 9% | 6% | 5% |
| UC Davis | 38% | 36% | 37% | 27% | 39% |
| UC Berkeley | 16% | 15% | 13% | 12% | 19% |
| UC Santa Barbara | 36% | 31% | 31% | 23% | 24% |
| UCLA | 11% | 10% | 7% | 11% | 17% |
| UC San Diego | 27% | 23% | 28% | 18% | 25% |

*Table 2: Racial groups' percentage in top SAT ranges and percentage admitted by UC*

167.    Note that 25% of Asian, 2% of Hispanic, and 1% of Black applicants are in the top 1400-1600 range. Yet UCLA's acceptance rates for Asian and Black applicants are both 11%, and the acceptance rates at UC Davis and UC San Diego for Asian and Hispanic applicants are also roughly equivalent. The above table clearly reflects profound racial disparities in UC admissions.

168.    In a 2014 study commissioned by UCLA, only later obtained through a public records request in 2018, sociology professor Robert Mare documented a consistent pattern of anti-Asian discrimination in admissions at UCLA.

169.    According to Mare, "'North Asian' (Chinese, Japanese, Korean, Indian/Pakistani American) applicants receive somewhat less favorable holistic read scores than applicants in other ethnic identity groups who are otherwise similar in measured academic qualifications, personal characteristics, and measured challenges and hardships."

170.    He further concluded that "among otherwise equivalent applicants, whites, African Americans and Latinos are overrepresented among those admitted, and Asian-American applicants

31

are underrepresented," noting that "the disadvantages of Asian applicants occur, with varying magnitudes, throughout the admissions process."

171.    Mare provided numerical estimates quantifying the number of admission offers—broken down by race—that resulted directly from the consideration of race. According to his analysis, more than two thousand offers were affected over a five-year period.

172.    The table below presents the undergraduate admissions rates for Black applicants compared to the overall applicant pool in both 2010 and 2023.

|  | 2010 Admissions Rates | | 2023 Admissions Rates | |
|---|---|---|---|---|
|  | Black | Overall | Black | Overall |
| UCLA | 14% | 23% | 10% | 9% |
| UC Berkeley | 13% | 21% | 10% | 12% |
| UC Irvine | 24% | 45% | 21% | 26% |
| UC Santa Barbara | 28% | 45% | 25% | 28% |
| UC San Diego | 19% | 38% | 18% | 25% |
| UC Santa Cruz | 41% | 64% | 52% | 63% |
| UC Davis | 31% | 48% | 30% | 42% |
| UC Riverside | 56% | 76% | 57% | 70% |
| UC Merced | 76% | 89% | 80% | 88% |

*Table 3: Black and overall admissions rates at UC in 2010 and 2023*

173.    Over this period, it is apparent that all UC campuses have shifted toward a practice of aligning admissions rates across racial and ethnic groups, irrespective of academic qualifications. This trend of convergence is especially pronounced at the more selective campuses, such as UCLA and UC Berkeley.

174.    Notably, Mare's reports had already documented significant admissions preferences for Black applicants at UCLA in 2010.

175.    Following public outcry over the Varsity Blues scandal, California state lawmakers commissioned an audit of the University of California's admissions practices. The California State

Auditor's 2020 report found that UC "has allowed for improper influence in admissions decisions, and it has not treated applicants fairly or consistently."

176.    Specifically, the audit revealed that UC Berkeley and UCLA "admitted thousands of applicants whose records demonstrated that they were less qualified than other applicants who were denied admission."

177.    The audit also identified significant bias within the admissions process. Despite UC's guidelines excluding personal details such as race, gender, and birthplace from the 14 official admission factors, several campuses allowed application readers to access such details. For example, UC Berkeley, UCLA, and UC San Diego permitted readers to view students' names and native languages. Additionally, UC Berkeley and UCLA displayed applicants' birthplaces. The audit warned that this practice could lead readers to infer race or ethnicity, introducing bias into decisions.

178.    Given UC's refusal to make its admissions data public in recent years, Plaintiffs must—and intend to—pursue this essential additional data during the discovery phase of this lawsuit to substantiate UC's continued intentional use of race in admissions.

**UC Officials' Callous Indifference to Plaintiffs' Federally Protected Rights**

179.    In addition to obscuring the statistical evidence of UC's discrimination, UC officials have also consistently ignored or dismissed complaints regarding absurd admissions outcomes and allegations of racial discrimination, highlighting reckless or callous indifference to Plaintiffs' federally protected rights across the board.

180.    More than a year passed between Nan Zhong's initial complaint to the UC Board of Regents about Stanley's admission results and the filing of this lawsuit in February 2025, during which the Board took no meaningful action.

181.    Nan initially contacted the UC Board of Regents in November 2023 and spoke four times directly to the Board during the public comment period of the UC Board of Regents meetings. Nan specifically requested their action after the Admissions Office was apparently dismissive. Yet,

the UC Board of Regents took no action. The entire Board demonstrated reckless or callous indifference to Plaintiffs' federally protected rights.

182.    Defendant Han Mi Yoon-Wu, UC's Associate Vice Provost and Executive Director of Undergraduate Admissions, repeatedly dismissed the complaints offhandedly, asserting that Nan's allegations of racial discrimination were unfounded because California law prohibits such practices. By that logic, any criminal could claim innocence simply because the law prohibits the very act they are accused of committing. When Nan questioned whether the mere existence of a law guaranteed compliance, Yoon-Wu failed to answer.

183.    Defendants Michael V. Drake, the President of UC, and Katherine S. Newman, the Provost and Executive Vice President of Academic Affairs of U-C, were both copied in the email exchanges between Nan and Han Mi Yoon-Wu. Mr. Drake was also present at the UC Board of Regents meetings when Nan made his comment to the Board multiple times over several months. Neither took any action, demonstrating reckless and callous indifference to Plaintiffs' federally protected rights.

184.    All campus admissions directors named as Defendants exhibited reckless and callous indifference to Plaintiffs' federally protected rights by systematically prioritizing racial considerations over academic qualifications, as evidenced by the starkly discriminatory admissions outcomes produced under their supervision. Despite unambiguous legal prohibitions against racial preferences, these officials repeatedly rejected exceptionally qualified applicants, including Stanley, whose academic and professional accomplishments far exceeded typical admissions standards. They persisted in this unlawful conduct notwithstanding public outcry, numerous complaints, and the well-established legal framework prohibiting such practices in public education. Their actions were not merely negligent—they reflected a deliberate and conscious disregard for Plaintiffs' rights under the law.

185.    Plaintiffs contacted the defendant Chairs of the Computer Science Departments at all five UC campuses on multiple occasions. Only Professors Divyakant Agrawal and Todd Millstein responded, expressing concern. The others failed to reply altogether— demonstrating

callous indifference to Plaintiffs' federally protected rights. This cavalier attitude has only deepened the emotional distress suffered by Plaintiffs, compounding the harm inflicted by the University's discriminatory practices.

186.    Plaintiffs allege that Defendants acted with deliberate indifference to Plaintiffs' rights but acknowledge that the precise mechanisms of discrimination—such as how racial balancing was operationalized, who authorized it, and whether specific metrics or targets were used—are likely concealed in non-public communications and internal documents.

187.    Courts have long recognized that discriminatory intent is rarely documented overtly, and that plaintiffs must be permitted to use discovery to obtain circumstantial and contextual evidence. *See Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 266–68 (1977) (permitting intent to be inferred from indirect evidence).

188.    Discovery is essential to uncover these non-public policies, communications, and data. Plaintiffs have alleged sufficient facts to render their claims plausible, and the case's factual development—particularly with respect to the roles of individual defendants, internal deliberations, and race-conscious criteria used in "holistic" review—must now proceed through discovery, as the key evidence lies within the exclusive control of UC.

### The Extraordinary Qualifications of Stanley Zhong

189.    It is against this backdrop that Stanley faced the UC admissions process. Stanley is not merely a qualified applicant—he is, by any objective measure, among the top college applicants in the country.

190.    Stanley attended Henry M. Gunn High School, ranked #14 in California by U.S. News & World Report and the #1 best public high school in the San Francisco Bay Area according to Niche.

191.    Within this elite setting, Stanley still stood head and shoulders above his peers. He distinguished himself as a National Merit Scholarship finalist and earned a place in at least the top 9% of his class—qualifying for the University of California's "Eligibility in the Local Context" program.

35

192.    Stanley's high school grade point average ("GPA") was 3.97 out of 4.00 without weighting to account for course difficulty, and 4.42 out of 4.0 when weighting was accounted for.

193.    Stanley achieved a perfect PSAT score without any preparation and went on to score 1590 out of 1600 on the SAT, after just a few nights of self-study and without any paid tutoring or test prep.

194.    Stanley's excellence extended well beyond the classroom. While still in high school, he co-founded OpenBrackets, a nonprofit that delivered free coding lessons to more than 500 students in underserved communities across California, Washington, and Texas. For this work, Stanley was awarded the President's Volunteer Service Award at its highest level.

195.    He also founded and led his school's competitive programming club and took on leadership roles in a variety of academic and volunteer organizations.

196.    Stanley is a self-taught programmer whose extraordinary talent has earned him top honors in some of the world's most competitive coding contests—often outperforming professional engineers.

197.    Stanley placed 2nd in Carnegie Mellon's picoCTF cybersecurity challenge and was invited to CMU with expenses paid, took 6th in Stanford's ProCo, and reached the elite Platinum Division of the USA Computing Olympiad.

198.    Twice, Stanley placed 2nd globally (2nd and 1st in the U.S., respectively) in MIT's Battlecode high school division, qualifying for invitations to MIT with expenses paid.

199.    Stanley also ranked among the top 500 worldwide in both Google's Code Jam (427th) and Meta's Hacker Cup (329th)—competitions dominated by seasoned professionals.

200.    Stanley's skill was so advanced that in 2019, Google invited him for a full-time software engineering interview, unaware that he was only 13 years old; the interview was canceled only after his age came to light.

201.    After reading an NPR story in April 2020 about state unemployment systems buckling under COVID-related demand due to outdated COBOL infrastructure, Stanley independently taught himself COBOL, published sample code to GitHub, and volunteered his help

to the "COBOL Cowboys" featured in the article—earning a personal phone call and words of encouragement from their CEO.

202.    A year later, frustrated by the lack of affordable e-signature tools during the pandemic, Stanley launched RabbitSign, the world's only unlimited free HIPAA-compliant e-signing platform. Built on Amazon Web Services, RabbitSign was so secure and well-constructed that AWS named it one of the best-engineered applications they had reviewed and decided to feature it in a case study.

203.    Stanley's innovation drew national attention: RabbitSign was spotlighted on Viewpoint with Dennis Quaid—a program that has previously interviewed Fortune 500 CEOs and U.S. presidents—for its potential to help reduce healthcare costs through accessible, secure digital tools.

204.    Stanley's college application essay, substantially reflected in the Viewpoint interview referenced above, recounted his motivation for creating RabbitSign, a free HIPAA-compliant e-signing platform designed to help reduce America's healthcare costs. He described how he overcame repeated rejections to eventually partner with a mission-aligned organization and launch RabbitSign as the first Activism Corporation—an innovative model aimed at tackling corporate greed using free market forces. A nearly identical version of this essay helped advance him from a National Merit Scholarship semifinalist to a finalist.

205.    Just before he turned 18, Stanley underwent one of the most rigorous and objective evaluations in the modern labor market: Google's full-time software engineering interview process. Five randomly assigned Google engineers, each professionally trained and authorized to assess candidates, devoted over ten hours to evaluating Stanley's technical skills, communication abilities, and teamwork—precisely the traits elite universities purport to assess through "holistic" admissions.

206.    Importantly, the structure of Google's process eliminates any risk of favoritism: interviewers are randomly assigned, shielded from outside influence, and incentivized to avoid inflating evaluations, as doing so could lead to internal compensation disparities.

207.    Based solely on their independent assessments, the engineers recommended Stanley for an L4 software engineering role, a position typically reserved for candidates with a Ph.D. or equivalent industry experience.

208.    Google made the offer in September 2023, just after Stanley's 18th birthday, and his full-year job performance evaluation in January 2025 confirmed the wisdom of that decision: he met all expectations and demonstrated strong potential for continued growth. For the full-year job performance evaluation received in January 2026, he was rated "Outstanding," indicating that he exceeded expectations.

209.    That Google—an employer with far more applicants than even the most competitive universities—recognized Stanley as qualified for a postdoctoral-level role, while UC deemed him unworthy of undergraduate admission, speaks volumes about the discriminatory standards UC applies to Asian American applicants.

210.    To the extent that Defendants attempt to explain their "holistic review" as accounting for likelihood of success, there is no question that Stanley should have been immediately accepted to UC on this basis as well.

211.    On the other hand, Plaintiff was able to secure a job with Google shortly after being rejected by UC, which has seen a dramatic decrease in graduate hires by Google at the same time.

212.    Despite Plaintiff's unique situation, however, there is no question that a degree from a high-level university is necessary for long-term success in his field. While some companies are willing to consider practical experience, nearly every job application for software engineering calls for – at minimum – a bachelor's degree.

**Stanley Applied on Merit – UC Rejected on Race**

213.    For enrollment in Fall 2023, Stanley applied to the undergraduate Computer Science programs at five UC campuses, namely the University of California at Davis, the University of California at Berkeley, the University of California at Santa Barbara, the University of California at Los Angeles, and the University of California at San Diego.

214.    Like many Asian American candidates for admission, Stanley naively hoped that, despite the well-known barriers facing applicants who look like him, his individual merit might still prevail.

215.    Unfortunately, like too many Asian American students, he learned that it would not. Despite extraordinary academic credentials and nationally recognized accomplishments, his applications were rejected.

216.    Stanley's story was reported in national news in October of 2023 and cited in a congressional hearing in September of 2023, and multiple independent college admissions experts and counselors (unconnected to UC) reviewed Stanley's application materials.

217.    Tellingly, not one of these experts could identify a legitimate, performance-based reason why Stanley would have been rejected by a school of UC's caliber. By all objective indicators, Stanley appeared to be the kind of candidate any top university would eagerly admit. The absence of any apparent, merit-based explanation for this "bizarre" result raises a strong inference that Stanley's race played a role in UC's decision.

218.    Stanley is ready and able to apply to UC when it ceases its intentional discrimination against Asian Americans.

**UC's Racial Discrimination in Hiring**

219.    While distinct from undergraduate admissions, UC's faculty hiring practices also provide compelling circumstantial evidence of its institutional and systematic race-conscious agenda. Racially motivated hiring policies often have a direct ripple effect on student admissions.

220.    Whistleblower reports and internal data indicate that UC has prioritized race in hiring decisions while attempting to preserve plausible deniability—mirroring the "unstated Affirmative Action" strategy candidly described by UC Berkeley's law dean.

221.    In 2016, at least five UC campuses — Berkeley, Davis, Irvine, Riverside and Santa Cruz — decided their hiring committees could perform an initial screening of candidates based only on diversity statements. For instance, at UC Davis, the vice provost explicitly instructed search

39

committees to disqualify candidates who did not "look outstanding" on diversity, regardless of the quality of their academic research.

222.    In 2017, the UC Berkeley College of Engineering conducted a hiring initiative which made "advancing equity and inclusion" a "key criterion in selecting faculty candidates," and which relied heavily upon applicant diversity statements as a selection tool throughout the hiring process. The program, by its own standards, was a remarkable success. The applicant pool was 2 percent African American, but 22 percent of candidates who received offers were African American. The College of Engineering declared in its follow-up report that emphasizing diversity would become a permanent priority in hiring, noting that "we will continue to emphasize in our hiring practices that excellence in advancing equity and inclusion must be considered on par with excellence in research and teaching."

223.    During the 2018-19 academic year, UC Berkeley's hiring process for a life sciences position narrowed 894 applicants to 214, peremptorily disqualifying 76% of applicants based solely on diversity statements. According to UC's summary report, "The LSI [Life Sciences Initiative] Committee conducted a first review and evaluated candidates based solely on contributions to diversity, equity and inclusion. Only candidates that met a high standard in this area were advanced for further review, narrowing the pool down to 214 for serious consideration." Under such a faculty hiring system, even Nobel Prize winners would not be considered if they focused on academic research instead of diversity. This approach disproportionately affected applicants of different racial groups, increasing the percentage of African American and Hispanic dramatically, while reducing the percentage of Asian and White significantly.

224.    The LSI Committee used a standardized rubric for its diversity statement review: "Rubric for Assessing Contributions to Diversity, Equity, and Inclusion" (RACDEI). RACDEI clearly promotes an ideological agenda. It dictates that candidates should receive a low score if they state the intention to "treat everyone the same." RACDEI also rewards candidates for discussing "diversity, equity, inclusion, and belonging as core values that every faculty member should actively contribute to."

225.    In 2019, in a faculty hiring program funded by UC's Office of the President, UC Santa Cruz "puts diversity at the forefront of searches". "Roughly a third of the faculty recruitments in the coming year will put contributions to diversity, equity, and inclusion at the forefront ... In the recruitments that are part of the pilot program, search committees will first review and assess candidates' statements on contributions to diversity, equity, and inclusion before determining whether to evaluate the rest of the application materials." "It's critical that our faculty better reflect the great diversity of our student body and arrive ready to help make our campus even more inclusive," said Herbert Lee, vice provost for Academic Affairs and the campus diversity officer for faculty. Given the university's "long standing commitment to progress on social justice, global and community health seemed like a natural area of growth for the campus, and one where we should make every possible effort to recruit faculty who reflect the diversity of the state and nation," Paul Koch, dean of physical and biological sciences, said in a press release.

226.    Mr. Yoel Inbar, a noted psychology professor at the University of Toronto, was rejected for a position at UCLA because his podcast expressed skepticism about the use of diversity statements in hiring.

227.    Perhaps recognizing its harm and illegality, in March 2025, UC finally disallowed requiring diversity statements in recruitment.

228.    While the Supreme Court's *Grutter* decision in 2003 permitted a limited, time-bound consideration of race in college admissions, no such exception has ever been allowed for hiring. Consequently, if a college intentionally incorporates race into its hiring decisions, it's more than plausible that they do the same for student admissions. UC's faculty-hiring record therefore supplies powerful circumstantial evidence that race remains a defining criterion in UC's decision-making, including the exclusion of Stanley and imminent exclusion of the Minor Son.

229.    These policies reveal a university culture deeply steeped in race-consciousness—one that cannot plausibly separate its hiring practices from its highly suspect admissions outcomes. When university leadership consistently selects and empowers individuals committed to race-based decision-making, it is hardly surprising that those values also shape admissions policy.

230.    Faculty widely acknowledge that expressing race-neutral values in diversity statements—such as advocating for merit or equal treatment—is considered "career suicide."

231.    Senior UC administrators not only preach and practice "unstated Affirmative Action", they also actively persecute those who advocate for academic excellence over identity politics. From 2022 to 2024, Professor Perry Link, Chancellorial Chair for Teaching Across Disciplines at UC Riverside and a leading authority on modern and contemporary Chinese literature and culture, faced disciplinary action after expressing concerns during a faculty search committee meeting about prioritizing a Black candidate's race over qualifications. His comments, which he stated were intended to caution against elevating race as the "overriding criterion," were reported to university officials without his knowledge. Professor Link was subsequently removed from the search committee and subjected to a prolonged disciplinary process, including hearings resembling a trial, where termination was suggested as a penalty. Although a faculty committee unanimously found him innocent of the charges, Chancellor Kim Wilcox issued a formal letter of censure, overriding the committee's recommendation. Professor Perry Link was accused of making racist comments during the hiring process but was not informed of the specific remarks deemed problematic until nearly a year later. UC Riverside eventually acquitted him of all charges but allegedly threatened to penalize him if he spoke publicly about the ordeal. Despite UC's threats, Professor Link, a distinguished scholar at age 80, courageously made the incident public. If UC has attempted to silence a prominent tenured professor, it is reasonable to infer the tremendous pressure any professor, non-tenured administrator or staff would face if they were to speak up. Therefore, it is reasonable to infer that numerous similar cases exist at UC in which victims chose to remain silent, fearing retaliation that could jeopardize their careers and livelihoods. This incident highlights senior UC administrators' preoccupation with immutable characteristics such as race, in clear violation of the laws. It also demonstrates the great lengths to which they go to silence any dissidents or whistleblowers, creating a reasonable fear of retaliation for students, administrators or faculties who might otherwise provide more direct evidence. This documented pattern of intimidation and suppression creates a chilling effect, making direct testimony from internal

sources exceptionally difficult to obtain outside of discovery. Therefore, Plaintiffs' reliance on compelling circumstantial evidence, coupled with their right to discovery, is not only justified but essential to uncover the full extent of UC's unlawful race-conscious practices.

232.    Despite a litigation hold in November 2024 and the initial complaint (Dkt. 1) explicitly naming Professor Perry Link as the only witness that came forward publicly, in May 2025 University of California personnel entered Professor Perry Link's office, removed his computer, and erased its contents. They also seized and destroyed his personal property. These actions were taken without his knowledge or consent and in direct violation of UC's written assurance that he could occupy the office until July 2025. The computer contained faculty hiring and admissions records that Professor Link had gathered over many years—materials directly relevant to Plaintiff's claims. Plaintiff consequently filed a Motion for Sanctions (Dkt. 39). The destruction of Professor Link's data and personal effects has had a substantial chilling and intimidating effect on other potential witnesses, demonstrating UC's willingness to retaliate against those who possess incriminating information.

233.    UC administrators have never apologized or offered any innocent explanation for their conduct. Their silence strongly indicates that the destruction was intentional, not accidental.

234.    Professor Perry Link has provided a sworn affidavit attesting to his direct knowledge of racial considerations in the university's faculty hiring practices, and the retaliation he experienced. He stands ready to testify at trial.

235.    Several other UC faculty members have provided, or agreed to provide, sworn affidavits concerning their direct knowledge of racial considerations in UC's faculty hiring and graduate admissions practices. Due to well-founded fears of retaliation, certain testimony will be provided under a Protective Order with an "Attorneys' Eyes Only" designation pursuant to Federal Rule of Civil Procedure 26(c).

236.    The retaliation against Professor Perry Link and the fear of retaliation by other witnesses is not an incident in niche departments or by isolated academics. Such institutional norms make it unsurprising that no whistleblower has emerged from the closely guarded undergraduate

admissions office, where there is no tenure protection and ideological conformity is enforced more easily – but Plaintiffs intend to uncover the magnitude of the harm through discovery.

237.    As a result of this unlawful discrimination, Plaintiffs have suffered or are in imminent danger of suffering significant harm, including but not limited to the loss of educational opportunities, reputational damage, and emotional distress. Plaintiffs seek all available legal and equitable relief to remedy and/or prevent these injuries.

### Prospective Applicant the Minor Son Can Only Conclude he is Not Welcome at UC

238.    The Minor Son is currently a junior in high school and has concrete plans to apply to UC for enrollment in the Fall of 2027.

239.    Like his brother, the Minor Son is talented. The Minor Son already demonstrates the academic excellence, intellectual curiosity, and extracurricular achievement that define top college applicants. In October 2025, with minimal preparation, he took the PSAT and scored in the 99th percentile among U.S. test takers, qualifying as a National Merit Scholarship Semifinalist. The Minor Son's current GPA stands at a perfect 4.0 unweighted, even higher than Stanley's at the same stage, placing him among the very top of his class.

240.    Outside the classroom, the Minor Son exhibits a well-rounded and disciplined character. He has been a member of his high school's varsity cross country team since his freshman year. In 2025, as a junior, he won the MVP award of the Varsity Cross Country team, and qualified for the State Cross Country Championship, ending a seven-year hiatus for his high school at the state level. He is a national-level Rubik's Cube competitor capable of solving the cube in 6.25 seconds during official events, and he has taught himself to juggle five balls and did so on stage at the second largest annual juggling festival in North America.

241.    However, based on Stanley's experience, the Minor Son has learned of the consistent pattern by which UC discriminates against Asian American applicants because of their race.

242.    The Minor Son is also discouraged and humiliated by repeated and public knowledge of UC's discrimination against Asian Americans.

243.   The Minor Son has also learned through friendship networks within his community and through publicly available reports that Asian American students who speak up for equal treatment under the law on college campuses and throughout academia are branded "racists" and ostracized on campus—reinforcing that UC's bias extends beyond admissions into campus culture.

244.   The Minor Son is aware of admissions statistics indicating that—even among the most qualified candidates—Asian Americans face significantly lower admission rates, as they lack the "correct" race for UC's race-conscious process.

245.   The Minor Son has concrete plans to apply to UC, but the evidence shows that should he do so, he faces an immediate and continuing injury-in-fact sufficient for standing – both because of hard data indicating that the collective experience of Asian Americans at UC is dismal and based on his direct experience with his brother's hardship and rejection.

246.   In sum, while the Minor Son is positioned to be a highly competitive applicant to any elite university including UC, he confronts a tangible and immediate risk of race-based discrimination at UC.

### Role of the U.S. Secretary and Department of Education

247.   The Dept. of Ed. administers Minority Serving Institutions ("MSI") grant programs with eligibility requirements tied to numerical racial targets, including the HSI program, which requires at least 25% Hispanic enrollment. The HSI program is found in Titles III and V of the Higher Education Act. See 20 U.S.C. §1067q(a)(2); §1101(c); §1101a.

248.   These numerical racial targets are inherently rigid and inflexible, arbitrary, and fail to preserve or advance national interests. They incentivize institutions to manipulate or strategically balance the racial composition of their student bodies to qualify for federal grant funding, do not remedy specific instances of federal government discrimination, and ultimately do not serve a compelling government interest.

249.   Even if racial diversity in the college student body is recognized as a compelling government interest, these numerical racial targets are not "narrowly tailored" to achieve the goal of genuine diversity.

250.    Any institution meeting the numerical target qualifies, even if its student body remains racially homogeneous beyond that threshold, and governments cannot "remedy the effects of societal discrimination through explicitly race-based measures," as noted by the Supreme Court in *SFFA*, 600 U.S. at 226.

251.    If MSI programs' primary purpose is to improve educational opportunities for historically underserved communities, that objective could be more effectively and legally achieved through race-neutral alternatives. For example, reallocating MSI program funding to existing need-based programs, such as the Pell Grant program, would directly support economically disadvantaged students regardless of their immutable traits such as race, ensuring equal access to higher education without violating constitutional principles.

252.    These numerical racial targets are "a facially discriminatory law or policy that expressly classifies individuals on the basis of race." *See Chinese Am. Citizens All. of Greater N.Y. v. Adams*, 116 F.4th 161, 170 (2d Cir. 2024).

253.    Under Title VI, a federal funding recipient's express or admitted use of a classification based on race, color, or national origin establishes intent without regard to the decision-makers' animus or ultimate objective. Such classifications demonstrate a discriminatory purpose as a matter of law. *See Miller v. Johnson*, 515 U.S. 900, 904–05 (1995); *see also Wittmer v. Peters*, 904 F. Supp. 845, 849–50 (C.D. Ill. 1995), *aff'd*, 87 F.3d 916 (7th Cir. 1996). "Put another way, direct evidence of intent is 'supplied by the policy itself.'" *Hassan v. City of New York*, 804 F.3d 277, 295 (3d Cir. 2015) (quoting Massarsky v. Gen. Motors Corp., 706 F.2d 111, 128 (3d Cir. 1983) (Sloviter, J., dissenting)).

254.    Where a plaintiff demonstrates that a challenged policy overtly and expressly singles out a protected group for disparate treatment, "a plaintiff need not prove the malice or discriminatory animus of a defendant…" *Bangerter v. Orem City Corp.*, 46 F.3d 1491, 1501 (10th Cir. 1995); *see also Ferrill v. Parker Grp., Inc.*, 168 F.3d 468, 473 n.7 (11th Cir. 1999) ("[I]ll will, enmity, or hostility are not prerequisites of intentional discrimination."). Even benign motivations

46

for racial classifications are presumptively invalid and trigger strict scrutiny in Equal Protection Clause and Title VI cases. *Adarand*, 515 U.S. at 223-24 (1995).

255.    The Secretary and Dept. of Ed.'s unconstitutional grant programs, like HSI, create a direct financial incentive for universities like UC to achieve numerical racial targets by engaging in unlawful racial balancing that has harmed Stanley's and will imminently harm the Minor Son's ability to compete on equal footing. This makes the threat to them—and Nan's interest as the Minor Son's parent and next friend—concrete and immediate, not speculative.

256.    Stanley's mother filed a civil rights complaint with the Dept. of Ed.'s OCR against all sixteen colleges that rejected Stanley. The OCR dismissed the case after misinterpreting her email, however, relying on reasoning that directly contradicted her intended meaning.

257.    When Stanley's mother pointed out the misunderstanding, the OCR refused to reopen the case, stating it had been closed. The official dismissal letter cited reasoning that the OCR knew was factually incorrect.

258.    Despite her repeated requests to correct the letter and remove the inaccurate rationale, the OCR declined to make any changes, even after she escalated the matter. The Secretary and Dept. of Ed.'s failure to enforce civil rights laws has let the direct harm to Stanley and other Asian American applicants persist.

259.    Plaintiffs have made every reasonable effort to engage in dialogue and pursue resolution before filing this lawsuit.

### COUNT I

### Violation of the Equal Protection Clause of the

### Fourteenth Amendment to the U.S. Constitution

### Pursuant to 42 U.S.C. § 1983

*(against the individual defendants for money damages in their personal capacities*

*and declaratory and injunctive relief in their official capacities)*

260.    Plaintiffs incorporate the preceding allegations as if fully restated herein.

47

261.    The Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution provides that "no state shall... deny to any person within its jurisdiction the equal protection of the laws."

262.    Section 1983 protects against the "deprivation of any rights, privileges, or immunities secured by the Constitution and laws" by persons acting under the color of law.

263.    Defendants acted under the color of state law in taking the actions described *supra*.

264.    A reasonable person or public official should have known that it is a violation of a person's clearly established constitutional rights to discriminate against him based on race.

265.    In fact, Defendants have publicly demonstrated their specific awareness of the Supreme Court's decision in *SFFA*.

266.    Accordingly, Defendants' actions outlined *supra* violated Plaintiff's clearly established constitutional rights, of which any reasonable person in their position would have known; Defendants are therefore not entitled to qualified immunity.

267.    Plaintiffs are entitled to punitive damages because Defendants engaged in the above-described conduct with malicious and evil intent, in callous disregard of Plaintiffs' federally protected rights.

268.    As a direct and proximate result of Defendants' unlawful actions, Plaintiffs have suffered or are at immediate risk of significant harm, injury, and damages, including, but not limited to, loss of career opportunities and earning capacity; mental and emotional distress; humiliation and embarrassment; and loss of personal and professional reputation, and will continue to so suffer in the future.

269.    As a direct and proximate result of Defendants' unlawful actions, Plaintiffs have had to retain the services of an attorney and will continue to so suffer in the future.

**COUNT II**

**Violation of 42 U.S.C. § 1981**

**Pursuant to 42 U.S.C. § 1983**

*(against the individual defendants for money damages in their personal capacities*

48

*and declaratory and injunctive relief in their official capacities)*

270.    Plaintiffs incorporate the preceding allegations as if fully restated herein.

271.    Section 1981 provides:

Equal Rights Under the Law. All persons in the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts to sue, be parties, give evidence, and to the full and equal benefit of all of laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses and exactions of every kind, and to no other.

272.    Under the 14th Amendment, Plaintiff has the guaranteed right to make and enforce contracts free from discrimination.

273.    Section 1981 prohibits intentional discrimination in the making and enforcement of contracts involving both public and private actors.

274.    Section 1983 protects against the "deprivation of any rights, privileges, or immunities secured by the Constitution and laws," including Section 1981, by persons acting under the color of law.

275.    Defendants have discriminated against Plaintiffs in violation of Section 1981 and deprived them of their civil right to make and enforce contracts free from racial discrimination by the conduct described herein, including but not limited to denying Stanley admission to the University.

276.    Defendants acted under the color of state law in taking the actions described *supra*.

277.    A reasonable person or public official should have known that it is a violation of a person's clearly established constitutional rights to discriminate against him on the basis of race.

278.    In fact, Defendants have publicly demonstrated their specific awareness of the Supreme Court's decision in *SFFA*.

279.    Accordingly, Defendants' actions outlined *supra* violated Plaintiff's clearly established constitutional rights, of which any reasonable person in their position would have known; Defendants are therefore not entitled to qualified immunity.

280.     Plaintiffs are entitled to punitive damages because Defendants engaged in the above-described conduct with malicious and evil intent, in callous disregard of Plaintiffs' federally protected rights.

281.     As a direct and proximate result of Defendants' unlawful actions, Plaintiffs have suffered or are at immediate risk of significant harm, injury, and damages, including, but not limited to, loss of career opportunities and earning capacity; mental and emotional distress; humiliation and embarrassment; and loss of personal and professional reputation, and will continue to so suffer in the future.

282.     As a direct and proximate result of Defendants' unlawful actions, Plaintiffs have had to retain the services of an attorney and will continue to so suffer in the future.

## COUNT III

### Violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d

*(against Defendant the Regents of the University of California)*

283.     Plaintiffs incorporate the preceding allegations as if fully restated herein.

284.     Title VI of the Civil Rights Act of 1964 provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

285.     As a public university, Defendant UC received and continues to receive federal financial assistance.

286.     Defendant UC subjected Plaintiffs to intentional discrimination, excluded them from participation in, and denied them the benefits offered by UC by their conduct described herein, including but not limited to denying Stanley admission to the University.

287.     As a direct and proximate result of Defendants' unlawful actions, Plaintiffs have suffered or are at immediate risk of significant harm, injury, and damages, including, but not limited to, loss of career opportunities and earning capacity; mental and emotional distress; humiliation

and embarrassment; and loss of personal and professional reputation, and will continue to so suffer in the future.

288.    As a direct and proximate result of Defendants' unlawful actions, Plaintiffs have had to retain the services of an attorney and will continue to so suffer in the future.

### COUNT IV

### Violation of the Due Process Clause of the Fifth Amendment

*(against Defendants United States Secretary of Education Linda McMahon and the United States Department of Education)*

289.    Plaintiffs incorporate the preceding allegations as if fully restated herein.

290.    The Secretary and Dept. of Ed.'s use of numerical racial targets, including but not limited to the 25% Hispanic enrollment requirement for HSI status under 20 U.S.C. § 1101a, constitutes racial discrimination in violation of the Due Process Clause of the Fifth Amendment, which encompasses equal protection principles.

291.    The Fifth Amendment prohibits the federal government from treating individuals differently based on race unless the policy is narrowly tailored to serve a compelling governmental interest.

292.    The Secretary and Dept. of Ed.'s racial targets fail this standard, functioning as rigid racial quotas that unlawfully disadvantage students of non-preferred racial groups, including Asian American applicants.

293.    On its face, the HSI program discriminates based on ethnicity. The program also unconstitutionally requires and encourages universities to discriminate against students based on ethnicity.

294.    The Supreme Court in *SFFA* reaffirmed that constitutional equal protection principles do not tolerate classifications that treat individuals differently on the basis of race. The HSI program does exactly that by tying eligibility to whether a school enrolls a critical mass of students from one racial category.

295.    As a direct and proximate result of the Secretary and Dept. of Ed.'s unlawful actions, Plaintiffs have suffered or are at immediate risk of significant harm, injury, and damages, including, but not limited to, loss of career opportunities and earning capacity; mental and emotional distress; humiliation and embarrassment; and loss of personal and professional reputation, and will continue to so suffer in the future.

296.    As a direct and proximate result of the Secretary and Dept. of Ed.'s unlawful actions, Plaintiffs have had to retain the services of an attorney and will continue to so suffer in the future.

## COUNT V

### Agency Action in Excess of Statutory Authority in Violation

### of the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.*

*(against Defendants United States Secretary of Education Linda McMahon and the United States Department of Education)*

297.    Plaintiffs incorporate the preceding allegations as if fully restated herein.

298.    Congress created the HSI program under Titles III and V of the Higher Education Act, defining HSIs as higher education institutions with at least 25% full-time equivalent undergraduate Hispanic enrollment.

299.    While Congress authorized the Dept. of Ed. to administer grant programs for HSIs, it did not authorize the agency to require, induce, or pressure universities to adopt racially preferential admissions policies in order to qualify for or retain HSI status.

300.    The Dept. of Ed. has exceeded the scope of congressional authorization by interpreting and implementing the HSI program in ways that condition substantial federal funding on the maintenance or expansion of particular racial enrollment percentages.

301.    The Dept. of Ed.'s administration of the program pressures universities—including UC—to treat race as a determinative factor in admissions in order to secure eligibility for HSI grants.

302.     This implementation is *ultra vires* because Congress never authorized the Dept. of Ed. to compel or incentivize institutions to engage in racial discrimination in admissions. The statute is a funding mechanism, not a license to disregard constitutional limits.

303.     Moreover, even if Congress had purported to authorize the Dept. of Ed. to incentivize racial preferences in admissions, such authorization would itself be unconstitutional. As the Supreme Court held in *Adarand Constructors, Inc. v. Peña*, 515 U.S. 200 (1995), all racial classifications imposed by the federal government are subject to strict scrutiny.

304.     The Dept. of Ed.'s implementation of the HSI program transforms a funding statute into a tool for unconstitutional discrimination, coercing universities to adopt racially preferential admissions policies that disadvantage Asian American applicants.

305.     Federal agencies may not implement congressional statutes in ways that compel unconstitutional conduct. *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 125 (2000) (an agency may not exercise its authority in a manner inconsistent with the governing statute or the Constitution).

306.     As a direct and proximate result of the Secretary and Dept. of Ed.'s unlawful actions and omissions, Plaintiffs have been and will continue to be injured and face imminent harm, including but not limited to the denial of equal access to federally funded educational programs and the loss of educational opportunities.

**COUNT VI**

**Arbitrary and Capricious Agency Action in Violation**

**of the Administrative Procedure Act, 5 U.S.C. § 551 *et seq*.**

*(against Defendants United States Secretary of Education Linda McMahon and the United States Department of Education)*

307.     Plaintiffs incorporate the preceding allegations as if fully restated herein.

308.     The Secretary and Dept. of Ed.'s failure to investigate and enforce federal anti-discrimination laws, including Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d), in

response to Plaintiffs' complaint constitutes arbitrary and capricious agency action in violation of the Administrative Procedure Act.

309.    The Dept. of Ed.'s OCR dismissed Plaintiffs' complaint after misinterpreting an email, refused to reopen the case when the error was pointed out, issued an official dismissal letter citing a rationale it knew to be false, and refused to correct it after repeated requests and escalation.

310.    In doing so, the OCR has abdicated its statutory duties under Title VI. The OCR's actions were arbitrary, capricious, and an abuse of discretion in violation of the APA and are indicative of a systemic failure.

311.    The APA's grant of agency discretion does not override clear statutory mandates that provide a clear standard for assessing the Dept. of Ed.'s actions, and the regulations interpreting Title VI state at 34 C.F.R. § 100.7(c) that the "responsible Department official or his designee will make a prompt investigation whenever a compliance review, report, complaint, or any other information indicates a possible failure to comply with this part" (emphasis supplied).

312.    This duty to investigate is triggered whenever information (like Plaintiffs' complaint filed with OCR) "indicates a possible failure to comply." Therefore, the OCR's failure to conduct a proper and prompt investigation into Plaintiffs' complaint—especially after Plaintiffs pointed out its clear misinterpretation of the facts—was not a lawful exercise of discretion but a failure to follow its own binding rules, making its action arbitrary, capricious, and an abuse of discretion under the Administrative Procedure Act.

313.    By refusing to act, the Secretary and Dept. of Ed.'s abdication of their investigative duties not only injured Stanley but also creates an imminent and irreparable harm by leaving Nan's Minor Son vulnerable to the same unaddressed discrimination as he prepares to apply to colleges.

314.    In sum, the Secretary and Dept. of Ed.'s refusal to investigate Plaintiffs' administrative complaint violates clear statutory obligations under Title VI of the Civil Rights Act, which expressly requires investigation of discrimination claims. Thus, this inaction is not "committed to agency discretion" and is subject to judicial review under the APA.

54

315.    Further, no adequate alternative remedy exists for the Secretary and Dept. of Ed.'s unlawful abdication of its investigative responsibilities, making judicial review both proper and necessary.

316.    As a direct and proximate result of the Secretary and Dept. of Ed.'s unlawful actions and omissions, Plaintiffs have been and will continue to be injured and face imminent harm, including but not limited to the denial of equal access to federally funded educational programs and the loss of educational opportunities.

## RELIEF REQUESTED

For all the foregoing reasons, Plaintiffs demand judgment against Defendants as follows:

a.    A declaration that the practices and actions of Defendants are unlawful practices in violation of the U.S. Constitution, 42 U.S.C. § 1983, 42 U.S.C. § 1981, Title VI and the Administrative Procedure Act;

b.    Compensatory damages in whatever amount they are found to be entitled;

c.    Punitive damages in whatever amount they are found to be entitled;

d.    Nominal damages in whatever amount they are found to be entitled;

e.    Interest, costs, reasonable attorney fees, and expert witness fees;

f.    The appointment of a monitor to oversee all decisions relating to admissions at UC, to ensure compliance with federal and state laws;

g.    All appropriate equitable and/or injunctive relief; and

h.    Whatever other relief this Court finds appropriate.

Respectfully submitted,

**NACHTLAW, P.C.**

/s/ David A. Nacht
David A. Nacht
Attorney for Plaintiff
501 Avis Dr, Ste. 3
Ann Arbor, MI 48108
(734) 663-7550

55

dnacht@nachtlaw.com

Dated: March 6, 2026                          *pro hac vice*